# EXHIBIT A

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, SS.

BUSINESS LITIGATION
SESSION OF THE
SUPERIOR COURT (BLS)

| | |
|---|---|
| NAHANT PRESERVATION TRUST, INC., and its Directors, Officers, Trustees, Committee Members and/or Volunteers:  CHRISTIAN BAUTA, TESS BAUTA, ELIZABETH K. BERMAN, ANNE BROMER, CANDACE CAHILL, MICHELLE CAPANO, ALICE CORT,  MARK CULLINAN, CARL JENKINS, MARILYN MAHONEY, WILLIAM MAHONEY, DAN McMACKIN, DIANE MONTEITH, ANDREA MURPHY, JEFFREY MUSMAN, PATRICK O'REILY, MARIE ELIZABETH PASINSKI, M.D., ROGER PASINSKI, M.D., VI PATEK, LINDA PIVACEK, EMILY POTTS,  LAURA POULIN, PETER ROGAL, PEGGY SILVA, SUSAN SOLOMON, Ph.D, PAUL SPIRN, DONNA STEINBERG, and JIM WALSH, <br><br> Plaintiffs, <br><br> v. <br><br> MOUNT VERNON FIRE INSURANCE COMPANY and UNITED STATES LIABILITY INSURANCE GROUP, <br><br> Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |

CIVIL ACTION NO.

## __COMPLAINT__

Plaintiffs, by and through their attorney, Law Office of John D. Frumer, submit their Complaint against the Defendants and state as follows:

1.     Plaintiff Nahant Preservation Trust, Inc. (hereinafter referred to as "NPT" or "Plaintiff"), and Christian Bauta, Tess Bauta, Elizabeth K. Berman, Anne Bromer, Candace Cahill, Michelle Capano, Alice Cort, Mark Cullinan, Carl Jenkins, Marilyn Mahoney, William Mahoney, Dan McMackin, Diane Monteith, Andrea Murphy, Jeffrey Musman, Patrick O' Reilly, Marie Elizabeth

Pasinski, M.D., Roger Pasinski, M.D., Vi Patek, Linda Pivacek, Emily Potts, Laura Poulin, Peter Rogal, Peggy Silva, Susan Solomon, Ph.D, Paul Spirn, Donna Steinberg, and Jim Walsh (collectively referred to as "Individual Plaintiffs") ("Plaintiff" and "Individual Plaintiffs  collectively referred to as "Plaintiffs") bring this action for a declaratory judgment, damages for breach of contract on certain insurance policies issued to Plaintiffs by Defendants, and attorneys' fees for this declaratory judgment action against Defendant Mount Vernon Fire Insurance Company ("Mount Vernon"), A Member Company of United States Liability Insurance Group ("USLI") and Defendant USLI (hereinafter collectively referred to as "USLI").

2.      Plaintiffs seek a declaration that USLI is obligated to defend and to indemnify them under certain insurance policies issued by USLI to Plaintiffs for costs they have incurred and may incur in the future with regard to the defense of claims asserted against them in the action captioned *Northeastern University v. Nahant Preservation Trust, Inc., et al,* No. MISC 19000390 (Mass. Land Court, filed August 9, 2019) (hereinafter "*Northeastern University* Action").

3.      In addition, Plaintiffs have filed a lawsuit in Massachusetts Superior Court against Northeastern University (hereinafter "Northeastern"), seeking immediate and permanent injunctive relief to protect certain land in the Town of Nahant, which action arises from the same facts and circumstances alleged in the *Northeastern University* Action. *Nahant Preservation Trust, Inc., et al., v. Northeastern University,* No. 1977CV01211 (Mass. Super. Ct., Essex County) ("*Nahant* Action").

4.      The *Northeastern University* Action and the *Nahant* Action address the same claims and arise from the same circumstances and operative facts, and have already been consolidated by the Massachusetts Courts.  Hereinafter, the consolidated *Northeastern University* Action and the *Nahant* Action will be referred to as "the Consolidated Action."

5.      Plaintiffs bring this action for declaratory relief seeking an order that USLI is obligated to defend, to indemnify, and to pay in full, the defense costs and damages which have been, and which

2

may be incurred by Plaintiffs, in connection with the Consolidated Action.  Plaintiffs also seek, by this declaratory judgment action, to recover damages for USLI's breach of contract, and to recover Plaintiffs' attorneys' fees for the prosecution of this declaratory judgment action to determine the parties' rights and obligations under the four continuous, successive, Non Profit Management Liability Policies issued to Plaintiffs by USLI without a lapse in coverage, as referenced below.

## **THE PARTIES**

6.       Plaintiff NPT is a Massachusetts not-for-profit charitable corporation based in the Town of Nahant, Massachusetts (hereinafter "Town").  Its mission is to preserve the open spaces, historically significant properties, and conservation lands of the Town for public and community benefit.

7.       All twenty-eight Massachusetts-domiciled Individual Plaintiffs are, or at all relevant times were, directors, officers, trustees, committee members, and/or volunteers of Plaintiff NPT, and are defendants in the Consolidated Action.  At all relevant times addressed in this Complaint, the Individual Plaintiffs resided at the following addresses in the Town of Nahant, County of Essex, Commonwealth of Massachusetts:

    a.       Christian Bauta is an individual, who resides at 3 Swallow Cave Road;

    b.       Tess Bauta is an individual who resides at 3 Swallow Cave Road;

    c.       Elizabeth K. Berman is an individual who resides at 44 Spring Road;

    d.       Anne Bromer is an individual who resides at 29 Willow Road;

    e.       Candace Cahill is an individual who resides at 20 Rollins Avenue;

    f.       Michelle Capano is an individual who resides at 29 Ocean Street;

    g.       Alice Cort is an individual who resides at 7 Valley Road;

    h.       Mark Cullinan is an individual who resides at 38 Ocean Street;

    i.       Carl Jenkins is an individual who resides at 339 Nahant Road;

    j.       Marilyn Mahoney is an individual who resides at 179 Willow Road;

k.      William Mahoney is an individual who resides at 179 Willow Road;

l.      Dan McMackin is an individual who resides at 20 Rollins Avenue;

m.      Diane Monteith is an individual who resides at 20 Seabreeze Lane;

n.      Andrea Murphy is an individual who resides at 8 Wendell Road;

o.      Jeffrey Musman is an individual who resides at 15 Trimountain Road;

p.      Patrick O'Reily is an individual who resides at 1 Harris Road;

q.      Marie Elizabeth Pasinski, M.D. is an individual who resides at 36 Swallow Cave Road;

r.      Roger Pasinski. M.D. is an individual who resides at 36 Swallow Cave Road;

s.      Vi Patek is an individual who resides at 172 Willow Road;

t.      Linda Pivacek is an individual who resides at 41 Little Nahant Road;

u.      Emily Potts is an individual who resides at 114 Pond Street;

v.      Laura Poulin is an individual who resides at 182 Wilson Road;

w.      Peter Rogal is an individual who resides at 391 Nahant Road;

x.      Peggy Silva is an individual who resides at 7 Burpee Road;

y.      Susan Solomon, Ph.D. is an individual who resides at 4 Wendell Road;

z.      Paul Spirn is an individual who resides at 36 Maolis Road;

aa.      Donna Steinberg is an individual who resides at 33 Winter Street, and;

bb.      Jim Walsh is an individual who resides at 33 High Street.

8.      Upon information and belief, USLI is a corporation organized under the laws of the State of Delaware, with its principal place of business at 1190 Devon Park Drive, Wayne, Pennsylvania 19087 that sells insurance policies in the Commonwealth of Massachusetts and is licensed to do business in Massachusetts.  USLI issued several Non Profit Management Liability Policies to Plaintiffs, as will be more specifically described below.

4

## JURISDICTION AND VENUE

9.      At all relevant times, USLI had its primary place of business in Pennsylvania.  However, this Court has personal jurisdiction over  USLI pursuant to M.G.L. ch. 223A, §§ 3 (a), (b), and (f), because, upon information and belief, USLI: (1) has transacted business in Massachusetts, (2) is licensed to do business in Massachusetts, and; 3) contracted with NPT, a not-for-profit Massachusetts charitable corporation, to issue the Non Profit Management Liability Policies of insurance that are the subject of this lawsuit.

10.      Venue is appropriate in the Business Litigation Session for this complex insurance coverage case, as the Business Litigation Session may handle business litigation cases that arise anywhere in the Commonwealth and have contacts to venues other than Suffolk County.  *See* Superior Court Administrative Directive No. 17-1 (stating that "A plaintiff may seek acceptance into the BLS even if venue for an action does not lie in Suffolk County.  Although nothing in this Administrative Directive changes the statutory requirements for venue, because improper venue may be waived, the BLS Administrative Justice does not consider venue when determining whether to accept case [sic] into the BLS.").

## FACTUAL ALLEGATIONS COMMON TO EACH COUNT

### A.      HISTORY OF THE CONSOLIDATED ACTION

11.      NPT's mission is, in relevant part, to protect the open spaces, historically significant properties, and conservation lands of the Town including the approximately 28 acres that comprise the peninsula of East Point.

12.      On information and belief, Northeastern owns approximately 20 of the 28 acres of East Point, which it acquired without payment in 1967.

13.      Northeastern constructed a Marine Science Center on its East Point property shortly

after acquiring the 20 acres, and has been operating that Science Center ever since.

14.     The deed to Northeastern expressly reserves a public easement across Northeastern's property to the remaining eight acres on East Point.  In or about 1975, the Town acquired the remaining eight acres of land on East Point.  In 1989, the Town dedicated that land as Lodge Park, and the Town has since reiterated its intent that the Lodge Park land remain protected open space.

15.     Northeastern made a dedication of approximately 12.5 acres of the undeveloped portions of its property for passive recreation and as an ecological preserve (hereinafter the "Ecological Preserve").  It is NPT's well-supported position that the Ecological Preserve constitutes natural resources protected from development under the provisions of Article 97 of the Articles of Amendment to the Massachusetts Constitution ("Article 97").  Land governed by Article 97 is deemed to be reserved exclusively for use by the public for passive recreation, open space and other environmental purposes, and may not be used for any other purposes without the approval of two-thirds of the members of each house of the Massachusetts State Legislature.

16.     A person or entity seeking to protect property governed by Article 97 from damage must first give written notice by certified mail to the Massachusetts Attorney General and all affected parties at least 21 days before filing a lawsuit or taking other action.  M.G.L. c. 214, § 7A  ("Section 7A").

17.     In 2018, Northeastern publicly proposed to further develop its property by, among other things, building a new 55,000 square foot building, with ancillary parking and other improvements in the midst of the Ecological Preserve, and in June of 2019 in furtherance of that plan Northeastern began cutting down trees and otherwise disturbing the natural habitat of the Ecological Preserve in order to clear cut an access road through land that NPT believes is protected.

18.     In response to Northeastern's actions, by letter dated July 23, 2019, NPT, and citizens of the Town, all of whom are or at all relevant times were directors, officers, trustees, committee members, and/or volunteers of NPT, gave notice to Northeastern under Section 7A in an effort to

6

prevent further damage to the environment of the Article 97 protected property that is the Ecological Preserve.

19.     Before the Section 7A 21-day notice period had run, on or about August 9, 2019 Northeastern filed the *Northeastern University* Action.  In its Complaint, Northeastern sought, among other claims and other monetary relief, a declaratory judgment as to whether its East Point property is subject to Article 97.

20.     Effectively as a responsive pleading, on or about August 20, 2019, Plaintiffs filed the *Nahant* Action, seeking a declaration that Article 97 has been violated by Northeastern, an injunction to enforce appropriate environmental regulations, costs of suit, and "such other and further relief as is just and proper."

21.     As stated above, the *Northeastern University* Action and the *Nahant* Action have been consolidated.  Plaintiffs have incurred, and continue to incur, reasonable and necessary legal fees and expenses in their defense of the *Northeastern University* Action as consolidated into the Consolidated Action.  Plaintiffs now seek payment under the Policies for those Defense Costs.

### B.    THE INSURANCE POLICIES

22.     USLI issued four continuous, successive, Non Profit Management Liability Policies to NPT for the period June 19, 2018-June 19, 2022 without a lapse in coverage (hereinafter "the Policies").

a.      USLI issued Non Profit Management Liability Policy No. NDO2557425 ("Policy 1") to NPT for the policy period from June 19, 2018 to June 19, 2019 with a limit of liability of $1,000,000 for each Claim and in the aggregate, and with no retention.  A true and correct copy of that Policy is attached hereto as Exhibit "1."

b.      USLI issued Non Profit Management Liability Policy No. NDO2557425A ("Policy 2") to NPT for the policy period from June 19, 2019 to June 19, 2020 with a limit of liability

of $1,000,000 for each Claim and in the aggregate, and with no retention. A true and correct copy of that Policy is attached hereto as Exhibit "2."

        c.    USLI issued Non Profit Management Liability Policy No. NDO2557425B ("Policy 3") to NPT for the policy period from June 19, 2020 to June 19, 2021 with a limit of liability of $1,000,000 for each Claim and in the aggregate, and with no retention. A true and correct copy of that Policy is attached hereto as Exhibit "3."

        d.    USLI issued Non Profit Management Liability Policy No. NDO2557425C ("Policy 4") to NPT for the policy period from June 19, 2021 to June 19, 2022 with a limit of liability of $1,000,000 for each Claim and in the aggregate, and with no retention. A true and correct copy of that Policy is attached hereto as Exhibit "4."

23.    Each of the Policies provides coverage for the "Organization" (*i.e.*, NPT) and for "Individual Insureds") (*i.e.*, NPT's directors, officers, trustees, committee members, and/or volunteers).

24.    Each of the Individual Plaintiffs named above is, or was at all relevant times herein, a director, officer, trustee, committee member, and/or volunteer of NPT, and is an Individual Insured under the Policies.

25.    The Declarations page of each of the Policies defines "Company" as Mount Vernon Fire Insurance Company, "A Member Company of United States Liability Insurance Group."

26.    Each of the Policies imposes upon USLI a "Duty to Defend" Claims covered under the Policies.

27.    The "Duty to Defend" language in Policy 1 at Section I., Insuring Agreement, paragraph B in Form DO-100 (04-07) reads: "The **Company** has the right and duty to defend any **Claim** to which this insurance applies, even if the allegations of the **Claim** are groundless, false or fraudulent." (emphasis in original).

28.    Policies 2, 3, and 4 state, in Section III, Defense & Settlement, of Form DO GTC (05-

17) that "The **Company** shall have the right and duty to defend any **Claim** covered by this Policy even if the allegations are groundless, false or fraudulent." (emphasis in original).

29.     Policies 2, 3, and 4 define "Claim" in Form DO 100 (05-17) in relevant part as any:

"1.     written demand for monetary damages or non-monetary relief, including injunctive relief:
    2.     civil proceeding commenced by service of a complaint or similar pleading;

\*   \*   \*   \*

...received by, or brought or initiated against any insured alleging a **Wrongful Act**, including any appeal therefrom." (emphasis in original).

30.     Policy 1 defines "Claim" differently than Policies 2, 3, and 4.  Policy 1 defines "Claim" in Form DO-100 (04-07) as follows:

'"**Claim**" means:

(1) Any written demand seeking money damages; or
(2) Any proceeding initiated against the **Insured**, including any appeal there from, before any governmental body legally authorized to render an enforceable judgment or order for money damages or other relief against such **Insured** alleging that the **Insured** has committed, or is responsible for, a **Wrongful Act.**" (emphasis in original).

31.     A Claim must allege a "Wrongful Act," which Policies 2, 3, and 4  define in relevant part in Form DO 100 (05-17) as follows:

'"**Wrongful Act**' means any:

1.     actual or alleged act, error, omission, misstatement, misleading statement, neglect, or breach of duties;
2.     **Personal Injury Wrongful Act**;  ...

committed or allegedly committed by:
    a.     the **Organization**;
    b.     any **Individual Insured,** arising solely from duties conducted on behalf of the **Organization** or asserted against an **Individual Insured** because of 1. above; .... (emphasis in original).

32.     Policy 1 defines "Wrongful Act" in Form DO-100 (04-07) as follows:

`

"'**Wrongful Act'** means any actual or alleged act, error, omission, misstatement, misleading statement, neglect, or breach of duties, or **Personal Injury Act** committed or allegedly committed:

> (1)   by the **Organization**;
> (2)   by the **Individual Insureds** arising solely from duties conducted

on behalf of the **Organization** or asserted against an **Individual Insured** because of 1. above; .... (emphasis in original).

33.    A "Personal Injury Wrongful Act" as defined in Policies 2, 3, and 4 in Form DO-100 (05/17) means "any actual or alleged false arrest, wrongful detention, malicious prosecution, invasion of privacy, wrongful entry or eviction, libel, slander or defamation."

34.    Although the definition of "Personal Injury Act" in Policy 1 is similar to the definition of "Personal Injury Wrongful Act" that appears in Form DO-100 (05/17) of Policies 2, 3, and 4, Policy 1 does not include false arrest or wrongful detention in its "Personal Injury Act" definition.

35.    In addition, each of the Policies imposes a duty on USLI to pay Loss and Defense Costs for covered Claims. "Loss" is defined in Form DO-100 (05/17) in Policies 2, 3, and 4 in relevant part as follows:

"**Loss** means the amount the **Insured** becomes legally obligated to pay as a result of a **Claim**, including:

> 1.    damages, settlements and judgments;
> 2.    pre-judgment and post judgment interest;
> 3.    punitive or exemplary damages to the extent such damages are insurable

under applicable law, statute or regulation;
> 4.    the multiplied portion of any multiple damage award to the extent such

damages are insurable under applicable law, statute or regulation. ....

For the purpose of determining the insurability of damages in items 3 and 4 above, the laws of the jurisdiction most favorable to the insurability of such damages shall control; provided that such jurisdiction has a substantial relationship to the relevant **Insured** or to the **Claim** giving rise to the damages. ...." (emphasis in original).

36.    The "Loss" definition in Policy 1, Form DO-100 (04-07) is different from the definition in Policies 2, 3, and 4 in that it does not include "fines, penalties, taxes, the multiplied portion of any multiple damage award, and other monetary sanctions that are uninsurable by operation of law."

10

37.    "Defense Costs" are defined in Policies 2, 3, and 4, Form DO 100 (05-17) as follows:

.

"1.    reasonable and necessary legal fees and expenses incurred by the **Company**, or by any attorney designated by the **Company** to defend the **Insured**; and
2.    all other fees, costs, costs of attachment or similar bonds (without any obligation on the **Company**'s part to apply for or furnish such bonds;

resulting from the investigation, defense, adjustment, defense and appeal of a **Claim**. **Defense Costs** does not include **Loss** or the **Insured**'s salaries, wages, overhead or benefits expenses." (emphasis in original).

38.    In contrast, Policy 1, in Form DO-100 (04-07) defines "Defense Costs" as follows:

"'**Defense Costs**' means reasonable and necessary legal fees and expenses incurred by the **Company**, or by any attorney designated by the **Company** to defend the **Insureds**, resulting from the investigation, adjustment, defense and appeal of a **Claim**. **Defense Costs** includes other fees, costs, costs of attachment or similar bonds (without any obligation on the part of the **Company** to apply for or furnish such bonds). but does not include salaries, wages, overhead or benefits expenses of the **Insured**." (emphasis in original).

39.    "Policy Period" is defined in Policies 2, 3, and 4, Form DO GTC (05-17) as follows:

"**Policy Period** means the period of time from the effective date and time of this **Policy** to the date and time of expiration as shown in the Policy Declarations, or its earlier cancellation or termination date.  If the length of the **Policy Period** is the same as the **Policy Year**, the terms **Policy Period** and **Policy Year** are used interchangeably herein."

40.    "Policy Period," in contrast, is defined in Policy 1, Form DO-100 (04-07) as "the period from the effective date of this Policy set forth in Item II. of the Policy Declarations, to the expiration date or the effective date of cancellation or non-renewal date, if any." Exhibit 1 (emphasis in original).

41.    Each of the four Policies contains a Notice and Claim Reporting Provision that requires written reporting of Claims (the "Notice Provision").

42.    The Notice Provision in Policy 1, Form DO 294 (04-14) Section IV. of Amended Notice/Claim And Circumstance Reporting Provisions,  reads in pertinent part:

"Notice hereunder shall be given in writing to the **Company**. If mailed, the date of mailing of such notice shall constitute the date that such notice was given and proof of mailing shall be sufficient proof of notice.

A.    **Written Notice of a Claim:**

11

(1) As a condition precedent to exercising any right to coverage under this Policy, an **Insured** shall give to the **Company** written notice of a **Claim**, as soon as practicable but:

(a) if the **Policy** expires, is cancelled or is non-renewed and if no Extended Reporting Period is purchased, no later than sixty (60) days after the expiration date or effective date of such cancellation or non-renewal. Coverage for a **Claim** reported to the **Company** during the sixty (60) day period after expiration, cancellation or non-renewal applies only if the **Claim** is first made against an Insured prior to the **Policy** expiration or effective date of cancellation or non-renewal; or

(b) if an Extended Reporting Period is purchased, no later than the last day of the Extended Reporting Period; provided that if the **Company** sends written notice to the **Parent Organization** stating that this Policy is being terminated for nonpayment of premium, an **Insured** shall give to the **Company** written notice of such **Claim** prior to the effective date of such termination.

Coverage for a **Claim** reported to the **Company** during an Extended Reporting Period shall only apply if the **Claim** arises from a **Wrongful Act** or **Wrongful Employment Act** committed before the date of the Policy expiration, cancellation or non-renewal." (boldface emphasis in original).

43.     Policies 2, 3 and 4 (Form DO GTC (05-17) contain a different Notice Provision than

Policy 1, with a longer time period for reporting claims. That Notice Provision, found in Section V.,

Notice and Claim Reporting Provisions, reads, in relevant part:

"Notice hereunder shall be given in writing to the **Company**. If mailed, the date of mailing of such notice shall constitute the date that such notice was given and proof of mailing shall be sufficient proof of notice.

1.     As a condition precedent to exercising any right to coverage under this **Policy**, the **Insured** shall give to the **Company** written notice of a **Claim** as soon as practicable after any Chief Executive Officer, Chief Financial Officer, Chief Operating Officer, Chairperson, Executive Director, Human Resources Manager, In-House General Counsel, Managing Member or Fiduciary of any **Plan** becomes aware of such **Claim**, however:

a.     if the **Policy** expires, is cancelled or is non-renewed and no Extended Reporting Period is purchased, no later than ninety (90) days after the expiration date or the effective date of such cancellation or non-renewal; or

b.     if an Extended Reporting Period is purchased, no later than the last day of the Extended Reporting Period.

12

However, if the **Policy** is cancelled for non-payment of premium, notice shall be provided by the **Insured** to the **Company** no later than the effective date of cancellation.

2.     Coverage for a **Claim** reported to the **Company** during the automatic 90 day period noted in 1. a. above shall only apply if the **Claim** is first made prior to the date of the **Policy** expiration, cancellation, or non-renewal." (boldface emphasis in original).

44.     The Declaration pages of all four of the Policies provide that "This is a Claims Made Policy Coverage Form and underscore otherwise provided herein, the coverage of this form is limited to liability for Claims first made during the Policy Period, or the extension period, if applicable." (underscore emphasis supplied).

45.     Thus, when these Notice Provisions trigger coverage depends upon how the term "Policy Period" is defined.

46.     Policy 1 reads: "**Policy Period** means the period from the effective date of this Policy set forth in ITEM II. of the Policy Declarations, to the expiration date or the effective date of cancellation or non-renewal date, if any." (underscore emphasis supplied; boldface in original).

47.     Policies 2, 3, and 4 define "Policy Period" in relevant part as "the period of time from the effective date and time of this **Policy** to the date and time of expiration as shown in the Policy Declarations, or its earlier cancellation or termination date." (underscore emphasis supplied; boldface in original).

48.     Policies 2, 3 and 4 also contain an Endorsement that changes the effective date of the Policies, and that extends the time in which a Claim must be reported to trigger coverage.   This Endorsement appears in Form DO-298 (05/17).   The Endorsement is titled "Amendment of Prior or Pending Litigation Exclusion" (hereinafter "Prior Pending Exclusion Amendment") and is applied specifically to each Coverage Part of each Policy.

49.     As applied to the Directors and Officers Coverage Part of each of the Policies, the Prior

13

Pending Exclusion Amendment states:

> It is hereby agreed that the Directors and Officers **Coverage Part,** Section IV. EXCLUSIONS, Subsection A., "Prior or Pending Litigation" is deleted and replaced by the following:

| | |
|---|---|
| Prior or Pending Litigation. | Any litigation, demand, claim, arbitration, decree, judgment, proceeding, or investigation against any **Insured**, or any such action based upon the same or essentially the same facts, circumstances, matters, situations, transactions or events underlying or alleged therein which was pending on or prior to the effective date of this **Policy;** |
| | provided that, if this **Policy** is a renewal of a **Policy** previously issued by the **Company** in a continuous succession of **Policies** with no lapses in coverage, the effective date of this **Policy** will mean the effective date of the first **Policy** issued by the **Company** in such succession of **Policies.** |

(emphasis in original).

50.     The Prior Pending Exclusion Amendment amends the term "Policy Period."  The Prior Pending Exclusion Amendment states that if "[a]ny litigation... " is pending "on or prior to the effective date of this Policy," the "effective date of this Policy will mean the effective date of the first Policy issued by the Company in such succession of Policies" so long as the Policy in effect is "a renewal of a Policy previously issued by the Company in a continuous succession of Policies with no lapses in coverage...." (underscore emphasis added; boldface emphasis in original).

51.     A plain reading of the Prior Pending Exclusion Amendment is that, so long as the continuous succession of Policies is not broken by a lapse in coverage, a Claim that is first asserted after the "effective date" of Policy 1 may be reported at any time before the continuous succession of policies lapses, in order to satisfy the reporting requirement for coverage.

52.     The Policies use a variety of different, undefined, terms intended to indicate the date on which the "Policy Period," and thus USLI's coverage obligations, begins.  Those terms include the

14

phrases "effective date," "inception date," and "the effective date set forth in ITEM II. of the Policy Declarations." To the extent that such differences and conflicts in critical wording create an ambiguity in the meaning of the term "Policy Period," that ambiguity must be strictly construed against USLI. *E.g., Hakim v. Massachusetts Insurers Insolvency Fund,* 424 Mass. 275, 281-82, 675 N.E.2d 1161 (Mass. 1997).

53.     All premiums have been paid for the Policies.

54.     No Policies have been cancelled or non-renewed by USLI and there is a continuous succession of Policies issued by USLI with no lapses in coverage.

55.     Plaintiffs have complied with all applicable conditions precedent and all other material terms under the Policies, as will be further described below.

## C.     USLI'S BREACHES OF CONTRACT AND DENIALS OF COVERAGE

56.     NPT's counsel sent a letter to USLI dated July 27, 2021, giving USLI notice of the Claims asserted by Northeastern in the *Northeastern University* Action as consolidated into the Consolidated Action and requesting payment of Plaintiff's Defense Costs. A true and correct copy of that Notice Letter, complete with attachments, is attached hereto as Exhibit "5."

57.     By letter dated August 3, 2021, Matthew Rubin, Assistant Vice President of USLI, responded to Plaintiffs' counsel's July 27, 2021 letter. Mr. Rubin's letter on behalf of USLI denied coverage, or any duty of defense or indemnification, for Plaintiffs' claims ("USLI Denial"). A true and correct copy of USLI's August 3, 2021 denial is attached hereto as Exhibit "6."

58.     The USLI Denial maintains that, if no Extended Reporting Period is purchased, notice of a claim shall be given "no later than "sixty (60) days after the expiration date or effective date of such cancellation or non-renewal" of the policy, or the last day of the Extended Policy period, if one is purchased.

59.     The USLI Denial also states that "Coverage for a **Claim** reported to the **Company**

during an Extended Reporting Period shall only apply if the **Claim** arises from a **Wrongful Act** or **Wrongful Employment Act** committed before the date of the Policy expiration, cancellation or non-renewal." (emphasis in original). No other grounds for USLI's disclaimer were identified in the USLI Denial.

60.     Plaintiffs' counsel responded to the USLI Denial with a letter dated August 6, 2021 ("Plaintiffs' Reply"). Plaintiffs' Reply explained that Plaintiffs' Claims were made after the effective date of the Policy, and within sixty days of its expiration date, because the Prior Pending Exclusion Amendment changed the effective date of Policy 3 to June 19, 2018, while the expiration date of Policy 4 is June 19, 2022. Thus, Plaintiffs' July 27, 2021 notice letter was timely. A true and correct copy of Plaintiffs' Reply is attached as Exhibit "7."

61.     Mr. Rubin responded to Plaintiffs' Reply by e-mail sent on August 25, 2021, stating that USLI stood by its coverage position that the "Amendment of Prior or Pending Litigation Exclusion" did not change the effective date or the expiration date of the relevant Policy Period. A true and correct copy of the relevant e-mail is attached as Exhibit "8."

62.     Upon information and belief, USLI never attempted to investigate Plaintiffs' Claim or to address the arguments, based upon the Prior Pending Exclusion Amendment, made by Plaintiffs' counsel which showed that Notice of Claim had been timely made, given the language of the Policies, properly read as a whole.

63.     Each of the four Policies is part of a continuous succession of Policies issued by USLI with no lapses in coverage.

64.     Plaintiffs contend that a plain reading of the Prior Pending Exclusion Amendment changes the effective date of Policy 4, the current USLI Policy, to the effective date of the earliest Policy issued by USLI, namely, Policy 1, effective date June 19, 2018.

65.     Plaintiffs contend that a plain reading of the Prior Pending Exclusion Amendment shows

16

that it expanded the time periods set forth in the Notice Provision.

66.     Thus, the Claim first asserted against Plaintiffs in the *Northeastern University* Action on or about August 9, 2019 was first made during the Policy Period, subsequent to the effective date, and Plaintiffs' written Notice of Claim, given on July 27, 2021, was provided before the expiration date of the Policy Period, June 19, 2022; which is the expiry of current Policy 4.

67.     Policy 1 does not use the term "effective date" for the date that marks the beginning of a Policy Period but instead uses the term "inception date." The term "inception date" does not appear in the notice or reporting provisions in Policies 2, 3, or 4  but is replaced by the term "effective date." To the extent this change of terms creates an ambiguity in the meaning of the policy language, that ambiguity must be construed against USLI. *E.g., Hakim v. Massachusetts Insurers Insolvency Fund,* 424 Mass. 275, 281-82, 675 N.E.2d 1161 (Mass. 1997).

68.     Plaintiffs aver that the meaning of the Prior Pending Exclusion Amendment is clear and unambiguous and provides coverage for Plaintiffs' claims for coverage in defense of the Consolidated Action.

69.     The USLI Denial creates an ambiguity which Plaintiffs do not believe exists, but if it does then an ambiguity must be construed against USLI and in favor of Plaintiffs.

70.     If the Prior Pending Exclusion Amendment is not clear and unambiguous, Plaintiffs' plain reading of the meaning of the Prior Pending Exclusion Amendment should be adopted to provide coverage for Plaintiffs because where "there is more than one rational interpretation of policy language, 'the insured is entitled to the benefit of the one that is more favorable to it.' " *Trustees of Tufts University v. Commercial Union Ins. Co.,* 415 Mass. 844, 849, 616 N.E.2d 68 (Mass. 1993).  This principle of construction "applies with particular force to exclusionary provisions" such as the Prior Pending Exclusion Amendment.  *E.g., Hakim v. Massachusetts Insurers Insolvency Fund,* 424 Mass. 275, 281-82, 675 N.E.2d 1161 (Mass. 1997).

71.     Plaintiffs have been damaged by the USLI Denial by (1) having to continue to pay for their own defense and losing the use of that money, and (2) having to pay to litigate the present action to obtain a declaration of their contractual rights under the Policies.

###     D.     INSURANCE COVERAGE FOR THE CONSOLIDATED ACTION

72.     The *Northeastern University* Action as consolidated into the Consolidated Action alleges, or allegedly involves, a Wrongful Act, and/or a Personal Injury Wrongful Act, by NPT and/or the Individual Plaintiffs taking place during one or more of the periods covered in the Policies.

73.     The Policies' definition of "Wrongful Act" includes an "actual or alleged act, error, omission, misstatement, misleading statement, neglect, or breach of duties," and Northeastern expressly alleges at least an "actual or alleged act" in its allegations as to NPT's and/or the Individual Plaintiffs' actions as to the Section 7A Notice.

74.     A "Personal Injury Wrongful Act" includes "any actual or alleged ... invasion of privacy, wrongful entry or eviction..." and Northeastern's allegations can be viewed as alleging that NPT's and/or the Individual Plaintiffs' actions amount to an invasion of privacy, a wrongful entry, or a de facto eviction.

75.     Specifically, in Paragraph 49 of the *Northeastern University* Action Complaint, Northeastern alleges that NPT and the Individual Plaintiffs advised Northeastern of their intent "to seek injunctive relief to prevent Northeastern from proceeding with the Project [*i.e.*, the new building in the Ecological Preserve]."   A true and correct copy of the *Northeastern University* Action Complaint is attached hereto as Exhibit "9."

76.  Because the *Northeastern University* Action Complaint makes explicit allegations of an "actual or alleged act, error, omission, misstatement, misleading statement, neglect, or breach of duties," and an "actual or alleged ... invasion of privacy, wrongful entry or eviction..." the *Northeastern University* Action as consolidated into the Consolidated Action alleges Claims that trigger USLI's duty

to defend under the Policies.

77.     Plaintiffs have paid, and will continue to pay, substantial defense costs, which USLI is obligated to pay pursuant to the terms of the Policies.

78.     USLI must pay on behalf of, or indemnify, Plaintiffs for any and all sums that Plaintiffs may be legally obligated to pay as damages under the Policies.

79.     USLI has disputed, and continues to dispute, its obligations to defend Plaintiffs and/or to pay Plaintiffs' defense costs in connection with the *Northeastern University* Action as consolidated into the Consolidated Action, and has also disputed its obligation to pay Plaintiffs' liabilities, if any, arising from the *Northeastern University* Action as consolidated into the Consolidated Action.

80.     USLI's wrongful denial of coverage in and through the USLI Denial and USLI's continuing failure to acknowledge its obligations under the Policies, thereby breaching its duties and obligations under the Policies, has damaged, and will continue to damage, Plaintiffs because USLI's failure has required, and will continue to require, Plaintiffs to expend sums for their defense and to pay for their liabilities, if any, arising from the *Northeastern University* Action as consolidated into the Consolidated Action.

## COUNT I
## DECLARATORY JUDGMENT PURSUANT TO M.G.L. c. 231A §§ 1-9

81.     Plaintiffs repeat and re-allege each and every averment contained in paragraphs 1 through 80 of this Complaint with the same force and effect as if set forth herein.

82.     All premiums owed to USLI for the Policies have been duly and timely paid.

83.     All conditions precedent to recovery under the Policies have been satisfied or waived.

84.     No Policy has been cancelled, non-renewed or terminated by USLI and there is a continuous succession of Policies issued by USLI with no lapses in coverage.

85.     USLI owes an obligation to defend Plaintiffs and an obligation to reimburse Plaintiffs

for all defense costs Plaintiffs have incurred, and will incur, by reason of the *Northeastern University* Action as consolidated into the Consolidated Action.

86.     USLI must pay, on behalf of Plaintiffs, all loss that Plaintiffs may become obligated to pay by reason of liability for damages either by way of settlement, judgment or otherwise, in connection with the *Northeastern University* Action as consolidated into the Consolidated Action.

87.     USLI has expressly denied, and on information and belief will continue to deny, its contractual obligation to pay Plaintiffs' liabilities, if any, in connection with the *Northeastern University* Action as consolidated into the Consolidated Action.

88.     As a result of USLI's refusal and failure to acknowledge its obligations as set forth in the foregoing paragraphs, a judicial declaration is necessary to determine Plaintiffs' rights and USLI's obligations under the Policies regarding the  Consolidated Action.

89.     Pursuant to M.G.L. c.  231A  §§ 1-9, Plaintiffs therefore seek a declaration that USLI is obligated under the Policies: (1) to reimburse Plaintiffs for the costs incurred to date in defending the *Northeastern University* Action as consolidated into the Consolidated Action; (2) to pay for costs of defending the *Northeastern University* Action as consolidated into the Consolidated Action that will be incurred in the future, and; (3) to indemnify Plaintiffs in full, to the limits of the Policies, for any and all loss Plaintiffs may be required to pay as damages in connection with the *Northeastern University* Action as consolidated into the Consolidated Action.

**COUNT II**
**BREACH OF CONTRACT**

90.     Plaintiffs repeat and re-allege each and every averment contained in paragraphs 1 through 89 of this Complaint with the same force and effect as if set forth herein.

91.     The Policies constitute valid contracts between Plaintiffs and USLI.  All premiums have been paid and all conditions precedent to recover under the Policies have been satisfied or waived,

Plaintiffs are entitled to the benefits of those contracts.

92.     Northeastern seeks to impose substantial liability on Plaintiffs for damages and/or other relief through settlement and judgment and/or otherwise, from the *Northeastern University* Action as consolidated into the Consolidated Action.   Plaintiffs have incurred, and will continue to incur, substantial costs and expenses in defending against the *Northeastern University* Action as consolidated into the Consolidated Action.

93.     USLI has breached its contractual obligations to Plaintiffs under the Policies by failing to pay the defense costs incurred by Plaintiffs, and by refusing to agree to pay the other costs and damages described above as they are incurred, as is required pursuant to the terms of the Policies.

94.     Plaintiffs have been damaged and may continue to be damaged by USLI's breach of its contractual obligations as aforesaid in the amount of costs, including, but not limited to, defense and indemnity costs, which Plaintiffs have incurred and may incur, in connection with the *Northeastern University* Action as consolidated into the Consolidated Action, which costs should be paid by USLI under the Policies.

**COUNT III**
**ATTORNEYS' FEES PURSUANT TO  MASSACHUSETTS CASE LAW**

95.     Plaintiffs repeat and re-allege each and every averment contained in paragraphs 1 through 94 of this Complaint with the same force and effect as if set forth herein.

96.     As averred above, USLI has breached its contractual obligations to Plaintiffs under the Policies by failing either to provide Plaintiffs with a defense to the claims asserted against them in the *Northeastern University* Action as consolidated into the Consolidated Action, or to pay the defense costs incurred by Plaintiffs in the *Northeastern University* Action as consolidated into the Consolidated Action, and by refusing to agree to pay costs and damages described above as they are incurred, as is required pursuant to the terms of the Policies.

21

97.    Because Plaintiffs have been forced to initiate this lawsuit to obtain a declaration of their rights and USLI's obligations under the Policies, and the defense and repayment of defense costs for the *Northeastern University* Action as consolidated into the Consolidated Action, Plaintiffs have incurred attorneys' fees, over and above any attorneys' fees necessary for the defense of the *Northeastern University* Action as consolidated into the Consolidated Action, which fees Plaintiffs would not have had to incur if USLI had honored the terms and USLI's obligations under the Policies.

98.    Under Massachusetts law, as set forth in the Supreme Judicial Court's decision in *Preferred Mutual Ins. Co. v. Gamache,* 426 Mass. 93, 686 N.E. 2d 989 (1997), Plaintiffs are entitled to payment of their attorneys' fees for the prosecution of this declaratory judgment action in order to make them whole.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment as follows:

1.    That this Court declare all rights and obligations that USLI owes to Plaintiffs under the Policies;

2.    That this Court declare that a plain reading of the Policies affords the coverage to Plaintiffs that Plaintiffs seek. *Trustees of Tufts University v. Commercial Union Ins. Co.,* 415 Mass. 844, 849, 616 N.E.2d 68 (Mass. 1993);

3.    That this Court declare that if the language of the Policies is ambiguous, that it will construe the ambiguity in Plaintiffs' favor and thus that the Plaintiffs are entitled to the coverage under the Policies that they seek.  *E.g., Hakim v. Massachusetts Insurers Insolvency Fund,* 424 Mass. 275, 281-82, 675 N.E.2d 1161 (Mass. 1997); *Trustees of Tufts Univ. v. Commercial Union Ins. Co.,* 415 Mass. 844, 849, 616 N.E.2d 68 (Mass. 1993);

4.    That this Court determine and declare that USLI is obligated under the Policies to reimburse Plaintiffs for the costs, including but not limited to attorneys' fees incurred to date in

22

defending the *Northeastern University* Action as consolidated into the Consolidated Action, plus interest;

5.      That this Court determine and declare that USLI is obligated under the Policies to reimburse Plaintiffs for costs, including but not limited to attorneys' fees, of defending the *Northeastern University* Action as consolidated into the Consolidated Action which will be incurred in the future;

6.      That this Court determine and declare that USLI is obligated under the Policies to pay and indemnify Plaintiffs in full for any and all sums which Plaintiffs may be compelled to pay as damages with regard to the *Northeastern University* Action as consolidated into the Consolidated Action;

7.      That this Court grant Plaintiffs specific performance of USLI's duty to defend them in the *Northeastern University* Action as consolidated into the Consolidated Action, pursuant to the Policies;

8.      That this Court order USLI to reimburse Plaintiffs, in accordance with the Policies, for all damages, costs and payment (whether by judgment, settlement, or otherwise), and all other sums incurred to date or in the future by Plaintiffs in the *Northeastern University* Action as consolidated into the Consolidated Action, including defense costs, which may include but are not limited to, counsel fees, expert fees, and all costs, and pre-judgment and post-judgment interest if and as applicable;

9.      That this Court order USLI to reimburse Plaintiffs, in accordance with the Policies, for any money damages that may be imposed upon Plaintiffs, including, but not limited to, consequential damages together with pre-judgment and post-judgment interest;

10.     That this Court order USLI to reimburse Plaintiffs, in accordance with Massachusetts law, for all litigation costs, including reasonable attorneys' fees, interest, and all other reasonable expenses for the commencement and pursuit of litigation of this action, *Preferred Mutual Ins. Co. v. Gamache,* 426 Mass. 93, 686 N.E. 2d 989 (1997);  and

11.    For such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury on all counts so triable.

Respectfully submitted,

Nahant Preservation Trust, Inc. and the Individual Plaintiffs identified above

By their attorney,

John D. Frumer
BBO# 546695
Law Office of John D. Frumer
199 Wells Avenue, Suite 301
Newton, MA  02459
Tel:  (617) 233-9147
jdfrumer@frumerlaw.com

Date:  2/17/22

## CERTIFICATE OF SERVICE

This is to certify that on this 9th day of March, 2022, I mailed by U. S. Postal Service, postage prepaid, a copy of the foregoing Complaint and Exhibits 1-9, inclusive, to the Montgomery, PA Sheriff for service upon the Defendants.

John D. Frumer

Dated: March 9, 2022

# EXHIBIT 1

NEW
_____
Renewal of Number

POLICY DECLARATIONS

No. NDO2557425

# Mount Vernon Fire Insurance Company
### 1190 Devon Park Drive, Wayne, Pennsylvania 19087
A Member Company of United States Liability Insurance Group

NAMED INSURED AND ADDRESS:

Nahant Preservation Trust
PO Box 30
Nahant, MA 01908

POLICY PERIOD: (MO. DAY YR.)   From:  06/19/2018  To:  06/19/2019

12:01 A.M. STANDARD TIME AT YOUR
MAILING ADDRESS SHOWN ABOVE

BUSINESS DESCRIPTION:  Non-Profit Directors and Officers

IN RETURN FOR THE PAYMENT OF THE PREMIUM, AND SUBJECT TO ALL THE TERMS OF THIS POLICY, WE AGREE
WITH YOU TO PROVIDE THE INSURANCE AS STATED IN THIS POLICY.

THIS POLICY CONSISTS OF THE FOLLOWING COVERAGE PARTS FOR WHICH A PREMIUM IS INDICATED.

| | PREMIUM |
|---|---|
| Directors And Officers Liability Coverage Part | $744.00 |
| TOTAL: | $744.00 |

Coverage Form(s) and Endorsement(s) made a part of this policy at time of issue
## See Endorsement EOD (1/95)

Agent:  MCGOWAN, DONNELLY & OBERHEU, LLC (1818)
106 East 6th Street, Suite 520
Austin, TX  78701

Broker:

Issued:  06/21/2018 10:38 AM

By: _____
Authorized Representative

THESE DECLARATIONS TOGETHER WITH THE COMMON POLICY CONDITIONS, COVERAGE PART DECLARATIONS,
COVERAGE PART COVERAGE FORM(S) AND FORMS AND ENDORSEMENTS, IF ANY, ISSUED TO FORM A PART THEREOF,
COMPLETE THE ABOVE NUMBERED POLICY.

UPD (08-07)

# EXTENSION OF DECLARATIONS

**Policy No. NDO2557425**

Effective Date: 06/19/2018

12:01 AM STANDARD TIME

## FORMS AND ENDORSEMENTS

The following forms apply to the Directors And Officers Liability coverage part

| Endt# | Revised | Description of Endorsements |
|-------|---------|---------------------------|
| DO-100 | 04/07 | Coverage Part A. Non Profit Directors and Officers Liability |
| DO-201 | 01/94 | Accreditation, Certification, Standard Setting Exclusion Endorsement |
| DO-209 | 01/94 | General Professional E & O Exclusion Endorsement |
| DO-224A | 12/13 | Abuse/Molestation Exclusion Endorsement |
| DO-233 | 05/95 | Builder / Developer Exclusion Endorsement |
| DO-283 | 01/14 | Data & Security+ Endorsement |
| DO-291 | 01/11 | Excess Benefit Transaction Excise Tax Endorsement |
| DO-293 | 06/13 | Amended Lifetime Occurrence Reporting Provision Endorsement |
| DO-294 | 04/14 | Amended Notice/Claim And Circumstance Reporting Provisions |
| NPPLA | 05/12 | Non Profit Professional Liability Application |
| DO Jacket | 09/10 | Non Profit Professional Liability Policy |
| USL-DOJ | 03/08 | Non Profit Professional Liability Common Conditions |

## PROFESSIONAL LIABILITY COVERAGE PART DECLARATIONS

PLEASE READ YOUR POLICY CAREFULLY.

THIS IS A CLAIMS MADE POLICY COVERAGE FORM AND UNLESS OTHERWISE PROVIDED HEREIN, THE COVERAGE OF THIS FORM IS LIMITED TO LIABILITY FOR CLAIMS FIRST MADE DURING THE POLICY PERIOD, OR THE EXTENSION PERIOD, IF APPLICABLE.  DEFENSE COSTS SHALL BE APPLIED AGAINST THE RETENTION.

No.  NDO2557425                                    Effective Date:  06/19/2018
                                                                   12:01 AM STANDARD TIME

ITEM I. PARENT ORGANIZATION AND PRINCIPAL ADDRESS

Nahant Preservation Trust
PO Box 30
Nahant, MA 01908

ITEM II. POLICY PERIOD: (MM/DD/YYYY)  From:  06/19/2018  To:  06/19/2019

### Coverage Part A: Non Profit Directors and Officers Liability

ITEM III. LIMITS OF LIABILITY

| | | | |
|---|---|---|---|
| a. Non Profit Directors & Officers | $1,000,000 | EACH CLAIM | |
| b. Non Profit Directors & Officers | $1,000,000 | IN THE AGGREGATE | |

ITEM IV. RETENTION:              $0              EACH CLAIM
ITEM V. PREMIUM:                 $744

### Coverage Part B: Employment Practices Liability

ITEM III. LIMITS OF LIABILITY

| | |
|---|---|
| a. Employment Practices | NOT COVERED |
| b. Employment Practices | |

ITEM IV. RETENTION:              NOT COVERED
ITEM V. PREMIUM:                 NOT COVERED

THESE DECLARATIONS ARE PART OF THE POLICY DECLARATIONS CONTAINING THE NAME OF THE INSURED AND THE POLICY PERIOD.

PROFESSIONAL LIABILITY COVERAGE PART DECLARATIONS

PLEASE READ YOUR POLICY CAREFULLY.

THIS IS A CLAIMS MADE POLICY COVERAGE FORM AND UNLESS OTHERWISE PROVIDED HEREIN, THE COVERAGE OF THIS FORM IS LIMITED TO LIABILITY FOR CLAIMS FIRST MADE DURING THE POLICY PERIOD, OR THE EXTENSION PERIOD, IF APPLICABLE.  DEFENSE COSTS SHALL BE APPLIED AGAINST THE RETENTION.

No.  NDO2557425

Effective Date:  06/19/2018
12:01 AM STANDARD TIME

## Coverage Part C: Fiduciary Liability

ITEM III. LIMITS OF LIABILITY

    a. Fiduciary Liability          NOT COVERED

ITEM IV. RETENTION:          NOT COVERED

ITEM V. PREMIUM:          NOT COVERED

ITEM VI. Coverage Form(s)/Part(s) and Endorsement(s) made a part of this policy at time of issue:

    See Endorsement EOD (01/95)

THESE DECLARATIONS ARE PART OF THE POLICY DECLARATIONS CONTAINING THE NAME OF THE INSURED AND THE POLICY PERIOD.



United States Liability Insurance Group
A BERKSHIRE HATHAWAY COMPANY

USLI.COM
888-523-5545
Mount Vernon Fire Insurance Company

# Non Profit Professional Liability Application - All States

APPLICANT MAY QUALIFY FOR AN **INSTANT QUOTE** BY COMPLETING SECTION I BELOW. SECTION II ANSWERS WILL BE REQUIRED PRIOR TO BINDING AND ARE SUBJECT TO UNDERWRITING APPROVAL.

This is an application for a claims made policy - Please read your policy carefully. Application for Non Profit Directors & Officers Liability Insurance (Coverage Part A) and Employment Practices Liability Insurance (Optional Coverage Part B) and Fiduciary Liability Insurance (Optional)

New York Disclosure Notice: Under DO 290 NY, DO 281 NY and DO 282 NY, if made part of your policy, the limits of liability available under this policy may be completely exhausted by the payment of defense costs. Defense costs shall be applied against the retention.

---

**I. INSTANT QUOTE INFORMATION**

Instant Quote is not available for accounts with losses in the past 5 years. If there is a loss history, please complete Section I, and submit details in a claim supplement

Applicant's Name: **Nahant Preservation Trust**

Location Address: _PO Box 30_          ☑ Same as mailing address or complete section III.

City: **Nahant**                                State: **MA**                    Zip: 01908

Web Address: _NAHANT PRESERVATION TRUST.ORG_   Email Address of primary contact: _DENNISMARONEY@LIFE.COM_

Description of Operations:

> The Nahant Preservation Trust is an all-volunteer, not-for-profit charitable corporation whose mission is to preserve our open spaces, historically significant properties, and our conservation lands for public and community benefit.

Total Annual Revenue: $162,801          (If > $2 million attach the most recent 12-month financial statement)

If less than 3 years in operation, annual revenue: this year $162,801    next year: _____    third year: _____

Total Fund Balance (Total Assets minus Total Liabilities): 1,810,000

Full Time Employees: 0          Part Time: 0          Temporary/Seasonal: 0          Volunteers: _20+_

Does the organization perform any operations located outside the U.S.? No          In Existence Since: _1999_

---

**II. UNDERWRITING INFORMATION**

1.  Does the organization have an anti-harassment and anti-discrimination policy? _※ SEE PAGE 2_          ☐ Yes ☑ No
2.  Does the organization have tax exempt status by the I.R.S.?          ☑ Yes ☐ No
3.  Does the organization have General Liability Insurance?          ☑ Yes ☐ No
4.  Expiring Information: Carrier _GREAT AMERICAN_ Limits _1M/2M_ Retention _NIL_ Premium _1960.-_
     (Attach a statement of details for all "yes" answers to the following questions)
5.  Is any entity proposed for insurance involved in any of the following:
    a)  Research, development or testing?          ☐ Yes ☑ No
    b)  Certification, accreditation or standard-setting?          ☐ Yes ☑ No
    c)  Disciplinary actions as a result of peer review activities?          ☐ Yes ☑ No
    d)  Administration or sponsorship of any insurance programs?          ☐ Yes ☑ No
    e)  Labor/union negotiations or collective bargaining?          ☐ Yes ☑ No
6.  Does the applicant have any chapters or subsidiaries requiring coverage?          ☐ Yes ☑ No

---

7   Has any entity proposed for insurance closed, downsized, laid off, reduced staff, sold, merged with or acquired any company in the past 12 months or anticipates doing so in the next 12 months?   ☐Yes ☑No

8   Has the Applicant or any person proposed for insurance (whether or not in the service of Applicant) been the subject of or been involved directly or indirectly in any civil, criminal, regulatory, legislative or administrative proceeding(s)?   ☐Yes ☑No

9 a   Within the last 5 years, has any inquiry, complaint, notice of hearing, claim or suit been made against any entity proposed for insurance, or any person proposed for insurance in the capacity of Director, Officer, Trustee, Employee or Volunteer of any entity proposed for insurance?   ☐Yes ☑No

9 b   Is any person(s) proposed for this insurance aware of any fact, circumstance or situation which may result in claim against any entity proposed for insurance or any of its Directors, Officers, Trustees, Employees or Volunteers?   ☐Yes ☑No

10   Has any Policy for Directors and Officers or Employment Practices Liability ever been cancelled or non-renewed?   ☐Yes ☑No
.   (Do not answer if applicant is located in Missouri)

## III  FIDUCIARY (Available for 500 employees or less)

(All questions must be answered in order for Fiduciary Liability coverage to be bound.)

1   Does each Pension Plan use an outside Investment Manager?   ☐Yes ☐No

2   Does each Plan subject to ERISA comply with all applicable requirements of ERISA and the Internal Revenue Code of 1982, as amended (the "Code") including eligibility, participation, vesting, fiduciary responsibility and funding standards?   ☐Yes ☐No

3   In the past 2 years has there been or is there now under consideration any material changes to a Plan or termination/consolidation of a Plan?   ☐Yes ☐No

4   Has there been or is there now pending any claim(s) against any proposed Insured arising out of any Plan?   ☐Yes ☐No

5   Does any proposed Insured have knowledge or information of any act, error or omission which might give rise to a claim under the proposed Fiduciary Liability Coverage?   ☐Yes ☐No

## IV  ADDITIONAL APPLICANT INFORMATION

Applicant's Mailing Address:  _PO Box 30_

City _Nahant_   State _MA_   Zip _01908_

Fraud Statement (All Other States): Any person who knowingly presents a false or fraudulent claim for payment of a loss or benefit or knowingly presents false information in an application for insurance is guilty of a crime and may be subject to fines and confinement in prison.

Retail Agency Name _Quinn of Lynn Inc_   License # _1341842_
Main Agency Phone Number _781-581-6300_
Agency Mailing Address _44 Box 744_
   City _Lynn_   State _MA_   Zip _0905_

The signer of this application acknowledges and understands that the information provided in this Application is material to the Insurer's decision to provide the requested insurance and is relied on by the Insurer in providing such insurance. The signer of this application represents that the information provided in this Application is true and correct in all matters. The signer of this Application further represents that any changes in matters inquired about in this Application occurring prior to the effective date of coverage, which render the information provided herein untrue, incorrect or inaccurate in any way will be reported to the Insurer immediately in writing. The Insurer reserves the right to modify or withdraw any quote or binder issued if such changes are material to the insurability or premium charged, based on the Insurer's underwriting guides. The Insurer is hereby authorized, but not required, to make any investigation and inquiry in connection with the information, statements and disclosures provided in this Application. The decision of the Insurer not to make or to limit any investigation or inquiry shall not be deemed a waiver of any rights by the Insurer and shall not estop the Insurer from relying on any statement in this Application in the event the Policy is issued. It is agreed that this Application shall be the basis of the contract should a policy be issued and it will be attached and become a part of the Policy.

Applicant's Signature _[signature]_   Title _TREASURER_   Date _11/4/11_
   President, Chairperson or Executive Director
   _[signature]_

✱   The NPT does not have a specific anti-harassment and anti-discrimination statement but we comply with all relevant MA & Federal laws.  The NPT is also an IRS, MA Sec of State & MA Attorney General approved 501 (c) 3 organization

COVERAGE PART A.  NON PROFIT DIRECTORS AND OFFICERS LIABILITY

NOTICE:  This is a Claims Made Policy.  This Policy only covers those **Claims** first made against the **Insured** during the **Policy Period** or Extended Reporting Period, if purchased.  **Defense Costs** shall be applied against the RETENTION.

In consideration of the payment of the premium and reliance upon all statements made and information furnished to the **Company**, including the statements made in the **Application** and all attachments and materials submitted therewith, and subject to all the provisions of this Policy, the **Company** agrees as follows:

I.  INSURING AGREEMENT
A.  The **Company** will pay on behalf of the **Insured Loss** in excess of the RETENTION, not exceeding the Limit of Liability for which this Coverage Part applies, that the **Insured** shall become legally obligated to pay because of **Claims** first made against the **Insured** during the **Policy Period** or during the Extended Reporting Period, if applicable, for **Wrongful Acts** arising solely out of an **Insured's** duties on behalf of the **Organization**.

B.  The **Company** has the right and duty to defend any **Claim** to which this insurance applies, even if the allegations of the **Claim** are groundless, false, or fraudulent.

II.  FULL PRIOR ACTS COVERAGE PROVISION
Coverage shall apply to any **Claim** made against the **Insured** for **Wrongful Acts** arising solely out of the **Insured's** duties on behalf of the **Organization** committed prior to the expiration date of this Policy, or the effective date of cancellation or non-renewal of this Policy, provided that the **Claim** is first made during the **Policy Period**, or the Extended Reporting Period if applicable, and written notice of said **Claim** is reported to the **Company** as soon as practicable.  There shall be no coverage for any **Claim** reported to the **Company** later than sixty (60) days after the end of the **Policy Period** or after the expiration of the Extended Reporting Period, if applicable.

However, coverage shall not apply to any **Claim** based upon or arising out of any **Wrongful Act** or circumstance likely to give rise to a **Claim** of which the person or persons signing the **Application** had knowledge, or otherwise had a reasonable basis to anticipate might result in a **Claim**, prior to the earlier of:

A.  The inception date of this Policy; or

B.  The inception date of the first Policy of this type the **Company** has issued to the **Parent Organization**, provided that the **Company** has written continuous coverage for the **Parent Organization** from such date to the inception date of this Policy.

**DO-100 (04-07)**                                                    **Page 1 of 9**

III. DEFINITIONS

A.  **"Application"** means:

(1) An application and any material submitted for this Policy and

(2) An application(s), including any material submitted, for all previous Policies issued by the **Company** providing continuous coverage until the inception date of this Policy.

The content of (1) and (2) above is incorporated by reference in this Policy as if physically attached hereto.

B.  **"Claim"** means:

(1) Any written demand seeking money damages; or

(2) Any proceeding initiated against the **Insured**, including any appeal there from, before any governmental body legally authorized to render an enforceable judgment or order for money damages or other relief against such **Insured** alleging that the **Insured** has committed, or is responsible for, a **Wrongful Act.**

A **Claim** shall be considered first made when the **Insured** or its legal representative or agent first receives notice of the **Claim.**

C.  **"Company"** means the insurer identified in the Policy Declarations.

D.  **"Defense Costs"** means reasonable and necessary legal fees and expenses incurred by the **Company**, or by any attorney designated by the **Company** to defend the **Insureds**, resulting from the investigation, adjustment, defense and appeal of a **Claim.  Defense Costs** includes other fees, costs, costs of attachment or similar bonds (without any obligation on the part of the **Company** to apply for or furnish such bonds), but does not include salaries, wages, overhead or benefits expenses of the **Insured**.

E.  **"Domestic Partner"** means any natural person qualifying as a domestic partner under the provisions of any applicable federal, state or local law.

F.  **"Employee"** means any natural person whose labor or service is engaged by and directed by the **Organization** while performing duties related to the conduct of the **Organization's** business and includes leased, part-time, seasonal and temporary workers, independent contractors, volunteers and interns.  An **Employee's** status as an **Insured** will be determined as of the date of the **Wrongful Act** that results in a **Claim.**

G.  **"Individual Insureds"** means any persons who were, now are, or shall be directors, trustees, officers, **Employees,** or committee members of the **Organization**, including their estates, heirs, legal representatives or assigns in the event of their death, incapacity or bankruptcy.

H.  **"Insured(s)"** means the **Organization** and the **Individual Insureds**.

I.  **"Loss"** means damages, settlements, pre-judgment and post judgment interest awarded by a court and punitive or exemplary damages to the extent such damages are

insurable under applicable law, but does not include fines, penalties, taxes, the multiplied portion of any multiple damage award, and other monetary sanctions that are uninsurable by operation of law.

For the purpose of determining the insurability of punitive damages and exemplary damages, the laws of the jurisdiction most favorable to the insurability of such damages shall control, provided that such jurisdiction has a substantial relationship to the relevant **Insured** or to the **Claim** giving rise to the damages.

J. **"Organization"** means:
(1) The **Parent Organization**;
(2) Any **Subsidiary** of the **Parent Organization**; or
(3) Any entity in its capacity as a debtor in possession of (1) or (2) above under the United States bankruptcy law or equivalent status under the law of any other jurisdiction.

K. **"Outside Entity"** means any not-for-profit organization that qualifies as such under Section 501(c) of the Internal Revenue Code of 1986 (as amended).

L. **"Parent Organization"** means the entity named in ITEM I. of the Policy Declarations.

M. **"Personal Injury Act"** means any actual or alleged malicious prosecution, invasion of privacy, wrongful entry or eviction, libel, slander or defamation.

N. **"Policy Period"** means the period from the effective date of this Policy set forth in ITEM II. of the Policy Declarations, to the expiration date or the effective date of cancellation or non-renewal date, if any.

O. **"Subsidiary"** means any nonprofit entity which is more than 50% owned or controlled by the **Parent Organization** as of the effective date of this Policy and is disclosed as a subsidiary in an **Application** to the **Company**.

A non profit entity formed or acquired after the effective date of this Policy is a **Subsidiary** if:
(1) its assets total less than 25% of the total consolidated assets of the **Parent Organization** at the time of formation or acquisition; and
(2) the formation or acquisition with full particulars about the new **Subsidiary** has been disclosed to the **Company** by the **Parent Organization** as soon as practicable but no later than the expiration date of the Policy, or effective date of cancellation or non-renewal of this Policy.

Any non profit entity formed or acquired after the effective date of this Policy whose assets total more than 25% of the total consolidated assets of the **Parent Organization** or any for profit entity formed or acquired after the effective date of this Policy is a **Subsidiary** only if:

(1) the **Parent Organization** provides written notice to the **Company** of such **Subsidiary** as soon as practicable, but not later than sixty (60) days of the formation or acquisition of the **Subsidiary**; and

(2) the **Parent Organization** provides the **Company** with such information as the **Company** may deem necessary to determine insurability of the **Subsidiary**; and

(3) the **Parent Organization** accepts any special terms, conditions, exclusions, limitations or premium imposed by the **Company**; and

(4) the **Company**, at its sole discretion, agrees to insure the **Subsidiary**.

A **Subsidiary** which is sold or dissolved:

(1) after the effective date of this Policy and which was  an **Insured** under this Policy; or

(2) prior to the effective date of this Policy and which was an **Insured** under a prior Policy issued by the **Company**;

shall continue to be an **Insured**, but only with respect to **Claim**s first made during this **Policy Period** or Extended Reporting Period, if applicable, arising out of **Wrongful Acts** committed or allegedly committed during the time the entity was a **Subsidiary** of the **Parent Organization.**

P. **"Wrongful Act"** means any actual or alleged act, error, omission, misstatement, misleading statement, neglect or breach of duties, or **Personal Injury Act** committed or allegedly committed;

(1) by the **Organization**; or

(2) by the **Individual Insureds** arising solely from duties conducted on behalf of the **Organization** or asserted against an **Individual Insured** because of (1) above.

It is further agreed that the same **Wrongful Act**, an interrelated series of **Wrongful Acts** or a series of similar or related **Wrongful Acts** by one or more **Insureds** shall be deemed to be one **Wrongful Act** and to have commenced at the time of the earliest **Wrongful Act**.

## IV. EXCLUSIONS

The **Company** shall not be liable to make payment for **Loss** or **Defense Costs** in connection with any **Claim** made against the **Insured** arising out of, directly or indirectly resulting from or in consequence of, or in any way involving:

A. Any actual or alleged bodily injury, sickness, humiliation, mental anguish, emotional distress, assault, battery, disease or death of any person, or damage to or destruction of any tangible property including any resulting loss of use. This exclusion shall not apply to **Claim** for humiliation, mental anguish or emotional distress resulting from any **Claim** from a **Personal Injury Act**;

B. Any dishonest, fraudulent or criminal **Wrongful Act** by the **Insured**, however, this exclusion shall not apply unless and until a final adjudication or judgment is rendered against the **Insured** as to this conduct;

C. Any of the **Insureds** gaining any profit, remuneration or advantage to which the **Insured** was not legally entitled provided, however, this exclusion shall not apply unless and until a final adjudication or judgment is rendered against the **Insured** as to this conduct;

D. The actual, alleged or threatened discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, noise, waste materials, or other irritants, contaminants or pollutants into or upon land, the atmosphere or any water course or body of water, whether or not such actual, alleged or threatened discharge, dispersal, release or escape is sudden, accidental or gradual in nature, or any cost or expense arising out of any request, demand, or order that the **Insured** or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize any pollutants;

E. Any radioactive, toxic or explosive properties of nuclear material which includes, but is not limited to, source material, "special nuclear material", and "by product material" as those terms are defined in the Atomic Energy Act of 1954 and any amendments thereto and any similar provisions by any federal, state or local statutory or common law;

F. Any pension, profit sharing, welfare benefit or other employee benefit program established in whole or in part for the benefit of any **Individual Insured**, or based upon, arising out of or in any way involving the Employee Retirement Income Security Act of 1974 (or any amendments thereof or regulations promulgated there under) or similar provisions of any federal, state or local statutory law or common law;

G. Any **Claim** by, at the behest of, or on behalf of the **Organization** and/or any **Individual Insured**; provided that this Exclusion shall not apply to:
(1) any derivative action on behalf of, or in the name or right of the **Organization**, if such action is brought and maintained totally independent of, and without the solicitation, assistance, participation or intervention of, any of the **Insureds**; or
(2) a **Claim** that is brought and maintained by or on behalf of any **Individual Insured** for contribution or indemnity which is part of or results directly from a **Claim** which is otherwise covered by the terms of this Policy;

H. Any actual or alleged: refusal to employ; termination of employment; employment related coercion, demotion, evaluation, reassignment, discipline, workplace conditions, false imprisonment, defamation, harassment, humiliation, or discrimination of employment; other employment-related practices, policies, acts or omissions; or sexual harassment by the **Insured** against any person(s) or entity; or negligence involving any of the foregoing;

it being understood that this Exclusion applies whether the **Insured** may be held liable as an employer or in any other capacity and to any obligation to contribute with or indemnify another with respect to such **Claim**;

I.  Any **Claims** made against the **Insured** based upon, arising out of, or in any way involving any actual or alleged discrimination, including but not limited to discrimination based on religion, race, creed, color, sex, age, marital status, sexual preference, pregnancy, handicap or disability;

J.  For actual or alleged liability of the **Insured** under any express contract or agreement; provided, however, this exclusion shall not apply to any **Claim** against an **Individual Insured**;

K.  Any pending or prior litigation, administrative or regulatory proceeding, claim, demand, arbitration, decree, or judgment of which the **Insured** had written notice before the effective date of this Policy; or any fact, circumstance, event, situation, or **Wrongful Act** which before the effective date of this Policy was the subject of any notice to an **Insured** under any other similar policy of insurance to the **Insured**; or any future **Claims** or litigation based upon the pending or prior litigation or derived from the same or essentially the same facts, actual or alleged;

provided that, if this Policy is a renewal of a Policy or Policies previously issued by the **Company** and if the coverage provided by the **Company** was continuous from the effective date of the first such other Policy to the effective date of this Policy, the effective date of this Policy will mean the effective date of the first Policy under which the **Company** first provided continuous coverage to an **Insured**;

L.  The rendering or failure to render medical, psychological or counseling services or referrals;

M.  Any **Claim** against any **Subsidiary** or its **Individual Insureds** for any **Wrongful Act** occurring prior to the date that such entity became a **Subsidiary** or any **Wrongful Act** occurring at any time that such entity is not a **Subsidiary**;

N.  The portion of any **Claim** covered under any other Coverage Part of this Policy;

No **Wrongful Act** of any **Individual Insured** nor any fact pertaining to any **Insured** shall be imputed to any other **Individual Insured** for purposes of determining the applicability of exclusions B. and C.


V.  LIMITS OF LIABILITY AND RETENTION
Regardless of the number of **Insureds** under this Policy, **Claims** made or brought on account of **Wrongful Acts** or otherwise, the **Company's** liability is limited as follows:

A.  The LIMIT OF LIABILITY specified in the Policy Declarations as IN THE AGGREGATE shall be the maximum liability for **Loss** from all **Claims** to which this Coverage Part applies;

B. The LIMIT OF LIABILITY specified in the Policy Declarations as the Limit for EACH **CLAIM** shall be the maximum liability for **Loss** for each **Claim** to which this Coverage Part applies;

C. **Defense Costs** shall be in addition to the LIMIT OF LIABILITY as shown in the Policy Declarations, except for when Item G. below applies;

D. Subject to the Limits of Liability provisions stated above, the **Company** shall be liable to pay only **Defense Costs** and **Loss** in excess of the RETENTION specified in the Policy Declarations hereof as respects each and every **Claim** to which the Coverage Part applies.

E. The **Company** shall have no obligation to pay any part or all of the RETENTION specified in the Policy Declarations for any **Claim** on behalf of an **Insured**. If the **Company**, at its sole discretion, elects to pay any part or all of the RETENTION, the **Insureds** agree to repay such amounts to the **Company** upon demand;

F. The RETENTION shall not apply to **Loss** paid to or on behalf of an **Individual Insured** when the **Organization** has not indemnified an **Individual Insured** for such **Loss** subject to the terms and conditions of Section VII. INDEMNIFICATION/ WAIVER OF RETENTION;

G. The LIMIT OF LIABILITY for the Extended Reporting Period, if applicable, shall be a part of and not in addition to the LIMIT OF LIABILITY specified in the Declarations;

H. **Claims** based upon or arising out of the same **Wrongful Act**, interrelated **Wrongful Acts**, or a series of similar or related **Wrongful Acts** shall be considered a single **Claim** and shall be considered first made during the **Policy Period** or Extended Reporting Period, if applicable, in which the earliest **Claim** arising out of such **Wrongful Act**(s) was first made and all **Loss** for such **Claims** shall be subject to the one Limit of Liability that applies to such earliest **Claim**;

I. The LIMIT OF LIABILITY for this Coverage Part shall apply separately to each consecutive annual period starting with the beginning of the **Policy Period** shown in the Declarations. If this Policy is issued for a period of more than twelve (12) months but less than twenty four (24) months or if the **Policy Period** is extended after issuance, the Extended Reporting Period will be deemed part of the last preceding annual period for the purposes of determining the LIMIT OF LIABILITY.


VI. LIFETIME OCCURRENCE REPORTING PROVISION

If the **Parent Organization** shall cancel or non-renew this Policy for a reason other than being sold, acquired or bankrupt, each **Individual Insured** who was not actively serving on behalf of the **Organization** at the time of the cancellation or non-renewal, shall be provided an unlimited extension of time to report any **Claim**(s) first made against the **Individual Insured** after the effective date of such cancellation or non-renewal.

However, this extension of time to report **Claim**(s) shall only be afforded in the event that the **Wrongful Act** was committed before the date of cancellation or non-renewal, and no Directors and Officers Liability policy, or policy providing essentially the same type of coverage, or extended reporting period, is in effect at the time the **Claim** is made.

VII. INDEMNIFICATION / WAIVER OF RETENTION
Regardless of whether **Loss** and **Defense Costs** resulting from any **Claim** against an **Individual Insured** is actually indemnified by the **Organization**, the RETENTION set forth in the Policy Declarations shall apply to any **Loss** and **Defense Costs** if indemnification of the **Individual Insured** by the **Organization** is legally permissible. The certificate of incorporation, charter, articles of association or other organizational documents of the **Organization**, including by-laws and resolutions, will be deemed to have been adopted or amended to provide indemnification to the **Individual Insured** to the fullest extent permitted by law.

However, if an **Individual Insured** is not indemnified for **Loss and Defense Costs** solely by reason of the **Organization's** financial insolvency or because indemnification is not legally permissible, an **Individual Insured's** RETENTION as stated on the Declarations for Coverage Part A. Non Profit Directors and Officers Liability, shall be amended to $0. This change in Retention shall not affect any other terms or conditions of this Policy.

VIII. SPOUSAL AND DOMESTIC PARTNER EXTENSION
If a **Claim** against an **Individual Insured** includes a **Claim** against the lawful spouse or **Domestic Partner** of such **Individual Insured** solely by reason of (a) such spousal or **Domestic Partner** status; or (b) such spouse's or **Domestic Partner's** ownership interest in property or assets that are sought as recovery for **Wrongful Acts**; any **Loss** which such spouse or **Domestic Partner** becomes legally obligated to pay on account of such **Claim** shall be deemed **Loss** which the **Individual Insured** becomes legally obligated to pay as a result of the **Claim.**

All definitions, exclusions, terms and conditions of this Policy, including the RETENTION, applicable to any **Claim** against or **Loss** sustained by such **Individual Insured** shall also apply to this coverage extension.

The extension of coverage afforded by this Section VIII. shall not apply to the extent the **Claim** alleges any **Wrongful Act**, error, omission, misstatement, misleading statement or neglect or breach of duties by such spouse or **Domestic Partner.**

IX. EXTENSION FOR OUTSIDE DIRECTORSHIP ACTIVITIES
Subject to the terms, conditions, exclusions and limitations of this Policy, coverage shall be extended under this Policy for any **Claim** against any director, officer or trustee of the

**Organization** while acting in the capacity of a director, officer or trustee of any **Outside Entity**, and performing duties related to the conduct of the **Outside Entity's** business, but only if such service is at the written request of the **Organization**.  Coverage under this Policy does not extend to any **Outside Entity** or to any other director, officer, trustee, **Employee**, temporary worker, volunteer or intern of such **Outside Entity**.  Any extension of coverage to any director, officer or trustee of the **Organization** as provided in this section shall be considered excess of any other indemnity or insurance available to or the director, officer or trustee under a Policy issued to the **Outside Entity** in question. Any payment for **Loss** under this extension shall reduce the LIMIT OF LIABILITY for this coverage part as set forth in the Declaration Page.

# UNITED STATES LIABILITY INSURANCE GROUP
# WAYNE, PENNSYLVANIA

This endorsement modifies insurance provided under the following:

## NON PROFIT DIRECTORS & OFFICERS LIABILITY

# ACCREDITATION / CERTIFICATION / STANDARD SETTING EXCLUSION ENDORSEMENT

In consideration of the premium paid, it is agreed that the **Company** shall not be liable to make any payment for **Loss** or **Defense Costs** in connection with any **Claim** made against any **Insured** based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any certification, accreditation, or standard setting activities, acts or errors by any **Insured**.

All other terms and conditions of this policy remain unchanged.  This endorsement is a part of your policy and takes effect on the effective date of your policy unless another effective date is shown.

**UNITED STATES LIABILITY INSURANCE GROUP**
**WAYNE, PENNSYLVANIA**

This endorsement modifies insurance provided under the following:

**NON PROFIT DIRECTORS & OFFICERS LIABILITY**

## GENERAL PROFESSIONAL ERRORS & OMISSIONS EXCLUSION ENDORSEMENT

It is hereby agreed that the **Company** shall not be liable to make any payment for **Loss** or **Defense Costs** in connection with any **Claim** made against any **Insured** based upon, arising out of, directly or indirectly resulting from, in consequence of or in any way involving liability arising out of any error or omission, malpractice or mistake of a professional nature committed or alleged to have been committed by or on behalf of the **Insured** in the conduct of any of the activities of the **Organization**.

All other terms and conditions of this policy remain unchanged.  This endorsement is a part of your policy and takes effect on the effective date of your policy unless another effective date is shown.

DO-209 (01/94)                                                        Page 1 of 1

> This endorsement modifies insurance provided under the following:
> ## NON PROFIT DIRECTORS & OFFICERS LIABILITY
> ## EMPLOYMENT PRACTICES LIABILITY

# ABUSE/MOLESTATION EXCLUSION ENDORSEMENT

It is agreed:

DO-100 COVERAGE PART A. NON PROFIT DIRECTORS AND OFFICERS LIABILITY, III. DEFINITIONS, is amended to add the following definition:

"**Abuse or Molestation**" means any actual or alleged illicit sexual or physical contact or illicit conduct of any kind, including but not limited to assault, battery, improper touching of any person or:

1. actual or alleged illicit filming, photographing, recording, reproducing or in any manner taking or using or disclosing the image of any person under eighteen (18) years of age .
2. actual or alleged negligence by any **Insured** in the hiring, supervision, training or management of a person alleged to have committed an act of "**Abuse or Molestation**".
3. actual or alleged negligence by any **Insured** in failing to report or failing to report on a timely basis, any actual or alleged act of "**Abuse or Molestation**".

which result directly or indirectly in any actual or alleged physical, emotional or mental injury to any person.

DO-100, COVERAGE PART A. NON PROFIT DIRECTORS AND OFFICERS LIABILITY, IV. EXCLUSIONS, is amended to add the following exclusion:

"**Abuse or Molestation**".

DO-101, COVERAGE PART B. EMPLOYMENT PRACTICES LIABILITY, III. DEFINITIONS, is amended to add the following definition:

"**Child Abuse or Molestation**" means any actual or alleged illicit sexual or physical contact or illicit conduct of any kind, including but not limited to assault, battery, improper touching of any person under the age of eighteen (18) or:

1. actual or alleged illicit filming, photographing, recording, reproducing or in any manner taking or using or disclosing the image of any person under eighteen (18) years of age.

2. actual or alleged negligence by any Insured in the hiring, supervision, training or management of a person alleged to have committed an act of "**Child Abuse or Molestation**".

DO 224A (12-13)                                                   Page 1 of 2

3.  actual or alleged negligence by any Insured in failing to report or failing to report on a timely basis, any actual or alleged act of **"Child Abuse or Molestation"**.

which result directly or indirectly in any actual or alleged physical, emotional or mental injury to any person.

DO-101, COVERAGE PART B. EMPLOYMENT PRACTICES LIABILITY, Section III. DEFINITIONS, S. **"Third Party Harassment"**, is amended to add the following:
**Third Party Harassment** does not include any **Claim** which in whole or part involves **"Child Abuse or Molestation"**.

DO-101, COVERAGE PART B. EMPLOYMENT PRACTICES LIABILITY, Section IV. EXCLUSIONS, is amended to add the following exclusion:
**"Child Abuse or Molestation"**

All other terms and conditions of this Policy remain unchanged.  This endorsement is a part of your Policy and takes effect on the effective date of your Policy unless another effective date is shown.

# UNITED STATES LIABILITY INSURANCE GROUP
# WAYNE, PENNSYLVANIA

---

This endorsement modifies insurance provided under the following:

### NON PROFIT DIRECTORS & OFFICERS LIABILITY

---

### BUILDER / DEVELOPER EXCLUSION ENDORSEMENT

In consideration of the premium paid, it is agreed that the **Company** shall not be liable to make any payment for **Loss** or **Defense Costs** in connection with any **Claim** made against any **Insured** based upon, arising out of, directly or indirectly resulting from, in consequence of, any **Claim** made by or against any builder and/or developer.

All other terms and conditions of this policy remain unchanged.  This endorsement is a part of your policy and takes effect on the effective date of your policy, unless another effective date is shown below.

---

This endorsement modifies insurance provided under the following:

**NON PROFIT DIRECTORS AND OFFICERS LIABILITY**

---

# DATA & SECURITY$^+$ ENDORSEMENT

Unless otherwise stated herein, the terms, conditions, exclusions and other limitations set forth in this endorsement are solely applicable to coverage afforded by this endorsement. This endorsement is part of and subject to the provisions of the Policy to which it is attached.

I.  SCHEDULE OF ADDITIONAL COVERAGES AND LIMITS

The following is a summary of Coverages and Limits of Liability provided by this endorsement.

| COVERAGE | LIMIT OF LIABILITY |
|---|---|
| A. Data Breach Expense | $50,000 each claim<br>$50,000 in the aggregate |
| B. Identity Theft Expense | $50,000 each claim<br>$50,000 in the aggregate |
| C. Workplace Violence Expense | $50,000 each claim<br>$50,000 in the aggregate |
| D. Kidnap Expense | $50,000 each claim<br>$50,000 in the aggregate |

In no event shall the **Company** pay more than $200,000 in any one **Policy Period** for any combination of **Claims** for covered expenses shown above. No retention applies to any claim or in the aggregate.

II.  COVERAGES:

Words shown in **bold** shall have the meaning provided in III. DEFINITIONS of this endorsement or as provided in COVERAGE PART A. NON PROFIT DIRECTORS AND OFFICERS LIABILITY, III. DEFINITIONS, as applicable.

A.  Data Breach Expense

The **Company** will pay on behalf of the **Organization** up to the **Data Breach** Expense Limit of Liability stated in the schedule above, for reasonable and necessary expenses in item 1. – 6 below incurred by the **Organization** as a result of a **Data Breach. The Data Breach** must be first discovered by an **Insured** during the **Policy Period** and reported to the **Company** during the **Policy Period** but in no event later than sixty (60) days after the **Data Breach** is first discovered by an **Insured**. The expenses below must be incurred within one (1) year of the reporting of such **Data Breach**:

1.  Development of a plan to assist the **Organization** in responding to a **Data Breach**;
2.  Data analysis or forensic investigation to assess the scope of a **Data Breach**;
3.  The development, printing and mailing of legally required notification letters to those affected by a **Data Breach**;

4. Development of a website link for use by the **Organization** in communicating with persons affected by a **Data Breach** after legally required notification letters are sent;

5. Development of a customer relationship management system for use by the **Organization** in communicating with persons affected by a **Data Breach** after legally required notification letters are sent**;**

6. Public relations services or crisis management services retained by the **Organization** to mitigate the adverse affect on the **Organization's** reputation with customers, investors and employees resulting from a **Data Breach** that becomes public and only after legally required notification letters are sent.

The **Organization** must first report the **Data Breach** to the **Company** and use a service provider of the **Company's** choice prior to incurring any of the above costs. The **Data Breach** must first occur during the **Policy Period**.

B. Identity Theft Expense

The **Company** will pay on behalf of a Director or Officer of the **Organization** up to the **Identity Theft** Expense Limit of Liability stated in the schedule above, for expenses, services or fees noted in item 1. – 3. below incurred by such Director or Officer after he or she has become a victim of **Identity Theft.** The **Identity Theft** must be first discovered by an **Insured** during the **Policy Period** and reported to the **Company** during the **Policy Period** but in no event later than sixty (60) days after the Identity Theft is first discovered by an **Insured.** The expenses below must be incurred within one (1) year of the reporting of such **Identity Theft**:

1. Credit monitoring services provided by a vendor of the **Company's** choice for the affected Director or Officer for up to one year following an **Identity Theft;**

2. Additional application fees paid by a Director or Officer whose loan(s) were rejected based on incorrect credit information resulting from an **Identity Theft**;

3. Notary fees, certified and overnight mail expenses paid by a Director or Officer in connection with reporting an **Identity Theft** to financial institutions, credit bureaus and agencies and law enforcement authorities.

Any Director or Officer of the **Organization** who is a victim of **Identity Theft** must first report the **Identity Theft** to the **Company** and use a service provider of the **Company's** choice prior to incurring any of the above expenses, services or fees. The **Identity Theft** must first occur during the **Policy Period**. In no event shall the **Company's** total **Policy Period** payment under this coverage be more than the per claim or aggregate limit shown on the Policy Declarations

C. Workplace Violence Expense

The **Company** will reimburse the **Organization,** up to the Workplace Violence Expense Limit of Liability stated in the schedule above**,** for the following reasonable costs paid by the **Organization** for a period of thirty (30) days following, and as a result of, a **Workplace Violence Act**:

1. Counseling services rendered to **Employees** and persons on the **Organization's Premises** directly affected by a **Workplace Violence Act**. The counseling services must be rendered by a licensed, professional counselor of the **Organization's** choice.

2. Services rendered by an independent public relations consultant of the **Organization's** choice for the purpose of mitigating the adverse affect of a **Workplace Violence Act** on the **Organization**.

To be covered, the **Workplace Violence Act** must occur during the **Policy Period** and be reported to the **Company** during the **Policy Period** but in no event later than sixty (60) days after the occurrence.

D. Kidnap Expense

The **Company** will reimburse the **Organization,** up to the Kidnap Expense Limit of Liability stated in the schedule above, for the following reasonable costs paid by the **Organization** as a result of a **Kidnapping** occurring during the **Policy Period** and reported to the **Company** during the **Policy Period** but in no event later than sixty (60) days after the occurrence.

1. Retaining an independent negotiator or consultant to facilitate the release of a **Kidnapping** victim. Nothing herein shall obligate the **Company** to recommend, select, retain or arrange for the retention of such independent negotiator or consultant;

2. Interest on a loan obtained by the **Organization** to pay expenses covered under this endorsement that is incurred as a result of a **Kidnapping.** However, there is no coverage for interest accruing prior to thirty (30) days preceding the date of such payment or subsequent to the date the **Company** pays any portion of a Kidnap Expense or for expenses not covered under this endorsement;

3. Travel and accommodations incurred by the **Organization** in direct response to the **Kidnapping.** Nothing herein shall obligate the **Company** to recommend, select, or arrange for such travel and accommodations;

4. A reward up to $10,000 paid by the **Organization** to an informant for information which leads to the arrest and conviction of the person(s) responsible for the **Kidnapping**;

5. The current base salary paid to a Director or Officer of the **Organization** for the Director or Officer's work on behalf of the **Organization**, who is a victim of a **Kidnapping** subject to the following:

   (a) salary reimbursement shall commence on the thirty-first (31st) consecutive day after a **Kidnapping**;

   (b) salary reimbursement shall end when the Director or Officer is released; or is confirmed dead; or one hundred and twenty (120) days after the Director or Officer is last confirmed to be alive; or twelve (12) months after the date of the **Kidnapping**, or when the Kidnap Expense Limit of Liability has been exhausted by payments made by the **Company**, whichever occurs first.

There is no coverage for Kidnap Expense resulting from a **Kidnapping** planned, carried out or participated in, directly or indirectly, by any person who is or was a member of the victim's family or the **Organization**.


III. DEFINITIONS

"**Data Breach**" means the misappropriation or public disclosure, by electronic or non-electronic means, by the **Organization** and without the knowledge of, consent, or

acquiescence of the President or member of the Board of Directors or any executive officer, of an individual(s) **Personally Identifiable Information** in the **Organization's** care, custody and control without the authorization or permission of the owner of such information.

"**Identity Theft**" means (1) the act of obtaining **Personally Identifiable Information** belonging to a Director or Officer of the **Parent Organization** or a Director or Officer of the **Parent Organization's Subsidiary(ies)** without that person's authorization, consent or permission; and (2) the use of **Personally Identifiable Information** so obtained to make or attempt to make transactions or purchases by fraudulently assuming that person's identity.

> **Identity Theft** does not mean any of the above committed directly or indirectly by a Director or Officer of the **Parent Organization** or a Director or Officer of the **Parent Organization's Subsidiary**(ies) or a family member of a Director or Officer.

There is no coverage for any **Identity Theft** Expense unless **Personally Identifiable Information** that is obtained without authorization, consent or permission is used to make or attempt to make transactions or purchases by fraudulently assuming the identity of a Director or Officer of the **Parent Organization** or a Director or Officer of the **Parent Organization's Subsidiary**(ies).

"**Kidnapping**" means an actual or alleged wrongful abduction and involuntary restraint of a Director or Officer of the **Organization**, by one or more persons acting individually or collectively in which monetary or non-monetary demands are made to the **Organization** to obtain the Directors or Officers release.

> **Personally Identifiable Information** means;
> (1) information concerning an individual(s) that would be considered "non-public information" within the meaning of Title V of the Gramm-Leach Bliley Act of 1999 (as amended) and its implementing regulations including but not limited to Social Security numbers or account numbers correlated with names and addresses which is in an Insured's care, custody and control; and
> (2) personal information as defined in any U.S. federal, state or local privacy protection law governing the control and use of an individual's personal and confidential information, including any regulations promulgated thereunder; and
> (3) protected health information as defined by the Health Insurance Portability and Accountability Act of 1996 (Public Law 104-191) ("HIPPA") or the Health Information Technology for Economic and Clinical Health Act of 2009 ("HITECH") (Public Law 111- 5), as amended, and any regulations promulgated thereto.
>
> **Personally Identifiable Information** does not mean information that is available to the public which does not include otherwise protected personal information.

"**Premises**" means buildings, facilities or properties leased or owned by the **Organization** in conducting its operations.

"**Workplace Violence Act**" means:
1. an actual use of unlawful deadly force, or
2. the threatened use of unlawful deadly force involving the display of a lethal weapon,

occurring on the **Organization's Premises** and directed at an **Individual Insured,** or other persons on the **Premises** of the **Organization**.

Where applicable, other terms used in this endorsement shall have the same meaning as defined in COVERAGE PART A. NON PROFIT DIRECTORS AND OFFICERS LIABILITY.

## IV. LIMITS OF LIABILITY AND RETENTION

The Limit of Liability specified above as in the aggregate shall be the maximum liability for all expenses to which the coverage applies.

The Limit of Liability specified above as the Limit for each claim shall be the maximum liability for expenses for each claim to which the coverage applies.

The maximum Limit of Liability for any expenses provided by this endorsement shall be in addition to the LIMIT OF LIABILITY specified in the Declarations IN THE AGGREGATE for COVERAGE PART A. NON PROFIT DIRECTORS AND OFFICERS LIABILITY.

The RETENTION shown on the Policy Declarations shall not apply to the expense coverage provided by this endorsement.

Regardless of the amount of covered expenses incurred by the **Organization** under this endorsement, the maximum Limit of Liability for any one **Data Breach**, **Identity Theft**, **Kidnapping** or **Workplace Violence Act** shall be $50,000 each claim and in the aggregate. Any one incident, interrelated incidents or series of similar or related incidents for which coverage is provided under this endorsement shall be treated as one incident subject to the maximum Limit of Liability available under this endorsement at the time the incident(s) is first reported to the Company regardless of whether the incident(s) continues and expenses are incurred by the Organization in any subsequent Policy Period(s).

## V. ADDITIONAL EXCLUSIONS

The insurance provided by this endorsement does not apply to:

1. Expense reimbursement resulting in any **Insured** gaining any profit, remuneration or advantage to which the **Insured** is not legally entitled.

2. Expense(s) arising from any incident(s) of which any **Insured** had notice before the inception date of this Policy; or any fact, circumstance, event, situation or incident which before the inception date of this Policy was the subject of any notice under any other similar policy of insurance or any future claims for expenses under this Policy based upon such pending or prior notice.

3. Expenses incurred by any **Subsidiary** of an **Organization** occurring prior to the date that such entity became a **Subsidiary** or incurred at any time that such entity is not a **Subsidiary**.

4. The portion of any expense(s) covered under this endorsement that is also covered under any other coverage part of this Policy.

5. Reissuance of credit or debit cards or any other expense not shown in Section II, COVERAGES, sub-section A, **Data Breach Expense**.

## VI. COVERAGE LIMITATIONS

DO 283 (01-14)                                                    Page 5 of 6

The following terms, conditions and exclusions in COVERAGE PART A. NON PROFIT DIRECTORS AND OFFICERS LIABILITY, do not apply to this endorsement:

1. Common Policy Conditions; I. EXTENDED REPORTING PERIOD.
2. II. FULL PRIOR ACTS COVERAGE PROVISION.
3. IV. EXCLUSION A
4. VI. LIFETIME OCCURRENCE REPORTING PROVISION
5. VIII. SPOUSAL AND DOMESTIC PARTNER EXTENSION.
6. IX. EXTENSION FOR OUTSIDE DIRECTORSHIP ACTIVITIES.

Otherwise, the terms and conditions of COVERAGE PART A. NON PROFIT DIRECTORS AND OFFICERS LIABILITY, shall apply where applicable to give effect to this endorsement.

Coverage provided by your Policy and any endorsements attached thereto are amended by this endorsement where applicable.  All other terms and conditions of this Policy remain unchanged. This endorsement is a part of the **Parent Organization's** Policy and takes effect on the effective date of the **Parent Organization's** Policy unless another effective date is shown.

## UNITED STATES LIABILITY INSURANCE GROUP
## WAYNE, PENNSYLVANIA

This endorsement modifies insurance provided under the following:

### NON PROFIT DIRECTORS & OFFICERS LIABILITY

## EXCESS BENEFIT TRANSACTION EXCISE TAX ENDORSEMENT

For purposes of this endorsement only, it is agreed:

COVERAGE PART A., III. DEFINITIONS, I. "**Loss**" is amended to include the following:

"**Loss**" means a ten percent (10%) **Excess Benefit Transaction Excise Tax** assessed by the Internal Revenue Service against any **Individual Insured(s)** who participated as an **Organization Manager** in connection with an **Excess Benefit Transaction**.

"**Loss**" does not mean:

1. A twenty five percent (25%) **Excess Benefit Transaction Excise Tax** assessed by the Internal Revenue Service against an **Individual Insured** as a **Disqualified Person** in connection with an **Excess Benefit Transaction**; or

2. A two hundred percent (200%) **Excess Benefit Transaction Excise Tax** assessed by the Internal Revenue Service against an **Individual Insured** as a **Disqualified Person** for failing to correct an **Excess Benefit** arising out of or resulting from an **Excess Benefit Transaction**.

COVERAGE PART A., III. DEFINITIONS is amended by the addition of the following:

"**Excess Benefit Transaction**" means a transaction as defined in Internal Revenue Code, Title 26 §4958 (c)(1)**.**

"**Excess Benefit**" means the excess resulting from an **Excess Benefit Transaction** as defined above.

"**Excess Benefits Transaction Excise Tax**" is any excise tax imposed by the Internal Revenue Service on an **Individual Insured** who is an **Organization Manager** as a result of that **Individual Insured**'s participation in an Excess Benefit Transaction as defined in the Internal Revenue Code, Title 26 §4958 (c)(1).

"**Organization Manager**" means a person or persons described in Internal Revenue Code, Title 26 §4958(f)(2).

"**Disqualified Person**" means a person or persons described in Internal Revenue Code, Title 26 §4958(f)(1)(A).

COVERAGE PART A., V. LIMITS OF LIABILITY AND RETENTION is amended by the addition of the following:

The maximum Limit of Liability for **Excess Benefit Transaction Excise Tax Claims** covered by the endorsement shall be part of and not in addition to the LIMIT OF LIABILITY

DO 291 (01-11)                                                                                    Page 1 of 2

specified in the Declarations as IN THE AGGREGATE and shall not exceed the lesser of such limit or $20,000.  **Defense Costs** as provided above shall be part of and not in addition to the LIMIT OF LIABILITY.

All other terms and conditions of this Policy remain unchanged.  This endorsement is a part of the **Parent Organization's** Policy and takes effect on the effective date of the **Parent Organization's** Policy unless another effective date is shown.

.
.
.

DO 291 (01-11)                                                                 Page 2 of 2

# UNITED STATES LIABILITY INSURANCE GROUP
# WAYNE, PENNSYLVANIA

This endorsement modifies insurance provided under the following:

## NON PROFIT PROFESSIONAL LIABILITY POLICY

## AMENDED LIFETIME OCCURRENCE REPORTING PROVISION ENDORSEMENT

It is hereby agreed that:

COVERAGE PART A. NON PROFIT DIRECTORS AND OFFICERS LIABILITY, VI. LIFETIME OCCURRENCE REPORTING PROVISION is deleted in its entirety and replaced with the following:

If the **Parent Organization** shall cancel or non-renew this Policy for a reason other than being sold, acquired or bankrupt, each director, officer, **Employee** or committee member who did not serve as such at the time of the cancellation or non-renewal, shall be provided an unlimited extension of time to report any **Claim**(s) first made against such person after the effective date of such cancellation or non-renewal.

However, this extension of time to report **Claim**(s) shall only be afforded in the event that:
- A. the **Wrongful Act** was committed before the date of cancellation or non-renewal; and
- B. the person was a director, officer, **Employee** or committee member during the **Policy Period** of a Policy issued by the **Company,** provided the **Company** has written continuous coverage for the **Parent Organization** from the effective date of the first Policy to the date of cancellation or non-renewal of this Policy; and
- C. no Directors and Officers Liability policy, or policy providing essentially the same type of coverage, or extended reporting period, is in effect at the time the **Claim** is made.

COVERAGE PART B. EMPLOYMENT PRACTICES LIABILITY, Section VI. LIFETIME OCCURRENCE REPORTING PROVISION is deleted in its entirety and replaced with the following:

If the **Parent Organization** shall cancel or non-renew this Policy for a reason other than being sold, acquired or bankrupt, each director or officer who did not serve as such at the time of the cancellation or non-renewal, shall be provided an unlimited extension of time to report any **Claim(s)** first made against such person after the effective date of such cancellation or non-renewal.

DO 293 (06-13)                                                           Page 1 of 2

However, this extension of time to report **Claim**(s) shall only be afforded in the event that:

    A.  the **Wrongful Employment Act** was committed before the date of cancellation or non-renewal; and

    B.  the person was a director or officer during the **Policy Period** of a Policy issued by the **Company,** provided the **Company** has written continuous coverage for the **Parent Organization** from the effective date of the first Policy to the date of cancellation or non-renewal of this Policy; and

    C.  no Directors and Officers Liability or Employment Practices Liability policy, or policy providing essentially the same type of coverage, or extended reporting period, is in effect at the time the **Claim** is made.

All other terms and conditions of this Policy remain unchanged. This endorsement is a part of the **Parent Organization**'s Policy and takes effect on the inception date of the **Parent Organization**'s Policy unless another inception date is shown.

| This endorsement modifies insurance provided under the following: |
| :---: |
| **NON PROFIT DIRECTORS & OFFICERS LIABILITY** |

## Amended Notice/Claim And Circumstance Reporting Provisions

It is agreed:

I. INSURING AGREEMENT, A. of COVERAGE PART A. NON PROFIT DIRECTORS AND
OFFICERS LIABILITY is deleted in its entirety and replaced by:

    A.  The **Company** will pay on behalf of the **Insured**, **Loss** in excess of the Retention not
exceeding the Limit of Liability shown on the policy Declarations for which this
coverage applies that the **Insured** shall become legally obligated to pay because of
**Claims** first made against the **Insured** during the **Policy Period** or during any
Extended Reporting Period, if applicable, for **Wrongful Acts** arising solely out of an
**Insured's** duties on behalf of the **Organization**. Such **Claim** must be reported to the
**Company** in accordance with Section IV. NOTICE/CLAIM REPORTING
PROVISIONS of the COMMON POLICY CONDITIONS.

II. FULL PRIOR ACTS COVERAGE PROVISION of COVERAGE PART A. NON PROFIT
DIRECTORS AND OFFICERS LIABILITY is deleted in its entirely and replaced by:

    Coverage shall apply to any **Claim** made against an **Insured** for **Wrongful Acts** arising
solely out of the **Insured's** duties on behalf of the **Organization** committed prior to the
expiration date of this Policy or the effective date of cancellation or non-renewal of this
Policy, if applicable, provided that the **Claim** is first made during the **Policy Period**, or
Extended Reporting Period, if applicable. Such **Claim** must be reported to the **Company**
in accordance with IV. NOTICE/CLAIM REPORTING PROVISIONS of the COMMON
POLICY CONDITIONS.

    However, coverage shall not apply to any **Claim** based upon or arising out of any
**Wrongful Act** or circumstance likely to give rise to a **Claim** of which the person or
persons signing the **Application** had knowledge or otherwise had a reasonable basis to
anticipate might result in a **Claim**, prior to the earlier of:

    A.  the inception date of this Policy; or

    B.  the inception date of the first Policy of this type the **Company** has issued to the
**Parent Organization**, provided that the **Company** has written continuous coverage
for the **Parent Organization** from such date to the inception date of this Policy.

I EXTENDED REPORTING PERIOD, A. of the COMMON POLICY CONDITIONS is deleted
in its entirety and replaced by:

I.   EXTENDED REPORTING PERIOD

    A. If the policy expires, is cancelled or non-renewed for any reason other than non-payment
of premium, the **Parent Organization** shall have the right to purchase an Extended
Reporting Period to report to the **Company** as soon as practicable during the Extended
Reporting Period any **Claim (s)** being first made against an **Insured** during the twelve
(12) months, or twenty-four (24) months or thirty six (36) months after the effective date

DO 294 (04-14)                                                                                    Page 1 of 3

of such expiration, non-renewal or cancellation (depending upon the Extended Reporting Period purchased,). For the purpose of this section, any change in premium terms or terms on renewal shall not constitute a refusal to renew.  An Extended Reporting Period shall only apply to a **Claim** arising from a **Wrongful Act** or **Wrongful Employment Act** which was committed before the date of such expiration, cancellation or non-renewal.

IV. NOTICE/CLAIM REPORTING PROVISIONS of the COMMON POLICY CONDITIONS is deleted in its entirety and replaced by:

IV. Notice hereunder shall be given in writing to the **Company**.  If mailed, the date of mailing of such notice shall constitute the date that such notice was given and proof of mailing shall be sufficient proof of notice.

   A. **Written Notice of a Claim:**

     (1) As a condition precedent to exercising any right to coverage under this Policy, an **Insured** shall give to the **Company** written notice of a **Claim,** as soon as practicable but:

       (a) if the Policy expires, is cancelled or is non-renewed and if no Extended Reporting Period is purchased, no later than sixty (60) days after the expiration date or effective date of such cancellation or non-renewal. Coverage for a **Claim** reported to the **Company** during the sixty (60) day period after expiration, cancellation or non-renewal applies only if the **Claim** is first made against an **Insured** prior to the Policy expiration or effective date of cancellation or non-renewal; or

       (b) if an Extended Reporting Period is purchased, no later than the last day of the Extended Reporting Period;

     provided that if the **Company** sends written notice to the **Parent Organization** stating that this Policy is being terminated for nonpayment of premium, an **Insured** shall give to the **Company** written notice of such **Claim** prior to the effective date of such termination.

     (2) Coverage for a **Claim** reported to the **Company** during an Extended Reporting Period shall only apply if the **Claim** arises from a **Wrongful Act** or **Wrongful Employment Act** committed before the date of the Policy expiration, cancellation or non-renewal.

   B. **Written Notice of a Circumstance:**

     An **Insured** shall give to the **Company** written notice of a circumstance which could reasonably be expected to give rise to a **Claim** for a **Wrongful Act** or **Wrongful Employment Act** being made against an **Insured** as soon as practicable during the **Policy Period** in which an **Insured** first becomes aware of the circumstance.

   C. If written notice of a circumstance which could reasonably be expected to give rise to a **Claim** being made against an **Insured** for a **Wrongful Act** or **Wrongful Employment Act** has been given to the **Company** during the **Policy Period**, any **Claim** which is subsequently made against an **Insured** and reported to the **Company** alleging, arising out of, based upon, or attributable to the facts specifically alleged in the reported circumstance shall be considered to have been first made at the time such notice of the circumstance was given to the **Company**.  Coverage for a circumstance reported pursuant to this provision applies only if the **Wrongful Act** or **Wrongful Employment Act** that is the subject of the reported circumstance occurs prior to the expiration date or if applicable, prior to the effective date of cancellation or non-renewal of the **Policy Period**

in which the circumstance was reported.

D. Notice of a circumstance under Section B., above shall include the specific facts of the actual or alleged **Wrongful Act** or **Wrongful Employment Act** including relevant dates and identities of the persons involved in sufficient detail to allow **Company** to conduct an investigation.

All other terms and conditions of this Policy remain unchanged.  This endorsement is part of the **Parent Organization's** Policy and takes effect on the effective date of the **Parent Organization's** Policy unless another effective date is shown.

DO 294 (04-14)                                                                        Page 3 of 3

# NON PROFIT

# PROFESSIONAL

# LIABILITY

# POLICY

## UNITED STATES LIABILITY
## INSURANCE GROUP

A BERKSHIRE HATHAWAY COMPANY

1190 Devon Park Drive
Wayne, PA 19087-2191
888-523-5545 -- USLI.COM

This policy jacket together with the policy declarations, coverage forms and endorsements, if any, complete this policy.

The enclosed declarations designates the issuing company.

DO Jacket (09-10)

## NON PROFIT PROFESSIONAL LIABILITY POLICY

# Read your policy carefully!

**In Witness Whereof**, the company has caused this Policy to be executed and attested.  Where required by law, this Policy shall not be valid unless countersigned by a duly authorized representative of the company.

Secretary

President

DO Jacket (09-10)

# UNITED STATES LIABILITY INSURANCE GROUP
# WAYNE, PENNSYLVANIA

## NON PROFIT PROFESSIONAL LIABILITY POLICY
## COMMON POLICY CONDITIONS

Except for the Common Policy Conditions, the terms and conditions of each Coverage Part shall apply only to that Coverage Part unless otherwise provided. If any provision in these Common Policy Conditions is inconsistent or in conflict with the terms and conditions of any Coverage Part, the terms and conditions of such Coverage Part shall control for the purposes of that Coverage Part. Any defined term referenced in these Common Policy Conditions but defined in a Coverage Part shall, for the purposes of coverage under that Coverage Part have the meaning set forth in that Coverage Part.

## I. EXTENDED REPORTING PERIOD

A.  If the Policy expires, is cancelled or non-renewed for any reason other than non payment of premium, the **Parent Organization** shall have the right to purchase an Extended Reporting Period to report any **Claim**(s) first made against an **Insured** during the twelve (12) months, or twenty-four (24) months or thirty-six (36) months after the effective date of such expiration, cancellation or non-renewal (depending upon the Extended Reporting Period purchased). An Extended Reporting Period shall only apply to a **Wrongful Act** or **Wrongful Employment Act** committed before the date of such expiration, cancellation or non-renewal. For the purpose of this clause, any change in premium terms or terms on renewal shall not constitute a refusal to renew.

B.  The additional premium for the Extended Reporting Period shall be 30% of the annual premium set forth in the Policy Declarations for the twelve (12) month period, 75% of the annual premium set forth in the Policy Declarations for the twenty-four (24) month period, and 120% of the annual premium set forth in the Policy Declarations for the thirty-six (36) month period. The Extended Reporting Period begins on the expiration date or the effective date of cancellation or non-renewal of the Policy. The **Parent Organization** must notify the **Company** in writing and must pay the additional premium due above no later than thirty (30) days after the effective date of such expiration, cancellation or non-renewal.

C.  All premium paid with respect to an Extended Reporting Period shall be deemed fully earned as of the first day of the Extended Reporting Period.

D.  The Limits of Liability available during the Extended Reporting Period shall not exceed the balance of the Limits of Liability available on the expiration date or effective date of the cancellation or non-renewal of the Policy.

E.  Coverage for **Claim**(s) first received and reported during the Extended Reporting Period shall be in excess over any other valid and collectible insurance providing coverage for such **Claim**(s).

## II. DEFENSE AND SETTLEMENT

A.  The **Insured** shall not demand or agree to arbitration of any **Claim** without the written consent of the **Company**. The **Insured** shall not, except at personal cost, make any offer, any payment, admit any liability, settle any **Claim**, assume any obligation or incur any expense without the **Company's** written consent.

B.  If a **Claim** is made against an **Insured** for **Loss** that is both covered and uncovered by this Policy, the **Company** will pay one hundred percent (100%) of **Defense Costs** for the **Claim** until such time that the Limits of Liability of this Policy are exhausted by payment of a covered **Loss** or the **Claim** for the covered **Loss** is resolved by settlement, verdict or summary judgment.

C.  The **Company**, as it deems expedient, has the right to investigate, adjust, defend, appeal and, with the consent of the **Insured**, negotiate the settlement of any **Claim** whether within or above the Retention. If the **Insured** refuses to consent to a settlement recommended by the **Company**; the **Company** is not obligated to pay any **Loss** or defend any **Claim** after the Limit of Liability has been exhausted by payment of **Loss**. The **Company's** obligation to the **Insured** for **Defense Costs** and **Loss** attributable to such **Claim**(s) shall be limited to:

(a) The amount of the covered **Loss** in excess of the Retention which the **Company** would have paid in settlement at the time the **Insured** first refused to settle;

(b) Plus covered **Defense Costs** incurred up to the date the **Insured** first refused to settle;

(c) Plus seventy five percent (**75%**) of covered **Loss** and **Defense Costs** in excess of the first settlement amount recommended by the **Company** to which the **Insured** did not consent.

It is understood that payment of (a), (b) and (c) above, is the limit of the **Company's** liability under this Policy on any **Claim** in which the **Insured** fails or refuses to consent to the **Company's** settlement recommendation, subject at all times to the Limits of Liability and Retention provisions of the applicable coverage section.   The remaining twenty five percent (25%) of **Loss** and **Defense Costs** in excess of the amount referenced in (a) and (b) above shall be the obligation of the **Insured**.

D. The **Insured** agrees to cooperate with the **Company** on all **Claims**, and provide such assistance and information as the **Company** may reasonably request.   Upon the **Company's** request, the **Insured** shall submit to examination and interrogation by a representative of the **Company**, under oath if required, and shall attend hearings, depositions and trials and shall assist in the conduct of suits, including but not limited to effecting settlement, securing and giving evidence, obtaining the attendance of witnesses, giving written statements to the **Company's** representatives and meeting with such representatives for the purpose of investigation and/or defense, all of the above without charge to the **Company**.   The **Insured** further agrees not to take any action which may increase the **Insured's** or the **Company's** exposure for **Loss** or **Defense Costs**.

E. The **Insured** shall execute all papers required and shall do everything that may be necessary to secure and preserve any rights of indemnity, contribution or apportionment which the **Insured** or the **Company** may have, including the execution of such documents as are necessary to enable the **Company** to bring suit in the **Insured's** name, and shall provide all other assistance and cooperation which the **Company** may reasonably require.

**III. ORDER OF PAYMENTS**

In the event payment of **Loss** is due under this Policy but the amount of such **Loss** exceeds the remaining available Limit of Liability specified in the Policy Declarations, the **Company** will:

(a) first pay such **Loss** on behalf of the **Individual Insured(s)** for which coverage is provided under Section I. Insuring Agreement; then

(b) to the extent of any remaining amount of the Limit of Liability available after payment under (a) above, pay such **Loss** on behalf of the **Organization** for which coverage is provided under Section I. Insuring Agreement.

**IV. NOTICE/ CLAIM REPORTING PROVISIONS**

Notice hereunder shall be given in writing to the **Company**.   If mailed, the date of mailing of such notice shall constitute the date that such notice was given and proof of mailing shall be sufficient proof of notice.

A. As a condition precedent to exercising any right to coverage under this Policy, the **Insured** shall give to the **Company** written notice of a **Claim** as soon as practicable, but:

   (1) if the Policy expires, is cancelled or is non-renewed and if no Extended Reporting Period is purchased, no later than 60 days after the expiration date or the effective date of such cancellation or non-renewal; or

   (2) if an Extended Reporting Period is purchased, no later than the last day of the Extended Reporting Period.

B. If written notice of a **Claim** has been given to the **Company** pursuant to Clause IV.A. above, then any **Claim** which is subsequently made against the **Insured** and reported to the **Company** alleging, arising out of, based upon or attributable to the facts alleged in the **Claim** for which notice was given or alleging any **Wrongful Act** or **Wrongful Employment Act** which is the same as or related to any **Wrongful Act** or **Wrongful Employment Act** alleged in the **Claim** for which notice was given, shall be considered made at the time such notice was given.

C. If during the **Policy Period** the **Insured** shall become aware of any circumstances which could give rise to a **Claim** being made against the **Insured**, the **Insured** shall give written notice to the **Company** of the circumstances and the reasons for anticipating such a **Claim** with full particulars as to dates and persons involved.   Such notice must be given to the **Company** within the Policy Period.   Any **Claim** which is

subsequently made against the **Insured** and reported to the **Company** as required by the Policy alleging, arising out of, based upon or attributable to such circumstances or alleging any **Wrongful Act** or **Wrongful Employment Act** which is the same as or related to any **Wrongful Act** or **Wrongful Employment Act** alleged or contained in such circumstances, shall be considered made at the time such notice of such circumstances was first given to the **Company.**

## V. CANCELLATION OR NON-RENEWAL

A. This Policy may be canceled by the **Parent Organization** by either surrender thereof to the **Company** at its address stated in the Policy Declarations or by mailing to the **Company** written notice requesting cancellation and in either case stating when thereafter such cancellation shall be effective.   If canceled by the **Parent Organization**, the **Company** shall retain the customary short rate proportion of the premium.

B. The **Company** may cancel this Policy only in the event of the failure of the **Insured** to pay the premium when due by mailing to the **Parent Organization** written notice when, not less than ten (10) days thereafter, such cancellation shall be effective.

C. In the event the **Company** refuses to renew this Policy, the **Company** shall mail to the **Parent Organization**, not less than sixty (60) days prior to the end of the Policy Period, written notice of non-renewal.  Such notice shall be binding on all **Insureds**.

D. The mailing of notice of cancellation or non-renewal shall be sufficient notice and the effective date of cancellation or non-renewal stated in any such notice shall become the end of the Policy Period.  Delivery of such written notice by the **Parent Organization** or the **Company** shall be equivalent to the mailing.

E. If the Policy is canceled by the **Company**, earned premium shall be computed pro rata. Premium adjustment may be made at the time cancellation is effected, or as soon as practicable thereafter.

## VI. REPRESENTATIONS AND SEVERABILITY

A. The **Insureds** represent that the particulars and statements contained in the **Application** are true and agree that (1) those particulars and statements are the basis of this Policy and are to be considered as incorporated into

and constituting a part of the Policy; (2) those particulars and statements are material to the acceptance of the risk assumed by the **Company**; and (3) the Policy is issued in reliance upon the truth of such representations.

B. Except for material facts or circumstances known to the person or persons signing the **Application**, no statement in the **Application** or knowledge or information possessed by an **Insured** shall be imputed to any other **Insured** for the purpose of determining the availability of coverage.

## VII. SUBROGATION

In the event of any payment under this Policy, the **Company** shall be subrogated to the **Insured's** right of recovery therefore against any person or entity and the **Insured** shall execute and deliver such instruments and papers and do whatever else is necessary to secure such rights.   The **Insured** shall do nothing to prejudice such rights.

## VIII. CHANGES

Notice to any agent or knowledge by any agent shall not affect a waiver or change in any part of this Policy or stop the **Company** from asserting any right under the terms of this Policy, nor shall the terms of this Policy be waived or changed except by an endorsement, issued by the **Company** to form a part of this Policy.

## IX. AUTHORIZATION CLAUSE AND NOTICES

By acceptance of this Policy, the **Insured** agrees that the **Parent Organization** shall act on behalf of all **Insureds** with respect to the giving and receiving of any return premiums that may become due under the Policy.   Notice to the **Parent Organization** shall be directed to the individual named in the **Application**, or such other person as shall be designated by the **Parent Organization** in writing, at the address of the **Parent Organization**.  Such notice shall be deemed to be notice to all **Insureds**. The **Parent Organization** shall be the agent of all **Insureds** to effect changes in the Policy or purchase Extended Reporting Period.

## X. ASSIGNMENT

Assignment of interest under this Policy shall not bind the **Company** unless its consent is endorsed hereon.

## XI. OTHER INSURANCE

This Policy shall be excess of and not contribute with other existing insurance, including but not limited to any insurance under which there is a duty to defend, unless such other insurance is specifically written to be in excess of this Policy.

## XII.   TERMS OF POLICY CONFORMED TO STATUTE

Terms of this Policy which are in conflict with the statutes of the State wherein this Policy is issued are hereby amended to conform to such statutes.

## XIII. CHANGES IN EXPOSURE

If after the Inception Date of this Policy:

(1) the **Parent Organization** merges into or consolidates with another entity such that the **Parent Organization** is not the surviving entity; or

(2) another entity, person or group of entities and/or persons acting in concert acquires more than fifty percent (50%) of the assets of the **Parent Organization**; or

(3) another entity, person or group of entities and/or persons acting in concert acquires the right to elect or select a majority of the directors of the **Parent Organization**; or

(4) the **Parent Organization** sells all or substantially all of its assets,

with such events being referred to as a "Transaction,"

this Policy shall continue in full force and effect until the expiration date of the policy, or the effective date of cancellation or non-renewal if applicable with respect to **Wrongful Acts** or **Wrongful Employment Acts** occurring before the Transaction, but there shall be no coverage under this Policy for actual or alleged **Wrongful Acts** or **Wrongful Employment Acts** occurring on and after the Transaction.

The **Parent Organization** shall give the **Company** written notice of the Transaction as soon as practicable, but not later than thirty (30) days after the effective date of the Transaction. The entire premium for this Policy shall be deemed earned regardless of any Transaction(s) during the Policy Period.  In the event of a Transaction, the **Parent Organization** shall have the right to an offer of coverage by the **Company** for an Extended Reporting Period to report **Wrongful Acts** or **Wrongful Employment Acts** occurring prior to the effective date of the transaction.

## XIV. ACTION AGAINST THE COMPANY

A.  No action shall lie against the **Company** unless as a condition precedent thereto, there shall have been full compliance with all of the terms of this Policy, and until the amount of the **Insured's** obligation to pay shall have been finally determined either by judgment against the **Insured** after actual trial or by written agreement of the **Insured**, the claimant or the claimant's legal representative, and the **Company**.

B.  Any person or the legal representatives thereof who has secured such judgment or written agreement shall thereafter be entitled to recover under this Policy to the extent of the insurance afforded by this Policy.   No person or entity shall have any right under this Policy to join the **Company** as a party to any action against the **Insured** to determine the **Insured's** liability, nor shall the **Company** be impleaded by the **Insured** or their legal representatives.   Bankruptcy or insolvency of the **Insured** or their successors in interest shall not relieve the **Company** of its obligations hereunder.

This page has been intentionally left blank.

 **business resource center** **bizresourcecenter.com**

# RESOURCES TO HELP YOUR BUSINESS GROW!

As a policyholder through USLI or Devon Park Specialty, you have access to many services through the Business Resource Center that will assist you in growing and protecting your business. Consider the following services and associated cost savings when making your decision where to place your insurance!

## HUMAN RESOURCES



» Free human resources consultation hotline to be used for personnel issues including harassment and discrimination, the Family and Medical Leave Act, disability, wage and hours regulations and more
» Online library with information, forms and articles pertaining to human resources
» Discounted human resources management system
» Resources for recruiting and training as well as termination and administration

## PRE-EMPLOYMENT AND TENANT SCREENINGS



» Discounted background checks, including multi-court criminal database searches, county criminal searches and more (first background check is free)
» Best practices for performing a background check
» Discounted tenant and drug screenings and Motor Vehicle Reports (MVRs)



**Try our cost savings calculator to see how much you could save!**

## PAYROLL AND TAXES



» Payroll processing and tax services tailored for either a small or large business
» Online business tax workshop provided by the Internal Revenue Service (IRS)

## CYBER RISK



» Materials about securing personal information and payment card information
» Complimentary access to tools and resources that will help you understand your exposure to a data breach and the importance of a response plan
» Discounted identity theft monitoring and recovery

## MARKETING



» Suggested free and paid services for web marketing for your business, including email campaigns, photo editing, file management and more
» Suggested free and paid services for social media platforms, development, management and more
» Discounted website package and access to consultants, designers and developers to help in the creation of a website for your business
» Suggested free and paid services for building your own website and tracking Search Engine Optimization (SEO)

## SAFETY



» Free on-site safety and occupational health consultation for your business
» Free personal credit report
» Disaster and emergency preparedness resources
» Discounted alcohol safety training for your staff and servers
» Youth resources for concussion training, waivers of liability, recognizing the signs and symptoms of child abuse and more

For a full list of vendors, discounts and resources, visit **bizresourcecenter.com.**



# 24/7 CLAIM REPORTING

In our continuing effort to provide you with excellent claim service, you may now report a claim and get claim assistance 24 hours a day/7 days a week.

## For claim reporting, call toll free 1-888-875-5231 or visit USLI.COM and select the "report a claim" option.

For emergency claims requiring immediate assistance, please use the toll free option. Your call will be referred to a claims professional who will respond within an hour of your call with direction and assistance.

Thank you for placing your trust in our company. We pledge to work hard every day to earn and maintain that trust.



**USLI.COM**
**888-523-5545**

CH: 12 E

  # FREE PRIVACY BREACH RISK MANAGEMENT RESOURCES



When a privacy breach occurs, will you be prepared?

In 2015, according to the Identity Theft Resource Center, more than 783 breaches were reported and more than 675 million records were exposed. The eRisk Hub® portal, powered by NetDiligence®, is an effective way to combat privacy breaches and other types of cyber losses.

**With your USLI policy, you will receive instructions on how to access the eRisk Hub® portal and begin using this benefit that is valued in excess of $1,200 a year!**

eRisk Hub® is the one-stop shop you need to become educated and prepared for a privacy breach. This FREE service is available to USLI policyholders.

Using proprietary tools anchored in proven risk management principals, NetDiligence® provides a full range of enterprise-level information security, e-risk insurability and regulatory compliance assessment and testing services. NetDiligence® supports and is endorsed by some of the world's largest network liability insurance underwriters.

## HOW TO START USING THIS FREE OFFERING:
- Go to eriskhub.com/usli
- Click "Register Now" to set up a free account
- Create your own username and password; your access code is **08451**

## Key Features of the eRisk Hub® Portal

 **Data Breach Calculators** – Learn how to estimate the cost of a breach, notification costs and business interruption

 **Learning Center** – Best practices articles, white papers and webinars from leading technical and legal experts. Highlighted topics include PCI compliance and social engineering

 **Security Training** – Watch videos for best practices in security and privacy awareness or download a training guide

 **Risk Manager Tools** – Assists you in managing your cyber risk, including a self-assessment, a sample website privacy policy and a tool for HIPAA compliance

 **eRisk Resources** – A directory to quickly find external resources with expertise in pre and post-breach disciplines

 **Consultation** – Breach Coach, HIPAA Coach and Security Coach available to assist you



**USLI.COM**
**888-523-5545**

# Check Out Your New Employment Practices Liability Risk Management Toolkit from PeopleSystems

**Free Employment Practices Liability (EPL) Helpline
1-888-811-4182
(8 a.m. to 7:30 p.m. Eastern Time)**

If a human resource consulting firm offered you their time and expertise for free, would you lock their phone number and email address in a drawer and never call? Of course not!  Do you have questions such as:

- ▸ What are the current federal and state employment laws I need to know?
- ▸ What are "wage and hour" regulations? What does "exempt" versus "non-exempt" mean?
- ▸ How should I handle terminating, suspending or warning an employee?
- ▸ What type of human resources policies should I have in place?
- ▸ How should I properly document performance issues and disciplinary actions in an employee's file?
- ▸ What are appropriate and inappropriate questions to ask during an employment interview?
- ▸ What guidelines should I use to investigate a complaint of discrimination or harassment?

PeopleSystems is just a free phone call or email away!

**Online Human Resources Center
www.peoplesystems.com/USLI**

To access the USLI policyholder features, click on "Request for client login" and complete with your information. Please take a moment to become familiar with the new PeopleSystems Resource Center's information.

- ▸ **Helpline to email your human resource questions:** Now you can email your questions via this web portal.
- ▸ **Human resource news center and recent employment law changes:** The news center keeps you up-to-date with recent changes in state and federal employment laws and what they mean to you as well as pertinent articles on employment issues you need to know about.
- ▸ **Human resource manual and employment forms:** You will find "Best Practices" helpful for handling common human resource issues. Issues may include conducting employee evaluations and understanding employment laws such as FLSA, FMLA and COBRA.
- ▸ **Human resource recommendations:** You will also find sample human resource policies regarding discrimination, harassment, employment at-will and electronic communications.

This document does not amend, extend or alter the coverage afforded by the policy. For a complete understanding of any insurance you purchase, you must first read your policy, declaration page and any endorsements and discuss them with your agent. A sample policy is available from your agent. Your actual policy conditions may be amended by endorsement or affected by state laws.

EPL Helpline Policy 6/17

# EXHIBIT

# 2

NDO2557425
Renewal of Number

POLICY DECLARATIONS

No. NDO2557425A

# *** RENEWAL CERTIFICATE ***

## Mount Vernon Fire Insurance Company
### 1190 Devon Park Drive, Wayne, Pennsylvania 19087
A Member Company of United States Liability Insurance Group

NAMED INSURED AND ADDRESS:
NAHANT PRESERVATION TRUST
PO BOX 30
NAHANT, MA 01908

POLICY PERIOD: (MO. DAY YR.)  From:  06/19/2019  To:  06/19/2020

12:01 A.M. STANDARD TIME AT YOUR
MAILING ADDRESS SHOWN ABOVE

BUSINESS DESCRIPTION:  Non-Profit Directors and Officers

IN CONSIDERATION OF THE RENEWAL PREMIUM STATED BELOW. EXPIRING POLICY NUMBER NDO2557425 IS RENEWED FOR THE POLICY PERIOD STATED ABOVE. PLEASE ATTACH THIS RENEWAL CERTIFICATE TO YOUR EXPIRING POLICY.

THIS POLICY CONSISTS OF THE FOLLOWING COVERAGE PARTS FOR WHICH A PREMIUM IS INDICATED.

|  | PREMIUM |
|---|---|
| Non Profit Management Liability Coverage Parts | $744.00 |
| TOTAL: | $744.00 |

Coverage Form(s) and Endorsement(s) made a part of this policy at time of issue
## See Endorsement EOD (1/95)

Agent:  MCGOWAN, DONNELLY & OBERHEU, LLC (1818)
2700 Via Fortuna Drive, Suite 145
Austin, TX  78746

Issued:  06/19/2019 1:05 PM

Broker:

By: _Thomas P. Kearney_
Authorized Representative

UPC (08-07)

THESE DECLARATIONS TOGETHER WITH THE COMMON POLICY CONDITIONS, COVERAGE PART DECLARATIONS, COVERAGE PART COVERAGE FORM(S) AND FORMS AND ENDORSEMENTS, IF ANY, ISSUED TO FORM A PART THEREOF, COMPLETE THE ABOVE NUMBERED POLICY.

# EXTENSION OF DECLARATIONS

**Policy No. NDO2557425A**

Effective Date:     06/19/2019

12:01 AM STANDARD TIME

**FORMS AND ENDORSEMENTS**

The following forms apply to the Management Liability coverage part

| Endt# | Revised | Description of Endorsements |
|---|---|---|
| * DO Jacket | 06/17 | Non Profit Management Liability Policy Jacket |
| * DO-100 | 05/17 | Directors and Officers Coverage Part |
| * DO-201 | 05/17 | Accreditation/Certification/Standard Setting Exclusion |
| * DO-209 | 05/17 | Absolute Professional Liability Exclusion |
| * DO-224A | 05/17 | Sexual Abuse Exclusion |
| * DO-233 | 05/17 | Builder or Developer Exclusion |
| * DO-283 | 05/17 | Data and Security Plus Endorsement |
| * DO-298 | 05/17 | Amendment of Prior or Pending Litigation Exclusion |
| * DO-GTC | 05/17 | General Terms and Conditions |

Endorsements marked with an asterisk (*) have been added to this policy or have a new edition date and are attached with this certificate.

NON PROFIT MANAGEMENT LIABILITY COVERAGE PART DECLARATIONS

PLEASE READ YOUR POLICY CAREFULLY.

THIS IS A CLAIMS MADE POLICY COVERAGE FORM AND UNLESS OTHERWISE PROVIDED HEREIN, THE COVERAGE OF THIS FORM IS LIMITED TO LIABILITY FOR CLAIMS FIRST MADE DURING THE POLICY PERIOD, OR THE EXTENSION PERIOD, IF APPLICABLE.  DEFENSE COSTS SHALL BE APPLIED AGAINST THE RETENTION.

No.  NDO2557425A

Effective Date:  06/19/2019
12:01 AM STANDARD TIME

ITEM I. PARENT ORGANIZATION AND PRINCIPAL ADDRESS

NAHANT PRESERVATION TRUST
PO BOX 30
NAHANT, MA 01908

ITEM II. POLICY PERIOD: (MM/DD/YYYY)  From:   06/19/2019  To:  06/19/2020

## Non Profit Directors and Officers Liability Coverage Part

ITEM III. LIMITS OF LIABILITY

| | | |
|---|---|---|
| a. Non Profit Directors & Officers | $1,000,000 | EACH CLAIM |
| b. Non Profit Directors & Officers | $1,000,000 | IN THE AGGREGATE |

| | | |
|---|---|---|
| ITEM IV. RETENTION: | $0 | EACH CLAIM |
| ITEM V. PREMIUM: | $744 | |
| RETROACTIVE DATE: | Full Prior Acts | |
| PRIOR OR PENDING LITIGATION | See form DO-298 | |

## Employment Practices Liability Coverage Part

ITEM III. LIMITS OF LIABILITY

| | |
|---|---|
| a. Employment Practices | NOT COVERED |
| b. Employment Practices | |
| ITEM IV. RETENTION: | NOT COVERED |
| ITEM V. PREMIUM: | NOT COVERED |

THESE DECLARATIONS ARE PART OF THE POLICY DECLARATIONS CONTAINING THE NAME OF THE INSURED AND THE POLICY PERIOD.

## NON PROFIT MANAGEMENT LIABILITY COVERAGE PART DECLARATIONS

PLEASE READ YOUR POLICY CAREFULLY.

THIS IS A CLAIMS MADE POLICY COVERAGE FORM AND UNLESS OTHERWISE PROVIDED HEREIN, THE COVERAGE OF THIS FORM IS LIMITED TO LIABILITY FOR CLAIMS FIRST MADE DURING THE POLICY PERIOD, OR THE EXTENSION PERIOD, IF APPLICABLE.  DEFENSE COSTS SHALL BE APPLIED AGAINST THE RETENTION.

No.  NDO2557425A

Effective Date:  06/19/2019
12:01 AM STANDARD TIME

## Fiduciary Liability Coverage Part

ITEM III. LIMITS OF LIABILITY
    a. Fiduciary Liability           NOT COVERED

ITEM IV. RETENTION:           NOT COVERED

ITEM V. PREMIUM:           NOT COVERED

ITEM VI. Coverage Form(s)/Part(s) and Endorsement(s) made a part of this policy at time of issue:
    See Endorsement EOD (01/95)

THESE DECLARATIONS ARE PART OF THE POLICY DECLARATIONS CONTAINING THE NAME OF THE INSURED AND THE POLICY PERIOD.

DO-150 (02/09)           Page   2 Of  2

# NON PROFIT

# MANAGEMENT

# LIABILITY

# POLICY

## UNITED STATES LIABILITY INSURANCE GROUP

A BERKSHIRE HATHAWAY COMPANY

1190 Devon Park Drive
Wayne, PA 19087-2191
888-523-5545 – USLI.COM

This policy jacket together with the policy declarations, coverage forms and endorsements, if any, complete this policy.

The enclosed declarations designates the issuing company.

DO Jacket (06-17)

## NON PROFIT MANAGEMENT LIABILITY POLICY

# Read your policy carefully!

**In Witness Whereof**, the company has caused this Policy to be executed and attested.  Where required by law, this Policy shall not be valid unless countersigned by a duly authorized representative of the company.

Secretary

President

**Non-Profit Management Liability Policy**          **Directors and Officers Coverage Part**

In consideration of payment of the premium and subject to the Policy Declarations, General Terms and Conditions, and the limitations, conditions, provisions and all other terms of this **Coverage Part**, the **Company** and the **Insureds** agree as follows:

Words that are in bold have special meaning and are defined in Section III. DEFINITIONS of this **Coverage Part**, or in Section I. DEFINITIONS of the General Terms and Conditions, incorporated in or attached to this **Coverage Part**, as applicable.

I.   INSURING AGREEMENTS

| | |
|---|---|
| A.  Individual Insured – Non-Indemnified Coverage | The **Company** will pay, on behalf of an **Individual Insured**, **Loss** and **Defense Costs** resulting from a **Claim** first made against an **Individual Insured** during the **Policy Period**, or Extended Reporting Period, if applicable, to the extent such **Individual Insured** is not indemnified by the **Organization** for such **Loss** and **Defense Costs**. |
| B.  Individual Insured – Indemnified Coverage | The **Company** will pay, on behalf of the **Organization**, **Loss** and **Defense Costs** resulting from a **Claim** first made against an **Individual Insured** during the **Policy Period**, or Extended Reporting Period, if applicable, but only to the extent the **Organization** indemnifies such **Individual Insured** for such **Loss** and **Defense Costs** as permitted or required by law. |
| C.  Organization Coverage | The **Company** will pay, on behalf of the **Organization**, **Loss** and **Defense Costs** resulting from a **Claim** first made against the **Organization** during the **Policy Period**, or the Extended Reporting Period, if applicable. |

II.   INDIVIDUAL INSURED – NON-INDEMNIFIED COVERAGE ADDITIONAL LIMIT

| | |
|---|---|
| "Dedicated Limit – Insuring Agreement A" | The **Company** shall pay an additional limit of liability, not to exceed an aggregate of $1,000,000 per **Policy Period**, solely for **Loss** covered under Section I. INSURING AGREEMENT, Subsection A. Individual Insured Non-Indemnified Coverage. This additional limit of liability shall be paid only after the applicable Limit of Liability for Individual Insured – Non-Indemnified Coverage of the Directors & Officers Liability **Coverage Part** shown in the Policy Declarations is completely exhausted by payment of **Loss**. |

DO 100 (05-17)                                                        Page 1 of 13

III.   DEFINITIONS

**Claim**                               means any:

1. written demand for monetary damages or non-monetary relief, including injunctive relief;
2. civil proceeding commenced by service of a complaint or similar pleading;
3. criminal proceeding commenced by the return of an indictment;
4. administrative or regulatory proceeding commenced by the filing of a formal written notice of charges, notice of violations, notice of investigation, cease and desist or similar action;
5. arbitration, mediation or other alternative dispute resolution proceeding in which the **Insured** is obligated to participate  if the **Insured** agrees to participate with the **Company's** prior written consent; or
6. other proceeding initiated before any governmental body which is authorized to render an enforceable judgment, order for monetary damages or other relief;

received by, or brought or initiated against any **Insured** alleging a **Wrongful Act**, including any appeal therefrom.

**Claim** also means any:

7. written request, first received by an **Insured** to toll or waive a statute of limitations relating to a potential **Claim** as described in subparagraphs 1. through 6. above.

A **Claim** shall be deemed made on the earliest of the date of service upon, or receipt by, any **Insured** of a potential **Claim** as described in subparagraphs 1. through 7. above.

**Defense Costs**                       means:

1. reasonable and necessary legal fees and expenses incurred by the **Company**, or by any attorney designated by the **Company** to defend the **Insured**; and

DO 100 (05-17)                                          Page 2 of 13

2. all other fees, costs, costs of attachment or similar bonds (without any obligation on the **Company's** part to apply for or furnish such bonds);

resulting from the investigation, adjustment, defense and appeal of a **Claim**. **Defense Costs** does not include **Loss** or the **Insured's** salaries, wages, overhead or benefits expenses.

**Employed Attorney Services**    means legal services provided by any **Individual Insured**, but only to the extent that such services are performed directly to the **Organization** and in the **Individual Insured's** capacity as an **Employee** of the **Organization**.

Any services rendered by an **Individual Insured** for any party other than the **Organization** shall not constitute **Employed Attorney Services**.

**Employee**    means any natural person whose labor or service is engaged and directed by the **Organization** while performing duties related to the conduct of the **Organization's** business and includes leased, part-time, seasonal and temporary workers, independent contractors, volunteers and interns.

**Executive**    means any natural persons who are directors, trustees, officers, managing members, advisory board members or committee members or any equivalent position of the **Organization**.

**Excess Benefit Transaction**    means a transaction as defined in Internal Revenue Code, Title 26 §4958 (c)(1).

**Excess Benefit Transaction Excise Tax**    means any excise tax imposed by the Internal Revenue Service, pursuant to Section 4958(a)(2) of the Internal Revenue Code, 26 U.S.C. § 4958(a)(2), against an **Individual Insured** who participated as an **Organization Manager** in connection with an **Excess Benefit Transaction**.

**Individual Insured**    means any past, present or future:

1. **Executive**;
2. **Employee**; or

3. the estates, heirs, legal representatives or assigns of 1. and 2., above in the event of their death, incapacity or bankruptcy.

**Loss**                    means the amount the **Insured** becomes legally obligated to pay as a result of a **Claim**, including:

1. damages, settlements and judgments;
2. pre-judgment and post judgment interest;
3. punitive or exemplary damages to the extent such damages are insurable under applicable law, statute or regulation;
4. the multiplied portion of any multiple damage award to the extent such damages are insurable under applicable law, statute or regulation; and
5. any ten percent (10%) **Excess Benefit Transaction Excise Tax** assessed by the Internal Revenue Service against any **Individual Insured**, subject to a $100,000 maximum sublimit of liability per **Policy Period** for **Loss** and **Defense Costs**, combined provided, however that indemnification by the **Organization** for such taxes is not expressly prohibited in the bylaws, certificate of incorporation or other governing documents of the **Organization**. This sublimit of liability is part of and not in addition to the applicable Directors and Officers Limit of Liability as set forth on the Policy Declarations.

For the purpose of determining the insurability of damages in items 3. and 4. above, the laws of the jurisdiction most favorable to the insurability of such damages shall control; provided that such jurisdiction has a substantial relationship to the relevant **Insured** or to the **Claim** giving rise to the damages.

However, **Loss** does not include:

1. fines, penalties, sanctions and forfeitures;
2. taxes, except for any ten percent (10%) **Excess Benefit Transaction Excise Tax** as outlined in subparagraph 5. above of this definition of "**Loss**", or as otherwise provided by endorsement;
3. any amount uninsurable under the law pursuant

to which this **Policy** is construed;

4. cost of compliance with any order for, grant of or agreement to provide non-monetary or injunctive relief;

5. any unpaid salary, wages, commissions, severance, bonus or incentive compensation that is due or alleged to be due to any person; or

6. any amount for which an **Individual Insured** is absolved from payment by reason of any covenant, agreement or court order.

**Organization Manager**  means a person or persons described in Internal Revenue Code, Title 26 §4958(f).

**Outside Entity**  means any not-for-profit organization that qualifies as such under Section 501(c) of the Internal Revenue Code of 1986 (as amended), that is not an **Insured**.

**Outside Capacity**  means the service, other than **Employed Attorney Services,** of an **Individual Insured** while acting in the capacity of director, officer, trustee, managing member or any equivalent position of an **Outside Entity,** but only if such service is provided on behalf of the **Outside Entity** with the specific knowledge, request, consent or direction of the **Named Insured**.

**Personal Injury Wrongful Act**  means any actual or alleged false arrest, wrongful detention, malicious prosecution, invasion of privacy, wrongful entry or eviction, libel, slander or defamation.

**Pollutants**  means any solid, liquid, gaseous, bacterial, fungal, electromagnetic, thermal or other substance, smoke, vapor, soot, fumes, acids, alkalis, chemicals, toxic materials, 'Volatile Organic Compound', 'Organic Pathogen', 'Silica', asbestos, lead and gases therefrom, radon, combustion byproducts, noise and 'Waste'. Specific examples include, but are not limited to diesel, kerosene, and other fuel oils, carbon monoxide, and other exhaust gases, mineral spirits and other solvents, tetrachloroethylene, perchloroethylene (PERC), trichloroethylene (TCE), methylene chloroform, and other dry cleaning chemicals, chlorofluorocarbons, chlorinated hydrocarbons, adhesives, pesticides, insecticides, and all substances specifically listed, identified, or described by one or more of the following references:

1. Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA) Priority List Hazardous Substances (1997 and all subsequent editions); or
2. Agency for Toxic Substances And Disease Registry ToxFAQs™; or
3. U.S. Environmental Protection Agency EMCI Chemical References Complete Index.

For the purposes of this definition;

1. 'Volatile Organic Compound' means any compound which discharges organic gases as it decomposes or evaporates, examples of which include but are not limited to formaldehyde, pesticides, adhesives, construction materials made with organic chemicals, solvents, paint varnish and cleaning products.
2. 'Organic Pathogen' means any organic irritant or contaminant, including but not limited to mold, fungus, bacteria or virus, including but not limited to their byproduct such as mycotoxin, mildew, or biogenic aerosol.
3. 'Silica' means silica in any form and any of its derivatives, including but not limited to silica dust, silicon dioxide, crystalline silica, quartz, or non-crystalline (amorphous) silica.
4. 'Waste' means any property intended to be disposed, recycled, reused or reclaimed by the owner or user thereof.

**Publisher Wrongful Act**

means any infringement of copyright, trademark, unauthorized use of title, or plagiarism or misappropriation of ideas.

**Wrongful Act**

means any:

1. actual or alleged act, error, omission, misstatement, misleading statement, neglect, or breach of duties;
2. **Personal Injury Wrongful Act**;
3. **Publisher Wrongful Act**; or
4. **Employed Attorney Services**

committed or allegedly committed by:

      a. the **Organization**;
      b. any **Individual Insured,** arising solely from duties conducted on behalf of the **Organization** or asserted against an **Individual Insured** because of 1. above; or
      c. any **Individual Insured** while acting in an **Outside Capacity**.

---

**IV.  EXCLUSIONS**

A. The **Company** shall not be liable to make payment for **Loss** or **Defense Costs** in connection with any **Claim** made against the **Insured** arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any actual or alleged:

| Conduct | 1. deliberately fraudulent act, omission, criminal act, or  willful violation of any statute or regulation by any **Insured**; or |
| --- | --- |
| | 2. any **Insured** having gained any profit, remuneration or other advantage to which such **Insured** was not legally entitled; |

provided that this exclusion will not apply to **Defense Costs** incurred until:

      a. a final, non-appealable adjudication in any underlying proceeding or action establishes such conduct; or
      b. the **Insured** has admitted, stipulated or pleaded no contest to such conduct;

| Bodily Injury/Property Damage | 1. bodily injury, assault, battery, sickness, disease, death, mental anguish, humiliation or emotional distress of any person; or |
| --- | --- |
| | 2. damage to or destruction of any tangible property including any resulting loss of use thereof; |

provided that this exclusion shall not apply to any mental anguish, humiliation or emotional distress asserted in an otherwise covered **Claim** alleging a **Personal Injury Wrongful Act**.

| Employee Benefits | pension, profit sharing, welfare benefit or other employee benefit program established in whole or in part for the benefit of any **Individual Insured**, or based upon, arising out of or in any way involving the Employee Retirement Income Security Act of 1974 (or |
| --- | --- |

any amendments thereof or regulations promulgated there under) or similar provisions of any federal, state or local statutory law or common law;

| | |
|---|---|
| Insured vs Insured | **Claim** brought by or on behalf of any **Insured**; provided that this exclusion shall not apply to: |

1. any derivative action on behalf of, or in the name or right of the **Organization,** if such action is brought and maintained independent of and without the solicitation, assistance, participation or intervention of any **Insured**;
2. any **Claim** in the form of a cross claim, third party claim or other claim for contribution or indemnity by any **Individual Insured** which is part of or results directly from a **Claim** which is not otherwise excluded under this **Policy**;
3. any **Claim** brought or maintained by or on behalf of a bankruptcy or insolvency trustee, examiner, liquidator, receiver, rehabilitator, or creditors committee for an **Organization**; or
4. any **Claim** brought and maintained by or on behalf of any former **Executive**, but only if such **Claim** does not arise out of, directly or indirectly result from, is in consequence of, or in any way involves any **Wrongful Act**, responsibilities, actions or failure to act by any **Insured** during the tenure of service of such former **Executive**.

| | |
|---|---|
| Employment Practices | refusal to employ, termination of employment, or employment related coercion, demotion, evaluation, reassignment, discipline, workplace conditions, false imprisonment, defamation, harassment, humiliation, or discrimination of employment, or other employment-related practices, policies, acts or omissions or sexual harassment by any **Insured** against any person(s) or entity; or negligence involving any of the foregoing; |
| | it being understood that this exclusion applies whether the **Insured** may be held liable as an employer or in any other capacity and to any obligation to contribute with or indemnify another with respect to such **Claim**; |
| Discrimination | discrimination, including but not limited to discrimination based on religion, race, creed, color, sex, age, marital status, sexual preference, pregnancy, |

handicap or disability;

Outside Entity vs. Insured

**Claim** made by or on behalf of an **Outside Entity** or one or more of the **Outside Entity's** directors, officers, trustees, managing members or any equivalent position against an **Individual Insured** acting in an **Outside Capacity**, provided, however that this exclusion shall not apply to:

1. any **Claim** brought derivatively on behalf of the **Outside Entity,** independently and without the direct solicitation, participation, intervention or assistance of the **Outside Entity** or any **Insured** in an **Outside Capacity**;
2. any **Claim** in the form of a cross claim, third party claim or other claim for contribution or indemnity by an **Insured** acting in an **Outside Capacity** and which is part of or results directly from a **Claim** which is not otherwise excluded under this **Policy**; and
3. any **Claim** brought or maintained by or on behalf of a bankruptcy or insolvency trustee, examiner, liquidator, receiver, rehabilitator, or creditors committee for an **Outside Entity** against an **Insured** acting in an **Outside Capacity** for such **Outside Entity**.

Pollution

1. discharge, emission, release, seepage, migration, dispersal or escape of **Pollutants** or any threat thereof, including nuclear reaction, radiation or contamination; or
2. treatment, removal or disposal of any **Pollutants**;
3. regulation, order, direction or request to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize any **Pollutants**; or any voluntary decision to do so; or
4. actual or alleged property damage including loss of use, bodily injury, sickness, disease or death of any person, or financial loss to an **Organization** or **Outside Entity**, their security holders, or their creditors resulting from any of the aforementioned matters in 1., 2., or 3. above of this Exclusion.

| | |
|---|---|
| Prior or Pending Litigation | litigation, demand, claim, arbitration, decree, judgment, proceeding, or investigation against any **Insured**, which was pending on or prior to the Prior or Pending Litigation date referenced on the Policy Declarations, or any such action based on the same or essentially the same fact, circumstance, matter, situation, transaction or event underlying or alleged therein; |
| Prior Notice | 1. fact, circumstance, matter, situation, transaction, event, or **Wrongful Act** that, before the effective date of this **Policy**, was the subject of any notice given under any similar policy of insurance; or<br>2. other fact, circumstance, matter, situation, transaction, event, or **Wrongful Act** whenever occurring, which together with a fact, circumstance, matter, situation, transaction, event, or **Wrongful Act** described in subparagraph 1. above, would constitute **Interrelated Wrongful Acts**; |
| Prior Wrongful Acts of Subsidiaries | 1. **Wrongful Act** committed by an **Individual Insured** of any **Subsidiary**, or by such **Subsidiary**, occurring before the date such entity became a **Subsidiary**; or<br>2. other fact, circumstance, matter, situation, transaction, event, or **Wrongful Act** whenever occurring, which together with a fact, circumstance, matter, situation, transaction, event, or **Wrongful Act** described in subparagraph 1. above, would constitute **Interrelated Wrongful Acts**; |
| Professional Services | rendering or failure to render legal (except **Employed Attorney Services**), medical, psychological, counseling services or referrals, if the **Claim** is brought by or on behalf of any individual and/or entity for whom such services were, now are, or shall be performed;<br><br>provided that this exclusion shall not apply to that part of a **Claim** against an **Individual Insured** which alleges that the **Individual Insured**, in his or her capacity as such, failed to supervise those who performed such services. |

B. The **Company** shall not be liable to make payment for **Loss** or **Defense Costs** in connection with any **Claim** made against the **Insured** for actual or alleged:

Contract

liability of the **Insured** under any express contract or agreement to which an **Organization** is a party, provided that this exclusion shall not apply to:

1.  the extent that such **Organization** would have been liable in the absence of such contract or agreement; and
2.  any **Claim** against an **Individual Insured**.

No **Wrongful Act** of one or more **Insureds** shall be imputed to any other **Insured** for the purpose of determining the applicability of any of the above exclusions in Section A. or B. above.

---

V.    ORDER OF PAYMENTS

In the event of **Loss** arising from a **Claim** for which payment is concurrently due under Insuring Agreement A., Individual Insured - Non-Indemnified Coverage, and one or more of the other Insuring Agreements of this **Coverage Part**, the **Company** shall:

1.  first pay **Loss** for which coverage is provided under Insuring Agreement A., Individual Insured - Non-Indemnified Coverage; then
2.  with respect to whatever remaining amount of the Limit of Liability is available after payment above, pay such **Loss** for which coverage is provided under any other Insuring Agreement.

Except as otherwise provided above, the **Company** may pay covered **Loss** as it becomes due under this **Coverage Part** without regard to the potential for other future payment obligations under this **Coverage Part**.

---

VI.   LIFETIME OCCURRENCE REPORTING PROVISION

A. If this Policy is cancelled or not renewed by the **Named Insured** for any reason other than being sold, acquired, or declaring bankruptcy, each **Individual Insured** who did not serve as such at the time of the cancellation or non-renewal, shall be provided with an unlimited extension of time to report any **Claim** first

made against such **Individual Insured** after the effective date of such cancellation or non-renewal, subject to the following conditions:

1. the **Claim** results from a **Wrongful Act** committed by the **Individual Insured** before the effective date of cancellation or non-renewal; and
2. the **Wrongful Act** was actually or allegedly committed during a **Policy Period** of a **Policy** issued by the **Company**; and
3. such **Individual Insured** was serving in such capacity during the **Policy Period** of a **Policy** issued by the **Company**; and
4. no Directors & Officers Liability policy, or similar policy providing essentially the same type of coverage, or extended reporting period, is in effect at the time the **Claim** is first made against such **Individual Insured**; and
5. the **Claim** is not otherwise excluded by the **Policy** issued by the **Company** in effect at the time the **Wrongful Act** actually or allegedly occurred; such **Policy** shall be the **Policy** under which coverage is applicable including all terms, conditions, limits, retentions, and endorsements therein.
6. the **Company** will have written continuous coverage for **Named Insured** from the effective date of the first **Policy** the **Company** issued to the date of cancellation or non-renewal of this **Policy**.

B. The LIFETIME OCCURRENCE REPORTING PROVISION described herein shall not apply to any **Claim** made against any **Individual Insured** caused by, arising or resulting, directly or indirectly from or in consequence of the **Individual Insured's** serving in an **Outside Capacity** for an **Outside Entity**.

---

## VII.  TIMELY NOTICE AND RESOLUTION INCENTIVE

Retention Forgiveness

In the event of a **Claim**, the **Company** shall waive the applicable retention under this **Coverage Part**, up to a maximum of $10,000, if each of the following conditions are met:

1. The **Claim** is reported to the **Company** within thirty (30) days of first receipt by an **Insured**; and
2. The **Company** successfully negotiates a

settlement of the **Claim** within the Limits of Liability of this **Coverage Part**; and

3. The **Insured** consents to the settlement of the **Claim** without condition within thirty (30) days after notice of the settlement is provided to the **Insured** by the **Company**; and

4. Settlement of the **Claim** is finalized by the **Company** within ninety (90) days of the **Claim** being first reported to the **Company**.

## VIII.   OUTSIDE DIRECTORSHIP PROVISION

In the event a **Claim** is made against any **Individual Insured** arising out of their service as a director, officer, trustee, managing member or any equivalent positions of an **Outside Entity**, coverage afforded under this **Policy** shall be excess of any indemnification provided by the **Outside Entity** and any insurance provided to the **Outside Entity** which covers its directors, trustees, officers, managing members or any equivalent position.

| This Endorsement modifies insurance provided under the following: |
|:---:|
| **NON PROFIT MANAGEMENT LIABILITY POLICY** |

## ACCREDITATION/CERTIFICATION/STANDARD SETTING EXCLUSION

It is hereby agreed that the Directors and Officers **Coverage Part**, Section IV. EXCLUSIONS, Subsection A. is amended by the addition of the following:

Accreditation/Certification/Standard Setting

accreditation, certification, standard setting, or similar such activities by or on behalf of any **Insured**;

All other terms and conditions of this **Policy** remain unchanged.  This endorsement is part of your **Policy** and takes effect on the effective date of your **Policy** unless another effective date is shown.

.

This Endorsement modifies insurance provided under the following:

**NON PROFIT MANAGEMENT LIABILITY POLICY**

## ABSOLUTE PROFESSIONAL LIABILITY EXCLUSION

It is hereby agreed that the Directors and Officers **Coverage Part**, Section IV. EXCLUSIONS, Subsection A. "Professional Services", is deleted in its entirety and replaced by the following:

Professional Services
1.  rendering or failure to render any professional services by any **Insured**, whether or not such services are rendered for a fee; or
2.  **Employed Attorney Services**

It is further agreed that the Directors and Officers **Coverage Part**, Section III. DEFINITIONS, **Wrongful Act** is amended by the deletion of Item 4. **Employed Attorney Services**.

All other terms and conditions of this **Policy** remain unchanged.  This endorsement is part of your **Policy** and takes effect on the effective date of your **Policy** unless another effective date is shown.

DO 209 (05-17)                                                                    Page 1 of 1

| This Endorsement modifies insurance provided under the following: |
| --- |
| **NON PROFIT MANAGEMENT LIABILITY POLICY** |

# SEXUAL ABUSE EXCLUSION

It is hereby agreed that the Directors and Officers **Coverage Part**, Section IV. EXCLUSIONS, Subsection A. is amended by the addition of the following:

Abuse/Molestation                    sexual misconduct, sexual molestation, or physical or mental abuse of any person.

It is also agreed that the Employment Practices Liability **Coverage Part**, Section II. DEFINITIONS, is amended by the addition of the following:

**Child Molestation**                    means sexual misconduct, sexual molestation, or physical or mental abuse of any 'Child'.  For the purposes of this definition:

'Child' shall mean any natural person who was under eighteen (18) years of age at the time an act of **Child Molestation** is first committed.

It is also agreed that the Employment Practices Liability Coverage Part, Section II. DEFINITIONS, "**Wrongful Third Party Act**" is amended by the addition of the following:

This definition does not mean **Child Molestation**.

It is further agreed that the Employment Practices Liability **Coverage Part**, Section III. EXCLUSIONS, Subsection B. is amended by the addition of the following:

Child Molestation                    **Child Molestation**, including any actual or alleged negligence in the hiring, supervision, training, screening or management of a person alleged to have committed an act of **Child Molestation** as well as any actual or alleged failure to report or failure to report in a timely manner any such act.

All other terms and conditions of this **Policy** remain unchanged.  This endorsement is part of your **Policy** and takes effect on the effective date of your **Policy** unless another effective date is shown.

This Endorsement modifies insurance provided under the following:

**NON PROFIT MANAGEMENT LIABILITY POLICY**

# BUILDER OR DEVELOPER EXCLUSION

It is hereby agreed that the Directors and Officers **Coverage Part**, Section IV. EXCLUSIONS, Subsection A., is amended by the addition of the following:

| | |
|---|---|
| Builder or Developer | acts, errors or omissions by or on behalf of any builder or developer, or any **Claim** made against any **Insured** by any builder or developer or by any person or entity acting on their behalf. |

All other terms and conditions of this **Policy** remain unchanged.  This endorsement is part of your **Policy** and takes effect on the effective date of your **Policy** unless another effective date is shown.

This Endorsement modifies insurance provided under the following:

**NON PROFIT MANAGEMENT LIABILITY POLICY**

# DATA & SECURITY+ ENDORSEMENT

It is hereby agreed:

Unless otherwise stated herein, the terms, conditions, exclusions and other limitations set forth in this endorsement are solely applicable to coverage afforded by this endorsement. This endorsement is part of and subject to the provisions of the **Policy** to which it is attached.

## I.   SCHEDULE OF ADDITIONAL COVERAGES AND LIMITS

The following is a summary of coverages and Limits of Liability provided by this endorsement.

| COVERAGE | LIMIT OF LIABILITY |
|---|---|
| A.  **Data Breach** Expense | $50,000 each claim<br>$50,000 in the aggregate |
| B.  **Identity Theft** Expense | $50,000 each claim<br>$50,000 in the aggregate |
| C.  **Workplace Violence Act** Expense | $50,000 each claim<br>$50,000 in the aggregate |
| D.  **Kidnapping** Expense | $50,000 each claim<br>$50,000 in the aggregate |

The maximum aggregate per **Policy Period** for A. through D. above shall be $200,000 in the aggregate.

No retentions shall apply to the sublimits shown above.

## II.  COVERAGES:

A.  **Data Breach** Expense
The **Company** will pay on behalf of the **Organization** up to the **Data Breach** Expense Limit of Liability stated in the schedule above, for reasonable and necessary expenses in items 1. through 6. below:
1.  Development of a plan to assist the **Organization** in responding to a **Data Breach**;
2.  Data analysis or forensic investigation to assess the scope of a **Data Breach**;
3.  The development, printing and mailing of legally required notification letters to those affected by a **Data Breach**;

DO 283 (05-17)                                                           Page 1 of 7

4. Development of a website link for use by the **Organization** in communicating with persons affected by a **Data Breach** after legally required notification letters are sent;

5. Development of a customer relationship management system for use by the **Organization** in communicating with persons affected by a **Data Breach** after legally required notification letters are sent**;**

6. Public relations services or crisis management services retained by the **Organization** to mitigate the adverse affect on the **Organization's** reputation  resulting from a **Data Breach** that becomes public and only after legally required notification letters are sent.

incurred by the **Organization** as a result of a **Data Breach. The Data Breach** must be first occur, be discovered by an **Insured**, and reported to the **Company** during the **Policy Period** but in no event later than sixty (60) days after the **Data Breach** is first discovered by an **Insured**. The expenses below must be incurred within one (1) year of the reporting of such **Data Breach**:

The **Organization** must first report the **Data Breach** to the **Company** and use a service provider of the **Company's** choice prior to incurring any of the above costs.

B. **Identity Theft** Expense

The **Company** will pay on behalf of a director or officer of the **Organization** up to the **Identity Theft** Expense Limit of Liability stated in the schedule above, for expenses, services or fees noted in items 1. through 3. below:

1. Credit monitoring services provided by a vendor of the **Company's** choice for the affected director or officer for up to one year following an **Identity Theft;**

2. Additional application fees paid by a director or officer whose loan(s) were rejected based on incorrect credit information resulting from an **Identity Theft;**

3. Notary fees, certified and overnight mail expenses paid by a director or officer in connection with reporting an **Identity Theft** to financial institutions, credit bureaus and agencies and law enforcement authorities.

incurred by such director or officer after he or she has become a victim of **Identity Theft. The Identity Theft** must first occur, be first discovered by an **Insured,** and reported to the **Company** during the **Policy Period** but in no event later than sixty (60) days after the **Identity Theft** is first discovered by an **Insured.** The expenses above must be incurred within one (1) year of the reporting of such **Identity Theft**:

Any director or officer of the **Organization** who is a victim of **Identity Theft** must first report the **Identity Theft** to the **Company** and use a service provider of the **Company's** choice prior to incurring any of the above expenses, services or fees.

C. **Workplace Violence Act** Expense
The **Company** will reimburse the **Organization,** up to the **Workplace Violence Act** Expense Limit of Liability stated in the schedule above**,** for the following reasonable costs paid by the **Organization** for a period of thirty (30) days following, and as a result of, a

**Workplace Violence Act**:
1. Counseling services rendered to **Employees** and persons on the **Organization's Premises** directly affected by a **Workplace Violence Act**. The counseling services must be rendered by a licensed, professional counselor of the **Organization's** choice.
2. Services rendered by an independent public relations consultant of the **Organization's** choice for the purpose of mitigating the adverse affect of a **Workplace Violence Act** on the **Organization**.

To be covered, the **Workplace Violence Act** must occur during the **Policy Period** and be reported to the **Company** during the **Policy Period** but in no event later than sixty (60) days after the occurrence.

D. **Kidnapping** Expense
The **Company** will reimburse the **Organization,** up to the **Kidnapping** Expense Limit of Liability stated in the schedule above, for the following reasonable costs paid by the **Organization** as a result of a **Kidnapping:**
1. Retaining an independent negotiator or consultant to facilitate the release of a **Kidnapping** victim.  Nothing herein shall obligate the **Company** to recommend, select, retain or arrange for the retention of such independent negotiator or consultant;
2. Interest on a loan obtained by the **Organization** to pay expenses covered under this endorsement that is incurred as a result of a **Kidnapping,** However, there is no coverage for interest accruing prior to thirty (30) days preceding the date of such payment or subsequent to the date the **Company** pays any portion of a **Kidnapping** Expense or for expenses not covered under this endorsement;
3. Travel and accommodations incurred by the **Organization** in direct response to the **Kidnapping.** Nothing herein shall obligate the **Company** to recommend, select, or arrange for such travel and accommodations;
4. A reward up to $10,000 paid by the **Organization** to an informant for information which leads to the arrest and conviction of the person(s) responsible for the **Kidnapping**;
5. The current base salary paid to a director or officer of the **Organization** for the director or officer's work on behalf of the **Organization**, who is a victim of a **Kidnapping** subject to the following:
   a. salary reimbursement shall commence on the thirty-first (31st) consecutive day after a **Kidnapping**;
   b. salary reimbursement shall end when the director or officer is released; or is confirmed dead; or one hundred and twenty (120) days after the director or Officer is last confirmed to be alive; or twelve (12) months after the date of the **Kidnapping**, or when the **Kidnapping** Expense Limit of Liability has been exhausted by payments made by the **Company**, whichever occurs first.
   There is no coverage for **Kidnapping** Expense resulting from a **Kidnapping** planned, carried out or participated in, directly or indirectly, by any person who is or was a member of the victim's family or the **Organization**.

The **Kidnapping** must occur and be reported to the **Company** during the **Policy Period** but in no event later than sixty (60) days after the occurrence.

III. ADDITIONAL DEFINITIONS

It is hereby agreed that the Directors and Officers **Coverage Part**, Section III. DEFINITIONS, is amended by the addition of the following definitions:

**Data Breach**

means the misappropriation or public disclosure, by electronic or non-electronic means, by the **Organization** and without the knowledge of, consent, or acquiescence of the president, member of the board of directors or any executive officer, of an individual(s) **Personally Identifiable Information** in the **Organization's** care, custody and control without the authorization or permission of the owner of such information.

**Identity Theft**

Means:
1. the act of obtaining **Personally Identifiable Information** belonging to a director or officer of the **Organization** without that person's authorization, consent or permission; and
2. the use of **Personally Identifiable Information** so obtained to make or attempt to make transactions or purchases by fraudulently assuming that person's identity.

**Identity Theft** does not mean any of the above committed directly or indirectly by a director or officer of the **Organization,** or by a family member of any  director or officer.

There is no coverage for any **Identity Theft** Expense unless **Personally Identifiable Information** that is obtained without authorization, consent or permission is used to make or attempt to make purchases or conduct transactions by fraudulently assuming the identity of a director or officer of the **Organization**.

**Kidnapping**

means an actual or alleged wrongful abduction and involuntary restraint of a director or officer of the **Organization**, by one or more persons acting individually or collectively in which monetary or non-monetary demands are made to the **Organization** to obtain the director's or officer's release.

| **Personally Identifiable Information** | means: |
|---|---|

    1. information concerning an individual(s) that would be considered "non-public information" within the meaning of Title V of the Gramm-Leach Bliley Act of 1999 (as amended) and its implementing regulations including but not limited to Social Security numbers or account numbers correlated with names and addresses which is in an Insured's care, custody and control; and

    2. personal information as defined in any U.S. federal, state or local privacy protection law governing the control and use of an individual's personal and confidential information, including any regulations promulgated thereunder; and

    3. protected health information as defined by the Health Insurance Portability and Accountability Act of 1996 (Public Law 104-191) ("HIPPA") or the Health Information Technology for Economic and Clinical Health Act of 2009 ("HITECH") (Public Law 111- 5), as amended, and any regulations promulgated thereto. **Personally Identifiable Information** does not mean information that is available to the public which does not include otherwise protected personal information.

| **Premises** | means buildings, facilities or properties leased or owned by the **Organization** in conducting its operations. |
|---|---|
| **Workplace Violence Act** | means an actual use of unlawful deadly force, or the threatened use of unlawful deadly force involving the display of a lethal weapon, occurring on the **Organization's Premises** and directed at an **Individual Insured,** or other persons on the **Premises** of the **Organization**. |

## IV. LIMITS OF LIABILITY AND RETENTION

1. The maximum Limit of Liability for any expenses provided by this endorsement shall be in addition to the Limits of Liability as set forth in the Policy Declarations for the Directors and Officers **Coverage Part**.

2. Any one incident, interrelated incidents or series of similar or related incidents for which coverage is provided under this endorsement shall be treated as one incident subject to

the maximum Limit of Liability available under this endorsement at the time the incident(s) is first reported to the Company regardless of whether the incident(s) continues and expenses are incurred by the Organization in any subsequent Policy Period(s).

## V.  ADDITIONAL EXCLUSIONS

It is hereby agreed that the Directors and Officers **Coverage Part**, Section IV. EXCLUSIONS, is amended by the addition of the following:

Data Breach Related

1.  Expense reimbursement resulting in any **Insured** gaining any profit, remuneration or advantage to which the **Insured** is not legally entitled;
2.  expenses incurred by any **Subsidiary** of an **Organization** occurring prior to the date that such entity became a **Subsidiary** or incurred at any time that such entity is not a **Subsidiary**;
3.  expenses arising from any incident(s) of which any **Insured** had notice before the inception date of this Policy; or any fact, circumstance, event, situation or incident which before the inception date of this Policy was the subject of any notice under any other similar policy of insurance or any future claims for expenses under this Policy based upon such pending or prior notice;
4.  The portion of any expenses covered under this endorsement that is also covered under any other coverage part of this **Policy**;
5.  Reissuance of credit or debit cards or any other expense not shown in Section II, COVERAGES, sub-section A, **Data Breach** Expense.

## VI. COVERAGE LIMITATIONS

The following terms, conditions and exclusions in the General Terms and Conditions and the Directors and Officers **Coverage Part** do not apply to this endorsement:
1.  General Terms and Conditions
    a.  Section II. EXTENDED REPORTING PERIOD
    b.  Section XI. SPOUSAL AND DOMESTIC PARTNER EXTENSION

2. Directors and Officers **Coverage Part**
   a. Section IV. EXCLUSIONS, Subsection A. "Bodily Injury/Property Damage"
   b. Section VI. LIFETIME OCCURRENCE REPORTING PROVISION
   c. Section VIII. OUTSIDE DIRECTORSHIP PROVISION

All other terms and conditions of this **Policy** remain unchanged.  This endorsement is part of your **Policy** and takes effect on the effective date of your **Policy** unless another effective date is shown.

| This Endorsement modifies insurance provided under the following: |
| :---: |
| **NON PROFIT MANAGEMENT LIABILITY POLICY** |

# AMENDMENT OF PRIOR OR PENDING LITIGATION EXCLUSION

It is hereby agreed that the Directors and Officers **Coverage Part**, Section IV. EXCLUSIONS, Subsection A. "Prior or Pending Litigation" is deleted and replaced by the following:

Prior or Pending Litigation

Any litigation, demand, claim, arbitration, decree, judgment, proceeding, or investigation against any **Insured,** or any such action based upon the same or essentially the same facts, circumstances, matters, situations, transactions or events underlying or alleged therein which was pending on or prior to the effective date of this **Policy**;

provided that, if this **Policy** is a renewal of a **Policy** previously issued by the **Company** in a continuous succession of **Policies** with no lapses in coverage, the effective date of this **Policy** will mean the effective date of the first **Policy** issued by the **Company** in such succession of **Policies.**

It is also agreed that the Employment Practices **Coverage Part** (if purchased), Section III. EXCLUSIONS, Subsection B. "Prior or Pending Litigation" is deleted and replaced by the following:

Prior or Pending Litigation

Any litigation, demand, claim, arbitration, decree, judgment, proceeding, or investigation against any **Insured,** or any such action based upon the same or essentially the same facts, circumstances, matters, situations, transactions or events underlying or alleged therein which was pending on or prior to the effective date of this **Policy**;

provided that, if this **Policy** is a renewal of a **Policy** previously issued by the **Company** in a continuous succession of **Policies** with no lapses in coverage, the effective date of this **Policy** will mean the effective date of the first **Policy** issued by the **Company** in such succession of **Policies.**

It is also agreed that the Fiduciary Liability **Coverage Part** (if purchased), Section III. EXCLUSIONS, Subsection B. "Prior or Pending Litigation" is deleted and replaced by the following:

DO 298 (05-17)                                                                                           Page 1 of 2

| | |
|---|---|
| Prior or Pending Litigation | Any litigation, demand, claim, arbitration, decree, judgment, proceeding, or investigation against any **Insured,** or any such action based upon the same or essentially the same facts, circumstances, matters, situations, transactions or events underlying or alleged therein which was pending on or prior to the effective date of this **Policy**; |
| | provided that, if this **Policy** is a renewal of a **Policy** previously issued by the **Company** in a continuous succession of **Policies** with no lapses in coverage, the effective date of this **Policy** will mean the effective date of the first **Policy** issued by the **Company** in such succession of **Policies.** |

All other terms and conditions of this **Policy** remain unchanged.  This endorsement is part of your **Policy** and takes effect on the effective date of your **Policy** unless another effective date is shown.

**Non-Profit Management Liability Policy**                    **General Terms and Conditions**

In consideration of the payment of the premium and reliance upon all statements made and information furnished to the **Company**, including the statements made in the **Application** and subject to all the provisions of this **Policy**, the **Company** and the **Insureds** agree as follows:

**NOTICE**: This is a Claims Made Policy. This means the **Company** will cover only those **Claims** first made against the **Insured** during the **Policy Period** or, where applicable, the Extended Reporting Period.

If any provision in these General Terms and Conditions is inconsistent or in conflict with the terms and conditions of any **Coverage Part**, the terms and conditions of such **Coverage Part** shall control for the purposes of that **Coverage Part**.

Any bolded term in a **Coverage Part** that is defined in these General Terms and Conditions shall have the meaning set forth in these General Terms and Conditions. Any bolded term in a **Coverage Part** that is defined in that **Coverage Part** shall have the meaning set forth in such **Coverage Part**.

The descriptions in the headings and subheadings of this **Policy** are solely for convenience and form no part of the terms and conditions of coverage, and do not serve to express, confirm, alter or provide coverage.

I.  DEFINITIONS

| | |
|---|---|
| **Application** | means: |
| | 1. an application and any materials submitted for this **Policy**; and |
| | 2. an application and any materials submitted for all previous **Policies** issued by the **Company** providing uninterrupted coverage. |
| | The content of 1. and 2. above are incorporated by reference in this **Policy** as if physically attached hereto. |
| **Claim** | shall have the meaning as defined in the applicable **Coverage Part**. |
| **Company** | means the insurance company identified in the Policy Declarations. |
| **Coverage Part** | means individually or collectively, as applicable, the purchased coverage parts as set forth in the Policy Declarations as included and attached to and made a part of this **Policy**. |

| | |
|---|---|
| **Defense Costs** | shall have the meaning as defined in the applicable **Coverage Part**. |
| **Domestic Partner** | means any natural person qualifying as a domestic partner under the provision of any applicable federal, state or local laws. |
| **Employee** | shall have the meaning as defined in the applicable **Coverage Part**. |
| **Financial Impairment** | means: |

1. the appointment by any federal or state official, agency or court of any receiver, conservator, liquidator, trustee, rehabilitator, creditors committee or similar official to take control of, supervise, manage or liquidate the **Organization** and provided that the court or other judicial or administrative body overseeing the receivership, conservatorship, liquidation, rehabilitation, bankruptcy or equivalent proceeding has denied a request by the **Organization** to indemnify an **Individual Insured** for a **Loss**; or
2. the **Organization** becoming a debtor in possession under the United States bankruptcy law or the equivalent of a debtor in possession under the law of any other country.

| | |
|---|---|
| **Insured** | means any **Organization** and any **Individual Insured**. |
| **Individual Insured** | shall have the meaning as defined in the applicable **Coverage Part**. |
| **Interrelated Wrongful Acts** | means any **Wrongful Acts** based upon, arising from, or in consequence of the same or related facts, circumstances, situations, transactions or events, or that are logically or causally connected by reason of any common or related series of facts, circumstances, situations, transactions or events. |
| **Loss** | shall have the meaning as defined in the applicable **Coverage Part**. |
| **Management Control** | means: |

1. control of more than fifty percent (50%) of the voting rights representing the right to appoint, elect, or designate the majority of the board of directors, board

of trustees, or board of managers; or

2. control of exactly fifty percent (50%) of the voting rights representing the right to appoint, elect, or designate the majority of the board of directors, board of trustees, or board of managers; and pursuant to a written contract solely controls the management and operations of such entity.

**Named Insured**    means the entity named in Item 1. of the Policy Declarations.

**Organization**    means:

1. the **Named Insured** and any **Subsidiary**; and
2. any entity as debtor in possession under United States bankruptcy law or equivalent status under the law of any other jurisdiction.

**Plan**    shall have the meaning as defined in the applicable **Coverage Part**.

**Policy**    means collectively the Policy Declarations, General Terms and Conditions, applicable **Coverage Parts**, applicable endorsements, and the **Application**.

**Policy Period**    means the period of time from the effective date and time of this **Policy** to the date and time of expiration as shown in the Policy Declarations, or its earlier cancellation or termination date. If the length of the **Policy Period** is the same as the **Policy Year**, the terms **Policy Period** and **Policy Year** are used interchangeably herein.

**Policy Year**    means the period of one (1) year following the effective date of the **Policy Period** or any subsequent one-year anniversary thereof; or

In the event the **Policy** expires less than one (1) year following the effective date of the **Policy Period**; or more than one (1) year but less than two (2) years following the effective date of the **Policy Period**; then **Policy Year** shall mean any such period.

**Subsidiary**    means:

1. any not-for-profit entity in which the **Named Insured** has **Management Control** directly or indirectly through one or more **Subsidiaries** on or before the

effective date of this **Policy**; and is disclosed as a **Subsidiary** in an **Application** to the **Company**; or

2. any other entity added as a **Subsidiary** by written endorsement to this **Policy**.

**Takeover**

means:

1. the acquisition by another entity or person or group of entities or persons acting in concert of:
   a. the **Management Control** of the **Named Insured**; or
   b. the acquisition of more than fifty percent ( 50%) of the total consolidated assets of the **Named Insured** as of the date of the **Named Insured's** most recent consolidated financial statements prior to such acquisition;
2. the merger of the **Named Insured** into another entity such that the **Named Insured** is not the surviving entity;
3. the consolidation of the **Named Insured** with another entity; or
4. the loss, forfeiture, or suspension of the **Named Insured's** tax exempt status.

**Wrongful Act**

shall have the meaning as defined in the applicable **Coverage Part**.

## II.    EXTENDED REPORTING PERIOD

Right to Purchase

If the **Policy** expires, is cancelled or not renewed for any reason other than non-payment of premium, then the **Named Insured** shall have the right to purchase an Extended Reporting Period to report to the **Company**, as soon as practicable prior to the expiration date of the purchased Extended Reporting Period, any **Claim** against an **Insured**.

An Extended Reporting Period shall only apply to **Claims** arising from a **Wrongful Act** which was actually or allegedly committed before the date of expiration, cancellation or non-renewal of this **Policy**, or prior to the effective date of any **Takeover**. For the purpose of this clause, the offer of renewal terms and conditions or premiums by the **Company** different from those in effect prior to renewal shall not constitute a refusal to renew.

| | |
|---|---|
| Options | The additional premium for the Extended Reporting Period shall be a percentage of the total annual premium as shown in the Policy Declarations.  The **Named Insured** may elect any one of the following options: |

1. Twelve (12) month period - 30% of the annual premium;
2. Twenty Four (24) month period - 75% of the annual premium; or
3. Thirty Six (36) month period - 120% of the annual premium.

The Extended Reporting Period begins on the expiration date of the **Policy**, or if cancelled or non-renewed, the effective date of such cancellation or non-renewal of the **Policy**.

| | |
|---|---|
| Payment & Notice to the Company | As a condition precedent to the right to purchase an Extended Reporting Period, the total earned premium for this **Policy** must have been paid to the **Company**. Any premium paid with respect to an Extended Reporting Period shall be deemed fully earned as of the first day of the Extended Reporting Period.  The right to elect the Extended Reporting Period will terminate unless written notice of such election, together with payment of the additional premium as set forth above, is received by the **Company** within sixty (60) days of the effective date of the expiration, nonrenewal or cancellation of this **Policy**. |
| Extended Reporting Period Limits & Other Insurance | The Extended Reporting Period will not provide a new, separate or additional Limit of Liability.  The remainder of the Limit of Liability applicable to the **Policy Year** in effect as of the effective date of the expiration, cancellation, or non-renewal is the maximum Limit of Liability for all **Claims** reported during the Extended Reporting Period. |

III.   DEFENSE & SETTLEMENT

| | |
|---|---|
| Duty To Defend | The **Company** shall have the right and duty to defend any **Claim** covered by this **Policy** even if the allegations are groundless, false or fraudulent.  The **Company** shall have the right to appoint counsel of its choice with respect to such **Claim**.  The **Company's** obligation to defend any **Claim** or pay any **Loss** or **Defense Costs** shall be completely |

fulfilled and extinguished if the applicable Limit of Liability has been exhausted by payment of **Loss**.

Consent to Settle

The **Company**, as it deems necessary, has the right to investigate, adjust, defend, appeal and, with the consent of the **Insured**, negotiate the settlement of any **Claim** whether within or in excess of the Retention. If the **Insured** refuses to consent to a settlement recommended by the **Company**, the **Company's** obligation to the **Insured** for **Loss** and **Defense Costs** attributable to such **Claim** shall be limited to:

    a. The amount of the covered **Loss** in excess of the Retention which the **Company** would have paid in settlement at the time the **Insured** first refused to settle; plus

    b. covered **Defense Costs** incurred up to the date the **Insured** first refused to settle; plus

    c. eighty percent (80%) of covered **Loss** and **Defense Costs** in excess of the first settlement amount recommended by the **Company** to which the **Insured** did not consent.

It is understood that payment of a., b. and c. above is the limit of the **Company's** liability under this **Policy** for any **Claim** in which the **Insured** fails or refuses to consent to the **Company's** settlement recommendation, subject at all times to Section IX. LIMITS OF LIABILITY and Section X. RETENTIONS AND PRESUMPTIVE INDEMNIFICATION of these General Terms and Conditions. The remaining twenty percent (20%) of **Loss** and **Defense Costs** in excess of the amount referenced in a. and b. above shall be the obligation of the **Insured**.

In no event shall the **Company** be obligated to pay any **Loss** or **Defense Costs** after the applicable Limit of Liability shown in the Policy Declarations has been exhausted by payment of **Loss**.

| | |
|---|---|
| Consent of the Company | The **Insured** shall not demand or agree to arbitration of any **Claim** without the **Company's** written consent. The **Insured** shall not, except at personal cost, make any offer or payment, admit any liability, settle any **Claim**, assume any obligation, or incur any expense without the **Company's** written consent. |
| Cooperation | The **Insured** agrees to cooperate with the **Company** with respect to all **Claims**, and provide such assistance and information as the **Company** may reasonably request. Upon the **Company's** request, the **Insured** shall submit to examination and interrogation by the **Company's** representative, under oath if required, and shall attend hearings, depositions, trials and shall assist in the conduct of suits, including but not limited to effecting settlement, securing and giving evidence, obtaining the attendance of witnesses, giving written statements to the **Company's** representatives and meeting with such representatives for the purpose of investigation and/or defense, all of the above without charge to the **Company**. The **Insured** further agrees not to take any action which may increase the **Insured's** or the **Company's** exposure under this **Policy**. |
| Papers/Documents | The **Insured** shall execute all papers required and shall do everything that may be necessary to secure and preserve any rights of indemnity, contribution or apportionment which the **Insured** or the **Company** may have, including the completion of such documents as are necessary to enable the **Company** to bring suit in the **Insured's** name, and shall provide all other assistance and cooperation which the **Company** may reasonably require. |

## IV.  ALLOCATION OF DEFENSE COSTS

If a **Claim** is made against an **Insured** for both **Loss** that is covered by this **Policy** and loss that is not covered by this **Policy**, the **Company** will pay as follows:

1.  One hundred percent (100%) of **Defense Costs** on account of such **Claim**; and

2. all remaining loss from such **Claim** shall be apportioned between covered **Loss** and uncovered loss based on the relative legal exposures of the parties to such matters.
3. Items 1. and 2. above of this Section IV. shall not apply to any **Insured** for whom coverage is excluded pursuant to Section VII. REPRESENTATIONS AND SEVERABILITY.

---

V.     NOTICE AND CLAIM REPORTING PROVISIONS

Notice hereunder shall be given in writing to the **Company**. If mailed, the date of mailing of such notice shall constitute the date that such notice was given and proof of mailing shall be sufficient proof of notice.

Written Notice of a Claim

1. As a condition precedent to exercising any right to coverage under this **Policy**, the **Insured** shall give to the **Company** written notice of a **Claim** as soon as practicable after any Chief Executive Officer, Chief Financial Officer, Chief Operating Officer, Chairperson, Executive Director, Human Resources Manager, In-House General Counsel, Managing Member or Fiduciary of any **Plan** becomes aware of such **Claim**, however:
   a. if the **Policy** expires, is cancelled or is non-renewed and no Extended Reporting Period is purchased, no later than ninety (90) days after the expiration date or the effective date of such cancellation or non-renewal; or
   b. if an Extended Reporting Period is purchased, no later than the last day of the Extended Reporting Period.

However, if the **Policy** is cancelled for non-payment of premium, notice shall be provided by the **Insured** to the **Company** no later than the effective date of cancellation.

2. Coverage for a **Claim** reported to the **Company** during the automatic 90 day period noted in 1. a. above shall only apply if the **Claim** is first made prior to the date of the **Policy** expiration, cancellation, or non-renewal.

| Written Notice of a Circumstance | 1. If during the **Policy Period**, or any applicable Extended Reporting Period, the **Insured** becomes aware of circumstances which could give rise to a **Claim** and gives written notice of such circumstances to the **Company** as soon as practicable during the **Policy Period**, or Extended Reporting Period if applicable, in which the **Insured** first becomes aware of such circumstances, then any **Claim** subsequently arising from such circumstances shall be deemed made against the **Insured** during the **Policy Year** in which such circumstances were first reported to the **Company**. Such subsequent **Claim** must be reported to the **Company** in accordance with this Section V. NOTICE AND CLAIM REPORTING PROVISIONS, "Written Notice of Claim" above.<br>2. When reporting a circumstance to the **Company**, an **Insured** shall give the names of any potential claimant; a description of the specific circumstances that could give rise to a **Claim**; the identity of the specific **Insureds** allegedly involved in such circumstance; the nature of the potential damages (monetary and non-monetary); and the specifics as to how the **Insureds** first became aware of such circumstance. |
|---|---|
| Interrelated Claims | More than one **Claim** involving the same **Wrongful Act** or **Interrelated Wrongful Acts** shall be considered as one **Claim** which shall be deemed made on the earlier of:<br><br>1. the date on which the earliest **Claim** was first made; or<br>2. the first date valid notice was given by the **Insured** to the **Company**, in accordance with applicable reporting provisions, under this **Policy** or under any prior policy, of any **Wrongful Act** or any fact, circumstance, situation, transaction or event which underlies such **Claim**. |

## VI.  CANCELLATION OR NON-RENEWAL

| Cancellation by the Insured | This **Policy** may be cancelled by the **Named Insured** by either surrender thereof to the **Company** at its address stated in the Policy Declarations or by mailing to the **Company** written notice requesting cancellation and in either case stating when thereafter such |
|---|---|

cancellation shall be effective. Earned premium shall be computed pro rata at the time cancellation is effected or as soon as practicable thereafter.

| | |
|---|---|
| Cancellation By the Company | The **Company** may cancel this **Policy** only in the event of the **Insured's** failure to pay the premium when due. The **Company** will mail to the **Named Insured**, written notice stating when cancellation shall take effect. The effective date of such cancellation shall not be less than twenty (20) days after the date of mailing. Earned premium shall be computed pro rata at the time cancellation is effected or as soon as practicable thereafter. |
| Non-Renewal | In the event the **Company** non-renews this **Policy**, the **Company** shall mail to the **Named Insured**, not less than sixty (60) days prior to the end of the **Policy Period**, written notice of non-renewal. Such notice shall be binding on all **Insureds**. |
| Delivery of Notice | The **Company** shall mail notice of cancellation or non-renewal with a certificate of mailing stating the effective date of cancellation or non-renewal which shall become the end of the **Policy Period**. Mailing of such notice shall be sufficient notice of cancellation or non-renewal. |

---

## VII.  REPRESENTATIONS AND SEVERABILITY

| | |
|---|---|
| Representations | The **Insured** represents that the particulars and statements contained in the **Application** are true and agree that: |

1. those particulars and statements are the basis of this **Policy** and are to be considered as incorporated into and constituting a part of the **Policy**;
2. those particulars and statements are material to the acceptance of the risk assumed by the **Company**; and
3. the **Policy** is issued in reliance upon the truth of such representations.

| | |
|---|---|
| Severability of Application | An **Application** for coverage shall be construed as a separate **Application** for coverage by each **Individual Insured**. With respect to the particulars and statements |

contained in the **Application**, no fact pertaining to or knowledge possessed by any **Individual Insured** shall be imputed to any other **Individual Insured** for the purpose of determining if coverage is available.

In the event that such **Application** contains any misrepresentations which materially affects either the acceptance of the risk or the hazard assumed by the **Company** under this **Policy**, then no coverage shall be afforded for any **Claim** based upon, arising out of, related to or in consequence of any such misrepresentation with respect to:

1. any **Individual Insured** who knew of such misrepresentations or knew of the facts or circumstances relating to such misrepresentations, or any **Organization** to the extent it indemnifies any such **Individual Insured**. Such knowledge possessed by such **Individual Insured** shall not be imputed to any other **Individual Insured; or**
2. any **Organization** if any past or present Chief Executive Officer, Chief Financial Officer, Chief Operating Officer, Chairperson, Executive Director, Human Resources Manager, In-House General Counsel, Managing Member or Fiduciary of any **Plan** or any equivalent position of the **Named Insured**, or the signer of the **Application**, knew of such misrepresentations or knew of the facts or circumstances relating to such misrepresentations.

## VIII.   CHANGES IN EXPOSURE

Creation, Acquisition of or  Merger with Another Entity

1. If, after the effective date of this **Policy**:
   a. the **Organization** creates, acquires, consolidates or merges with another nonprofit entity incorporated under the laws of a jurisdiction within the territorial United States, (hereafter referred to as "other entity") such that the **Organization** is the surviving entity, and if as a result of such creation, acquisition, consolidation or merger, the other entity becomes a **Subsidiary** of the **Organization**, then coverage shall be provided for the other entity as an **Insured** solely for **Wrongful Acts** committed or

allegedly committed after the effective date of such creation, acquisition, consolidation or merger. The **Insured** shall disclose full particulars of such a change to the **Company** as soon as practicable but not later than the expiration date of the **Policy Year**, or effective date of cancellation or non-renewal of this **Policy**.

b. However, if at the time of an event described in Paragraph 1, a., above:

   i.  the assets of the other entity exceed thirty five percent (35%) of the total assets of the **Organization** as reflected in the **Organization's** most recent annual financial statements; or

   ii.  if the Employment Practices Liability Coverage Part is attached to this **Policy**, the total number of employees of the other entity exceeds thirty five (35%) of the total number of **Employees** of the **Organization** immediately prior to such event, then:

the **Named Insured** shall provide to the **Company** written notice of such creation, acquisition, consolidation or merger, containing full details thereof, as soon as practicable but within sixty (60) days of such event. The **Company**, at its sole discretion, may require additional premium and may alter the terms, conditions or limitations of coverage. The **Company** reserves the right to refuse any extension of coverage to such entity.

2. If, after the effective date of this **Policy**, the **Organization** creates, acquires, consolidates or merges with a for-profit entity, or any entity incorporated outside of the territorial United States, such that the **Organization** is the surviving entity, and if as a result of such creation, acquisition, consolidation or merger, such for-profit or foreign entity becomes a **Subsidiary** of the **Organization**, then:

the **Named Insured** shall provide to the

**Company** written notice of such creation, acquisition, consolidation or merger, containing full details thereof, as soon as practicable but within sixty (60) days of such event. The **Company**, at its sole discretion, may require additional premium and may alter the terms, conditions or limitations of coverage. The **Company** reserves the right to refuse any extension of coverage to such entity.

Cessation of Subsidiaries

If during the **Policy Period** any **Subsidiary** ceases to be a **Subsidiary**, then coverage under this **Policy** shall continue for such **Subsidiary** and its **Individual Insureds** until the expiration of this **Policy** or the last **Policy** in an uninterrupted series of policies issued by the **Company**, but solely for **Claims** arising out of **Wrongful Acts** committed or allegedly committed by such **Subsidiary** or its **Individual Insureds** while such **Subsidiary** was a **Subsidiary** and prior to the effective date of such cessation. There shall be no coverage for **Claims** arising out of actual or alleged **Wrongful Acts** occurring on or after the effective date of cessation.

Takeover of the
Named Insured

In the event of a **Takeover** of the **Named Insured:**

1. coverage under this **Policy** shall continue until the earlier of:
   a. the expiration of the **Policy Year**; or
   b. if the **Policy** is cancelled or non-renewed, the effective date of cancellation or non-renewal;

   but only with respect to **Claims** arising out of **Wrongful Acts** that occurred or allegedly occurred prior to the effective date of the **Takeover**. There shall be no coverage for **Claims** arising out of actual or alleged **Wrongful Acts** occurring on or after the date of **Takeover**;

2. the **Named Insured** shall give the **Company** written notice of the **Takeover** as soon as practicable, but not later than sixty (60) days after the effective date of the **Takeover**; and
3. the premium for the **Policy Year** in which the **Takeover** occurred shall be deemed to be fully

earned.  The **Named Insured** shall have the right to purchase an Extended Reporting Period, subject to Section II. EXTENDED REPORTING PERIOD herein, to report **Claims** arising out of **Wrongful Acts** occurring prior to the effective date of any **Takeover**.

**Merger, Sale, Transfer or Termination of a Plan**

If after the inception date of the Fiduciary Liability **Coverage Part,** or the date the Fiduciary Liability Coverage Endorsement is added to this **Policy**:

1. the sponsorship of a **Plan** is transferred so that an **Organization** is no longer the sole employer sponsor of such **Plan**;
2. a **Plan** is merged with another plan for which coverage is not afforded under the Fiduciary Liability **Coverage Part**;
3. a **Plan** is terminated or sold; or
4. the Pension Benefit Guaranty Corporation (PBGC) becomes the Trustee of a **Plan**;

then:

a. in the case of paragraphs 1., 2. and 3. above, the Fiduciary Liability **Coverage Part** or the Fiduciary Liability Coverage Endorsement, as applicable, shall continue to apply to such transferred, merged, terminated or sold **Plan**, but solely for **Claims** based upon or arising out of **Wrongful Acts** that occurred or allegedly occurred prior to the date of such transfer, merger, termination or sale. There shall be no coverage for **Claims** arising out of actual or alleged **Wrongful Acts** occurring on or after the date of merger, transfer, termination or sale of any **Plan** as described in paragraphs 1., 2. and 3. above; or
b. in the case of paragraph 4. above, the Fiduciary Liability **Coverage Part** or the Fiduciary Liability Coverage Endorsement shall continue to apply to such **Plan** for those who were **Insureds** at the time the PBGC became the Trustee of such **Plan** but solely for **Claims** based upon or arising out of **Wrongful Acts** that occurred or allegedly occurred prior to the date the PBGC became

the Trustee of such **Plan**. There shall be no coverage for **Claims** arising out of actual or alleged **Wrongful Acts** occurring on or after the date the PBGC becomes the Trustee of any **Plan**.

Cancellation of the Policy

If the **Named Insured** requests cancellation of this **Policy** as a result of a "Creation, Acquisition of or Merger with Another Entity", "Cessation of Subsidiaries", or "Takeover of the Named Insured", the **Company** shall compute earned premium on a pro rata basis and return any unearned premium to such entity as of the effective date of such cancellation as long as notice of the event is provided to the **Company** as soon as practicable but not later than sixty (60) days after such event, together with such information as the **Company** may require.

## IX. LIMITS OF LIABILITY

"Each Claim"

The "Each Claim" Limit of Liability shown on the Policy Declarations is the **Company's** maximum liability for **Loss** for each **Claim** to which the applicable **Coverage Part** applies, during each **Policy Year**.

"In the Aggregate"

The "In the Aggregate" Limit of Liability shown on the Policy Declarations is the **Company's** maximum liability for **Loss** for all **Claims** to which the applicable **Coverage Part** applies, during each **Policy Year**.

Policy Year Limits

The Limits of Liability for any **Policy Year** may not be aggregated or transferred, in whole or in part, so as to provide any additional coverage with respect to **Claims** first made or deemed made, as provided in Section V. NOTICE AND CLAIM REPORTING PROVISIONS of these General Terms and Conditions during any other **Policy Year**. If the applicable Limits of Liability for any **Policy Year** are exhausted, the **Company's** obligation for that **Policy Year** shall be deemed completely fulfilled and extinguished.

Extended Reporting Period Limits

The Extended Reporting Period will not provide a new, separate or additional Limit of Liability. The remainder of the Limit of Liability applicable to the **Policy Year** in effect as of the date of expiration, cancellation, or non-renewal is the maximum Limit of Liability for all

|                        | **Claims** reported during the Extended Reporting Period. |
|------------------------|-----------------------------------------------------------|

Defense Costs

**Defense Costs** shall be in addition to the Limits of Liability for each **Coverage Part** purchased as shown on the Policy Declarations, unless as otherwise provided within that **Coverage Part** or by endorsement.

Interrelated Claims

More than one **Claim** involving the same **Wrongful Act** or **Interrelated Wrongful Acts** shall be considered as one **Claim** pursuant to Section V. NOTICE AND CLAIM REPORTING PROVISIONS, "Interrelated Claims" and shall be subject to the Limit of Liability in effect when the **Claim** was first made.

X.   RETENTIONS AND PRESUMPTIVE INDEMNIFICATION

Retentions

Retentions set forth in the Policy Declarations for each **Coverage Part** shall apply per **Claim** per **Policy Year** under each respective **Coverage Part**.

If more than one Retention applies to any one **Claim** then each applicable Retention shall be applied to the applicable part of such **Claim**, but the sum of such Retentions shall not exceed the highest of such applicable Retentions.

**Claims** shall be subject to the Retention applicable to the **Policy Year** during which the **Claims** are first made as provided in Section V. NOTICE AND CLAIM REPORTING PROVISIONS.

Except as otherwise provided by Section VII. TIMELY NOTICE AND RESOLUTION INCENTIVE of the Directors and Officers **Coverage Part**:

1.  the **Company** shall be liable to pay only **Loss** and **Defense Costs** in excess of the applicable Retention for the **Coverage Part** to which the **Claim** applies;
2.  the **Company** shall have no obligation to pay any part or all of such Retention on the **Insured's** behalf; and
3.  if the **Company**, at its sole discretion, elects to pay any part of or all of such Retention, the **Insured** agrees to repay such amounts to the **Company** upon demand.

·

| | |
|---|---|
| Presumptive Indemnification | Regardless of whether **Loss** or **Defense Costs** resulting from any **Claim** against an **Individual Insured** is actually indemnified by the **Organization**, the applicable Retention set forth in the Policy Declarations shall apply to any **Loss** and **Defense Costs** if indemnification of the **Individual Insured** by the **Organization** is legally permissible. The certificate of incorporation, charter, articles of association or other organizational documents of the **Organization**, including by-laws and resolutions, will be deemed to have been adopted or amended to provide indemnification to the **Individual Insured** to the fullest extent permitted by law. |

However, if an **Individual Insured** is not indemnified for **Loss** or **Defense Costs** solely by reason of:

1. **Financial Impairment**; or
2. a good faith determination by the **Organization** that such indemnification is not permitted by common or statutory law; then

an **Individual Insured's** Retention for this **Coverage Part** shall be amended to $0.

---

## XI.   SPOUSAL AND DOMESTIC PARTNER EXTENSION

If a **Claim** against an **Individual Insured** includes a **Claim** against the lawful spouse or **Domestic Partner** of such **Individual Insured** solely by reason of:

1. such spousal or **Domestic Partner** status;  or
2. such spouse's or **Domestic Partner's** ownership interest in property or assets that are sought as recovery for **Wrongful Acts**; then

any **Loss** which such spouse or **Domestic Partner** becomes legally obligated to pay on account of such **Claim** shall be deemed **Loss** which the **Individual Insured** becomes legally obligated to pay as a result of the **Claim.**

This extension of coverage shall not apply to the extent a **Claim** alleges any **Wrongful Act**, error, omission, misstatement, misleading statement or neglect or breach

of duties by such spouse or **Domestic Partner**.

XII.   SUBROGATION

In the event of payment under this **Policy**, the **Company** shall be subrogated to the **Insureds'** rights of recovery. The **Insured** shall do everything necessary to secure such rights, including the execution of such documents necessary to enable the **Company** to effectively bring suit in the name of any **Company**.

In no event, however, shall the **Company** exercise its rights to subrogation against an **Individual Insured** under this **Policy** unless such **Individual Insured**:

1. has been convicted of a deliberate criminal act; or
2. has been determined by a final adjudication adverse to the **Individual Insured** to have committed a deliberate fraudulent act, or to have obtained any profit, advantage or remuneration to which such **Individual Insured** was not legally entitled.

In the event the **Company** shall for any reason pay indemnifiable **Loss** on behalf of an **Individual Insured**, the **Company** shall have the contractual right hereunder to recover from the **Organization** or any **Subsidiary** the amount of such **Loss** equal to the amount of the Retention not satisfied by the **Organization** or any **Subsidiary** and shall be subrogated to rights of the **Individual Insureds** hereunder.

XIII.   CHANGES

Notice to any agent or knowledge by any agent shall not affect a waiver or change in any part of this **Policy** or stop the **Company** from asserting any right under the terms of this Policy, nor shall the terms of this **Policy** be waived or changed except by an endorsement, issued by the **Company** to form a part of this **Policy**.

XIV.   AUTHORIZATION CLAUSE AND NOTICES

By acceptance of this **Policy**, the **Insured** agrees that the **Named Insured** shall act on behalf of all **Insureds** with respect to:

1. the payment of premiums or the receipt of any return premiums that may become due under the **Policy**;
2. the cancellation or non-renewal of this **Policy**;
3. the effecting of any changes to the **Policy** or purchasing of an Extended Reporting Period; or
4. the giving and receiving of all notices and correspondence.

Any notice given to the **Named Insured** by the **Company** pursuant to Section VI. CANCELLATION OR NON-RENEWAL shall be deemed to be notice to all **Insureds**.

## XV.   ASSIGNMENT

Assignment of interest under this **Policy** shall not bind the **Company** until the **Company's** consent is endorsed hereon.

## XVI.   OTHER INSURANCE

This **Policy** is excess of other valid and collectable insurance, unless such other insurance is specifically written to be in excess of this **Policy**. For purposes of this provision, "other valid and collectable insurance" means insurance provided by an entity or organization other than the **Company**.

When it is determined that both this insurance and other insurance or self-insurance apply to any **Claim** on the same basis, whether primary, excess or contingent, the **Company** shall not be liable under this **Policy** for a greater proportion of the **Loss** and **Defense Costs** than the applicable Limit of Liability under the **Policy** for such **Loss** and **Defense Costs** bears to the total applicable Limit of Liability of all valid and collectible insurance against such **Claims**.

## XVII.   TERMS OF POLICY CONFORMED TO STATUTE

Terms of this **Policy** which are in conflict with the statutes of the state or territory wherein this **Policy** is

issued are hereby amended to conform to such statutes.

## XVIII. ACTION AGAINST THE COMPANY

| | |
|---|---|
| Compliance | No action shall lie against the **Company** unless, as a condition precedent thereto, there has been full compliance with all of the terms of this **Policy**, and until the amount of the **Insured's** obligation to pay shall have been finally determined either by judgment against the **Insured** after actual trial or by the **Insured's** written agreement, the claimant or the claimant's legal representative, and the **Company**. |
| Rights to Recover | Any person or the legal representatives thereof who has secured such judgment or written agreement shall thereafter be entitled to recover under this **Policy** to the extent of the insurance afforded by this **Policy**. No person or entity shall have any right under this **Policy** to join the **Company** as a party to any action against the **Insured** to determine the **Insured's** liability, nor shall the **Company** be impleaded by the **Insured** or the **Insured's** legal representatives. Bankruptcy or insolvency of the **Insured** or the **Insured's** successors in interest shall not relieve the **Company** of its obligations hereunder. |

## XIX. POLICY TERRITORY

This **Policy** shall apply worldwide.

## XX. COORDINATION OF COVERAGE

Subject always to the applicable Limit of Liability, should two or more **Coverage Parts** apply to the same **Claim**, the **Company** will not pay more than the actual **Loss** incurred by the **Insureds**.

## XXI. ACCEPTANCE

This **Policy** embodies all agreements existing between the parties hereunder or any of their agents relating to this insurance.

## XXII. LIBERALIZATION

If within forty-five (45) days of binding this **Policy**, the **Company** broadens coverage under any **Coverage Part** or the General Terms & Conditions attached to this

**Policy**, and;

1. such broadened coverage applies to policies in the state or territory in which this **Policy** is written;
2. the effective date of the policies which are to receive the broadened coverage is after the effective date of this **Policy**; and
3. there is no additional premium charged for such broadened coverage;

then the **Company** shall apply the broadened coverage to this **Policy** as applicable for no additional premium, but only for a **Wrongful Act** which first occurs after the effective date of such broadened coverage.

This page has been intentionally left blank.

 **business resource center**          **bizresourcecenter.com**

## RESOURCES TO HELP YOUR BUSINESS GROW!

As a policyholder through USLI or Devon Park Specialty, you have access to many services through the Business Resource Center that will assist you in growing and protecting your business. Consider the following services and associated cost savings when making your decision where to place your insurance!

### HUMAN RESOURCES



» Free human resources consultation hotline to be used for personnel issues including harassment and discrimination, the Family and Medical Leave Act, disability, wage and hours regulations and more
» Online library with information, forms and articles pertaining to human resources
» Discounted human resources management system
» Resources for recruiting and training as well as termination and administration

### PRE-EMPLOYMENT AND TENANT SCREENINGS



» Discounted background checks, including multi-court criminal database searches, county criminal searches and more (first background check is free)
» Best practices for performing a background check
» Discounted tenant and drug screenings and Motor Vehicle Reports (MVRs)



**Try our cost savings calculator to see how much you could save!**

### PAYROLL AND TAXES



» Payroll processing and tax services tailored for either a small or large business
» Online business tax workshop provided by the Internal Revenue Service (IRS)

### CYBER RISK



» Materials about securing personal information and payment card information
» Complimentary access to tools and resources that will help you understand your exposure to a data breach and the importance of a response plan
» Discounted identity theft monitoring and recovery

### MARKETING



» Suggested free and paid services for web marketing for your business, including email campaigns, photo editing, file management and more
» Suggested free and paid services for social media platforms, development, management and more
» Discounted website package and access to consultants, designers and developers to help in the creation of a website for your business
» Suggested free and paid services for building your own website and tracking Search Engine Optimization (SEO)

### SAFETY



» Free on-site safety and occupational health consultation for your business
» Free personal credit report
» Disaster and emergency preparedness resources
» Discounted alcohol safety training for your staff and servers
» Youth resources for concussion training, waivers of liability, recognizing the signs and symptoms of child abuse and more

**For a full list of vendors, discounts and resources, visit bizresourcecenter.com.**



# 24/7 CLAIM REPORTING

In our continuing effort to provide you with excellent claim service, you may now report a claim and get claim assistance 24 hours a day/7 days a week.

## For claim reporting, call toll free 1-888-875-5231 or visit USLI.COM and select the "report a claim" option.

For emergency claims requiring immediate assistance, please use the toll free option. Your call will be referred to a claims professional who will respond within an hour of your call with direction and assistance.

Thank you for placing your trust in our company. We pledge to work hard every day to earn and maintain that trust.



**USLI.COM**
**888-523-5545**

CRF 12-18

  # FREE PRIVACY BREACH RISK MANAGEMENT RESOURCES



When a privacy breach occurs, will you be prepared?

In 2015, according to the Identity Theft Resource Center, more than 783 breaches were reported and more than 675 million records were exposed. The eRisk Hub® portal, powered by NetDiligence®, is an effective way to combat privacy breaches and other types of cyber losses.

## With your USLI policy, you will receive instructions on how to access the eRisk Hub® portal and begin using this benefit that is valued in excess of $1,200 a year!

eRisk Hub® is the one-stop shop you need to become educated and prepared for a privacy breach. This FREE service is available to USLI policyholders.

Using proprietary tools anchored in proven risk management principals, NetDiligence® provides a full range of enterprise-level information security, e-risk insurability and regulatory compliance assessment and testing services. NetDiligence® supports and is endorsed by some of the world's largest network liability insurance underwriters.

### HOW TO START USING THIS FREE OFFERING:
- Go to eriskhub.com/usli
- Click "Register Now" to set up a free account
- Create your own username and password; your access code is **08451**

## Key Features of the eRisk Hub® Portal



**Data Breach Calculators** – Learn how to estimate the cost of a breach, notification costs and business interruption



**Learning Center** – Best practices articles, white papers and webinars from leading technical and legal experts. Highlighted topics include PCI compliance and social engineering



**Security Training** – Watch videos for best practices in security and privacy awareness or download a training guide



**Risk Manager Tools** – Assists you in managing your cyber risk, including a self-assessment, a sample website privacy policy and a tool for HIPAA compliance



**eRisk Resources** – A directory to quickly find external resources with expertise in pre and post-breach disciplines



**Consultation** – Breach Coach, HIPAA Coach and Security Coach available to assist you



# Check Out Your New Employment Practices Liability Risk Management Toolkit from PeopleSystems

**Free Employment Practices Liability (EPL) Helpline
1-888-811-4182
(8 a.m. to 7:30 p.m. Eastern Time)**

If a human resource consulting firm offered you their time and expertise for free, would you lock their phone number and email address in a drawer and never call? Of course not!  Do you have questions such as:

- What are the current federal and state employment laws I need to know?
- What are "wage and hour" regulations? What does "exempt" versus "non-exempt" mean?
- How should I handle terminating, suspending or warning an employee?
- What type of human resources policies should I have in place?
- How should I properly document performance issues and disciplinary actions in an employee's file?
- What are appropriate and inappropriate questions to ask during an employment interview?
- What guidelines should I use to investigate a complaint of discrimination or harassment?

PeopleSystems is just a free phone call or email away!

**Online Human Resources Center
www.peoplesystems.com/USLI**

To access the USLI policyholder features, click on "Request for client login" and complete with your information. Please take a moment to become familiar with the new PeopleSystems Resource Center's information.

- **Helpline to email your human resource questions:** Now you can email your questions via this web portal.
- **Human resource news center and recent employment law changes:** The news center keeps you up-to-date with recent changes in state and federal employment laws and what they mean to you as well as pertinent articles on employment issues you need to know about.
- **Human resource manual and employment forms:** You will find "Best Practices" helpful for handling common human resource issues. Issues may include conducting employee evaluations and understanding employment laws such as FLSA, FMLA and COBRA.
- **Human resource recommendations:** You will also find sample human resource policies regarding discrimination, harassment, employment at-will and electronic communications.

This document does not amend, extend or alter the coverage afforded by the policy. For a complete understanding of any insurance you purchase, you must first read your policy, declaration page and any endorsements and discuss them with your agent. A sample policy is available from your agent. Your actual policy conditions may be amended by endorsement or affected by state laws.

EPL Helpline Policy 6/17

# EXHIBIT

# 3

**NDO2557425A**
Renewal of Number

**POLICY DECLARATIONS**

# Mount Vernon Fire Insurance Company
**1190 Devon Park Drive, Wayne, Pennsylvania 19087**
A Member Company of United States Liability Insurance Group

## No. NDO2557425B

NAMED INSURED AND ADDRESS:
**NAHANT PRESERVATION TRUST**
**PO BOX 30**
**NAHANT, MA 01908**

POLICY PERIOD: (MO. DAY YR.)   From:  06/19/2020  To:  06/19/2021

12:01 A.M. STANDARD TIME AT YOUR
MAILING ADDRESS SHOWN ABOVE

BUSINESS DESCRIPTION:  Non-Profit Directors and Officers

**IN RETURN FOR THE PAYMENT OF THE PREMIUM, AND SUBJECT TO ALL THE TERMS OF THIS POLICY, WE AGREE WITH YOU TO PROVIDE THE INSURANCE AS STATED IN THIS POLICY.**

THIS POLICY CONSISTS OF THE FOLLOWING COVERAGE PARTS FOR WHICH A PREMIUM IS INDICATED.

|  | PREMIUM |
|---|---|
| Non Profit Management Liability Coverage Parts | $698.00 |
| **TOTAL:** | **$698.00** |

Coverage Form(s) and Endorsement(s) made a part of this policy at time of issue
### See Endorsement EOD (1/95)

Agent:  **MCGOWAN, DONNELLY & OBERHEU, LLC (1818)**
**2700 Via Fortuna Drive, Suite 145**
**Austin, TX  78746**

Broker:

Issued:  **06/22/2020 10:16 AM**

By: _Thomas P. Verney_
Authorized Representative

UPD (08-07)   THESE DECLARATIONS TOGETHER WITH THE COMMON POLICY CONDITIONS, COVERAGE PART DECLARATIONS, COVERAGE PART COVERAGE FORM(S) AND FORMS AND ENDORSEMENTS, IF ANY, ISSUED TO FORM A PART THEREOF, COMPLETE THE ABOVE NUMBERED POLICY.

# EXTENSION OF DECLARATIONS

**Policy No. NDO2557425B**

Effective Date:   **06/19/2020**
12:01 AM STANDARD TIME AT YOUR MAILING ADDRESS

**FORMS AND ENDORSEMENTS**

**The following forms apply to the Management Liability coverage part**

| Endt# | Revised | Description of Endorsements |
|-------|---------|----------------------------|
| DO Jacket | 06/17 | Non Profit Management Liability Policy Jacket |
| DO-100 | 05/17 | Directors and Officers Coverage Part |
| DO-201 | 05/17 | Accreditation/Certification/Standard Setting Exclusion |
| DO-209 | 05/17 | Absolute Professional Liability Exclusion |
| DO-224A | 05/17 | Sexual Abuse Exclusion |
| DO-233 | 05/17 | Builder or Developer Exclusion |
| DO-283 | 05/17 | Data and Security Plus Endorsement |
| DO-298 | 05/17 | Amendment of Prior or Pending Litigation Exclusion |
| DO-GTC | 05/17 | General Terms and Conditions |

## NON PROFIT MANAGEMENT LIABILITY COVERAGE PART DECLARATIONS

**PLEASE READ YOUR POLICY CAREFULLY.**

**THIS IS A CLAIMS MADE POLICY COVERAGE FORM AND UNLESS OTHERWISE PROVIDED HEREIN, THE COVERAGE OF THIS FORM IS LIMITED TO LIABILITY FOR CLAIMS FIRST MADE DURING THE POLICY PERIOD, OR THE EXTENSION PERIOD, IF APPLICABLE.  DEFENSE COSTS SHALL BE APPLIED AGAINST THE RETENTION.**

**No.  NDO2557425B**

Effective Date: **06/19/2020**
12:01 AM STANDARD TIME

ITEM I. PARENT ORGANIZATION AND PRINCIPAL ADDRESS

**NAHANT PRESERVATION TRUST
PO BOX 30
NAHANT, MA 01908**

ITEM II. POLICY PERIOD: (MM/DD/YYYY)  From:  06/19/2020  To:  06/19/2021

### Non Profit Directors and Officers Liability Coverage Part

ITEM III. LIMITS OF LIABILITY

| | | |
|---|---|---|
| a. Non Profit Directors & Officers | $1,000,000 | EACH CLAIM |
| b. Non Profit Directors & Officers | $1,000,000 | IN THE AGGREGATE |

| | | |
|---|---|---|
| ITEM IV. RETENTION: | $0 | EACH CLAIM |
| ITEM V. PREMIUM: | $698 | |
| RETROACTIVE DATE: | Full Prior Acts | |
| PRIOR OR PENDING LITIGATION | See form DO-298 | |

### Employment Practices Liability Coverage Part

ITEM III. LIMITS OF LIABILITY

| | |
|---|---|
| a. Employment Practices | NOT COVERED |
| b. Employment Practices | |
| ITEM IV. RETENTION: | NOT COVERED |
| ITEM V. PREMIUM: | NOT COVERED |

**THESE DECLARATIONS ARE PART OF THE POLICY DECLARATIONS CONTAINING THE NAME OF THE INSURED AND THE POLICY PERIOD.**

**NON PROFIT MANAGEMENT LIABILITY COVERAGE PART DECLARATIONS**

**PLEASE READ YOUR POLICY CAREFULLY.**

**THIS IS A CLAIMS MADE POLICY COVERAGE FORM AND UNLESS OTHERWISE PROVIDED HEREIN, THE COVERAGE OF THIS FORM IS LIMITED TO LIABILITY FOR CLAIMS FIRST MADE DURING THE POLICY PERIOD, OR THE EXTENSION PERIOD, IF APPLICABLE. DEFENSE COSTS SHALL BE APPLIED AGAINST THE RETENTION.**

**No. NDO2557425B**                       Effective Date: **06/19/2020**
                                                          12:01 AM STANDARD TIME

**Fiduciary Liability Coverage Part**

ITEM III. LIMITS OF LIABILITY

    a. Fiduciary Liability              NOT COVERED

ITEM IV. RETENTION:             NOT COVERED

ITEM V. PREMIUM:               NOT COVERED

ITEM VI. Coverage Form(s)/Part(s) and Endorsement(s) made a part of this policy at time of issue:

    **See Endorsement EOD (01/95)**

**THESE DECLARATIONS ARE PART OF THE POLICY DECLARATIONS CONTAINING THE NAME OF THE INSURED AND THE POLICY PERIOD.**



**business resource center**                    **bizresourcecenter.com**

# RESOURCES TO HELP YOUR BUSINESS GROW!

As a policyholder through USLI or Devon Park Specialty, you have access to many free and discounted services through the Business Resource Center that will assist you in operating, growing and protecting your business. Consider the following services and associated cost savings when deciding where to place your insurance!

## HUMAN RESOURCES



- » Free human resources consultation hotline to be used for personnel issues, including harassment and discrimination, the Family and Medical Leave Act, disability, wage and hours regulations and more
- » Online library with information, forms and articles pertaining to human resources
- » Discounted sexual harassment training and more
- » Resources for recruiting and training as well as termination and administration

## PRE-EMPLOYMENT AND TENANT SCREENINGS



- » Discounted background checks, including multi-court criminal database searches, county criminal searches and more (first background check is free)
- » Best practices for performing a background check
- » Discounted tenant and drug screenings and motor vehicle reports (MVRs)



**Try our cost-savings calculator to see how much you could save!**

## PAYROLL AND TAXES



- » Discounted payroll processing and tax services tailored for either a small or large business

## CYBER RISK



- » Materials about securing personal and payment card information
- » Complimentary access to tools and resources that will help you understand your exposure to a data breach and the importance of a response plan

## MARKETING



- » Suggested free and paid services, including email campaigns, photo editing, file management and more, for web marketing for your business
- » Suggested free and paid services for social media platforms, development, management and more
- » Discounted promotional items, giveaways and signage

## SAFETY



- » Free on-site safety and occupational health consultation for your business
- » Free personal credit report
- » Disaster and emergency preparedness resources
- » Discounted alcohol and food server safety training for your staff and servers
- » Discounted CPR and first aid training
- » Youth resources for concussion training, waivers of liability, recognizing the signs and symptoms of child abuse, and more

**For a full list of vendors, discounts and resources, visit bizresourcecenter.com.**

BRC-Quote and Policy 3/20



# 24/7 CLAIM REPORTING

In our continuing effort to provide you with excellent claim service, you may now report a claim and get claim assistance 24 hours a day/7 days a week.

## For claim reporting, call toll free 1-888-875-5231 or visit USLI.COM and select the "report a claim" option.

For emergency claims requiring immediate assistance, please use the toll free option. Your call will be referred to a claims professional who will respond within an hour of your call with direction and assistance.

Thank you for placing your trust in our company. We pledge to work hard every day to earn and maintain that trust.



**USLI.COM**
**888-523-5545**

CRF 12 16

  # FREE PRIVACY BREACH RISK MANAGEMENT RESOURCES



**When a privacy breach occurs, will you be prepared?**

In 2015, according to the Identity Theft Resource Center, more than 783 breaches were reported and more than 675 million records were exposed. The eRisk Hub® portal, powered by NetDiligence®, is an effective way to combat privacy breaches and other types of cyber losses.

**With your USLI policy, you will receive instructions on how to access the eRisk Hub® portal and begin using this benefit that is valued in excess of $1,200 a year!**

eRisk Hub® is the one-stop shop you need to become educated and prepared for a privacy breach. This FREE service is available to USLI policyholders.

Using proprietary tools anchored in proven risk management principals, NetDiligence® provides a full range of enterprise-level information security, e-risk insurability and regulatory compliance assessment and testing services. NetDiligence® supports and is endorsed by some of the world's largest network liability insurance underwriters.

**HOW TO START USING THIS FREE OFFERING:**
- Go to eriskhub.com/usli
- Click "Register Now" to set up a free account
- Create your own username and password; your access code is **08451**

## Key Features of the eRisk Hub® Portal



**Data Breach Calculators** – Learn how to estimate the cost of a breach, notification costs and business interruption



**Learning Center** – Best practices articles, white papers and webinars from leading technical and legal experts. Highlighted topics include PCI compliance and social engineering



**Security Training** – Watch videos for best practices in security and privacy awareness or download a training guide



**Risk Manager Tools** – Assists you in managing your cyber risk, including a self-assessment, a sample website privacy policy and a tool for HIPAA compliance



**eRisk Resources** – A directory to quickly find external resources with expertise in pre and post-breach disciplines



**Consultation** – Breach Coach, HIPAA Coach and Security Coach available to assist you



# Check Out Your New Employment Practices Liability Risk Management Toolkit from PeopleSystems

**Free Employment Practices Liability (EPL) Helpline
1-888-811-4182
(8 a.m. to 7:30 p.m. Eastern Time)**

If a human resource consulting firm offered you their time and expertise for free, would you lock their phone number and email address in a drawer and never call? Of course not!  Do you have questions such as:

► What are the current federal and state employment laws I need to know?

► What are "wage and hour" regulations? What does "exempt" versus "non-exempt" mean?

► How should I handle terminating, suspending or warning an employee?

► What type of human resources policies should I have in place?

► How should I properly document performance issues and disciplinary actions in an employee's file?

► What are appropriate and inappropriate questions to ask during an employment interview?

► What guidelines should I use to investigate a complaint of discrimination or harassment?

PeopleSystems is just a free phone call or email away!

**Online Human Resources Center
www.peoplesystems.com/USLI**

To access the USLI policyholder features, click on "Request for client login" and complete with your information. Please take a moment to become familiar with the new PeopleSystems Resource Center's information.

► **Helpline to email your human resource questions:** Now you can email your questions via this web portal.

► **Human resource news center and recent employment law changes:** The news center keeps you up-to-date with recent changes in state and federal employment laws and what they mean to you as well as pertinent articles on employment issues you need to know about.

► **Human resource manual and employment forms:** You will find "Best Practices" helpful for handling common human resource issues. Issues may include conducting employee evaluations and understanding employment laws such as FLSA, FMLA and COBRA.

► **Human resource recommendations:** You will also find sample human resource policies regarding discrimination, harassment, employment at-will and electronic communications.

This document does not amend, extend or alter the coverage afforded by the policy. For a complete understanding of any insurance you purchase, you must first read your policy, declaration page and any endorsements and discuss them with your agent. A sample policy is available from your agent. Your actual policy conditions may be amended by endorsement or affected by state laws.

EPL Helpline Policy 6/17

# NON PROFIT

# MANAGEMENT

# LIABILITY

# POLICY

## UNITED STATES LIABILITY INSURANCE GROUP

A BERKSHIRE HATHAWAY COMPANY

1190 Devon Park Drive
Wayne, PA 19087-2191
888-523-5545 – USLI.COM

This policy jacket together with the policy declarations, coverage forms and endorsements, if any, complete this policy.

The enclosed declarations designates the issuing company.

## NON PROFIT MANAGEMENT LIABILITY POLICY

# Read your policy carefully!

**In Witness Whereof**, the company has caused this Policy to be executed and attested.  Where required by law, this Policy shall not be valid unless countersigned by a duly authorized representative of the company.

Secretary

President

**Non-Profit Management Liability Policy**          **Directors and Officers Coverage Part**

In consideration of payment of the premium and subject to the Policy Declarations, General Terms and Conditions, and the limitations, conditions, provisions and all other terms of this **Coverage Part**, the **Company** and the **Insureds** agree as follows:

Words that are in bold have special meaning and are defined in Section III. DEFINITIONS of this **Coverage Part**, or in Section I. DEFINITIONS of the General Terms and Conditions, incorporated in or attached to this **Coverage Part**, as applicable.

I.   INSURING AGREEMENTS

| | |
|---|---|
| A.  Individual Insured – Non-Indemnified Coverage | The **Company** will pay, on behalf of an **Individual Insured**, **Loss** and **Defense Costs** resulting from a **Claim** first made against an **Individual Insured** during the **Policy Period**, or Extended Reporting Period, if applicable, to the extent such **Individual Insured** is not indemnified by the **Organization** for such **Loss** and **Defense Costs**. |
| B.  Individual Insured – Indemnified Coverage | The **Company** will pay, on behalf of the **Organization**, **Loss** and **Defense Costs** resulting from a **Claim** first made against an **Individual Insured** during the **Policy Period**, or Extended Reporting Period, if applicable, but only to the extent the **Organization** indemnifies such **Individual Insured** for such **Loss** and **Defense Costs** as permitted or required by law. |
| C.  Organization Coverage | The **Company** will pay, on behalf of the **Organization**, **Loss** and **Defense Costs** resulting from a **Claim** first made against the **Organization** during the **Policy Period**, or the Extended Reporting Period, if applicable. |

II.   INDIVIDUAL INSURED – NON-INDEMNIFIED COVERAGE ADDITIONAL LIMIT

| | |
|---|---|
| "Dedicated Limit – Insuring Agreement A" | The **Company** shall pay an additional limit of liability, not to exceed an aggregate of $1,000,000 per **Policy Period**, solely for **Loss** covered under Section I. INSURING AGREEMENT, Subsection A. Individual Insured Non-Indemnified Coverage. This additional limit of liability shall be paid only after the applicable Limit of Liability for Individual Insured – Non-Indemnified Coverage of the Directors & Officers Liability **Coverage Part** shown in the Policy Declarations is completely exhausted by payment of **Loss**. |

DO 100 (05-17)                                                        Page 1 of 13

III.   DEFINITIONS

**Claim**                          means any:

1. written demand for monetary damages or non-monetary relief, including injunctive relief;
2. civil proceeding commenced by service of a complaint or similar pleading;
3. criminal proceeding commenced by the return of an indictment;
4. administrative or regulatory proceeding commenced by the filing of a formal written notice of charges, notice of violations, notice of investigation, cease and desist or similar action;
5. arbitration, mediation or other alternative dispute resolution proceeding in which the **Insured** is obligated to participate  if the **Insured** agrees to participate with the **Company's** prior written consent; or
6. other proceeding initiated before any governmental body which is authorized to render an enforceable judgment, order for monetary damages or other relief;

received by, or brought or initiated against any **Insured** alleging a **Wrongful Act**, including any appeal therefrom.

**Claim** also means any:

7. written request, first received by an **Insured** to toll or waive a statute of limitations relating to a potential **Claim** as described in subparagraphs 1. through 6. above.

A **Claim** shall be deemed made on the earliest of the date of service upon, or receipt by, any **Insured** of a potential **Claim** as described in subparagraphs 1. through 7. above.

**Defense Costs**                  means:

1. reasonable and necessary legal fees and expenses incurred by the **Company**, or by any attorney designated by the **Company** to defend the **Insured**; and

DO 100 (05-17)                                                    Page 2 of 13

2. all other fees, costs, costs of attachment or similar bonds (without any obligation on the **Company's** part to apply for or furnish such bonds);

resulting from the investigation, adjustment, defense and appeal of a **Claim**. **Defense Costs** does not include **Loss** or the **Insured's** salaries, wages, overhead or benefits expenses.

| | |
|---|---|
| **Employed Attorney Services** | means legal services provided by any **Individual Insured**, but only to the extent that such services are performed directly to the **Organization** and in the **Individual Insured's** capacity as an **Employee** of the **Organization**. |
| | Any services rendered by an **Individual Insured** for any party other than the **Organization** shall not constitute **Employed Attorney Services**. |
| **Employee** | means any natural person whose labor or service is engaged and directed by the **Organization** while performing duties related to the conduct of the **Organization's** business and includes leased, part-time, seasonal and temporary workers, independent contractors, volunteers and interns. |
| **Executive** | means any natural persons who are directors, trustees, officers, managing members, advisory board members or committee members or any equivalent position of the **Organization**. |
| **Excess Benefit Transaction** | means a transaction as defined in Internal Revenue Code, Title 26 §4958 (c)(1). |
| **Excess Benefit Transaction Excise Tax** | means any excise tax imposed by the Internal Revenue Service, pursuant to Section 4958(a)(2) of the Internal Revenue Code, 26 U.S.C. § 4958(a)(2), against an **Individual Insured** who participated as an **Organization Manager** in connection with an **Excess Benefit Transaction**. |
| **Individual Insured** | means any past, present or future: |

1. **Executive**;
2. **Employee**; or

3. the estates, heirs, legal representatives or assigns of 1. and 2., above in the event of their death, incapacity or bankruptcy.

**Loss**

means the amount the **Insured** becomes legally obligated to pay as a result of a **Claim**, including:

1. damages, settlements and judgments;
2. pre-judgment and post judgment interest;
3. punitive or exemplary damages to the extent such damages are insurable under applicable law, statute or regulation;
4. the multiplied portion of any multiple damage award to the extent such damages are insurable under applicable law, statute or regulation; and
5. any ten percent (10%) **Excess Benefit Transaction Excise Tax** assessed by the Internal Revenue Service against any **Individual Insured**, subject to a $100,000 maximum sublimit of liability per **Policy Period** for **Loss** and **Defense Costs**, combined provided, however that indemnification by the **Organization** for such taxes is not expressly prohibited in the bylaws, certificate of incorporation or other governing documents of the **Organization**. This sublimit of liability is part of and not in addition to the applicable Directors and Officers Limit of Liability as set forth on the Policy Declarations.

For the purpose of determining the insurability of damages in items 3. and 4. above, the laws of the jurisdiction most favorable to the insurability of such damages shall control; provided that such jurisdiction has a substantial relationship to the relevant **Insured** or to the **Claim** giving rise to the damages.

However, **Loss** does not include:

1. fines, penalties, sanctions and forfeitures;
2. taxes, except for any ten percent (10%) **Excess Benefit Transaction Excise Tax** as outlined in subparagraph 5. above of this definition of "**Loss**", or as otherwise provided by endorsement;
3. any amount uninsurable under the law pursuant

to which this **Policy** is construed;

4. cost of compliance with any order for, grant of or agreement to provide non-monetary or injunctive relief;

5. any unpaid salary, wages, commissions, severance, bonus or incentive compensation that is due or alleged to be due to any person; or

6. any amount for which an **Individual Insured** is absolved from payment by reason of any covenant, agreement or court order.

**Organization Manager**   means a person or persons described in Internal Revenue Code, Title 26 §4958(f).

**Outside Entity**   means any not-for-profit organization that qualifies as such under Section 501(c) of the Internal Revenue Code of 1986 (as amended), that is not an **Insured**.

**Outside Capacity**   means the service, other than **Employed Attorney Services,** of an **Individual Insured** while acting in the capacity of director, officer, trustee, managing member or any equivalent position of an **Outside Entity,** but only if such service is provided on behalf of the **Outside Entity** with the specific knowledge, request, consent or direction of the **Named Insured**.

**Personal Injury Wrongful Act**   means any actual or alleged false arrest, wrongful detention, malicious prosecution, invasion of privacy, wrongful entry or eviction, libel, slander or defamation.

**Pollutants**   means any solid, liquid, gaseous, bacterial, fungal, electromagnetic, thermal or other substance, smoke, vapor, soot, fumes, acids, alkalis, chemicals, toxic materials, 'Volatile Organic Compound', 'Organic Pathogen', 'Silica', asbestos, lead and gases therefrom, radon, combustion byproducts, noise and 'Waste'. Specific examples include, but are not limited to diesel, kerosene, and other fuel oils, carbon monoxide, and other exhaust gases, mineral spirits and other solvents, tetrachloroethylene, perchloroethylene (PERC), trichloroethylene (TCE), methylene chloroform, and other dry cleaning chemicals, chlorofluorocarbons, chlorinated hydrocarbons, adhesives, pesticides, insecticides, and all substances specifically listed, identified, or described by one or more of the following references:

1. Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA) Priority List Hazardous Substances (1997 and all subsequent editions); or
2. Agency for Toxic Substances And Disease Registry ToxFAQs™; or
3. U.S. Environmental Protection Agency EMCI Chemical References Complete Index.

For the purposes of this definition;

1. 'Volatile Organic Compound' means any compound which discharges organic gases as it decomposes or evaporates, examples of which include but are not limited to formaldehyde, pesticides, adhesives, construction materials made with organic chemicals, solvents, paint varnish and cleaning products.
2. 'Organic Pathogen' means any organic irritant or contaminant, including but not limited to mold, fungus, bacteria or virus, including but not limited to their byproduct such as mycotoxin, mildew, or biogenic aerosol.
3. 'Silica' means silica in any form and any of its derivatives, including but not limited to silica dust, silicon dioxide, crystalline silica, quartz, or non-crystalline (amorphous) silica.
4. 'Waste' means any property intended to be disposed, recycled, reused or reclaimed by the owner or user thereof.

**Publisher Wrongful Act**    means any infringement of copyright, trademark, unauthorized use of title, or plagiarism or misappropriation of ideas.

**Wrongful Act**    means any:

1. actual or alleged act, error, omission, misstatement, misleading statement, neglect, or breach of duties;
2. **Personal Injury Wrongful Act**;
3. **Publisher Wrongful Act**; or
4. **Employed Attorney Services**

committed or allegedly committed by:

      a.  the **Organization**;

      b.  any **Individual Insured,** arising solely from duties conducted on behalf of the **Organization** or asserted against an **Individual Insured** because of 1. above; or

      c.  any **Individual Insured** while acting in an **Outside Capacity**.

---

## IV.  EXCLUSIONS

A.  The **Company** shall not be liable to make payment for **Loss** or **Defense Costs** in connection with any **Claim** made against the **Insured** arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any actual or alleged:

**Conduct**

1. deliberately fraudulent act, omission, criminal act, or willful violation of any statute or regulation by any **Insured**; or
2. any **Insured** having gained any profit, remuneration or other advantage to which such **Insured** was not legally entitled;

provided that this exclusion will not apply to **Defense Costs** incurred until:

      a.  a final, non-appealable adjudication in any underlying proceeding or action establishes such conduct; or

      b.  the **Insured** has admitted, stipulated or pleaded no contest to such conduct;

**Bodily Injury/Property Damage**

1. bodily injury, assault, battery, sickness, disease, death, mental anguish, humiliation or emotional distress of any person; or
2. damage to or destruction of any tangible property including any resulting loss of use thereof;

provided that this exclusion shall not apply to any mental anguish, humiliation or emotional distress asserted in an otherwise covered **Claim** alleging a **Personal Injury Wrongful Act**.

**Employee Benefits**

pension, profit sharing, welfare benefit or other employee benefit program established in whole or in part for the benefit of any **Individual Insured**, or based upon, arising out of or in any way involving the Employee Retirement Income Security Act of 1974 (or

any amendments thereof or regulations promulgated there under) or similar provisions of any federal, state or local statutory law or common law;

Insured vs Insured

**Claim** brought by or on behalf of any **Insured**; provided that this exclusion shall not apply to:

1. any derivative action on behalf of, or in the name or right of the **Organization,** if such action is brought and maintained independent of and without the solicitation, assistance, participation or intervention of any **Insured**;
2. any **Claim** in the form of a cross claim, third party claim or other claim for contribution or indemnity by any **Individual Insured** which is part of or results directly from a **Claim** which is not otherwise excluded under this **Policy**;
3. any **Claim** brought or maintained by or on behalf of a bankruptcy or insolvency trustee, examiner, liquidator, receiver, rehabilitator, or creditors committee for an **Organization**; or
4. any **Claim** brought and maintained by or on behalf of any former **Executive**, but only if such **Claim** does not arise out of, directly or indirectly result from, is in consequence of, or in any way involves any **Wrongful Act**, responsibilities, actions or failure to act by any **Insured** during the tenure of service of such former **Executive**.

Employment Practices

refusal to employ, termination of employment, or employment related coercion, demotion, evaluation, reassignment, discipline, workplace conditions, false imprisonment, defamation, harassment, humiliation, or discrimination of employment, or other employment-related practices, policies, acts or omissions or sexual harassment by any **Insured** against any person(s) or entity; or negligence involving any of the foregoing;

it being understood that this exclusion applies whether the **Insured** may be held liable as an employer or in any other capacity and to any obligation to contribute with or indemnify another with respect to such **Claim**;

Discrimination

discrimination, including but not limited to discrimination based on religion, race, creed, color, sex, age, marital status, sexual preference, pregnancy,

handicap or disability;

Outside Entity vs. Insured

**Claim** made by or on behalf of an **Outside Entity** or one or more of the **Outside Entity's** directors, officers, trustees, managing members or any equivalent position against an **Individual Insured** acting in an **Outside Capacity**, provided, however that this exclusion shall not apply to:

1. any **Claim** brought derivatively on behalf of the **Outside Entity,** independently and without the direct solicitation, participation, intervention or assistance of the **Outside Entity** or any **Insured** in an **Outside Capacity**;
2. any **Claim** in the form of a cross claim, third party claim or other claim for contribution or indemnity by an **Insured** acting in an **Outside Capacity** and which is part of or results directly from a **Claim** which is not otherwise excluded under this **Policy**; and
3. any **Claim** brought or maintained by or on behalf of a bankruptcy or insolvency trustee, examiner, liquidator, receiver, rehabilitator, or creditors committee for an **Outside Entity** against an **Insured** acting in an **Outside Capacity** for such **Outside Entity**.

Pollution

1. discharge, emission, release, seepage, migration, dispersal or escape of **Pollutants** or any threat thereof, including nuclear reaction, radiation or contamination; or
2. treatment, removal or disposal of any **Pollutants**;
3. regulation, order, direction or request to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize any **Pollutants**; or any voluntary decision to do so; or
4. actual or alleged property damage including loss of use, bodily injury, sickness, disease or death of any person, or financial loss to an **Organization** or **Outside Entity**, their security holders, or their creditors resulting from any of the aforementioned matters in 1., 2., or 3. above of this Exclusion.

| | |
|---|---|
| Prior or Pending Litigation | litigation, demand, claim, arbitration, decree, judgment, proceeding, or investigation against any **Insured**, which was pending on or prior to the Prior or Pending Litigation date referenced on the Policy Declarations, or any such action based on the same or essentially the same fact, circumstance, matter, situation, transaction or event underlying or alleged therein; |
| Prior Notice | 1. fact, circumstance, matter, situation, transaction, event, or **Wrongful Act** that, before the effective date of this **Policy**, was the subject of any notice given under any similar policy of insurance; or<br><br>2. other fact, circumstance, matter, situation, transaction, event, or **Wrongful Act** whenever occurring, which together with a fact, circumstance, matter, situation, transaction, event, or **Wrongful Act** described in subparagraph 1. above, would constitute **Interrelated Wrongful Acts**; |
| Prior Wrongful Acts of Subsidiaries | 1. **Wrongful Act** committed by an **Individual Insured** of any **Subsidiary**, or by such **Subsidiary**, occurring before the date such entity became a **Subsidiary**; or<br><br>2. other fact, circumstance, matter, situation, transaction, event, or **Wrongful Act** whenever occurring, which together with a fact, circumstance, matter, situation, transaction, event, or **Wrongful Act** described in subparagraph 1. above, would constitute **Interrelated Wrongful Acts**; |
| Professional Services | rendering or failure to render legal (except **Employed Attorney Services**), medical, psychological, counseling services or referrals, if the **Claim** is brought by or on behalf of any individual and/or entity for whom such services were, now are, or shall be performed;<br><br>provided that this exclusion shall not apply to that part of a **Claim** against an **Individual Insured** which alleges that the **Individual Insured**, in his or her capacity as such, failed to supervise those who performed such services. |

B. The **Company** shall not be liable to make payment for **Loss** or **Defense Costs** in connection with any **Claim** made against the **Insured** for actual or alleged:

Contract

liability of the **Insured** under any express contract or agreement to which an **Organization** is a party, provided that this exclusion shall not apply to:

1. the extent that such **Organization** would have been liable in the absence of such contract or agreement; and
2. any **Claim** against an **Individual Insured**.

No **Wrongful Act** of one or more **Insureds** shall be imputed to any other **Insured** for the purpose of determining the applicability of any of the above exclusions in Section A. or B. above.

---

## V.   ORDER OF PAYMENTS

In the event of **Loss** arising from a **Claim** for which payment is concurrently due under Insuring Agreement A., Individual Insured - Non-Indemnified Coverage, and one or more of the other Insuring Agreements of this **Coverage Part**, the **Company** shall:

1. first pay **Loss** for which coverage is provided under Insuring Agreement A., Individual Insured - Non-Indemnified Coverage; then
2. with respect to whatever remaining amount of the Limit of Liability is available after payment above, pay such **Loss** for which coverage is provided under any other Insuring Agreement.

Except as otherwise provided above, the **Company** may pay covered **Loss** as it becomes due under this **Coverage Part** without regard to the potential for other future payment obligations under this **Coverage Part**.

---

## VI.   LIFETIME OCCURRENCE REPORTING PROVISION

A. If this Policy is cancelled or not renewed by the **Named Insured** for any reason other than being sold, acquired, or declaring bankruptcy, each **Individual Insured** who did not serve as such at the time of the cancellation or non-renewal, shall be provided with an unlimited extension of time to report any **Claim** first

DO 100 (05-17)

made against such **Individual Insured** after the effective date of such cancellation or non-renewal, subject to the following conditions:

1. the **Claim** results from a **Wrongful Act** committed by the **Individual Insured** before the effective date of cancellation or non-renewal; and
2. the **Wrongful Act** was actually or allegedly committed during a **Policy Period** of a **Policy** issued by the **Company**; and
3. such **Individual Insured** was serving in such capacity during the **Policy Period** of a **Policy** issued by the **Company**; and
4. no Directors & Officers Liability policy, or similar policy providing essentially the same type of coverage, or extended reporting period, is in effect at the time the **Claim** is first made against such **Individual Insured**; and
5. the **Claim** is not otherwise excluded by the **Policy** issued by the **Company** in effect at the time the **Wrongful Act** actually or allegedly occurred; such **Policy** shall be the **Policy** under which coverage is applicable including all terms, conditions, limits, retentions, and endorsements therein.
6. the **Company** will have written continuous coverage for **Named Insured** from the effective date of the first **Policy** the **Company** issued to the date of cancellation or non-renewal of this **Policy**.

B. The LIFETIME OCCURRENCE REPORTING PROVISION described herein shall not apply to any **Claim** made against any **Individual Insured** caused by, arising or resulting, directly or indirectly from or in consequence of the **Individual Insured's** serving in an **Outside Capacity** for an **Outside Entity**.

---

**VII.   TIMELY NOTICE AND RESOLUTION INCENTIVE**

Retention Forgiveness

In the event of a **Claim**, the **Company** shall waive the applicable retention under this **Coverage Part**, up to a maximum of $10,000, if each of the following conditions are met:

1. The **Claim** is reported to the **Company** within thirty (30) days of first receipt by an **Insured**; and
2. The **Company** successfully negotiates a

settlement of the **Claim** within the Limits of Liability of this **Coverage Part**; and

3. The **Insured** consents to the settlement of the **Claim** without condition within thirty (30) days after notice of the settlement is provided to the **Insured** by the **Company**; and

4. Settlement of the **Claim** is finalized by the **Company** within ninety (90) days of the **Claim** being first reported to the **Company**.

## VIII.   OUTSIDE DIRECTORSHIP PROVISION

In the event a **Claim** is made against any **Individual Insured** arising out of their service as a director, officer, trustee, managing member or any equivalent positions of an **Outside Entity**, coverage afforded under this **Policy** shall be excess of any indemnification provided by the **Outside Entity** and any insurance provided to the **Outside Entity** which covers its directors, trustees, officers, managing members or any equivalent position.

This Endorsement modifies insurance provided under the following:

**NON PROFIT MANAGEMENT LIABILITY POLICY**

## ACCREDITATION/CERTIFICATION/STANDARD SETTING EXCLUSION

It is hereby agreed that the Directors and Officers **Coverage Part**, Section **IV**. EXCLUSIONS, Subsection **A**. is amended by the addition of the following:

| | |
|---|---|
| Accreditation/Certification/Standard Setting | accreditation, certification, standard setting, or similar such activities by or on behalf of any **Insured**; |

All other terms and conditions of this **Policy** remain unchanged.  This endorsement is part of your **Policy** and takes effect on the effective date of your **Policy** unless another effective date is shown.

DO 201 (05-17)                                                                                          Page 1 of 1

This Endorsement modifies insurance provided under the following:

**NON PROFIT MANAGEMENT LIABILITY POLICY**

## ABSOLUTE PROFESSIONAL LIABILITY EXCLUSION

It is hereby agreed that the Directors and Officers **Coverage Part**, Section IV. EXCLUSIONS, Subsection A. "Professional Services", is deleted in its entirety and replaced by the following:

Professional Services

1. rendering or failure to render any professional services by any **Insured**, whether or not such services are rendered for a fee; or
2. **Employed Attorney Services**

It is further agreed that the Directors and Officers **Coverage Part**, Section III. DEFINITIONS, **Wrongful Act** is amended by the deletion of Item 4. **Employed Attorney Services**.

All other terms and conditions of this **Policy** remain unchanged. This endorsement is part of your **Policy** and takes effect on the effective date of your **Policy** unless another effective date is shown.

---

This Endorsement modifies insurance provided under the following:

**NON PROFIT MANAGEMENT LIABILITY POLICY**

---

## SEXUAL ABUSE EXCLUSION

It is hereby agreed that the Directors and Officers **Coverage Part**, Section IV. EXCLUSIONS, Subsection A. is amended by the addition of the following:

| | |
|---|---|
| Abuse/Molestation | sexual misconduct, sexual molestation, or physical or mental abuse of any person. |

It is also agreed that the Employment Practices Liability **Coverage Part**, Section II. DEFINITIONS, is amended by the addition of the following:

| | |
|---|---|
| **Child Molestation** | means sexual misconduct, sexual molestation, or physical or mental abuse of any 'Child'.  For the purposes of this definition: |
| | 'Child' shall mean any natural person who was under eighteen (18) years of age at the time an act of **Child Molestation** is first committed. |

It is also agreed that the Employment Practices Liability Coverage Part, Section II. DEFINITIONS, "**Wrongful Third Party Act**" is amended by the addition of the following:

> This definition does not mean **Child Molestation**.

It is further agreed that the Employment Practices Liability **Coverage Part**, Section III. EXCLUSIONS, Subsection B. is amended by the addition of the following:

| | |
|---|---|
| Child Molestation | **Child Molestation**, including any actual or alleged negligence in the hiring, supervision, training, screening or management of a person alleged to have committed an act of **Child Molestation** as well as any actual or alleged failure to report or failure to report in a timely manner any such act. |

All other terms and conditions of this **Policy** remain unchanged.  This endorsement is part of your **Policy** and takes effect on the effective date of your **Policy** unless another effective date is shown.

DO 224A (05-17)                                                                                      Page 1 of 1

This Endorsement modifies insurance provided under the following:

**NON PROFIT MANAGEMENT LIABILITY POLICY**

# BUILDER OR DEVELOPER EXCLUSION

It is hereby agreed that the Directors and Officers **Coverage Part**, Section IV. EXCLUSIONS, Subsection A., is amended by the addition of the following:

| | |
|---|---|
| Builder or Developer | acts, errors or omissions by or on behalf of any builder or developer, or any **Claim** made against any **Insured** by any builder or developer or by any person or entity acting on their behalf. |

All other terms and conditions of this **Policy** remain unchanged.  This endorsement is part of your **Policy** and takes effect on the effective date of your **Policy** unless another effective date is shown.

This Endorsement modifies insurance provided under the following:

**NON PROFIT MANAGEMENT LIABILITY POLICY**

# DATA & SECURITY+ ENDORSEMENT

It is hereby agreed:

Unless otherwise stated herein, the terms, conditions, exclusions and other limitations set forth in this endorsement are solely applicable to coverage afforded by this endorsement. This endorsement is part of and subject to the provisions of the **Policy** to which it is attached.

## I.   SCHEDULE OF ADDITIONAL COVERAGES AND LIMITS

The following is a summary of coverages and Limits of Liability provided by this endorsement.

| COVERAGE | LIMIT OF LIABILITY |
|---|---|
| A. **Data Breach** Expense | $50,000 each claim<br>$50,000 in the aggregate |
| B. **Identity Theft** Expense | $50,000 each claim<br>$50,000 in the aggregate |
| C. **Workplace Violence Act** Expense | $50,000 each claim<br>$50,000 in the aggregate |
| D. **Kidnapping** Expense | $50,000 each claim<br>$50,000 in the aggregate |

The maximum aggregate per **Policy Period** for A. through D. above shall be $200,000 in the aggregate.

No retentions shall apply to the sublimits shown above.

## II.  COVERAGES:

A. **Data Breach** Expense
The **Company** will pay on behalf of the **Organization** up to the **Data Breach** Expense Limit of Liability stated in the schedule above, for reasonable and necessary expenses in items 1. through 6. below:
1. Development of a plan to assist the **Organization** in responding to a **Data Breach**;
2. Data analysis or forensic investigation to assess the scope of a **Data Breach**;
3. The development, printing and mailing of legally required notification letters to those affected by a **Data Breach**;

DO 283 (05-17)                                                                    Page 1 of 7

4. Development of a website link for use by the **Organization** in communicating with persons affected by a **Data Breach** after legally required notification letters are sent;

5. Development of a customer relationship management system for use by the **Organization** in communicating with persons affected by a **Data Breach** after legally required notification letters are sent**;**

6. Public relations services or crisis management services retained by the **Organization** to mitigate the adverse affect on the **Organization's** reputation  resulting from a **Data Breach** that becomes public and only after legally required notification letters are sent.

incurred by the **Organization** as a result of a **Data Breach. The Data Breach** must be first occur, be discovered by an **Insured**, and reported to the **Company** during the **Policy Period** but in no event later than sixty (60) days after the **Data Breach** is first discovered by an **Insured**. The expenses below must be incurred within one (1) year of the reporting of such **Data Breach**:

The **Organization** must first report the **Data Breach** to the **Company** and use a service provider of the **Company's** choice prior to incurring any of the above costs.

B. **Identity Theft** Expense

The **Company** will pay on behalf of a director or officer of the **Organization** up to the **Identity Theft** Expense Limit of Liability stated in the schedule above, for expenses, services or fees noted in items 1. through 3. below:

1. Credit monitoring services provided by a vendor of the **Company's** choice for the affected director or officer for up to one year following an **Identity Theft;**

2. Additional application fees paid by a director or officer whose loan(s) were rejected based on incorrect credit information resulting from an **Identity Theft**;

3. Notary fees, certified and overnight mail expenses paid by a director or officer in connection with reporting an **Identity Theft** to financial institutions, credit bureaus and agencies and law enforcement authorities.

incurred by such director or officer after he or she has become a victim of **Identity Theft. The Identity Theft** must first occur, be first discovered by an **Insured,** and reported to the **Company** during the **Policy Period** but in no event later than sixty (60) days after the **Identity Theft** is first discovered by an **Insured.**  The expenses above must be incurred within one (1) year of the reporting of such **Identity Theft**:

Any director or officer of the **Organization** who is a victim of **Identity Theft** must first report the **Identity Theft** to the **Company** and use a service provider of the **Company's** choice prior to incurring any of the above expenses, services or fees.

C. **Workplace Violence Act** Expense
The **Company** will reimburse the **Organization,** up to the **Workplace Violence Act** Expense Limit of Liability stated in the schedule above**,** for the following reasonable costs paid by the **Organization** for a period of thirty (30) days following, and as a result of, a

DO 283 (05-17)                                                                                                      Page 2 of 7

**Workplace Violence Act**:
1. Counseling services rendered to **Employees** and persons on the **Organization's Premises** directly affected by a **Workplace Violence Act**. The counseling services must be rendered by a licensed, professional counselor of the **Organization's** choice.
2. Services rendered by an independent public relations consultant of the **Organization's** choice for the purpose of mitigating the adverse affect of a **Workplace Violence Act** on the **Organization**.

To be covered, the **Workplace Violence Act** must occur during the **Policy Period** and be reported to the **Company** during the **Policy Period** but in no event later than sixty (60) days after the occurrence.

D. **Kidnapping** Expense
The **Company** will reimburse the **Organization,** up to the **Kidnapping** Expense Limit of Liability stated in the schedule above**,** for the following reasonable costs paid by the **Organization** as a result of a **Kidnapping:**
1. Retaining an independent negotiator or consultant to facilitate the release of a **Kidnapping** victim.  Nothing herein shall obligate the **Company** to recommend, select, retain or arrange for the retention of such independent negotiator or consultant;
2. Interest on a loan obtained by the **Organization** to pay expenses covered under this endorsement that is incurred as a result of a **Kidnapping.** However, there is no coverage for interest accruing prior to thirty (30) days preceding the date of such payment or subsequent to the date the **Company** pays any portion of a **Kidnapping** Expense or for expenses not covered under this endorsement;
3. Travel and accommodations incurred by the **Organization** in direct response to the **Kidnapping.** Nothing herein shall obligate the **Company** to recommend, select, or arrange for such travel and accommodations;
4. A reward up to $10,000 paid by the **Organization** to an informant for information which leads to the arrest and conviction of the person(s) responsible for the **Kidnapping**;
5. The current base salary paid to a director or officer of the **Organization** for the director or officer's work on behalf of the **Organization,** who is a victim of a **Kidnapping** subject to the following:
   a. salary reimbursement shall commence on the thirty-first (31st) consecutive day after a **Kidnapping**;
   b. salary reimbursement shall end when the director or officer is released; or is confirmed dead; or one hundred and twenty (120) days after the director or Officer is last confirmed to be alive; or twelve (12) months after the date of the **Kidnapping**, or when the **Kidnapping** Expense Limit of Liability has been exhausted by payments made by the **Company**, whichever occurs first.
   There is no coverage for **Kidnapping** Expense resulting from a **Kidnapping** planned, carried out or participated in, directly or indirectly, by any person who is or was a member of the victim's family or the **Organization**.

The **Kidnapping** must occur and be reported to the **Company** during the **Policy Period** but in no event later than sixty (60) days after the occurrence.

III. ADDITIONAL DEFINITIONS

It is hereby agreed that the Directors and Officers **Coverage Part**, Section III. DEFINITIONS, is amended by the addition of the following definitions:

| | |
|---|---|
| **Data Breach** | means the misappropriation or public disclosure, by electronic or non-electronic means, by the **Organization** and without the knowledge of, consent, or acquiescence of the president, member of the board of directors or any executive officer, of an individual(s) **Personally Identifiable Information** in the **Organization's** care, custody and control without the authorization or permission of the owner of such information. |

**Identity Theft**

Means:

1. the act of obtaining **Personally Identifiable Information** belonging to a director or officer of the **Organization** without that person's authorization, consent or permission; and
2. the use of **Personally Identifiable Information** so obtained to make or attempt to make transactions or purchases by fraudulently assuming that person's identity.

**Identity Theft** does not mean any of the above committed directly or indirectly by a director or officer of the **Organization,** or by a family member of any director or officer.

There is no coverage for any **Identity Theft** Expense unless **Personally Identifiable Information** that is obtained without authorization, consent or permission is used to make or attempt to make purchases or conduct transactions by fraudulently assuming the identity of a director or officer of the **Organization**.

**Kidnapping**

means an actual or alleged wrongful abduction and involuntary restraint of a director or officer of the **Organization**, by one or more persons acting individually or collectively in which monetary or non-monetary demands are made to the **Organization** to obtain the director's or officer's release.

**Personally Identifiable Information**

means:

1. information concerning an individual(s) that would be considered "non-public information" within the meaning of Title V of the Gramm-Leach Bliley Act of 1999 (as amended) and its implementing regulations including but not limited to Social Security numbers or account numbers correlated with names and addresses which is in an Insured's care, custody and control; and

2. personal information as defined in any U.S. federal, state or local privacy protection law governing the control and use of an individual's personal and confidential information, including any regulations promulgated thereunder; and

3. protected health information as defined by the Health Insurance Portability and Accountability Act of 1996 (Public Law 104-191) ("HIPPA") or the Health Information Technology for Economic and Clinical Health Act of 2009 ("HITECH") (Public Law 111- 5), as amended, and any regulations promulgated thereto. **Personally Identifiable Information** does not mean information that is available to the public which does not include otherwise protected personal information.

**Premises**

means buildings, facilities or properties leased or owned by the **Organization** in conducting its operations.

**Workplace Violence Act**

means an actual use of unlawful deadly force, or the threatened use of unlawful deadly force involving the display of a lethal weapon, occurring on the **Organization's Premises** and directed at an **Individual Insured,** or other persons on the **Premises** of the **Organization.**

## IV. LIMITS OF LIABILITY AND RETENTION

1. The maximum Limit of Liability for any expenses provided by this endorsement shall be in addition to the Limits of Liability as set forth in the Policy Declarations for the Directors and Officers **Coverage Part**.

2. Any one incident, interrelated incidents or series of similar or related incidents for which coverage is provided under this endorsement shall be treated as one incident subject to

the maximum Limit of Liability available under this endorsement at the time the incident(s) is first reported to the Company regardless of whether the incident(s) continues and expenses are incurred by the Organization in any subsequent Policy Period(s).

## V.  ADDITIONAL EXCLUSIONS

It is hereby agreed that the Directors and Officers **Coverage Part**, Section IV. EXCLUSIONS, is amended by the addition of the following:

Data Breach Related

1. Expense reimbursement resulting in any **Insured** gaining any profit, remuneration or advantage to which the **Insured** is not legally entitled;
2. expenses incurred by any **Subsidiary** of an **Organization** occurring prior to the date that such entity became a **Subsidiary** or incurred at any time that such entity is not a **Subsidiary**;
3. expenses arising from any incident(s) of which any **Insured** had notice before the inception date of this Policy; or any fact, circumstance, event, situation or incident which before the inception date of this Policy was the subject of any notice under any other similar policy of insurance or any future claims for expenses under this Policy based upon such pending or prior notice;
4. The portion of any expenses covered under this endorsement that is also covered under any other coverage part of this **Policy**;
5. Reissuance of credit or debit cards or any other expense not shown in Section II, COVERAGES, sub-section A, **Data Breach** Expense.

## VI. COVERAGE LIMITATIONS

The following terms, conditions and exclusions in the General Terms and Conditions and the Directors and Officers **Coverage Part** do not apply to this endorsement:
1. General Terms and Conditions
   a. Section II. EXTENDED REPORTING PERIOD
   b. Section XI. SPOUSAL AND DOMESTIC PARTNER EXTENSION

2. Directors and Officers **Coverage Part**
   a. Section IV. EXCLUSIONS, Subsection A. "Bodily Injury/Property Damage"
   b. Section VI. LIFETIME OCCURRENCE REPORTING PROVISION
   c. Section VIII. OUTSIDE DIRECTORSHIP PROVISION


All other terms and conditions of this **Policy** remain unchanged.  This endorsement is part of your **Policy** and takes effect on the effective date of your **Policy** unless another effective date is shown.

This Endorsement modifies insurance provided under the following:

**NON PROFIT MANAGEMENT LIABILITY POLICY**

# AMENDMENT OF PRIOR OR PENDING LITIGATION EXCLUSION

It is hereby agreed that the Directors and Officers **Coverage Part**, Section IV. EXCLUSIONS, Subsection A. "Prior or Pending Litigation" is deleted and replaced by the following:

Prior or Pending Litigation    Any litigation, demand, claim, arbitration, decree, judgment, proceeding, or investigation against any **Insured,** or any such action based upon the same or essentially the same facts, circumstances, matters, situations, transactions or events underlying or alleged therein which was pending on or prior to the effective date of this **Policy**;

provided that, if this **Policy** is a renewal of a **Policy** previously issued by the **Company** in a continuous succession of **Policies** with no lapses in coverage, the effective date of this **Policy** will mean the effective date of the first **Policy** issued by the **Company** in such succession of **Policies.**

It is also agreed that the Employment Practices **Coverage Part** (if purchased), Section III. EXCLUSIONS, Subsection B. "Prior or Pending Litigation" is deleted and replaced by the following:

Prior or Pending Litigation    Any litigation, demand, claim, arbitration, decree, judgment, proceeding, or investigation against any **Insured,** or any such action based upon the same or essentially the same facts, circumstances, matters, situations, transactions or events underlying or alleged therein which was pending on or prior to the effective date of this **Policy**;

provided that, if this **Policy** is a renewal of a **Policy** previously issued by the **Company** in a continuous succession of **Policies** with no lapses in coverage, the effective date of this **Policy** will mean the effective date of the first **Policy** issued by the **Company** in such succession of **Policies.**

It is also agreed that the Fiduciary Liability **Coverage Part** (if purchased), Section III. EXCLUSIONS, Subsection B. "Prior or Pending Litigation" is deleted and replaced by the following:

DO 298 (05-17)                                                      Page 1 of 2

Prior or Pending Litigation

Any litigation, demand, claim, arbitration, decree, judgment, proceeding, or investigation against any **Insured,** or any such action based upon the same or essentially the same facts, circumstances, matters, situations, transactions or events underlying or alleged therein which was pending on or prior to the effective date of this **Policy**;

provided that, if this **Policy** is a renewal of a **Policy** previously issued by the **Company** in a continuous succession of **Policies** with no lapses in coverage, the effective date of this **Policy** will mean the effective date of the first **Policy** issued by the **Company** in such succession of **Policies.**

All other terms and conditions of this **Policy** remain unchanged.  This endorsement is part of your **Policy** and takes effect on the effective date of your **Policy** unless another effective date is shown.

**Non-Profit Management Liability Policy**                    **General Terms and Conditions**

In consideration of the payment of the premium and reliance upon all statements made and information furnished to the **Company**, including the statements made in the **Application** and subject to all the provisions of this **Policy**, the **Company** and the **Insureds** agree as follows:

**NOTICE**: This is a Claims Made Policy.  This means the **Company** will cover only those **Claims** first made against the **Insured** during the **Policy Period** or, where applicable, the Extended Reporting Period.

If any provision in these General Terms and Conditions is inconsistent or in conflict with the terms and conditions of any **Coverage Part**, the terms and conditions of such **Coverage Part** shall control for the purposes of that **Coverage Part**.

Any bolded term in a **Coverage Part** that is defined in these General Terms and Conditions shall have the meaning set forth in these General Terms and Conditions. Any bolded term in a **Coverage Part** that is defined in that **Coverage Part** shall have the meaning set forth in such **Coverage Part**.

The descriptions in the headings and subheadings of this **Policy** are solely for convenience and form no part of the terms and conditions of coverage, and do not serve to express, confirm, alter or provide coverage.

I.    DEFINITIONS

| | |
|---|---|
| **Application** | means: |

1. an application and any materials submitted for this **Policy**; and
2. an application and any materials submitted for all previous **Policies** issued by the **Company** providing uninterrupted coverage.

The content of 1. and 2. above are incorporated by reference in this **Policy** as if physically attached hereto.

| | |
|---|---|
| **Claim** | shall have the meaning as defined in the applicable **Coverage Part**. |
| **Company** | means the insurance company identified in the Policy Declarations. |
| **Coverage Part** | means individually or collectively, as applicable, the purchased coverage parts as set forth in the Policy Declarations as included and attached to and made a part of this **Policy**. |

| | |
|---|---|
| **Defense Costs** | shall have the meaning as defined in the applicable **Coverage Part**. |
| **Domestic Partner** | means any natural person qualifying as a domestic partner under the provision of any applicable federal, state or local laws. |
| **Employee** | shall have the meaning as defined in the applicable **Coverage Part**. |
| **Financial Impairment** | means: |

1. the appointment by any federal or state official, agency or court of any receiver, conservator, liquidator, trustee, rehabilitator, creditors committee or similar official to take control of, supervise, manage or liquidate the **Organization** and provided that the court or other judicial or administrative body overseeing the receivership, conservatorship, liquidation, rehabilitation, bankruptcy or equivalent proceeding has denied a request by the **Organization** to indemnify an **Individual Insured** for a **Loss**; or
2. the **Organization** becoming a debtor in possession under the United States bankruptcy law or the equivalent of a debtor in possession under the law of any other country.

| | |
|---|---|
| **Insured** | means any **Organization** and any **Individual Insured**. |
| **Individual Insured** | shall have the meaning as defined in the applicable **Coverage Part**. |
| **Interrelated Wrongful Acts** | means any **Wrongful Acts** based upon, arising from, or in consequence of the same or related facts, circumstances, situations, transactions or events, or that are logically or causally connected by reason of any common or related series of facts, circumstances, situations, transactions or events. |
| **Loss** | shall have the meaning as defined in the applicable **Coverage Part**. |
| **Management Control** | means: |

1. control of more than fifty percent (50%) of the voting rights representing the right to appoint, elect, or designate the majority of the board of directors, board

of trustees, or board of managers; or

2. control of exactly fifty percent (50%) of the voting rights representing the right to appoint, elect, or designate the majority of the board of directors, board of trustees, or board of managers; and pursuant to a written contract solely controls the management and operations of such entity.

**Named Insured**   means the entity named in Item 1. of the Policy Declarations.

**Organization**   means:

1. the **Named Insured** and any **Subsidiary**; and
2. any entity as debtor in possession under United States bankruptcy law or equivalent status under the law of any other jurisdiction.

**Plan**   shall have the meaning as defined in the applicable **Coverage Part**.

**Policy**   means collectively the Policy Declarations, General Terms and Conditions, applicable **Coverage Parts**, applicable endorsements, and the **Application**.

**Policy Period**   means the period of time from the effective date and time of this **Policy** to the date and time of expiration as shown in the Policy Declarations, or its earlier cancellation or termination date. If the length of the **Policy Period** is the same as the **Policy Year**, the terms **Policy Period** and **Policy Year** are used interchangeably herein.

**Policy Year**   means the period of one (1) year following the effective date of the **Policy Period** or any subsequent one-year anniversary thereof; or

In the event the **Policy** expires less than one (1) year following the effective date of the **Policy Period**; or more than one (1) year but less than two (2) years following the effective date of the **Policy Period**; then **Policy Year** shall mean any such period.

**Subsidiary**   means:

1. any not-for-profit entity in which the **Named Insured** has **Management Control** directly or indirectly through one or more **Subsidiaries** on or before the

.

effective date of this **Policy**; and is disclosed as a **Subsidiary** in an **Application** to the **Company**; or

2. any other entity added as a **Subsidiary** by written endorsement to this **Policy**.

**Takeover**   means:

1. the acquisition by another entity or person or group of entities or persons acting in concert of:
   a. the **Management Control** of the **Named Insured**; or
   b. the acquisition of more than fifty percent ( 50%) of the total consolidated assets of the **Named Insured** as of the date of the **Named Insured's** most recent consolidated financial statements prior to such acquisition;
2. the merger of the **Named Insured** into another entity such that the **Named Insured** is not the surviving entity;
3. the consolidation of the **Named Insured** with another entity; or
4. the loss, forfeiture, or suspension of the **Named Insured's** tax exempt status.

**Wrongful Act**   shall have the meaning as defined in the applicable **Coverage Part**.

---

II.   EXTENDED REPORTING PERIOD

Right to Purchase   If the **Policy** expires, is cancelled or not renewed for any reason other than non-payment of premium, then the **Named Insured** shall have the right to purchase an Extended Reporting Period to report to the **Company**, as soon as practicable prior to the expiration date of the purchased Extended Reporting Period, any **Claim** against an **Insured**.

An Extended Reporting Period shall only apply to **Claims** arising from a **Wrongful Act** which was actually or allegedly committed before the date of expiration, cancellation or non-renewal of this **Policy**, or prior to the effective date of any **Takeover**.  For the purpose of this clause, the offer of renewal terms and conditions or premiums by the **Company** different from those in effect prior to renewal shall not constitute a refusal to renew.

| | |
|---|---|
| Options | The additional premium for the Extended Reporting Period shall be a percentage of the total annual premium as shown in the Policy Declarations.  The **Named Insured** may elect any one of the following options: |

1. Twelve (12) month period - 30% of the annual premium;
2. Twenty Four (24) month period - 75% of the annual premium; or
3. Thirty Six (36) month period - 120% of the annual premium.

The Extended Reporting Period begins on the expiration date of the **Policy**, or if cancelled or non-renewed, the effective date of such cancellation or non-renewal of the **Policy**.

| | |
|---|---|
| Payment & Notice to the Company | As a condition precedent to the right to purchase an Extended Reporting Period, the total earned premium for this **Policy** must have been paid to the **Company**. Any premium paid with respect to an Extended Reporting Period shall be deemed fully earned as of the first day of the Extended Reporting Period.  The right to elect the Extended Reporting Period will terminate unless written notice of such election, together with payment of the additional premium as set forth above, is received by the **Company** within sixty (60) days of the effective date of the expiration, nonrenewal or cancellation of this **Policy**. |
| Extended Reporting Period Limits & Other Insurance | The Extended Reporting Period will not provide a new, separate or additional Limit of Liability.  The remainder of the Limit of Liability applicable to the **Policy Year** in effect as of the effective date of the expiration, cancellation, or non-renewal is the maximum Limit of Liability for all **Claims** reported during the Extended Reporting Period. |

## III.  DEFENSE & SETTLEMENT

| | |
|---|---|
| Duty To Defend | The **Company** shall have the right and duty to defend any **Claim** covered by this **Policy** even if the allegations are groundless, false or fraudulent.  The **Company** shall have the right to appoint counsel of its choice with respect to such **Claim**.  The **Company's** obligation to defend any **Claim** or pay any **Loss** or **Defense Costs** shall be completely |

fulfilled and extinguished if the applicable Limit of Liability has been exhausted by payment of **Loss**.

Consent to Settle

The **Company**, as it deems necessary, has the right to investigate, adjust, defend, appeal and, with the consent of the **Insured**, negotiate the settlement of any **Claim** whether within or in excess of the Retention. If the **Insured** refuses to consent to a settlement recommended by the **Company**, the **Company's** obligation to the **Insured** for **Loss** and **Defense Costs** attributable to such **Claim** shall be limited to:

a. The amount of the covered **Loss** in excess of the Retention which the **Company** would have paid in settlement at the time the **Insured** first refused to settle; plus

b. covered **Defense Costs** incurred up to the date the **Insured** first refused to settle; plus

c. eighty percent (80%) of covered **Loss** and **Defense Costs** in excess of the first settlement amount recommended by the **Company** to which the **Insured** did not consent.

It is understood that payment of a., b. and c. above is the limit of the **Company's** liability under this **Policy** for any **Claim** in which the **Insured** fails or refuses to consent to the **Company's** settlement recommendation, subject at all times to Section IX. LIMITS OF LIABILITY and Section X. RETENTIONS AND PRESUMPTIVE INDEMNIFICATION of these General Terms and Conditions. The remaining twenty percent (20%) of **Loss** and **Defense Costs** in excess of the amount referenced in a. and b. above shall be the obligation of the **Insured**.

In no event shall the **Company** be obligated to pay any **Loss** or **Defense Costs** after the applicable Limit of Liability shown in the Policy Declarations has been exhausted by payment of **Loss**.

| | |
|---|---|
| Consent of the Company | The **Insured** shall not demand or agree to arbitration of any **Claim** without the **Company's** written consent. The **Insured** shall not, except at personal cost, make any offer or payment, admit any liability, settle any **Claim**, assume any obligation, or incur any expense without the **Company's** written consent. |
| Cooperation | The **Insured** agrees to cooperate with the **Company** with respect to all **Claims**, and provide such assistance and information as the **Company** may reasonably request. Upon the **Company's** request, the **Insured** shall submit to examination and interrogation by the **Company's** representative, under oath if required, and shall attend hearings, depositions, trials and shall assist in the conduct of suits, including but not limited to effecting settlement, securing and giving evidence, obtaining the attendance of witnesses, giving written statements to the **Company's** representatives and meeting with such representatives for the purpose of investigation and/or defense, all of the above without charge to the **Company**. The **Insured** further agrees not to take any action which may increase the **Insured's** or the **Company's** exposure under this **Policy**. |
| Papers/Documents | The **Insured** shall execute all papers required and shall do everything that may be necessary to secure and preserve any rights of indemnity, contribution or apportionment which the **Insured** or the **Company** may have, including the completion of such documents as are necessary to enable the **Company** to bring suit in the **Insured's** name, and shall provide all other assistance and cooperation which the **Company** may reasonably require. |

## IV.   ALLOCATION OF DEFENSE COSTS

If a **Claim** is made against an **Insured** for both **Loss** that is covered by this **Policy** and loss that is not covered by this **Policy**, the **Company** will pay as follows:

1. One hundred percent (100%) of **Defense Costs** on account of such **Claim**; and

2.  all remaining loss from such **Claim** shall be apportioned between covered **Loss** and uncovered loss based on the relative legal exposures of the parties to such matters.

3.  Items 1. and 2. above of this Section IV. shall not apply to any **Insured** for whom coverage is excluded pursuant to Section VII. REPRESENTATIONS AND SEVERABILITY.

---

V.     NOTICE AND CLAIM REPORTING PROVISIONS

Notice hereunder shall be given in writing to the **Company**. If mailed, the date of mailing of such notice shall constitute the date that such notice was given and proof of mailing shall be sufficient proof of notice.

Written Notice of a Claim

1.  As a condition precedent to exercising any right to coverage under this **Policy**, the **Insured** shall give to the **Company** written notice of a **Claim** as soon as practicable after any Chief Executive Officer, Chief Financial Officer, Chief Operating Officer, Chairperson, Executive Director, Human Resources Manager, In-House General Counsel, Managing Member or Fiduciary of any **Plan** becomes aware of such **Claim**, however:

    a.  if the **Policy** expires, is cancelled or is non-renewed and no Extended Reporting Period is purchased, no later than ninety (90) days after the expiration date or the effective date of such cancellation or non-renewal; or

    b.  if an Extended Reporting Period is purchased, no later than the last day of the Extended Reporting Period.

However, if the **Policy** is cancelled for non-payment of premium, notice shall be provided by the **Insured** to the **Company** no later than the effective date of cancellation.

2.  Coverage for a **Claim** reported to the **Company** during the automatic 90 day period noted in 1. a. above shall only apply if the **Claim** is first made prior to the date of the **Policy** expiration, cancellation, or non-renewal.

| Written Notice of a Circumstance | 1. | If during the **Policy Period**, or any applicable Extended Reporting Period, the **Insured** becomes aware of circumstances which could give rise to a **Claim** and gives written notice of such circumstances to the **Company** as soon as practicable during the **Policy Period**, or Extended Reporting Period if applicable, in which the **Insured** first becomes aware of such circumstances, then any **Claim** subsequently arising from such circumstances shall be deemed made against the **Insured** during the **Policy Year** in which such circumstances were first reported to the **Company**. Such subsequent **Claim** must be reported to the **Company** in accordance with this Section V. NOTICE AND CLAIM REPORTING PROVISIONS, "Written Notice of Claim" above. |
|---|---|---|
| | 2. | When reporting a circumstance to the **Company**, an **Insured** shall give the names of any potential claimant; a description of the specific circumstances that could give rise to a **Claim**; the identity of the specific **Insureds** allegedly involved in such circumstance; the nature of the potential damages (monetary and non-monetary); and the specifics as to how the **Insureds** first became aware of such circumstance. |

| Interrelated Claims | More than one **Claim** involving the same **Wrongful Act** or **Interrelated Wrongful Acts** shall be considered as one **Claim** which shall be deemed made on the earlier of: |
|---|---|
| | 1. the date on which the earliest **Claim** was first made; or |
| | 2. the first date valid notice was given by the **Insured** to the **Company**, in accordance with applicable reporting provisions, under this **Policy** or under any prior policy, of any **Wrongful Act** or any fact, circumstance, situation, transaction or event which underlies such **Claim**. |

## VI. CANCELLATION OR NON-RENEWAL

| Cancellation by the Insured | This **Policy** may be cancelled by the **Named Insured** by either surrender thereof to the **Company** at its address stated in the Policy Declarations or by mailing to the **Company** written notice requesting cancellation and in either case stating when thereafter such |
|---|---|

cancellation shall be effective. Earned premium shall be computed pro rata at the time cancellation is effected or as soon as practicable thereafter.

Cancellation By the Company

The **Company** may cancel this **Policy** only in the event of the **Insured's** failure to pay the premium when due. The **Company** will mail to the **Named Insured**, written notice stating when cancellation shall take effect. The effective date of such cancellation shall not be less than twenty (20) days after the date of mailing. Earned premium shall be computed pro rata at the time cancellation is effected or as soon as practicable thereafter.

Non-Renewal

In the event the **Company** non-renews this **Policy**, the **Company** shall mail to the **Named Insured**, not less than sixty (60) days prior to the end of the **Policy Period**, written notice of non-renewal. Such notice shall be binding on all **Insureds**.

Delivery of Notice

The **Company** shall mail notice of cancellation or non-renewal with a certificate of mailing stating the effective date of cancellation or non-renewal which shall become the end of the **Policy Period**. Mailing of such notice shall be sufficient notice of cancellation or non-renewal.

---

## VII.   REPRESENTATIONS AND SEVERABILITY

Representations

The **Insured** represents that the particulars and statements contained in the **Application** are true and agree that:

1. those particulars and statements are the basis of this **Policy** and are to be considered as incorporated into and constituting a part of the **Policy**;
2. those particulars and statements are material to the acceptance of the risk assumed by the **Company**; and
3. the **Policy** is issued in reliance upon the truth of such representations.

Severability of Application

An **Application** for coverage shall be construed as a separate **Application** for coverage by each **Individual Insured**. With respect to the particulars and statements

contained in the **Application**, no fact pertaining to or knowledge possessed by any **Individual Insured** shall be imputed to any other **Individual Insured** for the purpose of determining if coverage is available.

In the event that such **Application** contains any misrepresentations which materially affects either the acceptance of the risk or the hazard assumed by the **Company** under this **Policy**, then no coverage shall be afforded for any **Claim** based upon, arising out of, related to or in consequence of any such misrepresentation with respect to:

1. any **Individual Insured** who knew of such misrepresentations or knew of the facts or circumstances relating to such misrepresentations, or any **Organization** to the extent it indemnifies any such **Individual Insured**. Such knowledge possessed by such **Individual Insured** shall not be imputed to any other **Individual Insured; or**

2. any **Organization** if any past or present Chief Executive Officer, Chief Financial Officer, Chief Operating Officer, Chairperson, Executive Director, Human Resources Manager, In-House General Counsel, Managing Member or Fiduciary of any **Plan** or any equivalent position of the **Named Insured**, or the signer of the **Application**, knew of such misrepresentations or knew of the facts or circumstances relating to such misrepresentations.

## VIII.   CHANGES IN EXPOSURE

Creation, Acquisition of or  Merger with Another Entity

1. If, after the effective date of this **Policy**:
   a. the **Organization** creates, acquires, consolidates or merges with another nonprofit entity incorporated under the laws of a jurisdiction within the territorial United States, (hereafter referred to as "other entity") such that the **Organization** is the surviving entity, and if as a result of such creation, acquisition, consolidation or merger, the other entity becomes a **Subsidiary** of the **Organization**, then coverage shall be provided for the other entity as an **Insured** solely for **Wrongful Acts** committed or

allegedly committed after the effective date of such creation, acquisition, consolidation or merger. The **Insured** shall disclose full particulars of such a change to the **Company** as soon as practicable but not later than the expiration date of the **Policy Year**, or effective date of cancellation or non-renewal of this **Policy**.

b. However, if at the time of an event described in Paragraph 1, a., above:

    i.    the assets of the other entity exceed thirty five percent (35%) of the total assets of the **Organization** as reflected in the **Organization's** most recent annual financial statements; or

    ii.    if the Employment Practices Liability Coverage Part is attached to this **Policy,** the total number of employees of the other entity exceeds thirty five (35%) of the total number of **Employees** of the **Organization** immediately prior to such event, then:

    the **Named Insured** shall provide to the **Company** written notice of such creation, acquisition, consolidation or merger, containing full details thereof, as soon as practicable but within sixty (60) days of such event. The **Company**, at its sole discretion, may require additional premium and may alter the terms, conditions or limitations of coverage. The **Company** reserves the right to refuse any extension of coverage to such entity.

2. If, after the effective date of this **Policy**, the **Organization** creates, acquires, consolidates or merges with a for-profit entity, or any entity incorporated outside of the territorial United States, such that the **Organization** is the surviving entity, and if as a result of such creation, acquisition, consolidation or merger, such for-profit or foreign entity becomes a **Subsidiary** of the **Organization**, then:

    the **Named Insured** shall provide to the

**Company** written notice of such creation, acquisition, consolidation or merger, containing full details thereof, as soon as practicable but within sixty (60) days of such event. The **Company**, at its sole discretion, may require additional premium and may alter the terms, conditions or limitations of coverage. The **Company** reserves the right to refuse any extension of coverage to such entity.

Cessation of Subsidiaries

If during the **Policy Period** any **Subsidiary** ceases to be a **Subsidiary**, then coverage under this **Policy** shall continue for such **Subsidiary** and its **Individual Insureds** until the expiration of this **Policy** or the last **Policy** in an uninterrupted series of policies issued by the **Company**, but solely for **Claims** arising out of **Wrongful Acts** committed or allegedly committed by such **Subsidiary** or its **Individual Insureds** while such **Subsidiary** was a **Subsidiary** and prior to the effective date of such cessation. There shall be no coverage for **Claims** arising out of actual or alleged **Wrongful Acts** occurring on or after the effective date of cessation.

Takeover of the Named Insured

In the event of a **Takeover** of the **Named Insured:**

1. coverage under this **Policy** shall continue until the earlier of:
   a. the expiration of the **Policy Year**; or
   b. if the **Policy** is cancelled or non-renewed, the effective date of cancellation or non-renewal;

   but only with respect to **Claims** arising out of **Wrongful Acts** that occurred or allegedly occurred prior to the effective date of the **Takeover**. There shall be no coverage for **Claims** arising out of actual or alleged **Wrongful Acts** occurring on or after the date of **Takeover;**

2. the **Named Insured** shall give the **Company** written notice of the **Takeover** as soon as practicable, but not later than sixty (60) days after the effective date of the **Takeover**; and

3. the premium for the **Policy Year** in which the **Takeover** occurred shall be deemed to be fully

earned.  The **Named Insured** shall have the right to purchase an Extended Reporting Period, subject to Section II. EXTENDED REPORTING PERIOD herein, to report **Claims** arising out of **Wrongful Acts** occurring prior to the effective date of any **Takeover**.

Merger, Sale, Transfer or Termination of a Plan

If after the inception date of the Fiduciary Liability **Coverage Part,** or the date the Fiduciary Liability Coverage Endorsement is added to this **Policy**:

1. the sponsorship of a **Plan** is transferred so that an **Organization** is no longer the sole employer sponsor of such **Plan**;
2. a **Plan** is merged with another plan for which coverage is not afforded under the Fiduciary Liability **Coverage Part**;
3. a **Plan** is terminated or sold; or
4. the Pension Benefit Guaranty Corporation (PBGC) becomes the Trustee of a **Plan**;

then:

a. in the case of paragraphs 1., 2. and 3. above, the Fiduciary Liability **Coverage Part** or the Fiduciary Liability Coverage Endorsement, as applicable, shall continue to apply to such transferred, merged, terminated or sold **Plan**, but solely for **Claims** based upon or arising out of **Wrongful Acts** that occurred or allegedly occurred prior to the date of such transfer, merger, termination or sale. There shall be no coverage for **Claims** arising out of actual or alleged **Wrongful Acts** occurring on or after the date of merger, transfer, termination or sale of any **Plan** as described in paragraphs 1., 2. and 3. above; or
b. in the case of paragraph 4. above, the Fiduciary Liability **Coverage Part** or the Fiduciary Liability Coverage Endorsement shall continue to apply to such **Plan** for those who were **Insureds** at the time the PBGC became the Trustee of such **Plan** but solely for **Claims** based upon or arising out of **Wrongful Acts** that occurred or allegedly occurred prior to the date the PBGC became

the Trustee of such **Plan**. There shall be no coverage for **Claims** arising out of actual or alleged **Wrongful Acts** occurring on or after the date the PBGC becomes the Trustee of any **Plan**.

Cancellation of the Policy

If the **Named Insured** requests cancellation of this **Policy** as a result of a "Creation, Acquisition of or Merger with Another Entity", "Cessation of Subsidiaries", or "Takeover of the Named Insured", the **Company** shall compute earned premium on a pro rata basis and return any unearned premium to such entity as of the effective date of such cancellation as long as notice of the event is provided to the **Company** as soon as practicable but not later than sixty (60) days after such event, together with such information as the **Company** may require.

IX.   LIMITS OF LIABILITY

"Each Claim"

The "Each Claim" Limit of Liability shown on the Policy Declarations is the **Company's** maximum liability for **Loss** for each **Claim** to which the applicable **Coverage Part** applies, during each **Policy Year**.

"In the Aggregate"

The "In the Aggregate" Limit of Liability shown on the Policy Declarations is the **Company's** maximum liability for **Loss** for all **Claims** to which the applicable **Coverage Part** applies, during each **Policy Year**.

Policy Year Limits

The Limits of Liability for any **Policy Year** may not be aggregated or transferred, in whole or in part, so as to provide any additional coverage with respect to **Claims** first made or deemed made, as provided in Section V. NOTICE AND CLAIM REPORTING PROVISIONS of these General Terms and Conditions during any other **Policy Year**.  If the applicable Limits of Liability for any **Policy Year** are exhausted, the **Company's** obligation for that **Policy Year** shall be deemed completely fulfilled and extinguished.

Extended Reporting Period Limits

The Extended Reporting Period will not provide a new, separate or additional Limit of Liability.  The remainder of the Limit of Liability applicable to the **Policy Year** in effect as of the date of expiration, cancellation, or non-renewal is the maximum Limit of Liability for all

**Claims** reported during the Extended Reporting Period.

Defense Costs

**Defense Costs** shall be in addition to the Limits of Liability for each **Coverage Part** purchased as shown on the Policy Declarations, unless as otherwise provided within that **Coverage Part** or by endorsement.

Interrelated Claims

More than one **Claim** involving the same **Wrongful Act** or **Interrelated Wrongful Acts** shall be considered as one **Claim** pursuant to Section **V.** NOTICE AND CLAIM REPORTING PROVISIONS, "Interrelated Claims" and shall be subject to the Limit of Liability in effect when the **Claim** was first made.

---

X. RETENTIONS AND PRESUMPTIVE INDEMNIFICATION

Retentions

Retentions set forth in the Policy Declarations for each **Coverage Part** shall apply per **Claim** per **Policy Year** under each respective **Coverage Part**.

If more than one Retention applies to any one **Claim** then each applicable Retention shall be applied to the applicable part of such **Claim**, but the sum of such Retentions shall not exceed the highest of such applicable Retentions.

**Claims** shall be subject to the Retention applicable to the **Policy Year** during which the **Claims** are first made as provided in Section **V.** NOTICE AND CLAIM REPORTING PROVISIONS.

Except as otherwise provided by Section **VII.** TIMELY NOTICE AND RESOLUTION INCENTIVE of the Directors and Officers **Coverage Part**:

1. the **Company** shall be liable to pay only **Loss** and **Defense Costs** in excess of the applicable Retention for the **Coverage Part** to which the **Claim** applies;
2. the **Company** shall have no obligation to pay any part or all of such Retention on the **Insured's** behalf; and
3. if the **Company**, at its sole discretion, elects to pay any part of or all of such Retention, the **Insured** agrees to repay such amounts to the **Company** upon demand.

Presumptive Indemnification

Regardless of whether **Loss** or **Defense Costs** resulting from any **Claim** against an **Individual Insured** is actually indemnified by the **Organization**, the applicable Retention set forth in the Policy Declarations shall apply to any **Loss** and **Defense Costs** if indemnification of the **Individual Insured** by the **Organization** is legally permissible. The certificate of incorporation, charter, articles of association or other organizational documents of the **Organization**, including by-laws and resolutions, will be deemed to have been adopted or amended to provide indemnification to the **Individual Insured** to the fullest extent permitted by law.

However, if an **Individual Insured** is not indemnified for **Loss** or **Defense Costs** solely by reason of:

1. **Financial Impairment**; or
2. a good faith determination by the **Organization** that such indemnification is not permitted by common or statutory law; then

an **Individual Insured's** Retention for this **Coverage Part** shall be amended to $0.

## XI.    SPOUSAL AND DOMESTIC PARTNER EXTENSION

If a **Claim** against an **Individual Insured** includes a **Claim** against the lawful spouse or **Domestic Partner** of such **Individual Insured** solely by reason of:

1. such spousal or **Domestic Partner** status;  or
2. such spouse's or **Domestic Partner's** ownership interest in property or assets that are sought as recovery for **Wrongful Acts**; then

any **Loss** which such spouse or **Domestic Partner** becomes legally obligated to pay on account of such **Claim** shall be deemed **Loss** which the **Individual Insured** becomes legally obligated to pay as a result of the **Claim.**

This extension of coverage shall not apply to the extent a **Claim** alleges any **Wrongful Act**, error, omission, misstatement, misleading statement or neglect or breach

of duties by such spouse or **Domestic Partner**.

## XII.   SUBROGATION

In the event of payment under this **Policy**, the **Company** shall be subrogated to the **Insureds'** rights of recovery. The **Insured** shall do everything necessary to secure such rights, including the execution of such documents necessary to enable the **Company** to effectively bring suit in the name of any **Company**.

In no event, however, shall the **Company** exercise its rights to subrogation against an **Individual Insured** under this **Policy** unless such **Individual Insured**:

1. has been convicted of a deliberate criminal act; or
2. has been determined by a final adjudication adverse to the **Individual Insured** to have committed a deliberate fraudulent act, or to have obtained any profit, advantage or remuneration to which such **Individual Insured** was not legally entitled.

In the event the **Company** shall for any reason pay indemnifiable **Loss** on behalf of an **Individual Insured**, the **Company** shall have the contractual right hereunder to recover from the **Organization** or any **Subsidiary** the amount of such **Loss** equal to the amount of the Retention not satisfied by the **Organization** or any **Subsidiary** and shall be subrogated to rights of the **Individual Insureds** hereunder.

## XIII.   CHANGES

Notice to any agent or knowledge by any agent shall not affect a waiver or change in any part of this **Policy** or stop the **Company** from asserting any right under the terms of this Policy, nor shall the terms of this **Policy** be waived or changed except by an endorsement, issued by the **Company** to form a part of this **Policy**.

## XIV.   AUTHORIZATION CLAUSE AND NOTICES

By acceptance of this **Policy**, the **Insured** agrees that the **Named Insured** shall act on behalf of all **Insureds** with respect to:

1. the payment of premiums or the receipt of any return premiums that may become due under the **Policy**;
2. the cancellation or non-renewal of this **Policy**;
3. the effecting of any changes to the **Policy** or purchasing of an Extended Reporting Period; or
4. the giving and receiving of all notices and correspondence.

Any notice given to the **Named Insured** by the **Company** pursuant to Section VI. CANCELLATION OR NON-RENEWAL shall be deemed to be notice to all **Insureds**.

## XV.   ASSIGNMENT

Assignment of interest under this **Policy** shall not bind the **Company** until the **Company's** consent is endorsed hereon.

## XVI.   OTHER INSURANCE

This **Policy** is excess of other valid and collectable insurance, unless such other insurance is specifically written to be in excess of this **Policy**. For purposes of this provision, "other valid and collectable insurance" means insurance provided by an entity or organization other than the **Company**.

When it is determined that both this insurance and other insurance or self-insurance apply to any **Claim** on the same basis, whether primary, excess or contingent, the **Company** shall not be liable under this **Policy** for a greater proportion of the **Loss** and **Defense Costs** than the applicable Limit of Liability under the **Policy** for such **Loss** and **Defense Costs** bears to the total applicable Limit of Liability of all valid and collectible insurance against such **Claims**.

## XVII.   TERMS OF POLICY CONFORMED TO STATUTE

Terms of this **Policy** which are in conflict with the statutes of the state or territory wherein this **Policy** is

issued are hereby amended to conform to such statutes.

## XVIII. ACTION AGAINST THE COMPANY

| | |
|---|---|
| Compliance | No action shall lie against the **Company** unless, as a condition precedent thereto, there has been full compliance with all of the terms of this **Policy**, and until the amount of the **Insured's** obligation to pay shall have been finally determined either by judgment against the **Insured** after actual trial or by the **Insured's** written agreement, the claimant or the claimant's legal representative, and the **Company**. |
| Rights to Recover | Any person or the legal representatives thereof who has secured such judgment or written agreement shall thereafter be entitled to recover under this **Policy** to the extent of the insurance afforded by this **Policy**. No person or entity shall have any right under this **Policy** to join the **Company** as a party to any action against the **Insured** to determine the **Insured's** liability, nor shall the **Company** be impleaded by the **Insured** or the **Insured's** legal representatives. Bankruptcy or insolvency of the **Insured** or the **Insured's** successors in interest shall not relieve the **Company** of its obligations hereunder. |

## XIX. POLICY TERRITORY

This **Policy** shall apply worldwide.

## XX. COORDINATION OF COVERAGE

Subject always to the applicable Limit of Liability, should two or more **Coverage Parts** apply to the same **Claim**, the **Company** will not pay more than the actual **Loss** incurred by the **Insureds**.

## XXI. ACCEPTANCE

This **Policy** embodies all agreements existing between the parties hereunder or any of their agents relating to this insurance.

## XXII. LIBERALIZATION

If within forty-five (45) days of binding this **Policy**, the **Company** broadens coverage under any **Coverage Part** or the General Terms & Conditions attached to this

**Policy**, and;

1. such broadened coverage applies to policies in the state or territory in which this **Policy** is written;
2. the effective date of the policies which are to receive the broadened coverage is after the effective date of this **Policy**; and
3. there is no additional premium charged for such broadened coverage;

then the **Company** shall apply the broadened coverage to this **Policy** as applicable for no additional premium, but only for a **Wrongful Act** which first occurs after the effective date of such broadened coverage.

**This page has been intentionally left blank.**

# EXHIBIT

# 4

NDO2557425B
_Renewal of Number_

POLICY DECLARATIONS

**No. NDO2557425C**

# Mount Vernon Fire Insurance Company
1190 Devon Park Drive, Wayne, Pennsylvania 19087
A Member Company of United States Liability Insurance Group

NAMED INSURED AND ADDRESS:
NAHANT PRESERVATION TRUST
PO BOX 30
NAHANT, MA 01908

POLICY PERIOD: (MO. DAY YR.)  From:  06/19/2021  To:  06/19/2022

12:01 A.M. STANDARD TIME AT YOUR
MAILING ADDRESS SHOWN ABOVE

BUSINESS DESCRIPTION:  Non-Profit Directors and Officers

IN RETURN FOR THE PAYMENT OF THE PREMIUM, AND SUBJECT TO ALL THE TERMS OF THIS POLICY, WE AGREE WITH YOU TO PROVIDE THE INSURANCE AS STATED IN THIS POLICY.

THIS POLICY CONSISTS OF THE FOLLOWING COVERAGE PARTS FOR WHICH A PREMIUM IS INDICATED.

|  | PREMIUM |
|---|---|
| Non Profit Management Liability Coverage Parts | $698.00 |
| TOTAL: | $698.00 |

Coverage Form(s) and Endorsement(s) made a part of this policy at time of issue
## See Endorsement EOD (1/95)

Agent:  MCGOWAN, DONNELLY & OBERHEU, LLC (1818)
2700 Via Fortuna Drive, Suite 145
Austin, TX 78746

Broker:

Issued:  05/10/2021 12:27 PM

By: _Thomas P. Verney_
Authorized Representative

UPD (08-07)   THESE DECLARATIONS TOGETHER WITH THE COMMON POLICY CONDITIONS, COVERAGE PART DECLARATIONS, COVERAGE PART COVERAGE FORM(S) AND FORMS AND ENDORSEMENTS, IF ANY, ISSUED TO FORM A PART THEREOF, COMPLETE THE ABOVE NUMBERED POLICY.

# EXTENSION OF DECLARATIONS

**Policy No. NDO2557425C**

Effective Date:    06/19/2021
12:01 AM STANDARD TIME AT YOUR MAILING ADDRESS

FORMS AND ENDORSEMENTS

The following forms apply to the Management Liability coverage part

| Endt# | Revised | Description of Endorsements |
|---|---|---|
| DO-100 | 05/17 | Directors and Officers Coverage Part |
| DO-201 | 05/17 | Accreditation/Certification/Standard Setting Exclusion |
| DO-209 | 05/17 | Absolute Professional Liability Exclusion |
| DO-224A | 05/17 | Sexual Abuse Exclusion |
| DO-233 | 05/17 | Builder or Developer Exclusion |
| DO-283 | 05/17 | Data and Security Plus Endorsement |
| DO-298 | 05/17 | Amendment of Prior or Pending Litigation Exclusion |
| DO-GTC | 05/17 | General Terms and Conditions |
| Jacket | 07/19 | Policy Jacket |

NON PROFIT MANAGEMENT LIABILITY COVERAGE PART DECLARATIONS

PLEASE READ YOUR POLICY CAREFULLY.

THIS IS A CLAIMS MADE POLICY COVERAGE FORM AND UNLESS OTHERWISE PROVIDED HEREIN, THE COVERAGE OF THIS FORM IS LIMITED TO LIABILITY FOR CLAIMS FIRST MADE DURING THE POLICY PERIOD, OR THE EXTENSION PERIOD, IF APPLICABLE.  DEFENSE COSTS SHALL BE APPLIED AGAINST THE RETENTION.

No.  NDO2557425C

Effective Date:  06/19/2021
12:01 AM STANDARD TIME

ITEM I. PARENT ORGANIZATION AND PRINCIPAL ADDRESS

NAHANT PRESERVATION TRUST
PO BOX 30
NAHANT, MA 01908

ITEM II. POLICY PERIOD: (MM/DD/YYYY)  From:   06/19/2021  To:  06/19/2022

## Non Profit Directors and Officers Liability Coverage Part

ITEM III. LIMITS OF LIABILITY

| | | |
|---|---|---|
| a. Non Profit Directors & Officers | $1,000,000 | EACH CLAIM |
| b. Non Profit Directors & Officers | $1,000,000 | IN THE AGGREGATE |

| | | |
|---|---|---|
| ITEM IV. RETENTION: | $0 | EACH CLAIM |
| ITEM V. PREMIUM: | $698 | |
| RETROACTIVE DATE: | Full Prior Acts | |
| PRIOR OR PENDING LITIGATION | See form DO-298 | |

## Employment Practices Liability Coverage Part

ITEM III. LIMITS OF LIABILITY

| | |
|---|---|
| a. Employment Practices | NOT COVERED |
| b. Employment Practices | |
| ITEM IV. RETENTION: | NOT COVERED |
| ITEM V. PREMIUM: | NOT COVERED |

THESE DECLARATIONS ARE PART OF THE POLICY DECLARATIONS CONTAINING THE NAME OF THE INSURED AND THE POLICY PERIOD.

NON PROFIT MANAGEMENT LIABILITY COVERAGE PART DECLARATIONS

PLEASE READ YOUR POLICY CAREFULLY.

THIS IS A CLAIMS MADE POLICY COVERAGE FORM AND UNLESS OTHERWISE PROVIDED HEREIN, THE COVERAGE OF THIS FORM IS LIMITED TO LIABILITY FOR CLAIMS FIRST MADE DURING THE POLICY PERIOD, OR THE EXTENSION PERIOD, IF APPLICABLE.  DEFENSE COSTS SHALL BE APPLIED AGAINST THE RETENTION.

No.  NDO2557425C

Effective Date:  06/19/2021
12:01 AM STANDARD TIME

## Fiduciary Liability Coverage Part

ITEM III. LIMITS OF LIABILITY

| | |
|---|---|
| a. Fiduciary Liability | NOT COVERED |

| | |
|---|---|
| ITEM IV. RETENTION: | NOT COVERED |
| ITEM V. PREMIUM: | NOT COVERED |

ITEM VI. Coverage Form(s)/Part(s) and Endorsement(s) made a part of this policy at time of issue:
See Endorsement EOD (01/95)

THESE DECLARATIONS ARE PART OF THE POLICY DECLARATIONS CONTAINING THE NAME OF THE INSURED AND THE POLICY PERIOD.

 **business resource center**　　　**bizresourcecenter.com**

# RESOURCES TO HELP YOUR BUSINESS GROW!

As a policyholder through USLI or Devon Park Specialty, you have access to many free and discounted services through the Business Resource Center that will assist you in operating, growing and protecting your business. Consider the following services and associated cost savings when deciding where to place your insurance!

## HUMAN RESOURCES



- » Free human resources consultation hotline to be used for personnel issues, including harassment and discrimination, the Family and Medical Leave Act, disability, wage and hours regulations and more
- » Online library with information, forms and articles pertaining to human resources
- » Resources for recruiting and training as well as termination and administration

## PRE-EMPLOYMENT AND TENANT SCREENINGS



- » Discounted background checks, including multi-court criminal database searches, county criminal searches and more (first background check is free)
- » Best practices for performing a background check
- » Discounted tenant and drug screenings and motor vehicle reports (MVRs)





**Try our cost-savings calculator to see how much you could save!**

## PAYROLL AND TAXES



- » Discounted payroll processing and tax services tailored for either a small or large business

## CYBER RISK



- » Materials about securing personal and payment card information
- » Complimentary access to tools and resources that will help you understand your exposure to a data breach and the importance of a response plan

## MARKETING

- » Suggested free and paid services, including email campaigns, photo editing, file management and more, for web marketing for your business
- » Suggested free and paid services for social media platforms, development, management and more
- » Discounted promotional items, giveaways and signage

## SAFETY



- » Free on-site safety and occupational health consultation for your business
- » Free personal credit report
- » Disaster and emergency preparedness resources
- » Discounted alcohol and food server safety training for your staff and servers
- » Discounted CPR and first aid training
- » Youth resources for concussion training, waivers of liability, recognizing the signs and symptoms of child abuse, and more



# 24/7 CLAIM REPORTING

In our continuing effort to provide you with excellent claim service, you may now report a claim and get claim assistance 24 hours a day/7 days a week.

## For claim reporting, call toll free 1-888-875-5231 or visit USLI.COM and select the "report a claim" option.

For emergency claims requiring immediate assistance, please use the toll free option. Your call will be referred to a claims professional who will respond within an hour of your call with direction and assistance.

Thank you for placing your trust in our company. We pledge to work hard every day to earn and maintain that trust.



**USLI.COM**
**888-523-5545**

  # FREE PRIVACY BREACH RISK MANAGEMENT RESOURCES



**When a privacy breach occurs, will you be prepared?**

In 2015, according to the Identity Theft Resource Center, more than 783 breaches were reported and more than 675 million records were exposed. The eRisk Hub® portal, powered by NetDiligence®, is an effective way to combat privacy breaches and other types of cyber losses.

**With your USLI policy, you will receive instructions on how to access the eRisk Hub® portal and begin using this benefit that is valued in excess of $1,200 a year!**

eRisk Hub® is the one-stop shop you need to become educated and prepared for a privacy breach. This FREE service is available to USLI policyholders.

Using proprietary tools anchored in proven risk management principals, NetDiligence® provides a full range of enterprise-level information security, e-risk insurability and regulatory compliance assessment and testing services. NetDiligence® supports and is endorsed by some of the world's largest network liability insurance underwriters.

---

**HOW TO START USING THIS FREE OFFERING:**
- Go to eriskhub.com/usli
- Click "Register Now" to set up a free account
- Create your own username and password; your access code is **08451**

---

## Key Features of the eRisk Hub® Portal


**Data Breach Calculators** – Learn how to estimate the cost of a breach, notification costs and business interruption


**Learning Center** – Best practices articles, white papers and webinars from leading technical and legal experts. Highlighted topics include PCI compliance and social engineering


**Security Training** – Watch videos for best practices in security and privacy awareness or download a training guide


**Risk Manager Tools** – Assists you in managing your cyber risk, including a self-assessment, a sample website privacy policy and a tool for HIPAA compliance


**eRisk Resources** – A directory to quickly find external resources with expertise in pre and post-breach disciplines


**Consultation** – Breach Coach, HIPAA Coach and Security Coach available to assist you



**USLI.COM**
**888-523-5545**

# Check Out Your New Employment Practices Liability Risk Management Toolkit from PeopleSystems

**Free Employment Practices Liability (EPL) Helpline**
**1-888-811-4182**
**(8 a.m. to 7:30 p.m. Eastern Time)**

If a human resource consulting firm offered you their time and expertise for free, would you lock their phone number and email address in a drawer and never call? Of course not! Do you have questions such as:

► What are the current federal and state employment laws I need to know?

► What are "wage and hour" regulations? What does "exempt" versus "non-exempt" mean?

► How should I handle terminating, suspending or warning an employee?

► What type of human resources policies should I have in place?

► How should I properly document performance issues and disciplinary actions in an employee's file?

► What are appropriate and inappropriate questions to ask during an employment interview?

► What guidelines should I use to investigate a complaint of discrimination or harassment?

PeopleSystems is just a free phone call or email away!

**Online Human Resources Center**
**www.peoplesystems.com/USLI**

To access the USLI policyholder features, click on "Request for client login" and complete with your information. Please take a moment to become familiar with the new PeopleSystems Resource Center's information.

► **Helpline to email your human resource questions:** Now you can email your questions via this web portal.

► **Human resource news center and recent employment law changes:** The news center keeps you up-to-date with recent changes in state and federal employment laws and what they mean to you as well as pertinent articles on employment issues you need to know about.

► **Human resource manual and employment forms:** You will find "Best Practices" helpful for handling common human resource issues. Issues may include conducting employee evaluations and understanding employment laws such as FLSA, FMLA and COBRA.

► **Human resource recommendations:** You will also find sample human resource policies regarding discrimination, harassment, employment at-will and electronic communications.

This document does not amend, extend or alter the coverage afforded by the policy. For a complete understanding of any insurance you purchase, you must first read your policy, declaration page and any endorsements and discuss them with your agent. A sample policy is available from your agent. Your actual policy conditions may be amended by endorsement or affected by state laws.

EPL Helpline Policy 6/17

**Non-Profit Management Liability Policy**      **Directors and Officers Coverage Part**

In consideration of payment of the premium and subject to the Policy Declarations, General Terms and Conditions, and the limitations, conditions, provisions and all other terms of this **Coverage Part**, the **Company** and the **Insureds** agree as follows:

Words that are in bold have special meaning and are defined in Section III. DEFINITIONS of this **Coverage Part**, or in Section I. DEFINITIONS of the General Terms and Conditions, incorporated in or attached to this **Coverage Part**, as applicable.

I.      INSURING AGREEMENTS

A. Individual Insured – Non-Indemnified Coverage

The **Company** will pay, on behalf of an **Individual Insured**, **Loss** and **Defense Costs** resulting from a **Claim** first made against an **Individual Insured** during the **Policy Period**, or Extended Reporting Period, if applicable, to the extent such **Individual Insured** is not indemnified by the **Organization** for such **Loss** and **Defense Costs**.

B. Individual Insured – Indemnified Coverage

The **Company** will pay, on behalf of the **Organization**, **Loss** and **Defense Costs** resulting from a **Claim** first made against an **Individual Insured** during the **Policy Period**, or Extended Reporting Period, if applicable, but only to the extent the **Organization** indemnifies such **Individual Insured** for such **Loss** and **Defense Costs** as permitted or required by law.

C. Organization Coverage

The **Company** will pay, on behalf of the **Organization**, **Loss** and **Defense Costs** resulting from a **Claim** first made against the **Organization** during the **Policy Period**, or the Extended Reporting Period, if applicable.

II.      INDIVIDUAL INSURED – NON-INDEMNIFIED COVERAGE ADDITIONAL LIMIT

"Dedicated Limit – Insuring Agreement A"

The **Company** shall pay an additional limit of liability, not to exceed an aggregate of $1,000,000 per **Policy Period**, solely for **Loss** covered under Section I. INSURING AGREEMENT, Subsection A. Individual Insured Non-Indemnified Coverage. This additional limit of liability shall be paid only after the applicable Limit of Liability for Individual Insured – Non-Indemnified Coverage of the Directors & Officers Liability **Coverage Part** shown in the Policy Declarations is completely exhausted by payment of **Loss**.

III.   DEFINITIONS

**Claim**                            means any:

1. written demand for monetary damages or non-monetary relief, including injunctive relief;
2. civil proceeding commenced by service of a complaint or similar pleading;
3. criminal proceeding commenced by the return of an indictment;
4. administrative or regulatory proceeding commenced by the filing of a formal written notice of charges, notice of violations, notice of investigation, cease and desist or similar action;
5. arbitration, mediation or other alternative dispute resolution proceeding in which the **Insured** is obligated to participate  if the **Insured** agrees to participate with the **Company's** prior written consent; or
6. other proceeding initiated before any governmental body which is authorized to render an enforceable judgment, order for monetary damages or other relief;

received by, or brought or initiated against any **Insured** alleging a **Wrongful Act**, including any appeal therefrom.

**Claim** also means any:

7. written request, first received by an **Insured** to toll or waive a statute of limitations relating to a potential **Claim** as described in subparagraphs 1. through 6. above.

A **Claim** shall be deemed made on the earliest of the date of service upon, or receipt by, any **Insured** of a potential **Claim** as described in subparagraphs 1. through 7. above.

**Defense Costs**                    means:

1. reasonable and necessary legal fees and expenses incurred by the **Company**, or by any attorney designated by the **Company** to defend the **Insured**; and

2. all other fees, costs, costs of attachment or similar bonds (without any obligation on the **Company's** part to apply for or furnish such bonds);

resulting from the investigation, adjustment, defense and appeal of a **Claim**. **Defense Costs** does not include **Loss** or the **Insured's** salaries, wages, overhead or benefits expenses.

| | |
|---|---|
| **Employed Attorney Services** | means legal services provided by any **Individual Insured**, but only to the extent that such services are performed directly to the **Organization** and in the **Individual Insured's** capacity as an **Employee** of the **Organization**. |
| | Any services rendered by an **Individual Insured** for any party other than the **Organization** shall not constitute **Employed Attorney Services**. |
| **Employee** | means any natural person whose labor or service is engaged and directed by the **Organization** while performing duties related to the conduct of the **Organization's** business and includes leased, part-time, seasonal and temporary workers, independent contractors, volunteers and interns. |
| **Executive** | means any natural persons who are directors, trustees, officers, managing members, advisory board members or committee members or any equivalent position of the **Organization**. |
| **Excess Benefit Transaction** | means a transaction as defined in Internal Revenue Code, Title 26 §4958 (c)(1). |
| **Excess Benefit Transaction Excise Tax** | means any excise tax imposed by the Internal Revenue Service, pursuant to Section 4958(a)(2) of the Internal Revenue Code, 26 U.S.C. § 4958(a)(2), against an **Individual Insured** who participated as an **Organization Manager** in connection with an **Excess Benefit Transaction**. |
| **Individual Insured** | means any past, present or future: |

1. **Executive**;
2. **Employee**; or

3.  the estates, heirs, legal representatives or assigns of 1. and 2., above in the event of their death, incapacity or bankruptcy.

**Loss**                              means the amount the **Insured** becomes legally obligated to pay as a result of a **Claim**, including:

1.  damages, settlements and judgments;
2.  pre-judgment and post judgment interest;
3.  punitive or exemplary damages to the extent such damages are insurable under applicable law, statute or regulation;
4.  the multiplied portion of any multiple damage award to the extent such damages are insurable under applicable law, statute or regulation; and
5.  any ten percent (10%) **Excess Benefit Transaction Excise Tax** assessed by the Internal Revenue Service against any **Individual Insured**, subject to a $100,000 maximum sublimit of liability per **Policy Period** for **Loss** and **Defense Costs**, combined provided, however that indemnification by the **Organization** for such taxes is not expressly prohibited in the bylaws, certificate of incorporation or other governing documents of the **Organization**. This sublimit of liability is part of and not in addition to the applicable Directors and Officers Limit of Liability as set forth on the Policy Declarations.

For the purpose of determining the insurability of damages in items 3. and 4. above, the laws of the jurisdiction most favorable to the insurability of such damages shall control; provided that such jurisdiction has a substantial relationship to the relevant **Insured** or to the **Claim** giving rise to the damages.

However, **Loss** does not include:

1.  fines, penalties, sanctions and forfeitures;
2.  taxes, except for any ten percent (10%) **Excess Benefit Transaction Excise Tax** as outlined in subparagraph 5. above of this definition of "**Loss**", or as otherwise provided by endorsement;
3.  any amount uninsurable under the law pursuant

to which this **Policy** is construed;

4.  cost of compliance with any order for, grant of or agreement to provide non-monetary or injunctive relief;

5.  any unpaid salary, wages, commissions, severance, bonus or incentive compensation that is due or alleged to be due to any person; or

6.  any amount for which an **Individual Insured** is absolved from payment by reason of any covenant, agreement or court order.

**Organization Manager**      means a person or persons described in Internal Revenue Code, Title 26 §4958(f).

**Outside Entity**      means any not-for-profit organization that qualifies as such under Section 501(c) of the Internal Revenue Code of 1986 (as amended), that is not an **Insured**.

**Outside Capacity**      means the service, other than **Employed Attorney Services,** of an **Individual Insured** while acting in the capacity of director, officer, trustee, managing member or any equivalent position of an **Outside Entity,** but only if such service is provided on behalf of the **Outside Entity** with the specific knowledge, request, consent or direction of the **Named Insured**.

**Personal Injury Wrongful Act**      means any actual or alleged false arrest, wrongful detention, malicious prosecution, invasion of privacy, wrongful entry or eviction, libel, slander or defamation.

**Pollutants**      means any solid, liquid, gaseous, bacterial, fungal, electromagnetic, thermal or other substance, smoke, vapor, soot, fumes, acids, alkalis, chemicals, toxic materials, 'Volatile Organic Compound', 'Organic Pathogen', 'Silica', asbestos, lead and gases therefrom, radon, combustion byproducts, noise and 'Waste'. Specific examples include, but are not limited to diesel, kerosene, and other fuel oils, carbon monoxide, and other exhaust gases, mineral spirits and other solvents, tetrachloroethylene, perchloroethylene (PERC), trichloroethylene (TCE), methylene chloroform, and other dry cleaning chemicals, chlorofluorocarbons, chlorinated hydrocarbons, adhesives, pesticides, insecticides, and all substances specifically listed, identified, or described by one or more of the following references:

1. Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA) Priority List Hazardous Substances (1997 and all subsequent editions); or
2. Agency for Toxic Substances And Disease Registry ToxFAQs™; or
3. U.S. Environmental Protection Agency EMCI Chemical References Complete Index.

For the purposes of this definition;

1. 'Volatile Organic Compound' means any compound which discharges organic gases as it decomposes or evaporates, examples of which include but are not limited to formaldehyde, pesticides, adhesives, construction materials made with organic chemicals, solvents, paint varnish and cleaning products.
2. 'Organic Pathogen' means any organic irritant or contaminant, including but not limited to mold, fungus, bacteria or virus, including but not limited to their byproduct such as mycotoxin, mildew, or biogenic aerosol.
3. 'Silica' means silica in any form and any of its derivatives, including but not limited to silica dust, silicon dioxide, crystalline silica, quartz, or non-crystalline (amorphous) silica.
4. 'Waste' means any property intended to be disposed, recycled, reused or reclaimed by the owner or user thereof.

**Publisher Wrongful Act**   means any infringement of copyright, trademark, unauthorized use of title, or plagiarism or misappropriation of ideas.

**Wrongful Act**   means any:

1. actual or alleged act, error, omission, misstatement, misleading statement, neglect, or breach of duties;
2. **Personal Injury Wrongful Act**;
3. **Publisher Wrongful Act**; or
4. **Employed Attorney Services**

committed or allegedly committed by:

a. the **Organization**;
b. any **Individual Insured,** arising solely from duties conducted on behalf of the **Organization** or asserted against an **Individual Insured** because of 1. above; or
c. any **Individual Insured** while acting in an **Outside Capacity**.

---

IV.   EXCLUSIONS

A. The **Company** shall not be liable to make payment for **Loss** or **Defense Costs** in connection with any **Claim** made against the **Insured** arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any actual or alleged:

Conduct

1. deliberately fraudulent act, omission, criminal act, or  willful violation of any statute or regulation by any **Insured**; or
2. any **Insured** having gained any profit, remuneration or other advantage to which such **Insured** was not legally entitled;

provided that this exclusion will not apply to **Defense Costs** incurred until:

a. a final, non-appealable adjudication in any underlying proceeding or action establishes such conduct; or
b. the **Insured** has admitted, stipulated or pleaded no contest to such conduct;

Bodily Injury/Property Damage

1. bodily injury, assault, battery, sickness, disease, death, mental anguish, humiliation or emotional distress of any person; or
2. damage to or destruction of any tangible property including any resulting loss of use thereof;

provided that this exclusion shall not apply to any mental anguish, humiliation or emotional distress asserted in an otherwise covered **Claim** alleging a **Personal Injury Wrongful Act**.

Employee Benefits

pension, profit sharing, welfare benefit or other employee benefit program established in whole or in part for the benefit of any **Individual Insured**, or based upon, arising out of or in any way involving the Employee Retirement Income Security Act of 1974 (or

any amendments thereof or regulations promulgated there under) or similar provisions of any federal, state or local statutory law or common law;

Insured vs Insured

**Claim** brought by or on behalf of any **Insured**; provided that this exclusion shall not apply to:

1. any derivative action on behalf of, or in the name or right of the **Organization,** if such action is brought and maintained independent of and without the solicitation, assistance, participation or intervention of any **Insured**;
2. any **Claim** in the form of a cross claim, third party claim or other claim for contribution or indemnity by any **Individual Insured** which is part of or results directly from a **Claim** which is not otherwise excluded under this **Policy**;
3. any **Claim** brought or maintained by or on behalf of a bankruptcy or insolvency trustee, examiner, liquidator, receiver, rehabilitator, or creditors committee for an **Organization**; or
4. any **Claim** brought and maintained by or on behalf of any former **Executive**, but only if such **Claim** does not arise out of, directly or indirectly result from, is in consequence of, or in any way involves any **Wrongful Act**, responsibilities, actions or failure to act by any **Insured** during the tenure of service of such former **Executive**.

Employment Practices

refusal to employ, termination of employment, or employment related coercion, demotion, evaluation, reassignment, discipline, workplace conditions, false imprisonment, defamation, harassment, humiliation, or discrimination of employment, or other employment-related practices, policies, acts or omissions or sexual harassment by any **Insured** against any person(s) or entity; or negligence involving any of the foregoing;

it being understood that this exclusion applies whether the **Insured** may be held liable as an employer or in any other capacity and to any obligation to contribute with or indemnify another with respect to such **Claim**;

Discrimination

discrimination, including but not limited to discrimination based on religion, race, creed, color, sex, age, marital status, sexual preference, pregnancy,

DO 100 (05-17)

handicap or disability;

| | |
|---|---|
| Outside Entity vs. Insured | **Claim** made by or on behalf of an **Outside Entity** or one or more of the **Outside Entity's** directors, officers, trustees, managing members or any equivalent position against an **Individual Insured** acting in an **Outside Capacity**, provided, however that this exclusion shall not apply to: |

1. any **Claim** brought derivatively on behalf of the **Outside Entity,** independently and without the direct solicitation, participation, intervention or assistance of the **Outside Entity** or any **Insured** in an **Outside Capacity**;
2. any **Claim** in the form of a cross claim, third party claim or other claim for contribution or indemnity by an **Insured** acting in an **Outside Capacity** and which is part of or results directly from a **Claim** which is not otherwise excluded under this **Policy**; and
3. any **Claim** brought or maintained by or on behalf of a bankruptcy or insolvency trustee, examiner, liquidator, receiver, rehabilitator, or creditors committee for an **Outside Entity** against an **Insured** acting in an **Outside Capacity** for such **Outside Entity**.

| | |
|---|---|
| Pollution | |

1. discharge, emission, release, seepage, migration, dispersal or escape of **Pollutants** or any threat thereof, including nuclear reaction, radiation or contamination; or
2. treatment, removal or disposal of any **Pollutants**;
3. regulation, order, direction or request to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize any **Pollutants**; or any voluntary decision to do so; or
4. actual or alleged property damage including loss of use, bodily injury, sickness, disease or death of any person, or financial loss to an **Organization** or **Outside Entity**, their security holders, or their creditors resulting from any of the aforementioned matters in 1., 2., or 3. above of this Exclusion.

| | |
|---|---|
| Prior or Pending Litigation | litigation, demand, claim, arbitration, decree, judgment, proceeding, or investigation against any **Insured**, which was pending on or prior to the Prior or Pending Litigation date referenced on the Policy Declarations, or any such action based on the same or essentially the same fact, circumstance, matter, situation, transaction or event underlying or alleged therein; |

Prior Notice

1. fact, circumstance, matter, situation, transaction, event, or **Wrongful Act** that, before the effective date of this **Policy**, was the subject of any notice given under any similar policy of insurance; or
2. other fact, circumstance, matter, situation, transaction, event, or **Wrongful Act** whenever occurring, which together with a fact, circumstance, matter, situation, transaction, event, or **Wrongful Act** described in subparagraph 1. above, would constitute **Interrelated Wrongful Acts**;

Prior Wrongful Acts of Subsidiaries

1. **Wrongful Act** committed by an **Individual Insured** of any **Subsidiary**, or by such **Subsidiary**, occurring before the date such entity became a **Subsidiary**; or
2. other fact, circumstance, matter, situation, transaction, event, or **Wrongful Act** whenever occurring, which together with a fact, circumstance, matter, situation, transaction, event, or **Wrongful Act** described in subparagraph 1. above, would constitute **Interrelated Wrongful Acts**;

Professional Services

rendering or failure to render legal (except **Employed Attorney Services**), medical, psychological, counseling services or referrals, if the **Claim** is brought by or on behalf of any individual and/or entity for whom such services were, now are, or shall be performed;

provided that this exclusion shall not apply to that part of a **Claim** against an **Individual Insured** which alleges that the **Individual Insured**, in his or her capacity as such, failed to supervise those who performed such services.

B. The **Company** shall not be liable to make payment for **Loss** or **Defense Costs** in connection with any **Claim** made against the **Insured** for actual or alleged:

Contract

liability of the **Insured** under any express contract or agreement to which an **Organization** is a party, provided that this exclusion shall not apply to:

1. the extent that such **Organization** would have been liable in the absence of such contract or agreement; and
2. any **Claim** against an **Individual Insured**.

No **Wrongful Act** of one or more **Insureds** shall be imputed to any other **Insured** for the purpose of determining the applicability of any of the above exclusions in Section A. or B. above.

---

V.   ORDER OF PAYMENTS

In the event of **Loss** arising from a **Claim** for which payment is concurrently due under Insuring Agreement A., Individual Insured - Non-Indemnified Coverage, and one or more of the other Insuring Agreements of this **Coverage Part**, the **Company** shall:

1. first pay **Loss** for which coverage is provided under Insuring Agreement A., Individual Insured - Non-Indemnified Coverage; then
2. with respect to whatever remaining amount of the Limit of Liability is available after payment above, pay such **Loss** for which coverage is provided under any other Insuring Agreement.

Except as otherwise provided above, the **Company** may pay covered **Loss** as it becomes due under this **Coverage Part** without regard to the potential for other future payment obligations under this **Coverage Part**.

---

VI.   LIFETIME OCCURRENCE REPORTING PROVISION

A. If this Policy is cancelled or not renewed by the **Named Insured** for any reason other than being sold, acquired, or declaring bankruptcy, each **Individual Insured** who did not serve as such at the time of the cancellation or non-renewal, shall be provided with an unlimited extension of time to report any **Claim** first

DO 100 (05-17)                                                            Page 11 of 13

made against such **Individual Insured** after the effective date of such cancellation or non-renewal, subject to the following conditions:

1. the **Claim** results from a **Wrongful Act** committed by the **Individual Insured** before the effective date of cancellation or non-renewal; and
2. the **Wrongful Act** was actually or allegedly committed during a **Policy Period** of a **Policy** issued by the **Company**; and
3. such **Individual Insured** was serving in such capacity during the **Policy Period** of a **Policy** issued by the **Company**; and
4. no Directors & Officers Liability policy, or similar policy providing essentially the same type of coverage, or extended reporting period, is in effect at the time the **Claim** is first made against such **Individual Insured**; and
5. the **Claim** is not otherwise excluded by the **Policy** issued by the **Company** in effect at the time the **Wrongful Act** actually or allegedly occurred; such **Policy** shall be the **Policy** under which coverage is applicable including all terms, conditions, limits, retentions, and endorsements therein.
6. the **Company** will have written continuous coverage for **Named Insured** from the effective date of the first **Policy** the **Company** issued to the date of cancellation or non-renewal of this **Policy**.

B. The LIFETIME OCCURRENCE REPORTING PROVISION described herein shall not apply to any **Claim** made against any **Individual Insured** caused by, arising or resulting, directly or indirectly from or in consequence of the **Individual Insured's** serving in an **Outside Capacity** for an **Outside Entity**.

## VII.   TIMELY NOTICE AND RESOLUTION INCENTIVE

Retention Forgiveness

In the event of a **Claim**, the **Company** shall waive the applicable retention under this **Coverage Part**, up to a maximum of $10,000, if each of the following conditions are met:

1. The **Claim** is reported to the **Company** within thirty (30) days of first receipt by an **Insured**; and
2. The **Company** successfully negotiates a

settlement of the **Claim** within the Limits of Liability of this **Coverage Part**; and

3. The **Insured** consents to the settlement of the **Claim** without condition within thirty (30) days after notice of the settlement is provided to the **Insured** by the **Company**; and

4. Settlement of the **Claim** is finalized by the **Company** within ninety (90) days of the **Claim** being first reported to the **Company**.

## VIII.   OUTSIDE DIRECTORSHIP PROVISION

In the event a **Claim** is made against any **Individual Insured** arising out of their service as a director, officer, trustee, managing member or any equivalent positions of an **Outside Entity**, coverage afforded under this **Policy** shall be excess of any indemnification provided by the **Outside Entity** and any insurance provided to the **Outside Entity** which covers its directors, trustees, officers, managing members or any equivalent position.

| This Endorsement modifies insurance provided under the following: |
| :---: |
| **NON PROFIT MANAGEMENT LIABILITY POLICY** |

## ACCREDITATION/CERTIFICATION/STANDARD SETTING EXCLUSION

It is hereby agreed that the Directors and Officers **Coverage Part**, Section IV. EXCLUSIONS, Subsection A. is amended by the addition of the following:

Accreditation/Certification/Standard          accreditation, certification, standard setting, or similar
Setting                                        such activities by or on behalf of any **Insured**;

All other terms and conditions of this **Policy** remain unchanged.  This endorsement is part of your **Policy** and takes effect on the effective date of your **Policy** unless another effective date is shown.

DO 201 (05-17)                                                                Page 1 of 1

This Endorsement modifies insurance provided under the following:

**NON PROFIT MANAGEMENT LIABILITY POLICY**

# ABSOLUTE PROFESSIONAL LIABILITY EXCLUSION

It is hereby agreed that the Directors and Officers **Coverage Part**, Section IV. EXCLUSIONS, Subsection A. "Professional Services", is deleted in its entirety and replaced by the following:

Professional Services

1. rendering or failure to render any professional services by any **Insured**, whether or not such services are rendered for a fee; or
2. **Employed Attorney Services**

It is further agreed that the Directors and Officers **Coverage Part**, Section III. DEFINITIONS, **Wrongful Act** is amended by the deletion of Item 4. **Employed Attorney Services**.

All other terms and conditions of this **Policy** remain unchanged.  This endorsement is part of your **Policy** and takes effect on the effective date of your **Policy** unless another effective date is shown.

DO 209 (05-17)                                                                    Page 1 of 1

This Endorsement modifies insurance provided under the following:

**NON PROFIT MANAGEMENT LIABILITY POLICY**

## SEXUAL ABUSE EXCLUSION

It is hereby agreed that the Directors and Officers **Coverage Part**, Section IV. EXCLUSIONS, Subsection A. is amended by the addition of the following:

| | |
|---|---|
| Abuse**/**Molestation | sexual misconduct, sexual molestation, or physical or mental abuse of any person. |

It is also agreed that the Employment Practices Liability **Coverage Part**, Section II. DEFINITIONS, is amended by the addition of the following:

| | |
|---|---|
| **Child Molestation** | means sexual misconduct, sexual molestation, or physical or mental abuse of any 'Child'.  For the purposes of this definition: |
| | 'Child' shall mean any natural person who was under eighteen (18) years of age at the time an act of **Child Molestation** is first committed. |

It is also agreed that the Employment Practices Liability Coverage Part, Section II. DEFINITIONS, "**Wrongful Third Party Act**" is amended by the addition of the following:

This definition does not mean **Child Molestation**.

It is further agreed that the Employment Practices Liability **Coverage Part**, Section III. EXCLUSIONS, Subsection B. is amended by the addition of the following:

| | |
|---|---|
| Child Molestation | **Child Molestation**, including any actual or alleged negligence in the hiring, supervision, training, screening or management of a person alleged to have committed an act of **Child Molestation** as well as any actual or alleged failure to report or failure to report in a timely manner any such act. |

All other terms and conditions of this **Policy** remain unchanged.  This endorsement is part of your **Policy** and takes effect on the effective date of your **Policy** unless another effective date is shown.

DO 224A (05-17)                                                                                         Page 1 of 1

This Endorsement modifies insurance provided under the following:

**NON PROFIT MANAGEMENT LIABILITY POLICY**

## BUILDER OR DEVELOPER EXCLUSION

It is hereby agreed that the Directors and Officers **Coverage Part**, Section IV. EXCLUSIONS, Subsection A., is amended by the addition of the following:

Builder or Developer

acts, errors or omissions by or on behalf of any builder or developer, or any **Claim** made against any **Insured** by any builder or developer or by any person or entity acting on their behalf.

All other terms and conditions of this **Policy** remain unchanged.  This endorsement is part of your **Policy** and takes effect on the effective date of your **Policy** unless another effective date is shown.

DO 233 (05-17)

---

This Endorsement modifies insurance provided under the following:

**NON PROFIT MANAGEMENT LIABILITY POLICY**

---

# DATA & SECURITY+ ENDORSEMENT

It is hereby agreed:

Unless otherwise stated herein, the terms, conditions, exclusions and other limitations set forth in this endorsement are solely applicable to coverage afforded by this endorsement. This endorsement is part of and subject to the provisions of the **Policy** to which it is attached.

## I.   SCHEDULE OF ADDITIONAL COVERAGES AND LIMITS

The following is a summary of coverages and Limits of Liability provided by this endorsement.

| COVERAGE | LIMIT OF LIABILITY |
|---|---|
| A.  **Data Breach** Expense | $50,000 each claim<br>$50,000 in the aggregate |
| B.  **Identity Theft** Expense | $50,000 each claim<br>$50,000 in the aggregate |
| C.  **Workplace Violence Act** Expense | $50,000 each claim<br>$50,000 in the aggregate |
| D.  **Kidnapping** Expense | $50,000 each claim<br>$50,000 in the aggregate |

The maximum aggregate per **Policy Period** for A. through D. above shall be $200,000 in the aggregate.

No retentions shall apply to the sublimits shown above.

## II.  COVERAGES:

A. **Data Breach** Expense
   The **Company** will pay on behalf of the **Organization** up to the **Data Breach** Expense
   Limit of Liability stated in the schedule above, for reasonable and necessary expenses in
   items 1. through 6. below:
   1. Development of a plan to assist the **Organization** in responding to a **Data Breach**;
   2. Data analysis or forensic investigation to assess the scope of a **Data Breach**;
   3. The development, printing and mailing of legally required notification letters to those
      affected by a **Data Breach;**

DO 283 (05-17)                                                          Page 1 of 7

4. Development of a website link for use by the **Organization** in communicating with persons affected by a **Data Breach** after legally required notification letters are sent;

5. Development of a customer relationship management system for use by the **Organization** in communicating with persons affected by a **Data Breach** after legally required notification letters are sent**;**

6. Public relations services or crisis management services retained by the **Organization** to mitigate the adverse affect on the **Organization's** reputation  resulting from a **Data Breach** that becomes public and only after legally required notification letters are sent.

incurred by the **Organization** as a result of a **Data Breach**. The **Data Breach** must be first occur, be discovered by an **Insured**, and reported to the **Company** during the **Policy Period** but in no event later than sixty (60) days after the **Data Breach** is first discovered by an **Insured**. The expenses below must be incurred within one (1) year of the reporting of such **Data Breach**:

The **Organization** must first report the **Data Breach** to the **Company** and use a service provider of the **Company's** choice prior to incurring any of the above costs.

B. **Identity Theft** Expense

The **Company** will pay on behalf of a director or officer of the **Organization** up to the **Identity Theft** Expense Limit of Liability stated in the schedule above, for expenses, services or fees noted in items 1. through 3. below:

1. Credit monitoring services provided by a vendor of the **Company's** choice for the affected director or officer for up to one year following an **Identity Theft;**

2. Additional application fees paid by a director or officer whose loan(s) were rejected based on incorrect credit information resulting from an **Identity Theft**;

3. Notary fees, certified and overnight mail expenses paid by a director or officer in connection with reporting an **Identity Theft** to financial institutions, credit bureaus and agencies and law enforcement authorities.

incurred by such director or officer after he or she has become a victim of **Identity Theft.** The **Identity Theft** must first occur, be first discovered by an **Insured,** and reported to the **Company** during the **Policy Period** but in no event later than sixty (60) days after the **Identity Theft** is first discovered by an **Insured.**  The expenses above must be incurred within one (1) year of the reporting of such **Identity Theft**:

Any director or officer of the **Organization** who is a victim of **Identity Theft** must first report the **Identity Theft** to the **Company** and use a service provider of the **Company's** choice prior to incurring any of the above expenses, services or fees.

C. **Workplace Violence Act** Expense
The **Company** will reimburse the **Organization,** up to the **Workplace Violence Act** Expense Limit of Liability stated in the schedule above**,** for the following reasonable costs paid by the **Organization** for a period of thirty (30) days following, and as a result of, a

**Workplace Violence Act**:

1. Counseling services rendered to **Employees** and persons on the **Organization's Premises** directly affected by a **Workplace Violence Act**. The counseling services must be rendered by a licensed, professional counselor of the **Organization's** choice.
2. Services rendered by an independent public relations consultant of the **Organization's** choice for the purpose of mitigating the adverse affect of a **Workplace Violence Act** on the **Organization**.

To be covered, the **Workplace Violence Act** must occur during the **Policy Period** and be reported to the **Company** during the **Policy Period** but in no event later than sixty (60) days after the occurrence.

D. **Kidnapping** Expense
The **Company** will reimburse the **Organization,** up to the **Kidnapping** Expense Limit of Liability stated in the schedule above, for the following reasonable costs paid by the **Organization** as a result of a **Kidnapping:**

1. Retaining an independent negotiator or consultant to facilitate the release of a **Kidnapping** victim.  Nothing herein shall obligate the **Company** to recommend, select, retain or arrange for the retention of such independent negotiator or consultant;
2. Interest on a loan obtained by the **Organization** to pay expenses covered under this endorsement that is incurred as a result of a **Kidnapping.** However, there is no coverage for interest accruing prior to thirty (30) days preceding the date of such payment or subsequent to the date the **Company** pays any portion of a **Kidnapping** Expense or for expenses not covered under this endorsement;
3. Travel and accommodations incurred by the **Organization** in direct response to the **Kidnapping.** Nothing herein shall obligate the **Company** to recommend, select, or arrange for such travel and accommodations;
4. A reward up to $10,000 paid by the **Organization** to an informant for information which leads to the arrest and conviction of the person(s) responsible for the **Kidnapping**;
5. The current base salary paid to a director or officer of the **Organization** for the director or officer's work on behalf of the **Organization**, who is a victim of a **Kidnapping** subject to the following:
   a. salary reimbursement shall commence on the thirty-first (31st) consecutive day after a **Kidnapping**;
   b. salary reimbursement shall end when the director or officer is released; or is confirmed dead; or one hundred and twenty (120) days after the director or Officer is last confirmed to be alive; or twelve (12) months after the date of the **Kidnapping**, or when the **Kidnapping** Expense Limit of Liability has been exhausted by payments made by the **Company**, whichever occurs first.
   There is no coverage for **Kidnapping** Expense resulting from a **Kidnapping** planned, carried out or participated in, directly or indirectly, by any person who is or was a member of the victim's family or the **Organization**.

The **Kidnapping** must occur and be reported to the **Company** during the **Policy Period** but in no event later than sixty (60) days after the occurrence.

DO 283 (05-17)                                                    Page 3 of 7

III. ADDITIONAL DEFINITIONS

It is hereby agreed that the Directors and Officers **Coverage Part**, Section III. DEFINITIONS, is amended by the addition of the following definitions:

**Data Breach**
means the misappropriation or public disclosure, by electronic or non-electronic means, by the **Organization** and without the knowledge of, consent, or acquiescence of the president, member of the board of directors or any executive officer, of an individual(s) **Personally Identifiable Information** in the **Organization's** care, custody and control without the authorization or permission of the owner of such information.

**Identity Theft**
Means:
1. the act of obtaining **Personally Identifiable Information** belonging to a director or officer of the **Organization** without that person's authorization, consent or permission; and
2. the use of **Personally Identifiable Information** so obtained to make or attempt to make transactions or purchases by fraudulently assuming that person's identity.

**Identity Theft** does not mean any of the above committed directly or indirectly by a director or officer of the **Organization,** or by a family member of any director or officer.

There is no coverage for any **Identity Theft** Expense unless **Personally Identifiable Information** that is obtained without authorization, consent or permission is used to make or attempt to make purchases or conduct transactions by fraudulently assuming the identity of a director or officer of the **Organization**.

**Kidnapping**
means an actual or alleged wrongful abduction and involuntary restraint of a director or officer of the **Organization**, by one or more persons acting individually or collectively in which monetary or non-monetary demands are made to the **Organization** to obtain the director's or officer's release.

DO 283 (05-17)

| | |
|---|---|
| **Personally Identifiable Information** | means: |

1. information concerning an individual(s) that would be considered "non-public information" within the meaning of Title V of the Gramm-Leach Bliley Act of 1999 (as amended) and its implementing regulations including but not limited to Social Security numbers or account numbers correlated with names and addresses which is in an Insured's care, custody and control; and

2. personal information as defined in any U.S. federal, state or local privacy protection law governing the control and use of an individual's personal and confidential information, including any regulations promulgated thereunder; and

3. protected health information as defined by the Health Insurance Portability and Accountability Act of 1996 (Public Law 104-191) ("HIPPA") or the Health Information Technology for Economic and Clinical Health Act of 2009 ("HITECH") (Public Law 111-5), as amended, and any regulations promulgated thereto. **Personally Identifiable Information** does not mean information that is available to the public which does not include otherwise protected personal information.

| | |
|---|---|
| **Premises** | means buildings, facilities or properties leased or owned by the **Organization** in conducting its operations. |
| **Workplace Violence Act** | means an actual use of unlawful deadly force, or the threatened use of unlawful deadly force involving the display of a lethal weapon, occurring on the **Organization's Premises** and directed at an **Individual Insured,** or other persons on the **Premises** of the **Organization**. |

## IV. LIMITS OF LIABILITY AND RETENTION

1. The maximum Limit of Liability for any expenses provided by this endorsement shall be in addition to the Limits of Liability as set forth in the Policy Declarations for the Directors and Officers **Coverage Part**.

2. Any one incident, interrelated incidents or series of similar or related incidents for which coverage is provided under this endorsement shall be treated as one incident subject to

the maximum Limit of Liability available under this endorsement at the time the incident(s) is first reported to the Company regardless of whether the incident(s) continues and expenses are incurred by the Organization in any subsequent Policy Period(s).

## V. ADDITIONAL EXCLUSIONS

It is hereby agreed that the Directors and Officers **Coverage Part**, Section IV. EXCLUSIONS, is amended by the addition of the following:

Data Breach Related

1. Expense reimbursement resulting in any **Insured** gaining any profit, remuneration or advantage to which the **Insured** is not legally entitled;
2. expenses incurred by any **Subsidiary** of an **Organization** occurring prior to the date that such entity became a **Subsidiary** or incurred at any time that such entity is not a **Subsidiary**;
3. expenses arising from any incident(s) of which any **Insured** had notice before the inception date of this Policy; or any fact, circumstance, event, situation or incident which before the inception date of this Policy was the subject of any notice under any other similar policy of insurance or any future claims for expenses under this Policy based upon such pending or prior notice;
4. The portion of any expenses covered under this endorsement that is also covered under any other coverage part of this **Policy**;
5. Reissuance of credit or debit cards or any other expense not shown in Section II, COVERAGES, sub-section A, **Data Breach** Expense.

## VI. COVERAGE LIMITATIONS

The following terms, conditions and exclusions in the General Terms and Conditions and the Directors and Officers **Coverage Part** do not apply to this endorsement:
1. General Terms and Conditions
   a. Section II. EXTENDED REPORTING PERIOD
   b. Section XI. SPOUSAL AND DOMESTIC PARTNER EXTENSION

2. Directors and Officers **Coverage Part**
   a. Section IV. EXCLUSIONS, Subsection A. "Bodily Injury/Property Damage"
   b. Section VI. LIFETIME OCCURRENCE REPORTING PROVISION
   c. Section VIII. OUTSIDE DIRECTORSHIP PROVISION

All other terms and conditions of this **Policy** remain unchanged.  This endorsement is part of your **Policy** and takes effect on the effective date of your **Policy** unless another effective date is shown.

| This Endorsement modifies insurance provided under the following: |
|:---:|
| **NON PROFIT MANAGEMENT LIABILITY POLICY** |

# AMENDMENT OF PRIOR OR PENDING LITIGATION EXCLUSION

It is hereby agreed that the Directors and Officers **Coverage Part**, Section IV. EXCLUSIONS, Subsection A. "Prior or Pending Litigation" is deleted and replaced by the following:

Prior or Pending Litigation

Any litigation, demand, claim, arbitration, decree, judgment, proceeding, or investigation against any **Insured,** or any such action based upon the same or essentially the same facts, circumstances, matters, situations, transactions or events underlying or alleged therein which was pending on or prior to the effective date of this **Policy**;

provided that, if this **Policy** is a renewal of a **Policy** previously issued by the **Company** in a continuous succession of **Policies** with no lapses in coverage, the effective date of this **Policy** will mean the effective date of the first **Policy** issued by the **Company** in such succession of **Policies.**

It is also agreed that the Employment Practices **Coverage Part** (if purchased), Section III. EXCLUSIONS, Subsection B. "Prior or Pending Litigation" is deleted and replaced by the following:

Prior or Pending Litigation

Any litigation, demand, claim, arbitration, decree, judgment, proceeding, or investigation against any **Insured,** or any such action based upon the same or essentially the same facts, circumstances, matters, situations, transactions or events underlying or alleged therein which was pending on or prior to the effective date of this **Policy**;

provided that, if this **Policy** is a renewal of a **Policy** previously issued by the **Company** in a continuous succession of **Policies** with no lapses in coverage, the effective date of this **Policy** will mean the effective date of the first **Policy** issued by the **Company** in such succession of **Policies.**

It is also agreed that the Fiduciary Liability **Coverage Part** (if purchased), Section III. EXCLUSIONS, Subsection B. "Prior or Pending Litigation" is deleted and replaced by the following:

.

| | |
|---|---|
| Prior or Pending Litigation | Any litigation, demand, claim, arbitration, decree, judgment, proceeding, or investigation against any **Insured,** or any such action based upon the same or essentially the same facts, circumstances, matters, situations, transactions or events underlying or alleged therein which was pending on or prior to the effective date of this **Policy**; |
| | provided that, if this **Policy** is a renewal of a **Policy** previously issued by the **Company** in a continuous succession of **Policies** with no lapses in coverage, the effective date of this **Policy** will mean the effective date of the first **Policy** issued by the **Company** in such succession of **Policies.** |

All other terms and conditions of this **Policy** remain unchanged.  This endorsement is part of your **Policy** and takes effect on the effective date of your **Policy** unless another effective date is shown.

.

**Non-Profit Management Liability Policy**                     **General Terms and Conditions**

In consideration of the payment of the premium and reliance upon all statements made and information furnished to the **Company**, including the statements made in the **Application** and subject to all the provisions of this **Policy**, the **Company** and the **Insureds** agree as follows:

**NOTICE**: This is a Claims Made Policy.  This means the **Company** will cover only those **Claims** first made against the **Insured** during the **Policy Period** or, where applicable, the Extended Reporting Period.

If any provision in these General Terms and Conditions is inconsistent or in conflict with the terms and conditions of any **Coverage Part**, the terms and conditions of such **Coverage Part** shall control for the purposes of that **Coverage Part**.

Any bolded term in a **Coverage Part** that is defined in these General Terms and Conditions shall have the meaning set forth in these General Terms and Conditions. Any bolded term in a **Coverage Part** that is defined in that **Coverage Part** shall have the meaning set forth in such **Coverage Part**.

The descriptions in the headings and subheadings of this **Policy** are solely for convenience and form no part of the terms and conditions of coverage, and do not serve to express, confirm, alter or provide coverage.

I.    DEFINITIONS

| | |
|---|---|
| **Application** | means: |
| | 1.  an application and any materials submitted for this **Policy**; and |
| | 2.  an application and any materials submitted for all previous **Policies** issued by the **Company** providing uninterrupted coverage. |
| | The content of 1. and 2. above are incorporated by reference in this **Policy** as if physically attached hereto. |
| **Claim** | shall have the meaning as defined in the applicable **Coverage Part**. |
| **Company** | means the insurance company identified in the Policy Declarations. |
| **Coverage Part** | means individually or collectively, as applicable, the purchased coverage parts as set forth in the Policy Declarations as included and attached to and made a part of this **Policy**. |

| | |
|---|---|
| **Defense Costs** | shall have the meaning as defined in the applicable **Coverage Part**. |
| **Domestic Partner** | means any natural person qualifying as a domestic partner under the provision of any applicable federal, state or local laws. |
| **Employee** | shall have the meaning as defined in the applicable **Coverage Part**. |
| **Financial Impairment** | means: |

1. the appointment by any federal or state official, agency or court of any receiver, conservator, liquidator, trustee, rehabilitator, creditors committee or similar official to take control of, supervise, manage or liquidate the **Organization** and provided that the court or other judicial or administrative body overseeing the receivership, conservatorship, liquidation, rehabilitation, bankruptcy or equivalent proceeding has denied a request by the **Organization** to indemnify an **Individual Insured** for a **Loss**; or
2. the **Organization** becoming a debtor in possession under the United States bankruptcy law or the equivalent of a debtor in possession under the law of any other country.

| | |
|---|---|
| **Insured** | means any **Organization** and any **Individual Insured**. |
| **Individual Insured** | shall have the meaning as defined in the applicable **Coverage Part**. |
| **Interrelated Wrongful Acts** | means any **Wrongful Acts** based upon, arising from, or in consequence of the same or related facts, circumstances, situations, transactions or events, or that are logically or causally connected by reason of any common or related series of facts, circumstances, situations, transactions or events. |
| **Loss** | shall have the meaning as defined in the applicable **Coverage Part**. |
| **Management Control** | means: |

1. control of more than fifty percent (50%) of the voting rights representing the right to appoint, elect, or designate the majority of the board of directors, board

of trustees, or board of managers; or

2. control of exactly fifty percent (50%) of the voting rights representing the right to appoint, elect, or designate the majority of the board of directors, board of trustees, or board of managers; and pursuant to a written contract solely controls the management and operations of such entity.

**Named Insured**      means the entity named in Item 1. of the Policy Declarations.

**Organization**      means:

1. the **Named Insured** and any **Subsidiary**; and
2. any entity as debtor in possession under United States bankruptcy law or equivalent status under the law of any other jurisdiction.

**Plan**      shall have the meaning as defined in the applicable **Coverage Part**.

**Policy**      means collectively the Policy Declarations, General Terms and Conditions, applicable **Coverage Parts**, applicable endorsements, and the **Application**.

**Policy Period**      means the period of time from the effective date and time of this **Policy** to the date and time of expiration as shown in the Policy Declarations, or its earlier cancellation or termination date. If the length of the **Policy Period** is the same as the **Policy Year**, the terms **Policy Period** and **Policy Year** are used interchangeably herein.

**Policy Year**      means the period of one (1) year following the effective date of the **Policy Period** or any subsequent one-year anniversary thereof; or

In the event the **Policy** expires less than one (1) year following the effective date of the **Policy Period**; or more than one (1) year but less than two (2) years following the effective date of the **Policy Period**; then **Policy Year** shall mean any such period.

**Subsidiary**      means:

1. any not-for-profit entity in which the **Named Insured** has **Management Control** directly or indirectly through one or more **Subsidiaries** on or before the

effective date of this **Policy**; and is disclosed as a **Subsidiary** in an **Application** to the **Company**; or

2. any other entity added as a **Subsidiary** by written endorsement to this **Policy**.

**Takeover**                means:

1. the acquisition by another entity or person or group of entities or persons acting in concert of:
   a. the **Management Control** of the **Named Insured**; or
   b. the acquisition of more than fifty percent ( 50%) of the total consolidated assets of the **Named Insured** as of the date of the **Named Insured's** most recent consolidated financial statements prior to such acquisition;
2. the merger of the **Named Insured** into another entity such that the **Named Insured** is not the surviving entity;
3. the consolidation of the **Named Insured** with another entity; or
4. the loss, forfeiture, or suspension of the **Named Insured's** tax exempt status.

**Wrongful Act**            shall have the meaning as defined in the applicable **Coverage Part**.

---

## II.   EXTENDED REPORTING PERIOD

Right to Purchase           If the **Policy** expires, is cancelled or not renewed for any reason other than non-payment of premium, then the **Named Insured** shall have the right to purchase an Extended Reporting Period to report to the **Company**, as soon as practicable prior to the expiration date of the purchased Extended Reporting Period, any **Claim** against an **Insured**.

An Extended Reporting Period shall only apply to **Claims** arising from a **Wrongful Act** which was actually or allegedly committed before the date of expiration, cancellation or non-renewal of this **Policy**, or prior to the effective date of any **Takeover**.  For the purpose of this clause, the offer of renewal terms and conditions or premiums by the **Company** different from those in effect prior to renewal shall not constitute a refusal to renew.

| Options | The additional premium for the Extended Reporting Period shall be a percentage of the total annual premium as shown in the Policy Declarations.  The **Named Insured** may elect any one of the following options: |

1. Twelve (12) month period - 30% of the annual premium;
2. Twenty Four (24) month period - 75% of the annual premium; or
3. Thirty Six (36) month period - 120% of the annual premium.

The Extended Reporting Period begins on the expiration date of the **Policy**, or if cancelled or non-renewed, the effective date of such cancellation or non-renewal of the **Policy**.

| Payment & Notice to the Company | As a condition precedent to the right to purchase an Extended Reporting Period, the total earned premium for this **Policy** must have been paid to the **Company**. Any premium paid with respect to an Extended Reporting Period shall be deemed fully earned as of the first day of the Extended Reporting Period.  The right to elect the Extended Reporting Period will terminate unless written notice of such election, together with payment of the additional premium as set forth above, is received by the **Company** within sixty (60) days of the effective date of the expiration, nonrenewal or cancellation of this **Policy**. |

| Extended Reporting Period Limits & Other Insurance | The Extended Reporting Period will not provide a new, separate or additional Limit of Liability.  The remainder of the Limit of Liability applicable to the **Policy Year** in effect as of the effective date of the expiration, cancellation, or non-renewal is the maximum Limit of Liability for all **Claims** reported during the Extended Reporting Period. |

## III.   DEFENSE & SETTLEMENT

| Duty To Defend | The **Company** shall have the right and duty to defend any **Claim** covered by this **Policy** even if the allegations are groundless, false or fraudulent.  The **Company** shall have the right to appoint counsel of its choice with respect to such **Claim.**  The **Company's** obligation to defend any **Claim** or pay any **Loss** or **Defense Costs** shall be completely |

fulfilled and extinguished if the applicable Limit of Liability has been exhausted by payment of **Loss**.

Consent to Settle

The **Company**, as it deems necessary, has the right to investigate, adjust, defend, appeal and, with the consent of the **Insured**, negotiate the settlement of any **Claim** whether within or in excess of the Retention. If the **Insured** refuses to consent to a settlement recommended by the **Company**, the **Company's** obligation to the **Insured** for **Loss** and **Defense Costs** attributable to such **Claim** shall be limited to:

    a.  The amount of the covered **Loss** in excess of the Retention which the **Company** would have paid in settlement at the time the **Insured** first refused to settle; plus

    b.  covered **Defense Costs** incurred up to the date the **Insured** first refused to settle; plus

    c.  eighty percent (80%) of covered **Loss** and **Defense Costs** in excess of the first settlement amount recommended by the **Company** to which the **Insured** did not consent.

It is understood that payment of a., b. and c. above is the limit of the **Company's** liability under this **Policy** for any **Claim** in which the **Insured** fails or refuses to consent to the **Company's** settlement recommendation, subject at all times to Section IX. LIMITS OF LIABILITY and Section X. RETENTIONS AND PRESUMPTIVE INDEMNIFICATION of these General Terms and Conditions. The remaining twenty percent (20%) of **Loss** and **Defense Costs** in excess of the amount referenced in a. and b. above shall be the obligation of the **Insured**.

In no event shall the **Company** be obligated to pay any **Loss** or **Defense Costs** after the applicable Limit of Liability shown in the Policy Declarations has been exhausted by payment of **Loss**.

| | |
|---|---|
| Consent of the Company | The **Insured** shall not demand or agree to arbitration of any **Claim** without the **Company's** written consent. The **Insured** shall not, except at personal cost, make any offer or payment, admit any liability, settle any **Claim**, assume any obligation, or incur any expense without the **Company's** written consent. |
| Cooperation | The **Insured** agrees to cooperate with the **Company** with respect to all **Claims**, and provide such assistance and information as the **Company** may reasonably request. Upon the **Company's** request, the **Insured** shall submit to examination and interrogation by the **Company's** representative, under oath if required, and shall attend hearings, depositions, trials and shall assist in the conduct of suits, including but not limited to effecting settlement, securing and giving evidence, obtaining the attendance of witnesses, giving written statements to the **Company's** representatives and meeting with such representatives for the purpose of investigation and/or defense, all of the above without charge to the **Company**. The **Insured** further agrees not to take any action which may increase the **Insured's** or the **Company's** exposure under this **Policy**. |
| Papers/Documents | The **Insured** shall execute all papers required and shall do everything that may be necessary to secure and preserve any rights of indemnity, contribution or apportionment which the **Insured** or the **Company** may have, including the completion of such documents as are necessary to enable the **Company** to bring suit in the **Insured's** name, and shall provide all other assistance and cooperation which the **Company** may reasonably require. |

## IV.   ALLOCATION OF DEFENSE COSTS

If a **Claim** is made against an **Insured** for both **Loss** that is covered by this **Policy** and loss that is not covered by this **Policy**, the **Company** will pay as follows:

1.   One hundred percent (100%) of **Defense Costs** on account of such **Claim**; and

2.  all remaining loss from such **Claim** shall be apportioned between covered **Loss** and uncovered loss based on the relative legal exposures of the parties to such matters.
3.  Items 1. and 2. above of this Section IV. shall not apply to any **Insured** for whom coverage is excluded pursuant to Section VII. REPRESENTATIONS AND SEVERABILITY.

---

V.   NOTICE AND CLAIM REPORTING PROVISIONS

Notice hereunder shall be given in writing to the **Company**. If mailed, the date of mailing of such notice shall constitute the date that such notice was given and proof of mailing shall be sufficient proof of notice.

Written Notice of a Claim

1.  As a condition precedent to exercising any right to coverage under this **Policy**, the **Insured** shall give to the **Company** written notice of a **Claim** as soon as practicable after any Chief Executive Officer, Chief Financial Officer, Chief Operating Officer, Chairperson, Executive Director, Human Resources Manager, In-House General Counsel, Managing Member or Fiduciary of any **Plan** becomes aware of such **Claim**, however:
    a.  if the **Policy** expires, is cancelled or is non-renewed and no Extended Reporting Period is purchased, no later than ninety (90) days after the expiration date or the effective date of such cancellation or non-renewal; or
    b.  if an Extended Reporting Period is purchased, no later than the last day of the Extended Reporting Period.

However, if the **Policy** is cancelled for non-payment of premium, notice shall be provided by the **Insured** to the **Company** no later than the effective date of cancellation.

2.  Coverage for a **Claim** reported to the **Company** during the automatic 90 day period noted in 1. a. above shall only apply if the **Claim** is first made prior to the date of the **Policy** expiration, cancellation, or non-renewal.

| Written Notice of a Circumstance | 1. If during the **Policy Period**, or any applicable Extended Reporting Period, the **Insured** becomes aware of circumstances which could give rise to a **Claim** and gives written notice of such circumstances to the **Company** as soon as practicable during the **Policy Period**, or Extended Reporting Period if applicable, in which the **Insured** first becomes aware of such circumstances, then any **Claim** subsequently arising from such circumstances shall be deemed made against the **Insured** during the **Policy Year** in which such circumstances were first reported to the **Company**. Such subsequent **Claim** must be reported to the **Company** in accordance with this Section V. NOTICE AND CLAIM REPORTING PROVISIONS, "Written Notice of Claim" above. |
|---|---|
| | 2. When reporting a circumstance to the **Company**, an **Insured** shall give the names of any potential claimant; a description of the specific circumstances that could give rise to a **Claim**; the identity of the specific **Insureds** allegedly involved in such circumstance; the nature of the potential damages (monetary and non-monetary); and the specifics as to how the **Insureds** first became aware of such circumstance. |
| Interrelated Claims | More than one **Claim** involving the same **Wrongful Act** or **Interrelated Wrongful Acts** shall be considered as one **Claim** which shall be deemed made on the earlier of: |
| | 1. the date on which the earliest **Claim** was first made; or |
| | 2. the first date valid notice was given by the **Insured** to the **Company**, in accordance with applicable reporting provisions, under this **Policy** or under any prior policy, of any **Wrongful Act** or any fact, circumstance, situation, transaction or event which underlies such **Claim**. |

---

**VI.    CANCELLATION OR NON-RENEWAL**

| Cancellation by the Insured | This **Policy** may be cancelled by the **Named Insured** by either surrender thereof to the **Company** at its address stated in the Policy Declarations or by mailing to the **Company** written notice requesting cancellation and in either case stating when thereafter such |
|---|---|

cancellation shall be effective. Earned premium shall be computed pro rata at the time cancellation is effected or as soon as practicable thereafter.

Cancellation By the Company

The **Company** may cancel this **Policy** only in the event of the **Insured's** failure to pay the premium when due. The **Company** will mail to the **Named Insured**, written notice stating when cancellation shall take effect. The effective date of such cancellation shall not be less than twenty (20) days after the date of mailing. Earned premium shall be computed pro rata at the time cancellation is effected or as soon as practicable thereafter.

Non-Renewal

In the event the **Company** non-renews this **Policy**, the **Company** shall mail to the **Named Insured**, not less than sixty (60) days prior to the end of the **Policy Period**, written notice of non-renewal. Such notice shall be binding on all **Insureds**.

Delivery of Notice

The **Company** shall mail notice of cancellation or non-renewal with a certificate of mailing stating the effective date of cancellation or non-renewal which shall become the end of the **Policy Period**. Mailing of such notice shall be sufficient notice of cancellation or non-renewal.

---

VII.   REPRESENTATIONS AND SEVERABILITY

Representations

The **Insured** represents that the particulars and statements contained in the **Application** are true and agree that:

1. those particulars and statements are the basis of this **Policy** and are to be considered as incorporated into and constituting a part of the **Policy**;
2. those particulars and statements are material to the acceptance of the risk assumed by the **Company**; and
3. the **Policy** is issued in reliance upon the truth of such representations.

Severability of Application

An **Application** for coverage shall be construed as a separate **Application** for coverage by each **Individual Insured**. With respect to the particulars and statements

contained in the **Application**, no fact pertaining to or knowledge possessed by any **Individual Insured** shall be imputed to any other **Individual Insured** for the purpose of determining if coverage is available.

In the event that such **Application** contains any misrepresentations which materially affects either the acceptance of the risk or the hazard assumed by the **Company** under this **Policy**, then no coverage shall be afforded for any **Claim** based upon, arising out of, related to or in consequence of any such misrepresentation with respect to:

1.  any **Individual Insured** who knew of such misrepresentations or knew of the facts or circumstances relating to such misrepresentations, or any **Organization** to the extent it indemnifies any such **Individual Insured**. Such knowledge possessed by such **Individual Insured** shall not be imputed to any other **Individual Insured;** or
2.  any **Organization** if any past or present Chief Executive Officer, Chief Financial Officer, Chief Operating Officer, Chairperson, Executive Director, Human Resources Manager, In-House General Counsel, Managing Member or Fiduciary of any **Plan** or any equivalent position of the **Named Insured**, or the signer of the **Application**, knew of such misrepresentations or knew of the facts or circumstances relating to such misrepresentations.

---

VIII.   CHANGES IN EXPOSURE

Creation, Acquisition of or Merger with Another Entity

1.  If, after the effective date of this **Policy**:
    a.  the **Organization** creates, acquires, consolidates or merges with another nonprofit entity incorporated under the laws of a jurisdiction within the territorial United States, (hereafter referred to as "other entity") such that the **Organization** is the surviving entity, and if as a result of such creation, acquisition, consolidation or merger, the other entity becomes a **Subsidiary** of the **Organization**, then coverage shall be provided for the other entity as an **Insured** solely for **Wrongful Acts** committed or

allegedly committed after the effective date of such creation, acquisition, consolidation or merger. The **Insured** shall disclose full particulars of such a change to the **Company** as soon as practicable but not later than the expiration date of the **Policy Year**, or effective date of cancellation or non-renewal of this **Policy**.

b. However, if at the time of an event described in Paragraph 1, a., above:

    i. the assets of the other entity exceed thirty five percent (35%) of the total assets of the **Organization** as reflected in the **Organization's** most recent annual financial statements; or

    ii. if the Employment Practices Liability Coverage Part is attached to this **Policy,** the total number of employees of the other entity exceeds thirty five (35%) of the total number of **Employees** of the **Organization** immediately prior to such event, then:

    the **Named Insured** shall provide to the **Company** written notice of such creation, acquisition, consolidation or merger, containing full details thereof, as soon as practicable but within sixty (60) days of such event. The **Company**, at its sole discretion, may require additional premium and may alter the terms, conditions or limitations of coverage. The **Company** reserves the right to refuse any extension of coverage to such entity.

2. If, after the effective date of this **Policy**, the **Organization** creates, acquires, consolidates or merges with a for-profit entity, or any entity incorporated outside of the territorial United States, such that the **Organization** is the surviving entity, and if as a result of such creation, acquisition, consolidation or merger, such for-profit or foreign entity becomes a **Subsidiary** of the **Organization**, then:

    the **Named Insured** shall provide to the

**Company** written notice of such creation, acquisition, consolidation or merger, containing full details thereof, as soon as practicable but within sixty (60) days of such event. The **Company**, at its sole discretion, may require additional premium and may alter the terms, conditions or limitations of coverage. The **Company** reserves the right to refuse any extension of coverage to such entity.

Cessation of Subsidiaries

If during the **Policy Period** any **Subsidiary** ceases to be a **Subsidiary**, then coverage under this **Policy** shall continue for such **Subsidiary** and its **Individual Insureds** until the expiration of this **Policy** or the last **Policy** in an uninterrupted series of policies issued by the **Company**, but solely for **Claims** arising out of **Wrongful Acts** committed or allegedly committed by such **Subsidiary** or its **Individual Insureds** while such **Subsidiary** was a **Subsidiary** and prior to the effective date of such cessation. There shall be no coverage for **Claims** arising out of actual or alleged **Wrongful Acts** occurring on or after the effective date of cessation.

Takeover of the
Named Insured

In the event of a **Takeover** of the **Named Insured:**

1. coverage under this **Policy** shall continue until the earlier of:
   a. the expiration of the **Policy Year**; or
   b. if the **Policy** is cancelled or non-renewed, the effective date of cancellation or non-renewal;

      but only with respect to **Claims** arising out of **Wrongful Acts** that occurred or allegedly occurred prior to the effective date of the **Takeover**. There shall be no coverage for **Claims** arising out of actual or alleged **Wrongful Acts** occurring on or after the date of **Takeover**;

2. the **Named Insured** shall give the **Company** written notice of the **Takeover** as soon as practicable, but not later than sixty (60) days after the effective date of the **Takeover**; and
3. the premium for the **Policy Year** in which the **Takeover** occurred shall be deemed to be fully

earned. The **Named Insured** shall have the right to purchase an Extended Reporting Period, subject to Section II. EXTENDED REPORTING PERIOD herein, to report **Claims** arising out of **Wrongful Acts** occurring prior to the effective date of any **Takeover**.

Merger, Sale, Transfer or Termination of a Plan

If after the inception date of the Fiduciary Liability **Coverage Part,** or the date the Fiduciary Liability Coverage Endorsement is added to this **Policy**:

1. the sponsorship of a **Plan** is transferred so that an **Organization** is no longer the sole employer sponsor of such **Plan**;
2. a **Plan** is merged with another plan for which coverage is not afforded under the Fiduciary Liability **Coverage Part**;
3. a **Plan** is terminated or sold; or
4. the Pension Benefit Guaranty Corporation (PBGC) becomes the Trustee of a **Plan**;

then:

a. in the case of paragraphs 1., 2. and 3. above, the Fiduciary Liability **Coverage Part** or the Fiduciary Liability Coverage Endorsement, as applicable, shall continue to apply to such transferred, merged, terminated or sold **Plan**, but solely for **Claims** based upon or arising out of **Wrongful Acts** that occurred or allegedly occurred prior to the date of such transfer, merger, termination or sale. There shall be no coverage for **Claims** arising out of actual or alleged **Wrongful Acts** occurring on or after the date of merger, transfer, termination or sale of any **Plan** as described in paragraphs 1., 2. and 3. above; or
b. in the case of paragraph 4. above, the Fiduciary Liability **Coverage Part** or the Fiduciary Liability Coverage Endorsement shall continue to apply to such **Plan** for those who were **Insureds** at the time the PBGC became the Trustee of such **Plan** but solely for **Claims** based upon or arising out of **Wrongful Acts** that occurred or allegedly occurred prior to the date the PBGC became

<table>
<tr><td></td><td>the Trustee of such **Plan**. There shall be no coverage for **Claims** arising out of actual or alleged **Wrongful Acts** occurring on or after the date the PBGC becomes the Trustee of any **Plan**.</td></tr>
<tr><td>Cancellation of the Policy</td><td>If the **Named Insured** requests cancellation of this **Policy** as a result of a "Creation, Acquisition of or Merger with Another Entity", "Cessation of Subsidiaries", or "Takeover of the Named Insured", the **Company** shall compute earned premium on a pro rata basis and return any unearned premium to such entity as of the effective date of such cancellation as long as notice of the event is provided to the **Company** as soon as practicable but not later than sixty (60) days after such event, together with such information as the **Company** may require.</td></tr>
</table>

## IX.   LIMITS OF LIABILITY

| | |
|---|---|
| "Each Claim" | The "Each Claim" Limit of Liability shown on the Policy Declarations is the **Company's** maximum liability for **Loss** for each **Claim** to which the applicable **Coverage Part** applies, during each **Policy Year**. |
| "In the Aggregate" | The "In the Aggregate" Limit of Liability shown on the Policy Declarations is the **Company's** maximum liability for **Loss** for all **Claims** to which the applicable **Coverage Part** applies, during each **Policy Year**. |
| Policy Year Limits | The Limits of Liability for any **Policy Year** may not be aggregated or transferred, in whole or in part, so as to provide any additional coverage with respect to **Claims** first made or deemed made, as provided in Section V. NOTICE AND CLAIM R̃EPORTING PROVISIONS of these General Terms and Conditions during any other **Policy Year**.  If the applicable Limits of Liability for any **Policy Year** are exhausted, the **Company's** obligation for that **Policy Year** shall be deemed completely fulfilled and extinguished. |
| Extended Reporting Period Limits | The Extended Reporting Period will not provide a new, separate or additional Limit of Liability.  The remainder of the Limit of Liability applicable to the **Policy Year** in effect as of the date of expiration, cancellation, or non-renewal is the maximum Limit of Liability for all |

**Claims** reported during the Extended Reporting Period.

Defense Costs

**Defense Costs** shall be in addition to the Limits of Liability for each **Coverage Part** purchased as shown on the Policy Declarations, unless as otherwise provided within that **Coverage Part** or by endorsement.

Interrelated Claims

More than one **Claim** involving the same **Wrongful Act** or **Interrelated Wrongful Acts** shall be considered as one **Claim** pursuant to Section V. NOTICE AND CLAIM REPORTING PROVISIONS, "Interrelated Claims" and shall be subject to the Limit of Liability in effect when the **Claim** was first made.

X.   RETENTIONS AND PRESUMPTIVE INDEMNIFICATION

Retentions

Retentions set forth in the Policy Declarations for each **Coverage Part** shall apply per **Claim** per **Policy Year** under each respective **Coverage Part**.

If more than one Retention applies to any one **Claim** then each applicable Retention shall be applied to the applicable part of such **Claim**, but the sum of such Retentions shall not exceed the highest of such applicable Retentions.

**Claims** shall be subject to the Retention applicable to the **Policy Year** during which the **Claims** are first made as provided in Section V. NOTICE AND CLAIM REPORTING PROVISIONS.

Except as otherwise provided by Section VII. TIMELY NOTICE AND RESOLUTION INCENTIVE of the Directors and Officers **Coverage Part**:

1. the **Company** shall be liable to pay only **Loss** and **Defense Costs** in excess of the applicable Retention for the **Coverage Part** to which the **Claim** applies;
2. the **Company** shall have no obligation to pay any part or all of such Retention on the **Insured's** behalf; and
3. if the **Company**, at its sole discretion, elects to pay any part of or all of such Retention, the **Insured** agrees to repay such amounts to the **Company** upon demand.

Presumptive Indemnification

Regardless of whether **Loss** or **Defense Costs** resulting from any **Claim** against an **Individual Insured** is actually indemnified by the **Organization**, the applicable Retention set forth in the Policy Declarations shall apply to any **Loss** and **Defense Costs** if indemnification of the **Individual Insured** by the **Organization** is legally permissible. The certificate of incorporation, charter, articles of association or other organizational documents of the **Organization**, including by-laws and resolutions, will be deemed to have been adopted or amended to provide indemnification to the **Individual Insured** to the fullest extent permitted by law.

However, if an **Individual Insured** is not indemnified for **Loss** or **Defense Costs** solely by reason of:

1. **Financial Impairment**; or
2. a good faith determination by the **Organization** that such indemnification is not permitted by common or statutory law; then

an **Individual Insured's** Retention for this **Coverage Part** shall be amended to $0.

## XI.   SPOUSAL AND DOMESTIC PARTNER EXTENSION

If a **Claim** against an **Individual Insured** includes a **Claim** against the lawful spouse or **Domestic Partner** of such **Individual Insured** solely by reason of:

1. such spousal or **Domestic Partner** status;  or
2. such spouse's or **Domestic Partner's** ownership interest in property or assets that are sought as recovery for **Wrongful Acts**; then

any **Loss** which such spouse or **Domestic Partner** becomes legally obligated to pay on account of such **Claim** shall be deemed **Loss** which the **Individual Insured** becomes legally obligated to pay as a result of the **Claim.**

This extension of coverage shall not apply to the extent a **Claim** alleges any **Wrongful Act**, error, omission, misstatement, misleading statement or neglect or breach

of duties by such spouse or **Domestic Partner**.

XII.   SUBROGATION

In the event of payment under this **Policy**, the **Company** shall be subrogated to the **Insureds'** rights of recovery. The **Insured** shall do everything necessary to secure such rights, including the execution of such documents necessary to enable the **Company** to effectively bring suit in the name of any **Company**.

In no event, however, shall the **Company** exercise its rights to subrogation against an **Individual Insured** under this **Policy** unless such **Individual Insured**:

1. has been convicted of a deliberate criminal act; or
2. has been determined by a final adjudication adverse to the **Individual Insured** to have committed a deliberate fraudulent act, or to have obtained any profit, advantage or remuneration to which such **Individual Insured** was not legally entitled.

In the event the **Company** shall for any reason pay indemnifiable **Loss** on behalf of an **Individual Insured**, the **Company** shall have the contractual right hereunder to recover from the **Organization** or any **Subsidiary** the amount of such **Loss** equal to the amount of the Retention not satisfied by the **Organization** or any **Subsidiary** and shall be subrogated to rights of the **Individual Insureds** hereunder.

XIII.   CHANGES

Notice to any agent or knowledge by any agent shall not affect a waiver or change in any part of this **Policy** or stop the **Company** from asserting any right under the terms of this Policy, nor shall the terms of this **Policy** be waived or changed except by an endorsement, issued by the **Company** to form a part of this **Policy**.

XIV.   AUTHORIZATION CLAUSE AND NOTICES

By acceptance of this **Policy**, the **Insured** agrees that the **Named Insured** shall act on behalf of all **Insureds** with respect to:

1. the payment of premiums or the receipt of any return premiums that may become due under the **Policy**;
2. the cancellation or non-renewal of this **Policy**;
3. the effecting of any changes to the **Policy** or purchasing of an Extended Reporting Period; or
4. the giving and receiving of all notices and correspondence.

Any notice given to the **Named Insured** by the **Company** pursuant to Section VI. CANCELLATION OR NON-RENEWAL shall be deemed to be notice to all **Insureds**.

XV.   ASSIGNMENT

Assignment of interest under this **Policy** shall not bind the **Company** until the **Company's** consent is endorsed hereon.

XVI.   OTHER INSURANCE

This **Policy** is excess of other valid and collectable insurance, unless such other insurance is specifically written to be in excess of this **Policy**. For purposes of this provision, "other valid and collectable insurance" means insurance provided by an entity or organization other than the **Company**.

When it is determined that both this insurance and other insurance or self-insurance apply to any **Claim** on the same basis, whether primary, excess or contingent, the **Company** shall not be liable under this **Policy** for a greater proportion of the **Loss** and **Defense Costs** than the applicable Limit of Liability under the **Policy** for such **Loss** and **Defense Costs** bears to the total applicable Limit of Liability of all valid and collectible insurance against such **Claims**.

XVII.   TERMS OF POLICY CONFORMED TO STATUTE

Terms of this **Policy** which are in conflict with the statutes of the state or territory wherein this **Policy** is

issued are hereby amended to conform to such statutes.

## XVIII. ACTION AGAINST THE COMPANY

Compliance

No action shall lie against the **Company** unless, as a condition precedent thereto, there has been full compliance with all of the terms of this **Policy**, and until the amount of the **Insured's** obligation to pay shall have been finally determined either by judgment against the **Insured** after actual trial or by the **Insured's** written agreement, the claimant or the claimant's legal representative, and the **Company**.

Rights to Recover

Any person or the legal representatives thereof who has secured such judgment or written agreement shall thereafter be entitled to recover under this **Policy** to the extent of the insurance afforded by this **Policy**. No person or entity shall have any right under this **Policy** to join the **Company** as a party to any action against the **Insured** to determine the **Insured's** liability, nor shall the **Company** be impleaded by the **Insured** or the **Insured's** legal representatives. Bankruptcy or insolvency of the **Insured** or the **Insured's** successors in interest shall not relieve the **Company** of its obligations hereunder.

## XIX. POLICY TERRITORY

This **Policy** shall apply worldwide.

## XX. COORDINATION OF COVERAGE

Subject always to the applicable Limit of Liability, should two or more **Coverage Parts** apply to the same **Claim**, the **Company** will not pay more than the actual **Loss** incurred by the **Insureds**.

## XXI. ACCEPTANCE

This **Policy** embodies all agreements existing between the parties hereunder or any of their agents relating to this insurance.

## XXII. LIBERALIZATION

If within forty-five (45) days of binding this **Policy**, the **Company** broadens coverage under any **Coverage Part** or the General Terms & Conditions attached to this

DO GTC (05-17)

**Policy**, and;

1. such broadened coverage applies to policies in the state or territory in which this **Policy** is written;
2. the effective date of the policies which are to receive the broadened coverage is after the effective date of this **Policy**; and
3. there is no additional premium charged for such broadened coverage;

then the **Company** shall apply the broadened coverage to this **Policy** as applicable for no additional premium, but only for a **Wrongful Act** which first occurs after the effective date of such broadened coverage.

# INSURANCE

# POLICY

**UNITED STATES LIABILITY INSURANCE GROUP**

A STOCK COMPANY

A BERKSHIRE HATHAWAY COMPANY

1190 Devon Park Drive
Wayne, PA 19087-2191
888-523-5545 – USLI.COM

This policy jacket together with the policy declarations, coverage forms and endorsements, if any, complete this policy.

The enclosed declarations designates the issuing company.

# INSURANCE POLICY

# Read your policy carefully!

**In Witness Whereof**, the company has caused this Policy to be executed and attested.  Where required by law, this Policy shall not be valid unless countersigned by a duly authorized representative of the company.

Secretary

President

This page has been intentionally left blank.

# EXHIBIT

# 5

# Law Office of John D. Frumer
**Admitted to Practice in Massachusetts and Maine**

199 WELLS AVENUE
NEWTON, MASSACHUSETTS 02459
617-233-9147

jdfrumer@frumerlaw.com
Fax: 617-830-0615

P.O. Box 74
Brunswick, ME 04011
Tel: 207-831-9900

July 27, 2021

Via Email (newlosses@usli.com)
Mount Vernon Fire Insurance Company
1190 Devon Park Drive
Wayne, PA 19087
Attention: Hayleigh Hunter

Re: Notice of Claim
Insured: Nahant Preservation Trust, PO Box 30, Nahant, MA 01908 (Named Insured)
Individual Insureds: Various, as generally identified herein below. Policy(ies): No.
ND02557425B (andNo. ND02557425A) Policy Period: 06/19/2020-06/19/2021 (as well as
current and any other applicable periods) (and 6/19/2019–6/19/2020).

Dear Ms. Hunter:

On behalf of your Insureds and my clients, Nahant Preservation Trust, Inc., ("Named Insured"
and "Trust") and various individuals identified herein below ("Individual Insureds" and
"Directors, Officers, and/or Volunteers") (Named Insured/Trust and Individual
Insureds/Directors, Officers, and/or Volunteers herein collectively referred to as "Insureds"), I
respectfully write to provide you with Notice of a Claim under the Directors and Officers
Liability Coverage Part of the Non Profit Management Liability Policy No. ND02557425B with
a policy period of 6/19/2020–6/19/2021 (as well as current and any other applicable periods)
(collectively "Policy B"), and through an amendatory endorsement in Policy B, Policy No.
ND02557425A with a policy period of 6/19/2019–6/19/2020 ("Policy A") (Policy B and Policy
A collectively "the Policy") issued by Mount Vernon Fire Insurance Company ("Mount
Vernon"). This Notice of Claim, at this time, is for Defense Costs incurred by the Named Insured
to defend the Insureds in a Claim brought against the Insureds.

## EXECUTIVE SUMMARY OF CLAIM

On or about August 9, 2019, Northeastern University ("Northeastern") commenced a lawsuit
naming the Trust and Directors, Officers and/or Volunteers as defendants, seeking, inter alia,

non-monetary relief in the form of a declaratory judgment as to whether or not Northeastern's proposed East Point property is subject to Article 97 of the Articles of Amendment to the Massachusetts Constitution ("Article 97").

Based upon definitions within the Policy: 1) The Trust is an "Organization" which is the "Named Insured;" 2) The Directors, Officers and/or Volunteers of the Trust are "Individual Insureds;" 3) Mount Vernon has an obligation to "defend any Claim or pay any Loss or Defense Costs" which obligation is triggered by the commencement of a "Claim" against a "Named Insured" or an "Individual Insured;" 4) Northeastern's claims within their lawsuit constitute one or more covered "Claim(s)" alleging a "Wrongful Act" and/or a "Personal Injury Wrongful Act" against the Insureds; and 5) Therefore, your Insureds are providing this Notice of Claim seeking payment by Mount Vernon of their Defense Costs.

## BACKGROUND

By way of background, the Trust is a not-for-profit charitable corporation under Massachusetts law that is based in Nahant, Massachusetts. Its mission is to preserve the open spaces, historically significant properties, and conservation lands of the Town of Nahant ("Town") for public and community benefit, including but not limited to the approximately 28 acres that comprise the peninsula of East Point.

Northeastern owns approximately 20 of the 28 acres of East Point, which it acquired without payment in 1967. Northeastern constructed a Marine Science Center on the property and has been operating it ever since. The deed to Northeastern expressly reserves a public easement across Northeastern's property to the remaining eight acres on East Point. In or about 1975, the Town acquired the remaining eight acres of land on East Point. In 1989, the Town dedicated that land as Lodge Park, and the Town has since reiterated its intent that the land remain protected open space.

As supported by substantial evidence, Northeastern made a dedication of approximately 12.5 acres of the undeveloped portions of the Northeastern property for passive recreation and as an ecological preserve (the "Ecological Preserve"). Thus it is the Trust's well supported position that the Ecological Preserve constitutes natural resources protected from development under the provisions of Article 97.  Land governed by Article 97 is deemed to be reserved exclusively for use by the public for passive recreation, open space and other environmental purposes, and may not be used for any other purposes without the approval of two-thirds of the members of each house of the Massachusetts state legislature. A person or entity seeking to protect Article 97 property from damage must first give written notice by certified mail to the Attorney General, and all affected parties at least 21 days before taking action. M.G.L. c. 214, §7A ("Section 7A").

In 2018, Northeastern publicly proposed to further develop its property by, among other things,

building a new 55,000 sq. ft. building, with ancillary parking and other improvements in the midst of the Ecological Preserve, and in June of 2019 in furtherance of that plan Northeastern began cutting down trees and otherwise disturbing the natural habitat of the Ecological Preserve in order to clear cut an access road through land that the Trust believes is protected.

In response to Northeastern's actions, by letter dated July 23, 2019, the Trust, and citizens of the Town, all of whom are Directors, Officers, and/or Volunteers of the Trust, gave notice to Northeastern under Section 7A in an effort to prevent further damage to the environment of the Article 97 protected property that is the Ecological Preserve. Before the Section 7A 21-day notice period had run, on or about August 9, 2019 Northeastern filed a lawsuit captioned *Northeastern University v. Nahant Preservation Trust, Inc. et al.,* Land Court Docket No. 19 MISC 000390 ("Northeastern Suit"). In its complaint, a copy of which is attached hereto, Northeastern sought, among other claims and non-monetary relief, a declaratory judgment as to whether its East Point property is subject to Article 97.

Effectively as a responsive pleading, on or about August 20, 2019, your Insureds filed a complaint, a copy of which is attached hereto, captioned *Nahant Preservation Trust, Inc., et al. v. Northeastern University,* Essex Superior Court Docket No. 1977CV01211 ("Nahant Suit") (Northeastern Suit and Nahant Suit collectively "the Lawsuits"), seeking a declaration that Article 97 has been violated by Northeastern, an injunction to enforce appropriate environmental regulations, costs of suit, and "such other and further relief as is just and proper."

The Lawsuits have been consolidated and your Insureds have incurred, and continue to incur, reasonable and necessary legal fees and expenses in their defense. Your Insureds now seek payment from Mount Vernon under the Policy for those Defense Costs.

## **THE POLICY**

Mount Vernon issued the Policy which has limits of liability of $1 million each claim; $1 million in the aggregate; with $0 retention for each claim. The Policy provides coverage for the "Organization" (the Trust), and "Individual Insureds" (Directors, Officers, and/or Volunteers), with each term defined in the Directors and Officers Coverage Part of the Policy.

Mount Vernon's defense obligations owed to the Insureds under the Policy include, in relevant part, the following:

"Duty To Defend."  The Company shall have the right and duty to defend any **Claim** covered by this Policy even if the allegations are groundless, false or fraudulent.

"Defense Costs" means in relevant part:

1.  reasonable and necessary legal fees and expenses incurred by the Company, or by any attorney designated by the Company to defend the Insured; and

2.  all other fees, costs...resulting from the investigation, adjustment, defense and

appeal of a Claim.

Mount Vernon's defense obligation under the Policy, generally, and specifically under the "Insuring Agreements," is triggered by a "Claim," which is defined in relevant part as:

"Claim" means any:

1. written demand for monetary damages or non-monetary relief, including injunctive relief;

2. civil proceeding commenced by service of a complaint or similar pleading;

* * * *

... received by, or brought or initiated against any Insured alleging a **Wrongful Act**, including any appeal therefrom. (emphasis supplied)

* * * *

A Claim must allege a "Wrongful Act" which is defined in relevant part as:

A "Wrongful Act" means any:
1. actual or alleged act, error, omission, misstatement, misleading statement, neglect, orbreach of duties;
2. Personal Injury Wrongful Act; ...committed or allegedly committed by:
a. the Organization;
b. any Individual Insured, arising solely from duties conducted on behalf of the Organization or asserted against an Individual Insured because of 1. above; . . .
A "Personal Injury Wrongful Act" means "any actual or alleged false arrest, wrongful detention, malicious prosecution, invasion of privacy, wrongful entry or eviction, libel, slander or defamation."

As stated on the Policy's Declarations Page, the Policy is a claims-made policy, which means that "unless otherwise provided herein, the coverage of this form is limited to liability for claims first made **during the Policy Period, or the extension period, if applicable.** Defense Costs shall be applied against the Retention." (emphasis supplied). Additionally, the Policy contains Prior or Pending Litigation exclusionary language. Both clauses are satisfied and the Exclusion does not apply because: a) another provision within the Policy does "otherwise provide;" b) the Retention in the Policy is $0 so Defense Costs are to be paid from the outset; and c) the Exclusion was amended.

The relevant provision of the Policy altering, or "otherwise providing," is contained within the Endorsement/Amendment of Prior or Pending Litigation Exclusion and reads in pertinent part as follows:

provided that, **if this Policy is a renewal of a Policy previously issued by the Company in a continuous succession of Policies with no lapses in coverage**, the effective date of this Policy **will mean the effective date of the first Policy** issued by the Company in such succession of Policies. (emphasis supplied).

## ALL CONDITIONS PRECEDENT FOR ENTITLEMENT TO THE COVERAGE GRANT ARE SATISFIED AND NO EXCLUSIONS APPLY

The Policy imposes upon Mount Vernon a duty to defend "Claims" made against its Insureds. Northeastern seeks a declaration of rights as to Article 97 and as to the "dedication" which is "non-monetary relief" and is a "civil proceeding commenced by service of a complaint. . ." These allegations confirm that the Northeastern Suit includes "Claims" within the meaning of the Policy.

To invoke Mount Vernon's Duty to Defend, a "Claim" must allege "Wrongful Acts" or "Personal Injury Wrongful Acts" within the meaning of the Policy. The Northeastern Suit does so. The basic definition of "Wrongful Act" includes an "actual or alleged act, error, omission. misstatement, misleading statement, neglect, or breach of duties," and Northeastern expressly alleges at least an "actual or alleged act" in its allegations as to the Trust's, Directors', Officers'. and/or Volunteers' actions as to the Section 7A notice. A "Personal Injury Wrongful Act" includes "any actual or alleged . . . invasion of privacy, wrongful entry or eviction ..." and Northeastern's allegations certainly can be viewed as alleging that the Trust's, Directors', Officers', and/or Volunteers' actions amount to an invasion of privacy, a wrongful entry or a de facto eviction.

Although Northeastern filed the Northeastern Suit in August 2019. before the inception of Policy B, to the extent that Policy B was preceded by another Mount Vernon Policy substantially identical to it, which it was, the Claims asserted in the Lawsuits are deemed to have been first made during that earlier Policy, Policy A's. period, and Mount Vernon is obligated to defend its Insureds.

Accordingly. your Insureds respectfully request payment, at your earliest opportunity, of Defense Costs which they have incurred. and continue to incur, for defense of this Claim under the Policy.

If you have any questions, please contact me. Thank you in advance for your anticipated cooperation.

Respectfully submitted,

John D. Frumer

Attachments: 2
Cc: Emily Potts, President, Nahant Preservation Trust, Inc. (w/ attachments)
Dennis Maroney, Treasurer, Nahant Preservation Trust, Inc. (w/ attachments)
Board of Directors, Nahant Preservation Trust, Inc. (w/ attachments)

# EXHIBIT 6



August 3, 2021

**VIA EMAIL at** jdfrumer@frumerlaw.com

Nahant Preservation Trust
c/o John Frumer, Esq.
Law Office of John D. Frumer
199 Wells Ave.
Newton, MA  02459

RE:  Insured:      Nahant Preservation Trust
     Claimant(s): Northeastern University
     Reported:    July 28, 2021
     Policy:      NDO2557425C
     Effective:   6/19/2021 – 6/19/2022
     Our File:    0-11119

Dear Mr. Frumer:

Mount Vernon Fire Insurance Company acknowledges receipt of correspondence on July 28, 2021, enclosing a Complaint filed by Northeastern University against Nahant Preservation Trust in the Land Court Department of the Trial Court of Essex County, Massachusetts. We also confirm issuing the above-referenced Non Profit Management Liability Policy ("the Policy"). We regret to inform you there is no coverage, either defense or indemnification, under the Policy for the Northeastern University's claim.

According to the Court's Order of October 24, 2019, Northeastern University filed its Complaint on August 9, 2019, seeking a declaration that it has not made a dedication of its property in the Town of Nahant (town) to the town or to the public, and that the property is not subject to Article 97 of the Massachusetts Constitution. Nahant Preservation Trust filed an Answer on September 16, 2019, seeking a declaration that Northeastern has made a dedication of its property to the town or the public. Nahant Preservation Trust now reports Northeastern University's claim seeking reimbursement of the defense costs it has incurred.

Bearing this in mind, please refer to the Insuring Agreements of the Policy, which read:

      I.     INSURING AGREEMENTS

A.    Individual Insured – Non-        The **Company** will pay, on behalf of an
       Indemnified Coverage          **Individual Insured**, **Loss** and **Defense Costs**
                                            resulting from a **Claim** first made against an
                                            **Individual Insured** during

BERKSHIRE HATHAWAY COMPANIES
1190 DEVON PARK DRIVE • P.O. BOX 6700 • WAYNE, PA 19087 • 610-688-2535 • 888-523-5545 • FAX 610-688-4391

United States Liability Insurance Company • Mount Vernon Fire Insurance Company • U.S. Underwriters Insurance Company
Mount Vernon Specialty Insurance Co. • Radnor Specialty Insurance Co.

USLI.COM • DEVONPARKSPECIALTY.COM

the **Policy Period**, or Extended Reporting Period, if applicable, to the extent such **Individual Insured** is not indemnified by the **Organization** for such **Loss** and **Defense Costs**.

B.  Individual Insured –
    Indemnified Coverage

The **Company** will pay, on behalf of the **Organization**, **Loss** and **Defense Costs** resulting from a **Claim** first made against an **Individual Insured** during the **Policy Period**, or Extended Reporting Period, if applicable, but only to the extent the **Organization** indemnifies such **Individual Insured** for such **Loss** and **Defense Costs** as permitted or required by law.

C.  Organization Coverage

The **Company** will pay, on behalf of the **Organization**, **Loss** and **Defense Costs** resulting from a **Claim** first made against the **Organization** during the **Policy Period**, or the Extended Reporting Period, if applicable.

Per the Insuring Agreements, the D&O coverage is a "Claims Made" coverage form, which means that coverage only exists for a "Claim first made… during the Policy Period". The Policy incepted on June 19, 2021, and the Policy Period began on that date. Nahant Preservation Trust filed its Answer on September 16, 2019. Logic dictates that Nahant Preservation Trust must have received notice of Northeastern University's Complaint on or before September 16, 2019, prior to the beginning of the Policy Period and Northeastern University's claim was not first made against Nahant Preservation Trust during the Policy Period.

To the extent you might inquire if coverage exists for Northeastern University's claim under policy NDO2557425A, in effect from June 19, 2019 to June 19, 2020, and which was in force at the time Northeastern University first made its claim against Nahant Preservation Trust, please refer to paragraph A in the Notice/Claim Reporting Provisions in the Common Policy Conditions of policy NDO2557425A, as modified by the Amended Notice/Claim and Circumstance Reporting Provisions endorsement attached to that policy, which reads:

IV.  Notice hereunder shall be given in writing to the **Company**. If mailed, the date of mailing of such notice shall constitute the date that such notice was given and proof of mailing shall be sufficient proof of notice.

A.  **Written Notice of a Claim:**

2

(1)    As a condition precedent to exercising any right to coverage under this Policy, an **Insured** shall give to the **Company** written notice of a **Claim,** as soon as practicable but:

        (a)    if the Policy expires, is cancelled or is non-renewed and if no Extended Reporting Period is purchased, no later than sixty (60) days after the expiration date or effective date of such cancellation or non-renewal. Coverage for a **Claim** reported to the **Company** during the sixty (60) day period after expiration, cancellation or non-renewal applies only if the **Claim** is first made against an **Insured** prior to the Policy expiration or effective date of cancellation or non-renewal; or

        (b)    if an Extended Reporting Period is purchased, no later than the last day of the Extended Reporting Period;

        provided that if the **Company** sends written notice to the **Parent Organization** stating that this Policy is being terminated for nonpayment of premium, an **Insured** shall give to the **Company** written notice of such **Claim** prior to the effective date of such termination.

(2)    Coverage for a **Claim** reported to the **Company** during an Extended Reporting Period shall only apply if the **Claim** arises from a **Wrongful Act** or **Wrongful Employment Act** committed before the date of the Policy expiration, cancellation or non-renewal.

        *                *                *

Per the Notice/Claim Reporting Provisions, reporting a claim within 60 days after the expiration of policy NDO2557425A is a condition precedent to coverage. Because Northeastern University first made its claim while policy NDO2557425A was in force, Nahant Preservation Trust had until August 18, 2020, to report Northeastern University's claim. Nahant Preservation Trust did not report that claim until July 28, 2021. Nahant Preservation Trust's failure to report Northeastern University's claim within 60 days after the expiration of policy NDO2557425A is a breach of a condition precedent to coverage under that policy and it negates any coverage that might have otherwise existed under policy NDO2557425A that claim. Therefore, there is also no coverage under that policy for Northeastern University's Complaint.

3

Because no coverage exists for Northeastern University's Complaint under either the Policy or policy NDO2557425A, this Company can neither defend nor indemnify Nahant Preservation Trust in this matter, and we must also politely decline Nahant Preservation Trust's request for reimbursement of the fees it incurred to date.

This determination is based upon all information presently available to us.  If you have any questions regarding the foregoing or have any information that may bear upon the Company's position, please do not hesitate to contact me at (610) 902-9515. Should you choose to, you may refer any questions to the Commonwealth of Massachusetts Division of Insurance located at One South Station, Boston, Massachusetts 02110. The contents of this letter should not be construed as a waiver of any other rights or defenses that this Company has or may have in the future under the Policy with respect to this matter.

Very truly yours,

Matthew Rubin
Assistant Vice President
Coverage Specialist

C:     Kimmi Cantwell
       McGowan, Donnelly & Oberheu
       Via email at kcantwell@mdoinsurance.com

4

# EXHIBIT 7

# Law Office of John D. Frumer
### Admitted to Practice in Massachusetts and Maine

**199 WELLS AVENUE**
**NEWTON, MASSACHUSETTS 02459**
**617-233-9147**

jdfrumer@frumerlaw.com
Fax: 617-830-0615

P.O. Box 74
Brunswick, ME 04011
Tel: 207-831-9900

August 6, 2021

**VIA E-MAIL (mrubin@USLI.com)**
Mount Vernon Fire Insurance Company
1190 Devon Park Drive
Wayne, PA 19087
Attention: Matthew Rubin, Assistant Vice President

RE:    **Insured:** Nahant Preservation Trust, PO Box 30, Nahant, MA 01908 (Named Insured)
       **Individual Insureds:** Various, as generally identified in prior communication
       **Policies:** No. ND02557425A, No. ND02557425B, and No. ND02557425C
       **Policy Period:** 06/19/2019-06/19/2022
       **USLI File:** #0-11119

Dear Mr. Rubin:

   I am in receipt of your letter dated August 3, 2021 on behalf of Mount Vernon[1], declining coverage to my clients, the Insureds, for Defense Costs incurred and to be incurred in defense of the Lawsuits.

   You identified only two grounds for denial of coverage for the Claim: 1) the Lawsuits commenced prior to the current Policy Period, and; 2) the Insureds did not give notice of the Claim to Mount Vernon within 60 days after Policy A "expired." These contentions misconstrue both the Insureds' position and the relevant language within the Policy. The Insureds are entitled to coverage under the Policy because the Amendment of Prior or Pending Litigation Exclusion Endorsement ("Endorsement") and other relevant language within the Policy amend the effective date of the Policy to be identical to the effective date stated in Policy A.

   Although you assert that two conditions precedent apply to an otherwise covered Claim (1) the Claim must have been first made during the Policy Period, and 2) the Insureds must give written notice of the Claim to Mount Vernon no later than 60 days after the expiration date of the Policy), your analysis ignores among other factors that, for purposes of the Claim, the Endorsement changes both the effective date and expiration date of the Policy

---

[1]   All defined terms herein have the same meanings utilized in my Notice of Claim Letter dated July 27, 2021 to Mount Vernon, which is incorporated by reference herein.

Mount Vernon Fire Insurance Company
August 6, 2021
Page 2

Period, and thus the dates within which conditions precedent must be fulfilled. The Endorsement reads in relevant part:

Prior or Pending Litigation.   Any litigation, demand, claim, arbitration, decree, judgment, proceeding, or investigation against any Insured, or any such action based upon the same or essentially the same facts, circumstances, matters, situations, transactions or events underlying or alleged therein which was pending on or prior to the effective date of this Policy;

**provided that,** if this Policy is a renewal of a Policy previously issued by the Company in a continuous succession of Policies with no lapses in coverage, the effective date of this Policy **will mean the effective date of the first Policy** issued by the Company in such succession of Policies. (emphasis supplied).

Per the Declarations Page, the Policy is "a claims made policy coverage form and unless otherwise provided herein, the coverage of this form is limited to liability for claims first made during the Policy Period, or the extension period, if applicable." Policy Period is defined as "the period of time **from the effective date and time of this Policy** to the date and time of expiration as shown in the Policy Declarations, or its earlier cancellation or termination date." (emphasis supplied).

The Endorsement changes the effective date of the current Policy to the effective date of the earliest Policy issued by Mount Vernon--6/19/2019.  Because each iteration of the Policy is substantially identical, and there is a continuous succession of Policies with no lapses in coverage, the plain meaning of the relevant language of the Policy, including but not limited to the Endorsement, as well as logic, dictate that the effective date of the current iteration of the Policy is 6/19/2019, while the expiration date is as stated on the Declarations Page of the current Policy--6/19/2022. Thus, the Claim first asserted against the Insureds on or about August 9, 2019 was made during the Policy Period, and the Insureds' written Notice of the Claim given on July 27, 2021 was provided prior to the expiry of the Policy (6/19/2022).

In summary, the Claim was first made, and Notice was first given, within the Policy Period as defined in the Policy. Accordingly, the Insureds reiterate their demand that Mount Vernon accept and honor its duty to defend and pay Defense Costs for the Lawsuits. The Insureds reserve their rights to assert additional grounds for coverage. However, at this time, Mount Vernon's duty to defend is clear.

I look forward to receipt of Mount Vernon's reconsidered coverage position given the Policy language focused upon herein, which obligates Mount Vernon to defend the Lawsuits.

Respectfully submitted,

JOHN D. FRUMER

cc:   Emily Potts, President, Nahant Preservation Trust, Inc.
      Dennis Maroney, Treasurer, Nahant Preservation Trust, Inc.
      Board of Directors, Nahant Preservation Trust, Inc.

# EXHIBIT 8

## jdfrumer@frumerlaw.com

| | |
|---|---|
| **From:** | Matt Rubin <mrubin@USLI.com> |
| **Sent:** | Wednesday, August 25, 2021 10:06 AM |
| **To:** | 'John D. Frumer ' |
| **Subject:** | RE: (EXTERNAL) Northeastern University v. Nahant Preservation Trust; USLI File 0-11119 |

CAUTION EXTERNAL EMAIL. This email originated outside of USLI.

Hello Mr. Frumer,
I apologize for the delay in responding. This Company stands by its position. The provision you referenced in your letter of August 6, modifies the Prior or Pending Litigation exclusion to clarify that the exclusion only applies if a claim is made, or litigation is filed, against the Policyholder prior to issuance of the first policy we issued to the Policyholder. We are not relying on the Prior or Pending Litigation exclusion and the modified language does not change the Insuring Agreements, it does not change the nature of the policy from a "claims made" policy, and it does not change the reporting requirements or the definition of "Policy Period" elsewhere in the Policy.
Mathew Rubin


**Matthew Rubin, J.D., R.P.L.U., C.P.C.U.**
Assistant Vice President
Coverage Specialist
Claims Department




---

**From:** John D. Frumer [mailto:jdfrumer@frumerlaw.com]
**Sent:** Monday, August 23, 2021 5:41 PM
**To:** Matt Rubin <mrubin@USLI.com>
**Subject:** Re: (EXTERNAL) Northeastern University v. Nahant Preservation Trust; USLI File 0-11119

CAUTION EXTERNAL EMAIL. This email originated outside of USLI.

Dear Mr. Rubin:
Please advise as to the status of your reconsidered position in this matter. Regards,
John

Sent from my iPhone

On Aug 6, 2021, at 4:36 PM, John D. Frumer <jdfrumer@frumerlaw.com> wrote:

> Thank you.
>
> Sent from my iPhone
>
> On Aug 6, 2021, at 4:10 PM, Matt Rubin <mrubin@USLI.com> wrote:
>
> > CAUTION EXTERNAL EMAIL. This email originated outside of USLI.
> >
> > Thank you, Mr. Frumer. I'll take another look and get back to you shortly.
> > Matthew Rubin

**Matthew Rubin, J.D., R.P.L.U., C.P.C.U.**
Assistant Vice President
Coverage Specialist
Claims Department

<image001.jpg>

**From:** jdfrumer@frumerlaw.com [mailto:jdfrumer@frumerlaw.com]
**Sent:** Friday, August 6, 2021 4:02 PM
**To:** Matt Rubin <mrubin@USLI.com>
**Cc:** jdfrumer@frumerlaw.com
**Subject:** (EXTERNAL) Northeastern University v. Nahant Preservation Trust; USLI File 0-11119

CAUTION EXTERNAL EMAIL. This email originated outside of USLI.

Dear Mr. Rubin:
Please see the attached response to your letter dated August 3, 2021.
Respectfully submitted,
John D. Frumer

# EXHIBIT 9

COMMONWEALTH OF MASSACHUSETTS

ESSEX    , ss.               LAND COURT DEPARTMENT
                                        OF THE TRIAL COURT

|  |  |
|---|---|
| NORTHEASTERN UNIVERSITY,<br>        Plaintiff,<br><br>v.<br><br>NAHANT PRESERVATION<br>TRUST, INC., CHRISIAN BAUTA,<br>TESS BAUTA, ELIZABETH K. BERMAN,<br>ANNE BROMER, CANDACE CAHILL,<br>MICHELLE CAPANO, ALICE CORT,<br>MARK CULLINAN, CARL JENKINS,<br>MARILYN MAHONEY,<br>DAN McMACKIN, DIANE MONTEITH,<br>ANDREA MURPHY, JEFFREY<br>MUSMAN, PAT O'REILLY, MARIE<br>ELIZABETH PASINSKI, M.D.,<br>ROGER PASINSIK, M.D.,<br>VI PATEK, LINDA PIVACEK, LAURA<br>POULIN, PETER ROGAL, PEGGY<br>SILVA, SUSAN SOLOMON, PAUL<br>SPIRN, DONNA STEINBERG, and<br>JIM WALSH<br><br>        Defendants. | MISC. CASE NO. _____ |

## COMPLAINT

This is an action pursuant to Mass. Gen. L. c. 231A, § 1 and c. 185, § 1(k) in

which Northeastern University ("Northeastern") seeks a declaratory judgment in its favor

and against a claim made by defendants Nahant Preservation Trust ("NPT") and certain

individuals. In a letter to Northeastern dated July 23, 2019, Defendants through their

counsel have threatened to sue Northeastern and to assert a claim that property owned by

Northeastern and located in Nahant, MA, has been dedicated by Northeastern to the Town of Nahant and, therefore, that the land owned by Northeastern is actually public land that Northeastern may not develop without legislative approval. Northeastern denies defendants' claim that it made a dedication of its property to the Town of Nahant.

<u>PARTIES</u>

1.       Plaintiff Northeastern is a not-for-profit educational institution with an address of 716 Columbus Avenue, Boston, MA 02115.

2.       Defendant Nahant Preservation Trust, Inc., on information and belief, is a not-for-profit charitable corporation with an address of 41 Valley Rd, Nahant, MA 01908.

3.       Defendant Christian H. Bauta is an individual, who, on information and belief, resides at 3 Swallow Cave Road, Nahant, MA 01908.

4.       Defendant Tess M. Bauta is an individual, who, on information and belief, resides at 3 Swallow Cave Road, Nahant, MA 01908.

5.       Defendant Elizabeth Berman is an individual, who, on information and belief, resides at 44 Spring Road, Nahant, MA 01908.

6.       Defendant Anne Bromer is an individual, who, on information and belief, resides at 29 Willow Road, Nahant, MA 01908.

7.       Defendant Candace Cahill is an individual, who, on information and belief, resides at 20 Rollins Avenue, Nahant, MA 01908

8.       Defendant Michelle Capano is an individual, who, on information and belief, resides at 29 Ocean Street, Nahant, MA 01908.

GSDocs-1147089-1

9.      Defendant Alice Cort is an individual, who, on information and belief, resides at 7 Valley Road, Nahant, MA  01908.

10.      Defendant Mark Cullinan is an individual, who, on information and belief, resides at 38 Ocean Street, Nahant, MA  01908.

11.      Defendant Carl Jenkins is an individual, who, on information and belief, resides at 339 Nahant Road, Nahant, MA  01908.

12.      Defendant Marilyn Mahoney is an individual, who, on information and belief, resides at 6 Maolis Road, Nahant, MA  01908.

13.      Defendant William Mahoney is an individual, who, on information and belief, resides at 6 Maolis Road.

14.      Defendant Daniel McMackin is an individual, who, on information and belief, resides at 118-120 Bass Point Road, Nahant, MA  01908.

15.      Defendant Diane Monteith is an individual, who, on information and belief, resides at 33 Winter Street, Nahant, MA  01908.

16.      Defendant Andrea Murphy is an individual, who, on information and belief, resides at 8 Wendell Road Ex, Nahant, MA  01908.

17.      Jeffrey Musman is an individual, who, on information and belief, resides at 15 Trimountain Road, Nahant, MA  01908.

18.      Defendant Patrick O'Reilly is an individual, who, on information and belief, resides at 1 Harris Street, Nahant, MA  01908.

19.      Defendant Marie Elizabeth Pasinski, M.D. is an individual, who, on information and belief, resides at 36 Swallow Cave Road, Nahant, MA  01908.

GSDocs-1147069-1

20.      Defendant Roger Pasinski, M.D. is an individual, who, on information and belief, resides at 36 Swallow Cave Road, Nahant, MA 01908.

21.      Defendant Viola Patek is an individual, who, on information and belief, resides at 172 Willow Road, Nahant, MA 01908.

22.      Defendant Linda Pivacek is an individual, who, on information and belief, resides at 41 Little Nahant Road, Nahant, MA 01908.

23.      Defendant Emily Potts is an individual, who, on information and belief, resides at 114 Pond Street, Nahant, MA 01908.

24.      Defendant Laura Poulin is an individual, who, on information and belief, resides at 182 Wilson Road, Nahant, MA 01908.

25.      Defendant Peter Rogal is an individual, who, on information and belief, resides at 391 Nahant Road, Nahant, MA 01908.

26.      Defendant Peggy Silva is an individual, who, on information and belief, resides at 7 Burpee Road, Nahant, MA 01908.

27.      Defendant Susan Solomon is an individual, who, on information and belief, resides at 5 Wendell Road, Nahant, MA 01908.

28.      Defendant Paul Spirn is an individual, who, on information and belief, resides at 36 Maolis Road, Nahant, MA 01908.

29.      Defendant Donna Steinberg is an individual, who, on information and belief, resides at 33 Winter Street, Nahant, MA 01908.

30.      Defendant Jim Walsh is an individual, who, on information and belief, resides at 29 Karolyn Circle, Nahant, MA 01908.

-4-

## JURISDICTION

31.     Jurisdiction is proper in this Court pursuant to G.L. c. 231A, § 1 and c. 185, § 1(k) and because all of the parties, on information and belief, are domiciled in Massachusetts.

## FACTS

32.     Pursuant to a deed from Harmon P. Elliott dated October 18, 1965 and a deed from the United States of America acting by and through the Secretary of Health, Education and Welfare dated February 23, 1966, Northeastern is owner of property located at East Point, at the end of Nahant Road east of Swallow Cave Road, Nahant, Massachusetts (the "Property"). The referenced deeds are attached hereto collectively as **Exhibit A**.

33.     In all, the Property comprises approximately 20.4 acres in the East Point area of Nahant.

34.     In furtherance of its educational purposes, Northeastern acquired the Property in order to build and operate on it a marine science research and teaching center.

35.     Prior to Northeastern's acquisition of the Property, the site was owned and operated by the United States Department of Defense as a coastal defense site known as East Point Military Reservation.

36.     During the First and Second World Wars the site was improved with bunkers and other military facilities and equipment. From 1955 to 1962, the site was a Nike Missile base, housing among other things, anti-aircraft missiles and associated facilities and equipment.

GSDocs-1147069-1

37.    In the early 1960s, the United States military decided it no longer needed the Property and offered the Property to the Town of Nahant.

38.    The Town declined to purchase the Property.

39.    Thereafter, the Property was offered to Northeastern, and Northeastern acquired it.

40.    The deed to Northeastern reserved an easement to an 8-acre adjacent parcel at the tip of East Point that was also owned by the U.S. Government.

41.    In 1974, the Town acquired that adjacent 8-acre parcel.

42.    In 1989, the Town voted to create a park ("Lodge Park") on that parcel. Lodge Park was opened in the mid-1990s.

43.    After it acquired the Property, in approximately 1967, Northeastern began to develop and use the Property for its Marine Science Center, converting the former barracks in the northwest portion of the site into the a research building (the "Edwards Laboratory"), and developing the largest of the three bunkers (the "Murphy Bunker") in the north-central portion of the site into classrooms and lab space. The Northeastern Marine Science Center has operated on the Property ever since.

44.    At the time that Northeastern acquired the Property, it was relatively barren.

45.    Over the years, Northeastern has allowed flora and fauna to return to the previously barren areas of the Property. Northeastern has also used these open areas for research on bees and plant pollination, among other things.

46.    Northeastern now proposes to construct a 60,000 sf addition to the Murphy Bunker to expand the laboratory space. Northeastern also proposes the

relocation of an existing site access drive, the construction of additional parking and the replacement of an existing seawater intake system used by the Marine Science Center, including the construction of a new pump house (collectively, the "Project").

47.    The easement across the Property to Lodge Park will be preserved and will not be impacted in any material way by the Project.

48.    In connection with the Project, Northeastern is seeking or will soon seek certain municipal and state level approvals.

49.    By letter dated July 23, 2019, NPT and 29 individuals who purport to live in Nahant, advised Northeastern of their intent to commence a 10-citizens suit against Northeastern pursuant to G.L. c. 214, § 7A and to seek injunctive relief to prevent Northeastern from proceeding with the Project. In order to commence an action under c. 214, § 7A, plaintiffs are required to provide a 21-day notice of their intent to sue. The letter dated July 23, 2019, purports to be that notice (the "Notice Letter").

50.    In the Notice Letter, NPT and the individuals claim, among other things, that Northeastern made a dedication of its Property to the Town of Nahant, and that the Property therefore is subject to the provisions of Article 97 of the Massachusetts Constitution ("Article 97") and that Northeastern has no right to proceed with the Project without obtaining a 2/3rds vote of the Legislature.

51.    Northeastern denies that it ever made a dedication of the Property to the Town of Nahant or that the Property is subject to Article 97.

## COUNT I FOR DECLARATORY RELIEF

52.    Northeastern repeats and re-alleges the allegations of paragraphs 1 through 51 as if set forth herein.

-7-

53.    An actual controversy exists between Northeastern, NPT and the individuals listed in the Appendix of NPT's Notice Letter regarding the status of Northeastern's right to use and develop its Property.

54.    The rendering of a declaratory judgment as to whether Northeastern has dedicated its Property to the Town of Nahant and to the public and whether Northeastern's Property is subject to Article 97 of the Massachusetts Constitution will resolve this controversy.

WHEREFORE, Northeastern respectfully requests that the Court enter judgment:

A.    Decreeing, declaring and adjudging that Northeastern has not made a dedication of its Property to the Town of Nahant or the public;

B.    Decreeing, declaring and adjudging that Northeastern's Property is not subject to Article 97 of the Massachusetts Constitution and is not so-called Article 97 land; and

C.    Awarding Northeastern such other and further relief as the Court deems just and proper under the circumstances.

NORTHEASTERN UNIVERSITY,

By its attorneys,

Kevin P. O'Flaherty (BBO# 561869)
GOULSTON & STORRS PC
400 Atlantic Avenue
Boston, MA 02110-3333
(617) 482-1776

Dated: August 7, 2019

GSDocs-1147069-1

# EXHIBIT A

GSDocs-1147069-1

118,923

5

## DEED

I, HARMON P. ELLIOTT, of Stuart, Martin County, Florida,
being married, for consideration paid, grant to NORTHEASTERN
UNIVERSITY, a corporation organized under the laws of the Common-
wealth of Massachusetts, and located in Boston within said Common-
wealth, with quitclaim covenants, the land in Nahant, in the County
of Essex, in said Commonwealth, bounded and described as follows:

Beginning at a point on the former division line between
land of A. D. Hill, et al., Trustees, and land of the Estate of
Henry Cabot Lodge, now land of the United States of America, said
point of beginning being at the Easterly end of the discontinued
portion of Nahant Road;  thence by the Southerly line of the dis-
continued portion of Nahant Road by land formerly of A. D. Hill,
et al., Trustees, now land of the United States of America, on the
following courses and distances:  by a curve to the right a dis-
tance of Seventeen and 94/100 (17.94) feet;  North 67° - 34' West,
Forty-nine and 1/10 (49.1) feet;  North 71° - 47' West, Thirty-four
and no/10 (34.0) feet;  and North 83° - 44' West, One Hundred
Forty-seven and 2/10 (147.2) feet to a point at the Westerly end
of the discontinued portion of Nahant Road;  thence North 4° - 16' -
50" East by the said Westerly end of the discontinued portion of
Nahant Road about Twenty-four (24) feet to the center line of said
road;  thence Southeasterly by the center line of the discontinued
portion of Nahant Road about Two Hundred and fifty (250) feet to
the Easterly end of said road to land formerly of the Estate of
Henry Cabot Lodge, now land of the United States of America;  thence
Southwesterly by the said Easterly end of the discontinued portion
of Nahant Road, by land formerly of the Estate of Henry Cabot Lodge,
now land of the United States of America, about Ten (10) feet to
the point of beginning.

Containing 0.14 of an acre more or less.

*fee in Nahant &.*
*adjacent to Lot 2   N.C. 2635 + 2634*
*[illegible] Plan plat [illegible] no. 118,926*

The above-described parcel of land is a portion of the land shown upon Land Court Plan numbered 6813 - 6814A, as modified and approved by the Land Court, filed in the Land Registration Office, a copy of a portion of which is filed with original Certificates of Title #2635 and #2636 in said Registry and the above-described parcel is shown thereon as a portion of Lot "C".

The above-described parcel of land is subject to the restrictions and easements and has the benefit of the restrictions and rights, as noted on Certificate #6814, to the extent that the same are now in force and are applicable.

By this deed, it is my intention to convey to the said Northeastern University all of my land in the said Nahant described in said Certificate #6284, which land, by inadvertence, was not taken by the United States of America as a result of the Declaration of Taking and the Judgment on the Declaration of Taking, the said Declaration and the said Judgment each being dated November 7, 1941, and entered in the Docket and papers in Miscellaneous Civil Case Number 6439 in the District Court of the United Staes for the District of Massachusetts.

For my title, see Certificate #6814 of the Land Registration Office.

The consideration for this deed being less than One Hundred Dollars ($100.00), no Federal Documentary Stamps or Massachusetts Deed Excise Stamps are affixed hereto.

I, NELLIE ELLIOTT, wife of said Grantor, release to said grantee all rights of Dower and Homestead and other interests therein.

WITNESS our hands and seals this _18_ day of _October_ 1965.

_Harrison P. Elliott_

_Nellie Elliott_

**STATE OF FLORIDA.**
**COUNTY OF MARTIN** } ss.

I, Dorothy Pierce, Clerk of the County of Martin and also Clerk of the Circuit Court for the said County, the same being a Court of Record, DO HEREBY CERTIFY, That...................... ..B.G..Leighton,..Jr.........................whose name is subscribed to the Certificate of the proof of acknowledgment of the annexed instrument and thereon written was, at the time of taking such proof and acknowledgment a Notary Public, in and for said County, residing therein, duly commissioned and sworn, and authorized by the laws of said State to take the acknowledgments and proofs of deeds or conveyances, for land tenements or hereditaments in said State, to be recorded therein. And further that I am well acquainted with the handwriting of such Notary Public, and verily believe that the Signature to said certificate of proof or acknowledgment is genuine.

I further Certify that the impression of the seal of a Notary Public is not required by law to be filed in this office.

IN TESTIMONY WHEREOF, I have hereunto set my hand and affixed the seal of the said Court and County, the 18th day of October 1965

DOROTHY PIERCE, Clerk of Circuit Court.

By....Carolynn..Ziemba...................

Carolynn Ziemba          Deputy Clerk.

STATE OF FLORIDA

County of MARTIN

Then personally appeared the above-named HARMON P. ELLIOTT & NELLIE ELLIOTT and acknowledged the foregoing instrument to be A free act and deed, before me,

NOTARY PUBLIC

My commission expires

NOTARY PUBLIC STATE OF FLORIDA AT LARGE
MY COMMISSION EXPIRES JULY. 29, 199?
BONDED THROUGH FRED W. DIESTELHORS?

DOCUMENT NO. 118825

Commonwealth of Massachusetts

H.

HARMON P. ELLIOTT

to

NORTHEASTERN UNIVERSITY

ESSEX SOUTH REGISTRY DISTRICT

MAR 4 1966

RECEIVED 10 O'CLOCK 30 M A M
NOTED ON CERTIFICATE 684
REGISTRATION BK. 28 PG. 674
No Cert. Issued

DEED

See Plan filed with Doc 118,926

FROM THE OFFICE OF

GALLUP & HADLEY
ATTORNEYS AT LAW
6 BEACON STREET
BOSTON 8, MASS.

Doc. 118726

## DEED WITHOUT WARRANTY

KNOW ALL MEN BY THESE PRESENTS: That the UNITED STATES OF AMERICA acting by and through the Secretary of Health, Education, and Welfare by the Regional Director of the Department of Health, Education, and Welfare, Region I, under and pursuant to the powers and authorities contained in the Federal Property and Administrative Services Act of 1949 (63 Stat. 377) as amended, the Civil Rights Act of 1964, and the regulations promulgated thereunder, and the Department of Health, Education, and Welfare Statement of Organization and Delegation of Authority, Part 2, section 2-249.10(A)(3) (29 F.R. 5096) for and in consideration of the observance and performance by Northeastern University, a corporation organized under the laws of the Commonwealth of Massachusetts, of the covenants, conditions, reservations, and restrictions hereinafter contained and for other valuable consideration grants to Northeastern University, its successors and assigns, subject to the covenants, conditions, reservations, and restrictions hereinafter set forth certain parcels of land with the buildings thereon situated in the Town of Nahant, County of Essex, Commonwealth of Massachusetts more particularly bounded and described as follows:

The fee simple title to land acquired by the United States of America through the filing of a Declaration of Taking on February 3, 1941 entitled, "United States of America Petitioner vs. 13.98 Acres of Land, More or Less, Situate in Nahant, Essex County Massachusetts and H.C. Lodge Estate, Defendant, Civil No. 6341," and obtaining final judgment thereon in the United States District Court in and for the District of Massachusetts.

### TRACT A (Parcel #1)

A certain parcel of land situated in the Town of Nahant, County of Essex, Commonwealth of Massachusetts, being more particularly bounded and described as follows:

SOUTHWESTERLY by Nahant Road and a portion of the former Nahant Road four hundred thirty six and 27/100 (436.27) feet;

NORTHWESTERLY by land now or formerly of Thomas P. Beal et al, Trustees, measuring on the upland ninety one and 90/100 (91.90) feet;

NORTHEASTERLY by Massachusetts Bay;

SOUTHEASTERLY by land of the United States of America five hundred and eleven (511) feet more or less;

SOUTHEASTERLY by land of the United States of America seventy and 98/100 (70.98) feet;

2

SOUTHEASTERLY by land of the United States of America forty-two and 86/100 (42.86) feet;

SOUTHWESTERLY by land now or formerly of A.D. Hill et al, Trustees two hundred fifty-three and 92/100 (253.92) feet by Parcel #2;

SOUTHWESTERLY by land now or formerly of A.D. Hill et al, Trustees, one hundred eighty-one and 10/100 (181.10) feet by Parcel #2;

NORTHWESTERLY, WESTERLY, AND SOUTHWESTERLY by said former Nahant Road by three (3) lines measuring together seventy-three and 62/100 (73.62) feet.

Containing 8.04 acres, more or less.

The above described property is a portion of the Henry Cabot Lodge Estate shown as part of Lot A on Land Court Plan #6813 - 6814A.

The fee simple title to land acquired by the United States of America through the filing of a Declaration of Taking on November 7, 1941, entitled "United States of America, Petitioner vs. 14.46 Acres of Land, More or Less, Situate in Essex County, State of Massachusetts and Harmon P. Elliott, Defendant, Civil No. 6439," and obtaining final judgment thereon in United States District Court in and for the District of Massachusetts.

The fee simple title to land hereinafter described, subject, however to existing easements for public roads and public utilities therein.

## TRACT A (Parcel #2)

Two (2) certain parcels of land situate in the Town of Nahant, County of Essex, Commonwealth of Massachusetts, being more particularly bounded and described as follows:

Beginning at the intersection of the Northerly corner of the former Estate of Julia Bryant Paine at the Southeasterly streetline of Swallows Cave Road;

thence by Swallows Cave Road and a private road on the following courses and distances; North 31° 14' East 208.86 feet; North 31° 55' East 103.19 feet; North 43° 35' East 56.3 feet; North 50° 53' East 53.0 feet; North 54° 32' East 62.2 feet; North 62° 43' East 87.2 feet; North 73° 28' East 40.8 feet;

thence by former Nahant Road on the following courses and distances South 83° 44' East 147.2 feet; South 71° 47' East 34.0 feet; South 67° 34' East 49.1 feet and by a curve to the left 17.94 feet;

thence by the following courses and distances South 56° 20' 45" East 181.10 feet by land now or formerly of the Henry Cabot Lodge Estate by Parcel #1; South

- 2 -

account of fees, or costs incurred in connection with the transfer of said property for surveys, title searches, appraisals, recordation of instruments, or escrow costs.

A true copy.

ATTEST

Lincoln C. Bateson, Secretary

March 1, 1966

3

50° 30' 45" East 253.92 feet by land now or formerly
of the Henry Cabot Lodge Estate by Parcel #1; South
46° 25' 00" West 313.52 feet by land of the United
States of America; South 43° 35' East 260 feet more
or less to Massachusetts Bay;

thence Southeasterly, Southerly, and Southwesterly by
Massachusetts Bay;

thence North 1° 43' East 24 feet more or less to a
bolt;

thence by land now or formerly of the Estate of Julia
Bryant Paine North 1° 43' East 155.82 feet to the apex
of a stone post;

thence by four (4) courses by land now or formerly of
the Estate of Julia Bryant Paine as follows: North
62° 00' West 28.5 feet; North 76° 18' West 129.6 feet;
North 63° 16' West 44.2 feet; North 59° 09' West 114.5
feet to the point of beginning.

Containing 12.10 acres, more or less.

The above-described property is a portion of the land formerly

of A. D. Hill, et al, Trustees, and is shown as part of Lot C

on Land Court Plan #6813 - 6814A and the two lots of land shown

on said plan as belonging to Thomas P. Curtis and Francis I.

Amory.

### TRACT A (Parcel #3)

Beginning at a point on the former division line between
land of A. D. Hill, et al, Trustees and land of the
Estate of Henry Cabot Lodge, now land of the United
States of America, said point of beginning being at the
Easterly end of the discontinued portion of Nahant Road;

thence by the Southerly line of the discontinued portion
of Nahant Road by land formerly of A. D. Hill, et al,
Trustees, now land of the United States of America on
the following courses and distances, by a curve to the
right a distance of 17.94 feet, North 67° 34' West 49.1
feet, North 71° 47' West 34.0 feet and North 83° 44'
West 147.2 feet to a point at the Westerly end of the
discontinued portion of Nahant Road;

thence North 4° 16' 50" East by the said Westerly end
of the discontinued portion of Nahant Road about 24
feet to the center line of said road;

thence Southeasterly by the center line of the dis-
continued portion of Nahant Road about 250 feet to
the Easterly end of said road at land formerly of
the Estate of Henry Cabot Lodge, now land of the
United States of America;

thence Southwesterly by the said Easterly end of the
discontinued portion of Nahant Road, by land formerly

4

of the Estate of Henry Cabot Lodge, now land of the
United States of America about 10 feet to the point of
beginning.

Containing 0.14 of an acre, more or less.

Reserving to the United States of America, its successors and assigns,
a perpetual easement and right of way in, over and across the above
described Parcels Nos. 1, 2 and 3, and for the benefit of remaining
land of the United States of America, as shown on "Plan of Land in
Nahant, Massachusetts, showing property in fee, Access and Utilities
Easements, by C.O. Baird, Jr., Civil Engineer, 360 Huntington Avenue,
Boston, Massachusetts, Scale 1" = 40', June 1, 1965," attached hereto
and marked Block 8, Schedule D, to allow access from Nahant Road to
said remaining land of the United States of America, shown on said Plan
to comprise 8.30 acres.  The location of said easement and right of way
is shown on said plan as an "existing road".  Together with the right to
enter upon the above described Parcels Nos. 1, 2 and 3 so far as is
reasonably necessary for the maintenance, repair, or replacement of
the said way, provided that the United States of America, its successors
and assigns shall restore the affected property to the same condition
it was in prior to the performance of such maintenance, repair or
replacement.

Reserving also to the United States of America, its successors and
assigns, a perpetual easement to use existing sanitary sewer and water
lines and electrical conduits, presently located in, over, across and
under the above described Parcels 1, 2 and 3, as shown on said Plan,
together with the right to enter upon said Parcels 1, 2 and 3 so far
as is reasonably necessary for the maintenance, repair, or replacement
of the said utility lines provided that the United States of America,
its successors and assigns shall restore the affected property to the
same condition it was in prior to the performance of such maintenance,
repair or replacement.

5

Future owner of Parcels 1, 2 and 3 hereafter referred to as the grantee, its successors and assigns, shall have the right to relocate any or all of the easements referred to above, the cost of such relocation to be borne entirely by the grantee; provided that any relocation of said easements which may be accomplished by the grantee shall be adequate to insure to the United States of America, for the benefit of its remaining land the continuation of the access and utility services furnished by said easements herein reserved, and shall be accomplished in a manner that will not create any unnecessary interference with the use and enjoyment by the United States of America of said easements.

Provided further that in the event there is a need to repair or replace said existing road or any of the said existing utility lines, the grantee and the United States of America, for themselves, their successors and assigns, covenant and agree that the cost of such repair or replacement, as well as the cost for any of the maintenance of the same, including but not limited to snow removal and sanding on the travelled portion of the way, shall, as to any portion used or to be used exclusively by one party, be borne by that party alone, and, as to any portion used or to be used by both parties, then by both parties equally, and covenant and agree further that in an emergency situation either party may act without the prior consent of the other party in order to preserve their common interests, and that otherwise either party may request of the other party in writing for the concurrence of the other party in the proposed work and if no agreement with respect to the said work is reached within thirty (30) days after the receipt by the other party of the said request, then the party making the request may have the said work done and may charge to the other party its share of the cost of the said work as above provided.  Such a request, if to the United States of America, shall be addressed to the Director, New England Division, Bureau of Yards and Docks, 495 Summer Street, Boston, Massachusetts, 02210, and if to the grantee, to the address of the grantee.

6

With respect to damages to or destruction of any property of the grantee,
its successors or assigns, or for injuries to the person of the grantee,
or the grantee's officers, agents, servants or employees or others who
may be on the granted premises at their invitation or the invitation of
any one of them, arising from or incident to the use, maintenance, repair
or replacement of the aforesaid easements, the United States of America
assumes no liability beyond the scope of its liability under the terms and
provisions of the Federal Tort Claims Act.  The United States of America
does, however, hereby covenant on behalf of its successors and assigns
that the property of the grantee, its successors and assigns, that is
damaged or destroyed by the successors, assigns or licensees of the United
States of America, incident to the use, maintenance, repair or replacement
of the aforesaid easements, shall be promptly repaired or replaced by the
said successors or assigns of the said United States of America, to the
reasonable satisfaction of the grantee, its successors or assigns, or the
cost of such repair or replacement (if the same is performed by the
grantee, its successors or assigns) paid to the grantee, its successors
and assigns.  The United States of America, for and on behalf of its suc-
cessors and assigns, further covenants and agrees that said successors and
assigns will indemnify and hold harmless the grantee, its successors and
assigns, of and from any claims for personal injury incident to the use,
maintenance, repair and replacement of the said easements by the succes-
sors, assigns, or licensees of the said grantor.

Said property conveyed hereby was declared surplus and was as-
signed to the Department of Health, Education, and Welfare for disposal
for educational purposes pursuant to the provisions of the aforementioned
Federal Property and Administrative Services Act of 1949 and of applicable
rules, regulations and orders.

This Deed is executed and delivered to Northeastern University,
its successors and assigns, without covenants or warranties by or on

7

behalf of the UNITED STATES OF AMERICA whatsoever, either express or implied.

AND this deed is made and accepted upon each of the following conditions subsequent which shall be binding upon and enforceable against Northeastern University, its successors or assigns, and each of them, as follows:

1. That for a period of twenty (20) years from the date of this deed the above described property herein conveyed shall be utilized continuously in the manner and for the educational purposes set forth in the approved program and plan contained in the application of Northeastern University, dated June 16, 1965, and for no other purpose.

2. That during the aforesaid period of twenty (20) years, North-eastern University will at all times be and remain a non-profit institution, organization or association, exempt from taxation under section 101(6) of the 1939 Internal Revenue Code, or section 501(c)(3) of the 1954 Internal Revenue Code;

3. That during the aforesaid period of twenty (20) years, North-eastern University will resell, lease, mortgage, or encumber, or otherwise dispose of the above described property or any part thereof or interest therein only as the Department of Health, Education, and Welfare, or its successor in function, in accordance with its existing regulations, may authorize in writing.

4. That one year from the date of this deed and annually there-after for the aforesaid period of twenty (20) years unless the Department of Health, Education, and Welfare or its successor in function otherwise directs, Northeastern University will file with the Department of Health, Educa-tion and Welfare or its successor in function reports on the operation and maintenance of the above described property

8

and will furnish, as requested, such other pertinent data evidencing continuous use of the property for the purposes specified in the above identified application.

5.  That for the period during which the above described property is used for a purpose for which the Federal financial assistance is extended by the Department or for another purpose involving the provision of similar services or benefits, Northeastern University hereby agrees that it will comply with Title VI of the Civil Rights Act of 1964 (P.L. 88-352) and all requirements imposed by or pursuant to the Regulation of the Department of Health, Education, and Welfare (45 CFR Part 80) issued pursuant to that title and as in effect on the date of this deed, to the end that, in accordance with Title VI of that Act and the Regulation, no person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be otherwise subjected to discrimination under the program and plan referred to in condition 1 above or under any other program or activity of Northeastern University, its successors or assigns, to which such Act and Regulation apply by reason of this conveyance.

In the event of a breach of any of the conditions set forth above whether caused by the legal or other inability of Northeastern University, its successors or assigns, to perform any of the obligations herein set forth, all right, title, and interest in and to the above described property shall, at its option revert to and become the property of the UNITED STATES OF AMERICA, which shall have an immediate right of entry thereon, and Northeastern University, its successors or assigns, shall forfeit all right, title, and interest in and to the above described property and in any and all of the tenements, hereditaments, and appurtenances thereunto belonging; PROVIDED HOWEVER, that the failure of the Department of Health, Education, and Welfare, or its successor in function, to insist in any one or more instances upon complete performance of any of the said conditions shall not be construed as a waiver or a relinquishment of the future performance of any such conditions, but the obligations of Northeastern University with respect to such future performance shall continue in full force and effect; PROVIDED FURTHER,

9

that in the event the UNITED STATES OF AMERICA fails to exercise its option to
re-enter the premises for any such breach of conditions subsequent numbered 1,
2, 3, and 4 herein within 21 years from the date of this conveyance, conditions
numbered 1, 2, 3, and 4 herein together with all rights of the UNITED STATES OF
AMERICA to re-enter as in this paragraph with respect to conditions numbered 1,
2, 3, and 4 herein, shall, as of that date, terminate and be extinguished;
PROVIDED FURTHER, that the expirations of conditions 1, 2, 3, and 4, and the
rights to re-enter shall not affect the obligation of Northeastern University,
its successors and assigns with respect to condition numbered 5 herein or the
right reserved to the UNITED STATES OF AMERICA to re-enter for breach of said
condition.

In the event title to the above described premises is reverted to the
UNITED STATES OF AMERICA for non-compliance or voluntarily reconveyed in
lieu of reverter, Northeastern University, its successors and assigns, at
the option of the Department of Health, Education, and Welfare or its suc-
cessor in function, shall be responsible and shall be required to reimburse
the UNITED STATES OF AMERICA for the decreased value of the above described
property not due to reasonable wear and tear, acts of God, and alterations
and conversions made by Northeastern University to adapt the property to the
educational use for which the property was acquired.  The UNITED STATES OF
AMERICA shall, in addition thereto, be reimbursed for such damages including
such costs as may be incurred in recovering title to or possession of the
above described property, as it may sustain as a result of the non-compliance.

Northeastern University may secure abrogation of the conditions subse-
quent numbered 1, 2, 3, and 4 herein by:

    a.  Obtaining the consent of the Department of Health, Education, and
        Welfare, or its successor in function; and

    b.  Payment to the UNITED STATES OF AMERICA of the public benefit
        allowance granted to Northeastern University of one hundred (100)
        percent from the current market value of eighty-five thousand
        ($85,000) dollars, less a credit at the rate of five (5) percent
        for each twelve (12) months during which the property has been
        utilized in accordance with the purposes specified in the above
        identified application.

Northeastern University, by acceptance of this deed covenants and agrees for itself, its successors and assigns, and every successor in interest to the property herein conveyed or any part thereof -- which covenant shall attach to and run with the land for so long as the property herein conveyed is used for a purpose for which the Federal financial assistance is extended by the Department or for another purpose involving the provision of similar services or benefits and which covenant shall in any event, and without regard to technical classification or designation, legal or otherwise, be binding to the fullest extent permitted by law and equity, for the benefit and in favor of and enforceable by the UNITED STATES OF AMERICA and its successors against Northeastern University, its successors and assigns, and every successor in interest to the property, or any part thereof -- that it will comply with Title VI of the Civil Rights Act of 1964 (P.L. 88-352) and all requirements imposed by or pursuant to the Regulation of the Department of Health, Education, and Welfare (45 CFR Part 80) issued pursuant to that title and as in effect on the date of this deed, to the end that, in accordance with Title VI of that Act and the Regulation, no person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be otherwise subjected to discrimination under the program and plan referred to in condition 1 above or under any other program or activity of Northeastern University, its successors or assigns, to which such Act and Regulation apply by reason of this conveyance.

Northeastern University, by the acceptance of this deed, further covenants and agrees for itself, its successors and assigns, that in the event the property conveyed herein is sold, leased, mortgaged, encumbered, or otherwise disposed of, or is used for purposes other than those set forth in the above identified program and plan without the consent of the Department of Health, Education, and Welfare, all revenues or the reasonable value, as determined by the Department of Health, Education, and Welfare, of benefits to Northeastern University deriving directly or indirectly from such sale, lease, mortgage, encumbrance, disposal or use (or the reasonable value as determined by the Department of Health, Education, and Welfare of any other unauthorized use) shall be considered to have been received and held in trust by Northeastern University for the UNITED STATES OF AMERICA

11

and shall be subject to the direction and control of the Department of Health, Education, and Welfare.

Northeastern University, by the acceptance of this deed, further covenants and agrees, for itself, its successors and assigns, that if Northeastern University, its successors and assigns, shall cause any of the buildings, structures, or improvements on the premises hereby conveyed to be insured against loss, damage or destruction and any such loss, damage or destruction shall occur during the period Northeastern University holds title to said property subject to said conditions, 1, 2, 3, and 4, said insurance and all moneys payable to Northeastern University, its successors or assigns, thereunder shall be held in trust by Northeastern University, its successors or assigns, and shall be promptly used by Northeastern University for the purpose of repairing such buildings, structures or improvements and restoring the same to their former condition, or, if not so used, shall be paid over to the Treasurer of the United States in an amount not exceeding the unamortized public benefit allowance of the buildings, structures or improvements lost, damaged, or destroyed.

Northeastern University, by the acceptance of this deed, further covenants and agrees, for itself, its successors and assigns, that the UNITED STATES OF AMERICA shall have the right during any period of emergency declared by the President of the United States or by the Congress of the United States to the full unrestricted possession, control and use of the property hereby conveyed, or of any portion thereof, including any additions or improvements thereto made subsequent to this conveyance. Prior to the expiration or termination of the 20-year period of restricted use by Northeastern University such use may be either exclusive or non-exclusive and shall not impose any obligation upon the Government to pay rent or any other fees or charges during the period of emergency, except that the Government shall (i) bear the entire cost of maintenance of such portion of the property used by it exclusively or over which it may have exclusive possession or control, (ii) pay the fair share, commensurate with the use, of the cost of maintenance of such of the property as it may use non-exclusively or over which it may have non-exclusive possession or control, (iii) pay a fair rental for the use of improvements or additions to the premises made by Northeastern

12

University without Government aid, and (iv) be responsible for any damage
to the property caused by its use, reasonable wear and tear, and acts of
God and the common enemy excepted. Subsequent to the expiration or termina-
tion of the 20-year period of restricted use, the obligations of the Govern-
ment shall be as set forth in the preceding sentence, and in addition the
Government shall be obligated to pay a fair rental for all or any portion
of the conveyed premises which it uses.

This instrument is intended to take effect as a sealed instrument.

IN WITNESS WHEREOF, the UNITED STATES OF AMERICA has caused this
instrument to be executed this *23rd* day of *February*, 1966.

                                    UNITED STATES OF AMERICA
                                    Acting by and through the
                                    Secretary of Health, Education, and
                                    Welfare

WITNESSES:

*Edward J. Bradley*

*Samuel C. Fish*                    By: *Walter W. Mode*
                                    WALTER W. MODE
                                    Regional Director, Region I
                                    Department of Health, Education,
                                    and Welfare

ACKNOWLEDGMENT

COMMONWEALTH OF MASSACHUSETTS )
COUNTY OF SUFFOLK             )      DATE: *February 23, 1966*

Before me a Notary Public in and for the Commonwealth of Massachusetts
then and there personally appeared Walter W. Mode duly empowered, authorized
and delegated by the Secretary of Health, Education, and Welfare pursuant to
a Delegation of Authority, who signed the foregoing instrument in behalf of
the UNITED STATES OF AMERICA and acknowledged the same to be his free act
and deed in his said capacity and the free act and deed of the UNITED STATES
OF AMERICA.

LAWRENCE E. BURSTEIN                 *Lawrence J. Burstein*
                                     Notary Public

My Commission Expires
LAWRENCE E. BURSTEIN
NOTARY PUBLIC
MY COMMISSION EXPIRES DECEMBER 8, 1972

13

**ACCEPTANCE**

I, Edward S. Parsons, Business Manager of Northeastern University having been duly authorized on June 10, 1965, by vote of the Board of Trustees of Northeastern University to accept this deed for and on behalf of the said Northeastern University do hereby accept this deed and do agree to all the terms, covenants, conditions, reservations and restrictions contained in said deed for and on behalf of said Northeastern University.

WITNESSES:

_Margery E. Cassel_

_Nelson R Hill_

Edward S. Parsons
Business Manager
Northeastern University

**ACKNOWLEDGMENT**

COMMONWEALTH OF MASSACHUSETTS )
COUNTY OF SUFFOLK

DATE: Feb. 24. 1966

Before me a Notary Public in and for the Commonwealth of Massachusetts then and there personally appeared Edward S. Parsons known to me to be the person described in and who signed the above "Acceptance" for and on behalf of Northeastern University and acknowledged the same to be his free act and deed in his said capacity and the free act and deed of said Northeastern University.

Oct. 18. 1967
My Commission Expires

Notary Public



DOCUMENT NO. 118926

United States of America

to

Northeastern University

Deed of Resolution to...

ESSEX SOUTH REGISTRY DISTRICT

MAR 4 1966

RECEIVED 10 O'CLOCK 30 M. A. M.
NOTED ON CERTIFICATES 70741 69444
REGISTRATION BKS. 29 PGS. 644

The Reot. Leonard

BOOK 5344 PAGE 142

## DEED WITHOUT WARRANTY

KNOW ALL MEN BY THESE PRESENTS: That the UNITED STATES OF AMERICA
acting by and through the Secretary of Health, Education, and Welfare by the
Regional Director of the Department of Health, Education, and Welfare, Region
I, under and pursuant to the powers and authorities contained in the Federal
Property and Administrative Services Act of 1949 (63 Stat. 377) as amended,
the Civil Rights Act of 1964, and the regulations promulgated thereunder, and
the Department of Health, Education, and Welfare Statement of Organization and
Delegation of Authority, Part 2, section 2-249.10(A)(3) (29 F.R. 5096) for and
in consideration of the observance and performance by Northeastern University,
a corporation organized under the laws of the Commonwealth of Massachusetts,
of the covenants, conditions, reservations, and restrictions hereinafter con-
tained and for other valuable consideration grants to Northeastern University,
its successors and assigns, subject to the covenants, conditions, reservations,
and restrictions hereinafter set forth certain parcels of land with the build-
ings thereon situated in the Town of Nahant, County of Essex, Commonwealth of
Massachusetts more particularly bounded and described as follows:

The fee simple title to land acquired by the United States of America
through the filing of a Declaration of Taking on February 3, 1941 entitled,
"United States of America Petitioner vs. 13.98 Acres of Land, More or Less,
Situate in Nahant, Essex County Massachusetts and H.C. Lodge Estate, Defend-
ant, Civil No. 6341," and obtaining final judgment thereon in the United
States District Court in and for the District of Massachusetts.

### TRACT A (Parcel #1)

A certain parcel of land situated in the Town of Nahant, County of
Essex, Commonwealth of Massachusetts, being more particularly bounded
and described as follows:

SOUTHWESTERLY by Nahant Road and a portion of the former Nahant
Road four hundred thirty six and 27/100 (436.87) feet;

NORTHWESTERLY by land now or formerly of Thomas P. Beal et al,
Trustees, measuring on the upland ninety one and 90/100 (91.90)
feet;

NORTHEASTERLY by Massachusetts Bay;

SOUTHEASTERLY by land of the United States of America five
hundred and eleven (511) feet more or less;

SOUTHEASTERLY by land of the United States of America seventy
and 98/100 (70.98) feet;

BOOK 5344 PAGE 143

SOUTHEASTERLY by land of the United States of America
forty-two and 86/100 (42.86) feet;

SOUTHWESTERLY by land now or formerly of A.D. Hill et
al, Trustees, two hundred fifty-three and 92/100 (253.92)
feet by Parcel #2;

SOUTHWESTERLY by land now or formerly of A.D. Hill et
al, Trustees, one hundred eighty-one and 10/100 (181.10)
feet by Parcel #2;

NORTHWESTERLY, WESTERLY, AND SOUTHWESTERLY by said for-
mer Nahant Road by three (3) lines measuring together seventy-
three and 62/100 (73.62) feet.

Containing 8.04 acres, more or less.

The above described property is a portion of the Henry Cabot Lodge
Estate shown as part of Lot A on Land Court Plan #6813 - 6814A.

The fee simple title to land acquired by the United States of America

through the filing of a Declaration of Taking on November 7, 1941, entitled

"United States of America, Petitioner vs. 14.46 Acres of Land, More or Less,

Situate in Essex County, State of Massachusetts and Barzon P. Elliott,

Defendant, Civil No. 6439," and obtaining final judgment thereof in United

States District Court in and for the District of Massachusetts.

The fee simple title to land hereinafter described, subject, however to

existing easements for public roads and public utilities therein.

TRACT A (Parcel #2)

Two (2) certain parcels of land situate in the Town of Nahant, County

of Essex, Commonwealth of Massachusetts, being more particularly

bounded and described as follows:

Beginning at the intersection of the Northerly corner
of the former Estate of Julia Bryant Pains at the
Southeasterly streetline of Swallows Cave Road;

thence by Swallows Cave Road and a private road on the
following courses and distances; North 31° 14' East
208.86 feet; North 31° 56' East 103.19 feet; North 49°
36' East 55.3 feet; North 50° 53' East 53.0 feet; North
54° 32' East 62.2 feet; North 62° 43' East 87.2 feet;
North 73° 28' East 40.8 feet;

thence by former Nahant Road on the following courses
and distances South 83° 44' East 147.2 feet; South 71°
47' East 34.0 feet; South 67° 34' East 49.1 feet and
by a curve to the left 17.94 feet;

thence by the following courses and distances South
56° 20' 45" East 181.10 feet by land now or formerly
of the Henry Cabot Lodge Estate by Parcel #1; South

BOOK 5344 PAGE 144

50° 30' 45" East 853.92 feet by land now or formerly of the Henry Cabot Lodge Estate by Parcel #1; South 46° 25' 00" West 113.52 feet by land of the United States of America; South 43° 35' East 250 feet more or less to Massachusetts Bay;

thence Southeasterly, Southerly, and Southwesterly by Massachusetts Bay;

thence North 1° 43' East 24 feet more or less to a bolt;

thence by land now or formerly of the Estate of Julia Bryant Paine North 1° 43' East 155.82 feet to the apex of a stone post;

thence by four (4) courses by land now or formerly of the Estate of Julia Bryant Paine as follows: North 62° 00' West 28.5 feet; North 76° 18' West 129.6 feet; North 63° 16' West 44.2 feet; North 59° 09' West 114.5 feet to the point of beginning.

Containing 12.10 acres, more or less.

The above-described property is a portion of the land formerly of A. D. Hill, et al, Trustees, and is shown as part of Lot C on Land Court Plan #6813 - 6814A and the two lots of land shown on said plan as belonging to Thomas P. Curtis and Francis X. Amory.

## TRACT A (Parcel #3)

Beginning at a point on the former division line between land of A. D. Hill, et al, Trustees and land of the Estate of Henry Cabot Lodge, now land of the United States of America, said point of beginning being at the Easterly end of the discontinued portion of Nahant Road;

thence by the Southerly line of the discontinued portion of Nahant Road by land formerly of A. D. Hill, et al, Trustees, now land of the United States of America on the following courses and distances, by a curve to the right a distance of 17.94 feet, North 67° 34' West 49.1 feet, North 71° 47' West 34.0 feet and North 85° 44' West 147.2 feet to a point at the Westerly end of the discontinued portion of Nahant Road;

thence North 4° 16' 50" East by the said Westerly end of the discontinued portion of Nahant Road about 24 feet to the center line of said road;

thence Southeasterly by the center line of the discontinued portion of Nahant Road about 250 feet to the Easterly end of said road at land formerly of the Estate of Henry Cabot Lodge, now land of the United States of America;

thence Southwesterly by the said Easterly end of the discontinued portion of Nahant Road, by land formerly

BOOK 5344 PAGE 145

...of the Estate of Henry Cabot Lodge, now land of the United States of America; about 10 feet to the point of beginning.

Containing 0.14 of an acre, more or less.

Reserving to the United States of America, its successors and assigns, a perpetual easement and right of way in, over and across the above described Parcels Nos. 1, 2 and 3, and for the benefit of remaining land of the United States of America, as shown on "Plan of Land in Nahant, Massachusetts, showing property in fee, Access and Utilities Easements, by C.O. Baird, Jr., Civil Engineer, 360 Huntington Avenue, Boston, Massachusetts, Scale 1" = 40', June 1, 1965," attached hereto and marked Block 8, Schedule D, to allow access from Nahant Road to said remaining land of the United States of America, shown on said Plan to comprise 8.30 acres. The location of said easement and right of way is shown on said plan as an "existing road". Together with the right to enter upon the above described Parcels Nos. 1, 2 and 3 so far as is reasonably necessary for the maintenance, repair, or replacement of the said way, provided that the United States of America, its successors and assigns shall restore the affected property to the same condition it was in prior to the performance of such maintenance, repair or replacement.

Reserving also to the United States of America, its successors and assigns, a perpetual easement to use existing sanitary sewer and water lines and electrical conduits, presently located in, over, across and under the above described Parcels 1, 2 and 3, as shown on said Plan, together with the right to enter upon said Parcels 1, 2 and 3 so far as is reasonably necessary for the maintenance, repair, or replacement of the said utility lines provided that the United States of America, its successors and assigns shall restore the affected property to the same condition it was in prior to the performance of such maintenance, repair or replacement.

BOOK 5344 PAGE 146

5

future owner of Parcels 1, 2 and 3 hereafter referred to as the grantee, its successors and assigns, shall have the right to relocate any or all of the easements referred to above, the cost of such relocation to be borne entirely by the grantee; provided that any relocation of said easements which may be accomplished by the grantee shall be adequate to insure to the United States of America, for the benefit of its remaining land the continuation of the access and utility services furnished by said easements herein reserved, and shall be accomplished in a manner that will not create any unnecessary interference with the use and enjoyment by the United States of America of said easements.

Provided further that in the event there is a need to repair or replace said existing road or any of the said existing utility lines, the grantee and the United States of America, for themselves, their successors and assigns, covenant and agree that the cost of such repair or replacement, as well as the cost for any of the maintenance of the same, including but not limited to snow removal and sanding on the travelled portion of the way, shall, as to any portion used or to be used exclusively by one party, be borne by that party alone, and, as to any portion used or to be used by both parties, then by both parties equally, and covenant and agree further that in an emergency situation either party may act without the prior consent of the other party in order to preserve their common interests, and that otherwise either party may request of the other party in writing for the concurrence of the other party in the proposed work and if no agreement with respect to the said work is reached within thirty (30) days after the receipt by the other party of the said request, then the party making the request may have the said work done and may charge to the other party its share of the cost of the said work as above provided.  Such a request, if to the United States of America, shall be addressed to the Director, New England Division, Bureau of Yards and Docks, 495 Summer Street, Boston, Massachusetts, 02210, and if to the grantee, to the address of the grantee.

BOOK 5344 PAGE 147

6

With respect to damages to or destruction of any property of the grantee,
its successors or assigns, or for injuries to the person of the grantee,
or the grantee's officers, agents, servants or employees or others who
may be on the granted premises at their invitation or the invitation of
any one of them, arising from or incident to the use, maintenance, repair
or replacement of the aforesaid easements, the United States of America
assumes no liability beyond the scope of its liability under the terms and
provisions of the Federal Tort Claims Act.  The United States of America
does, however, hereby covenant on behalf of its successors and assigns
that the property of the grantee, its successors and assigns, that is
damaged or destroyed by the successors, assigns or licensees of the United
States of America, incident to the use, maintenance, repair or replacement
of the aforesaid easements, shall be promptly repaired or replaced by the
said successors or assigns of the said United States of America, to the
reasonable satisfaction of the grantee, its successors or assigns, or the
cost of such repair or replacement (if the same is performed by the
grantee, its successors or assigns) paid to the grantee, its successors
and assigns.  The United States of America, for and on behalf of its suc-
cessors and assigns, further covenants and agrees that said successors and
assigns will indemnify and hold harmless the grantee, its successors and
assigns, of and from any claims for personal injury incident to the use,
maintenance, repair and replacement of the said easements by the succes-
sors, assigns, or licensees of the said grantor.

Said property conveyed hereby was declared surplus and was as-
signed to the Department of Health, Education, and Welfare for disposal
for educational purposes pursuant to the provisions of the aforementioned
Federal Property and Administrative Services Act of 1949 and of applicable
rules, regulations and orders.

This Deed is executed and delivered to Northeastern University,
its successors and assigns, without covenants or warranties by or on

BOOK 5344 PAGE 148                                                    7

behalf of the UNITED STATES OF AMERICA whatsoever, either express or
implied.

AND this deed is made and accepted upon each of the following
conditions subsequent which shall be binding upon and enforceable against
Northeastern University, its successors or assigns, and each of them, as
follows:

1. That for a period of twenty (20) years from the date of this
   deed the above described property herein conveyed shall be
   utilized continuously in the manner and for the educational
   purposes set forth in the approved program and plan contained
   in the application of Northeastern University, dated June 16,
   1965, and for no other purpose.

2. That during the aforesaid period of twenty (20) years, North-
   eastern University will at all times be and remain a non-
   profit institution, organization or association, exempt from
   taxation under section 101(6) of the 1939 Internal Revenue
   Code, or section 501(c)(3) of the 1954 Internal Revenue Code;

3. That during the aforesaid period of twenty (20) years, North-
   eastern University will resell, lease, mortgage, or encumber,
   or otherwise dispose of the above described property or any
   part thereof or interest therein only as the Department of
   Health, Education, and Welfare, or its successor in function,
   in accordance with its existing regulations, may authorize in
   writing.

4. That one year from the date of this deed and annually there-
   after for the aforesaid period of twenty (20) years unless
   the Department of Health, Education, and Welfare or its
   successor in function otherwise directs, Northeastern
   University will file with the Department of Health, Educa-
   tion and Welfare or its successor in function reports on the
   operation and maintenance of the above described property

BOOK 5344 PAGE 149                                8

and will furnish, as requested, such other pertinent data evi-
dencing continuous use of the property for the purposes specified
in the above identified application.

5.   That for the period during which the above described property is
used for a purpose for which the Federal financial assistance is
extended by the Department or for another purpose involving the
provision of similar services or benefits, Northeastern University
hereby agrees that it will comply with Title VI of the Civil Rights
Act of 1964 (P.L. 88-352) and all requirements imposed by or pur-
suant to the Regulation of the Department of Health, Education, and
Welfare (45 CFR Part 80) issued pursuant to that title and as in
effect on the date of this deed, to the end that, in accordance with
Title VI of that Act and the Regulation, no person in the United
States shall, on the ground of race, color, or national origin, be
excluded from participation in, be denied the benefits of, or be
otherwise subjected to discrimination under the program and plan
referred to in condition 1 above or under any other program or
activity of Northeastern University, its successors or assigns, to
which such Act and Regulation apply by reason of this conveyance.

In the event of a breach of any of the conditions set forth above whether
caused by the legal or other inability of Northeastern University, its suc-
cessors or assigns, to perform any of the obligations herein set forth, all
right, title, and interest in and to the above described property shall, at
its option revert to and become the property of the UNITED STATES OF AMERICA,
which shall have an immediate right of entry thereon, and Northeastern Uni-
versity, its successors or assigns, shall forfeit all right, title, and
interest in and to the above described property and in any and all of the
tenements, hereditaments, and appurtenances thereunto belonging; PROVIDED
HOWEVER, that the failure of the Department of Health, Education, and
Welfare, or its successor in function, to insist in any one or more instances
upon complete performance of any of the said conditions shall not be construed
as a waiver or a relinquishment of the future performance of any such condi-
tions, but the obligations of Northeastern University with respect to such
future performance shall continue in full force and effect; PROVIDED FURTHER,

BOOK 5344 PAGE 150

9

that in the event the UNITED STATES OF AMERICA fails to exercise its option to re-enter the premises for any such breach of conditions subsequent numbered 1, 2, 3, and 4 herein within 21 years from the date of this conveyance, conditions numbered 1, 2, 3, and 4 herein together with all rights of the UNITED STATES OF AMERICA to re-enter as in this paragraph with respect to conditions numbered 1, 2, 3, and 4 herein, shall, as of that date, terminate and be extinguished; PROVIDED FURTHER, that the expirations of conditions 1, 2, 3, and 4, and the rights to re-enter shall not affect the obligation of Northeastern University, its successors and assigns with respect to condition numbered 5 herein or the right reserved to the UNITED STATES OF AMERICA to re-enter for breach of said condition.

In the event title to the above described premises is reverted to the UNITED STATES OF AMERICA for non-compliance or voluntarily reconveyed in lieu of reverter, Northeastern University, its successors and assigns, at the option of the Department of Health, Education, and Welfare or its successor in function, shall be responsible and shall be required to reimburse the UNITED STATES OF AMERICA for the decreased value of the above described property not due to reasonable wear and tear, acts of God, and alterations and conversions made by Northeastern University to adapt the property to the educational use for which the property was acquired. The UNITED STATES OF AMERICA shall, in addition thereto, be reimbursed for such damages including such costs as may be incurred in recovering title to or possession of the above described property, as it may sustain as a result of the non-compliance.

Northeastern University may secure abrogation of the conditions subsequent numbered 1, 2, 3, and 4 herein by:

a. Obtaining the consent of the Department of Health, Education, and Welfare or its successor in function; and

b. Payment to the UNITED STATES OF AMERICA of the public benefit allowance granted to Northeastern University of one hundred (100) percent from the current market value of eighty-five thousand ($85,000) dollars, less a credit at the rate of five (5) percent for each twelve (12) months during which the property has been utilized in accordance with the purposes specified in the above identified application.

BOOK 5344 PAGE 151                                              10

Northeastern University, by acceptance of this deed covenants and agrees
for itself, its successors and assigns, and every successor in interest to
the property herein conveyed or any part thereof -- which covenant shall
attach to and run with the land for so long as the property herein conveyed
is used for a purpose for which the Federal financial assistance is extended
by the Department or for another purpose involving the provision of similar
services or benefits and which covenant shall in any event, and without
regard to technical classification or designation, legal or otherwise, be
binding to the fullest extent permitted by law and equity, for the benefit
and in favor of and enforceable by the UNITED STATES OF AMERICA and its suc-
cessors against Northeastern University, its successors and assigns, and
every successor in interest to the property, or any part thereof -- that it
will comply with Title VI of the Civil Rights Act of 1964 (P.L. 88-352) and
all requirements imposed by or pursuant to the Regulation of the Department
of Health, Education, and Welfare (45 CFR Part 80) issued pursuant to that
title and as in effect on the date of this deed, to the end that, in accordance
with Title VI of that Act and the Regulation, no person in the United States
shall, on the ground of race, color, or national origin, be excluded from
participation in, be denied the benefits of, or be otherwise subjected to
discrimination under the program and plan referred to in condition 1 above
or under any other program or activity of Northeastern University, its suc-
cessors or assigns, to which such Act and Regulation apply by reason of this
conveyance.

Northeastern University, by the acceptance of this deed, further covenants
and agrees for itself, its successors and assigns, that in the event the property
conveyed herein is sold, leased, mortgaged, encumbered, or otherwise disposed of,
or is used for purposes other than those set forth in the above identified pro-
gram and plan without the consent of the Department of Health, Education, and
Welfare, all revenues by the reasonable value, as determined by the Department
of Health, Education, and Welfare, of benefits to Northeastern University deriving
directly or indirectly from such sale, lease, mortgage, encumbrance, disposal or
use (or the reasonable value as determined by the Department of Health, Education,
and Welfare of any other unauthorized use) shall be considered to have been re-
ceived and held in trust by Northeastern University for the UNITED STATES OF AMERICA

and shall be subject to the direction and control of the Department of Health,
Education, and Welfare.

Northeastern University, by the acceptance of this deed, further cove-
nants and agrees, for itself, its successors and assigns, that if Northeastern
University, its successors and assigns, shall cause any of the buildings,
structures, or improvements on the premises hereby conveyed to be insured
against loss, damage or destruction and any such loss, damage or destruction
shall occur during the period Northeastern University holds title to said
property subject to said conditions, 1, 2, 3, and 4, said insurance and all
moneys payable to Northeastern University, its successors or assigns, there-
under shall be held in trust by Northeastern University, its successors or
assigns, and shall be promptly used by Northeastern University for the
purpose of repairing such buildings, structures or improvements and restor-
ing the same to their former condition, or, if not so used, shall be paid
over to the Treasurer of the United States in an amount not exceeding the
unamortized public benefit allowance of the buildings, structures or improve-
ments lost, damaged, or destroyed.

Northeastern University, by the acceptance of this deed, further cove-
nants and agrees, for itself, its successors and assigns, that the UNITED
STATES OF AMERICA shall have the right during any period of emergency
declared by the President of the United States or by the Congress of the
United States to the full unrestricted possession, control and use of the
property hereby conveyed, or of any portion thereof, including any additions
or improvements thereto made subsequent to this conveyance.  Prior to the ex-
piration or termination of the 20-year period of restricted use by Northeastern
University such use may be either exclusive or non-exclusive and shall not
impose any obligation upon the Government to pay rent or any other fees or
charges during the period of emergency, except that the Government shall (i)
bear the entire cost of maintenance of such portion of the property used by
it exclusively or over which it may have exclusive possession or control,
(ii) pay the fair share, commensurate with the use, of the cost of mainte-
nance of such of the property as it may use non-exclusively or over which
it may have non-exclusive possession or control, (iii) pay a fair rental for
the use of improvements or additions to the premises made by Northeastern

BOOK 5344 PAGE 153

University without Government aid, and (iv) be responsible for any damage to the property caused by its use, reasonable wear and tear, and acts of God and the common enemy excepted. Subsequent to the expiration or termination of the 20-year period of restricted use, the obligations of the Government shall be as set forth in the preceding sentence, and in addition the Government shall be obligated to pay a fair rental for all or any portion of the conveyed premises which it uses.

This instrument is intended to take effect as a sealed instrument.

IN WITNESS WHEREOF, the UNITED STATES OF AMERICA has caused this instrument to be executed this 23rd day of February, 1966.

UNITED STATES OF AMERICA
Acting by and through the
Secretary of Health, Education, and
Welfare

WITNESSES:

*Edward J. Bradley*

*Daniel C. Fish*

By: *Walter W. Mode*
WALTER W. MODE
Regional Director, Region I
Department of Health, Education,
and Welfare

ACKNOWLEDGMENT

COMMONWEALTH OF MASSACHUSETTS )
COUNTY OF SUFFOLK )            DATE: February 23, 1966

Before me a Notary Public in and for the Commonwealth of Massachusetts then and there personally appeared Walter W. Mode duly empowered, authorized and delegated by the Secretary of Health, Education, and Welfare pursuant to a Delegation of Authority, who signed the foregoing instrument in behalf of the UNITED STATES OF AMERICA and acknowledged the same to be his free act and deed in his said capacity and the free act and deed of the UNITED STATES OF AMERICA.

LAWRENCE B. BURSTEIN
NOTARY PUBLIC
MY COMMISSION EXPIRES DECEMBER 8, 1967

*Notary Public*

My Commission Expires

BOOK 5344 PAGE 154

# NORTHEASTERN UNIVERSITY

BOSTON, MASSACHUSETTS 02115

BOARD OF TRUSTEES

CERTIFICATE .

I, Lincoln C. Bateson, hereby certify that I am Secretary of
Northeastern University and that at a regular meeting of the Board of
Trustees of Northeastern University duly called and held on June 10, 1965
at which meeting a quorum was present and voting. The following resolutions
were adopted:

RESOLVED: That whereas, certain real property owned by the United States,
located in the Town of Nahant in the County of Essex, Common-
wealth of Massachusetts, has been declared surplus and is
subject to assignment for disposal for educational or public
health purposes by the Secretary of Health, Education, and
Welfare, under the provisions of Section 203 (k) (1) of the
Federal Property and Administrative Services Act of 1969
(63 Stat. 377), as amended, and rules and regulations promul-
gated pursuant thereto, more particularly described as follows:

Whereas, Northeastern University needs and can utilize said
property for educational purposes in accordance with the
requirements of said Act and the rules and regulations pro-
mulgated thereunder; now therefore

Be it Resolved, that Northeastern University shall make
application to the Secretary of Health, Education, and Wel-
fare for and secure the transfer to it of the above-mentioned
property for said use upon and subject to such exceptions,
reservations, terms, covenants, agreements, conditions, and
restrictions as the Secretary of Health, Education, and Welfare,
or his authorized representative, may require in connection
with the disposal of said property under said Act and the rules
and regulations issued pursuant thereto; and

Be it Further Resolved that Northeastern University has legal
authority, is willing and is in a position to assume immediate
care and maintenance of the property, and that Edward S.
Parsons, Business Manager, be and he is hereby authorized,
for and on behalf of Northeastern University, to do and perform
any and all acts and things which may be necessary to carry out
the foregoing resolution, including the preparing, making, and
filing of plans, application, reports, and other documents, the
execution, acceptance, delivery, and recordation of agreements,
deeds, and other instruments pertaining to the transfer of said
property, and the payment of any and all sums necessary on



- 2 -

BOOK 5344 PAGE 155

account of fees, or costs incurred in connection with the
transfer of said property for surveys, title searches, appraisals,
recordation of instruments, or escrow costs.

A true copy.

ATTEST

*Lincoln C. Batson*

Lincoln C. Batson, Secretary

This is to certify that this
is a true copy of the original instrument
*Lincoln C. Batson*
*Mar 4, 1966*

March 1, 1966

Essex ss. Recorded Mar. 4, 1966. 12 m. past 9 A. M. #38

## ACCEPTANCE

I, Edward S. Parsons, Business Manager of Northeastern University having been duly authorized on June 10, 1965, by vote of the Board of Trustees of Northeastern University to accept this deed for and on behalf of the said Northeastern University do hereby accept this deed and do agree to all the terms, covenants, conditions, reservations and restrictions contained in said deed for and on behalf of said Northeastern University.

WITNESSES:

_Margery E. Russel_

_Nelson R. Hill_

_Edward S. Parsons_
Edward S. Parsons
Business Manager
Northeastern University

## ACKNOWLEDGMENT

COMMONWEALTH OF MASSACHUSETTS}
COUNTY OF SUFFOLK

DATE: _Feb 24, 1966_

Before me a Notary Public in and for the Commonwealth of Massachusetts then and there personally appeared Edward S. Parsons known to me to be the person described in and who signed the above "Acceptance" for and on behalf of Northeastern University and acknowledged the same to be his free act and deed in his said capacity and the free act and deed of said Northeastern University.

_Feb. 18, 1967_
My Commission Expires

_Kenneth L. Brown_
Notary Public

Essex ss. Recorded Mar. 4, 1966.    12 m. past 8 A. M. #83 1/2

BK 5489 PG 111

NORTHEASTERN UNIVERSITY, a Massachusetts corporation of Boston, Suffolk County, Massachusetts (hereinafter called the Grantor), for consideration paid, grants to MASSACHUSETTS ELECTRIC COMPANY, a Massachusetts corporation (hereinafter called the Grantee), with warranty covenants, the perpetual right and easement to construct, reconstruct, repair, maintain, operate and patrol, for the transmission of high and low voltage electric current, a line of four (4) poles (which may be erected at different times), with wires and cables strung upon and from the same, and all necessary foundations, anchors, guys, braces, fittings, equipment and appurtenances, over, across and upon land in Nahant, Essex County, Massachusetts. Said line to enter from Swallow Cave Road and cross to land of the Grantor all as shown on sketch entitled: "MASSACHUSETTS ELECTRIC CO.  LYNN, MASS. AND PROPOSED NEW POLES ON PRIVATE PROP. OFF SWALLOW CAVE RD., NAHANT DATE 3-21-66  SCALE NTS  PLATE 5818," copies of which are in the possession of both parties hereto.

Also the perpetual right and easement from time to time without further payment therefor to trim and keep trimmed along said line, such trees or underbrush as may in the opinion of the Grantee interfere with the efficient and safe operation of the line, and to renew, replace and otherwise change but not relocate the line and each and every part thereof, and to pass along said line to and from the adjoining lands for all the above purposes and the removal of the line.

It is understood and agreed that in the event the Grantor abandons its possession of the land which is the subject matter of this agreement or loses title because it violates conditions of its deed, this easement shall

BK5489 PG112

become voidable upon the written notice of the Grantor's successor in title to the Grantee, delivered or mailed to the Grantee at its corporate offices.

It is expressly understood and agreed that the rights and easements granted herein are to be used soley for the purpose of providing or maintaining services to the Grantor.

It is agreed that the line shall remain the property of the Grantee, its successors and assigns, and that the Grantee, its successors and assigns, shall pay all taxes assessed thereon.

IN WITNESS WHEREOF, the said NORTHEASTERN UNIVERSITY has caused its corporate seal to be hereto affixed and these presents to be signed in its name and behalf by ___Asa S. Knowles___ , its ___President___ and by ___Lincoln C. Bateson___ , its ___Vice President___ being thereunto duly authorized, this ninth day of ___October___ , 1967.

THE CONSIDERATION PAID FOR THE
WITHIN DEED IS LESS THAN $100.

NORTHEASTERN UNIVERSITY

By _____

By _____
Lincoln C. Bateson
Its President-Finance

THE COMMONWEALTH OF MASSACHUSETTS

Suffolk , ss.                                    October 9 , 1967

Then personally appeared the above named ___Asa S. Knowles___ and ___Lincoln C. Bateson___ and acknowledged the foregoing instrument to be the free act and deed of NORTHEASTERN UNIVERSITY.

Before me,

_____
Notary Public
My commission expires ___Nov. 30, 1970___

Essex ss. Recorded Nov. 3, 1967, ²⁻ 50 m. past 10 A.M. #93