UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| NAHANT PRESERVATION TRUST, INC., and its Directors, Officers, Trustees, Committee Members, et al., | ) ) ) ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | Civil No. 22-10486-LTS |
| MOUNT VERNON FIRE INSURANCE COMPANY and UNITED STATES LIABILITY INSURANCE GROUP, | ) ) ) ) | |
| Defendants. | ) ) ) | |

ORDER ON DEFENDANTS' MOTION TO DISMISS (DOC. NO. 12)

November 7, 2022

SOROKIN, J.

Nahant Preservation Trust, Inc. is a Massachusetts not-for-profit charitable corporation with a mission of preserving the open spaces, historically significant properties, and conservation lands of the Town of Nahant, Massachusetts ("the Town") for public and community benefit. Doc. No. 7 ¶ 6.[1] The present case is brought by Nahant and its Directors, Officers, Trustees, and Committee Members (hereinafter collectively referred to as "Nahant") against defendants Mount Vernon Fire Insurance Company and United States Liability Insurance Group (collectively "USLI"). Id. ¶ 1. This case is an insurance dispute about coverage of an underlying state court

---

[1] Citations to "Doc. No. __ at __" reference items appearing on the court's electronic docketing system, and pincites are to the page numbers in the ECF header.

action between Nahant and Northeastern University over the use of certain portions of Northeastern's land on the East Point peninsula. Id. ¶¶ 1–5, 11–21.

I.      BACKGROUND

      A.   Underlying Nahant-Northeastern Dispute

In 1967, Northeastern University acquired without payment 20 acres of the 28-acre peninsula of East Point, which is within the Town. Id. ¶ 12. The deed to Northeastern expressly reserves a public easement across Northeastern's property to the remaining eight acres on East Point. Id. ¶ 14. The Town acquired those remaining eight acres in 1989 and dedicated that land as Lodge Park, protected open space. Id. Northeastern also dedicated about 12.5 acres of the undeveloped portions of its property for passive recreation and as an ecological preserve (hereinafter the "Ecological Preserve"). Id. ¶ 15.

In 2018, Northeastern publicly proposed to develop its property by, among other changes, building a new 55,000 square foot building with ancillary parking and other improvements in the middle of the ecological preserve. Id. ¶ 17. In furtherance of that plan, in June 2019 Northeastern began cutting down trees and otherwise disturbing the natural habitat of the Ecological Preserve in order to clear cut an access road. Id. ¶ 17.

Nahant believes that the Ecological Preserve constitutes natural resources protected from development under the provisions of Article 97 of the Articles of Amendment to the Massachusetts Constitution. Id. ¶ 15. Land protected under that provision is reserved exclusively for use by the public for passive recreation, open space, and other environmental purposes; use of protected land for other purposes requires approval of two-thirds of the members of each house of the Massachusetts State Legislature. Id. ¶ 15. State law requires parties seeking to protect property governed by Article 97 to give written notice to the Massachusetts Attorney

General and all affected parties at least 21 days before filing a lawsuit or taking other action. Id.
¶ 16; M.G.L. c. 214, § 7A. Nahant and citizens of the Town (all of whom are or were directors,
officers, trustees, committee members, and/or volunteers of Nahant) gave such notice to
Northeastern by letter dated July 23, 2019. Doc. No. 7 ¶ 15. Before the 21-day notice period had
run, Northeastern filed a lawsuit against Nahant on August 9, 2019 (hereinafter the
"Northeastern Action") seeking, among other claims and monetary relief, a declaratory judgment
as to whether its East Point property is subject to Article 97. Id. ¶ 19. On August 20, 2019,
Nahant filed suit (hereinafter the "Nahant Action"), effectively as a responsive pleading, seeking
a declaration that Article 97 has been violated by Northeastern, an injunction to enforce
appropriate environmental regulations, costs of suit, and "such other and further relief as is just
and proper." Id. ¶ 20. The two actions have since been consolidated (hereinafter the
"Consolidated Action"). Id. ¶ 21.

      B.  USLI Insurance Policy Background, Relevant Provisions, and Dispute

      USLI issued four continuous, successive, Non Profit Management Liability Policies to
Nahant. Id. ¶ 22. Policy 1 had a start date of June 19, 2018 and an end date of June 19, 2019
("the 2018 policy"). Id. Policy 2 had a start date of June 19, 2019 and an end date of June 19,
2020 ("the 2019 policy"). Id. Policy 3 had a start date of June 19, 2020 and an end date of June
19, 2021 ("the 2020 policy"). Id. Policy 4 had a start date of June 19, 2021 and an end date of
June 19, 2022 ("the 2021 policy"). Id.

      Policy 2, the 2019 policy, was in effect at the time the now-consolidated actions between
Nahant and Northeastern were filed in state court in August 2019. About two years after the
filing of the actions, Nahant's counsel sent a letter to USLI dated July 27, 2021 giving USLI
notice of the claims asserted by Northeastern in the consolidated action and requesting payment

from USLI of Nahant's defense costs. Id. ¶ 56. USLI responded in a letter dated August 3, 2021 denying coverage or any duty of defense or indemnification on the basis that notice of the claim was not given within 60 days of expiration of the 2019 policy.[2] Id. ¶¶ 57–58. Nahant's counsel wrote back in a letter dated August 16, 2021 arguing the Amendment of Prior or Pending Litigation Exclusion provision changed the policy effective dates such that the July 27, 2021 notice was timely. Id. ¶ 60. In an email reply on August 25, 2021, USLI stated that it stood by its prior position and the Amendment provision did not change the effective date or expiration date of the relevant policy period. Id. ¶ 61. Nahant subsequently filed the present suit on February 18, 2022. Id. at 2. Nahant seeks declaratory relief regarding USLI's obligations to defend, indemnify, and pay in full the defense costs and damages which have been and which may be incurred by Nahant in connection with the Northeastern Action as consolidated into the Consolidated Action. Id. ¶ 5; Id. at 23–25. Nahant also seeks specific performance regarding USLI's alleged duties described above. Id. at 24. Finally, Nahant seeks to recover damages for USLI's alleged breach of contract and to recover attorneys' fees for the prosecution of the present action. Id. ¶ 5; Id. at 24.

The 2019, 2020, and 2021 policies issued to Nahant (Policies 2–4) include the following relevant provisions.

The declarations pages of Policies 2–4 all contain the following notice:

---

[2] The insurance claim arose during the year in which the 2019 policy was in effect (June 19, 2019 to June 19, 2020) when Nahant received notice of the Northeastern Action, filed in August 2019. Doc. No. 7 ¶ 19–20. The notice and claim reporting provision of the 2019 policy requires notice of a claim "no later than ninety (90) days after the expiration date" of the policy. Doc. No. 7 at 112; Doc. No. 7 at ¶ 43. USLI's August 3, 2021 response letter incorrectly references a 60-day rather than a 90-day post-expiration reporting period. See Doc. No. 7 at 258–59; Doc. No. 7 ¶ 57–58. The 60-day time period comes from the 2018 policy, Doc. No. 7 at 59, which was not the relevant policy. The parties have not noted this discrepancy in the letter or suggested it materially bears on the issues in dispute, no doubt because it is immaterial to the disputed issues.

4

PLEASE READ YOUR POLICY CAREFULLY.

THIS IS A CLAIMS MADE POLICY COVERAGE FORM AND UNLESS OTHERWISE PROVIDED HEREIN, THE COVERAGE OF THIS FORM IS LIMITED TO LIABILITY FOR CLAIMS FIRST MADE DURING THE POLICY PERIOD, OR THE EXTENSION PERIOD, IF APPLICABLE. DEFENSE COSTS SHALL BE APPLIED AGAINST THE RETENTION.

Id. at 75, 134, 193. Similarly, the General Terms and Conditions of Policies 2–4 each contain a

notice that states:

**Notice:** This is a Claims Made Policy. This means the **Company** will cover only those **Claims** first made against the **Insured** during the **Policy Period** or, where applicable, the Extended Reporting Period.

Id. at 105, 168, 225. Policies 2–4 define Policy Period as:

the period of time from the effective date and time of this **Policy** to the date and time of expiration as shown in the Policy Declarations, or its earlier cancellation or termination date. If the length of the **Policy Period** is the same as the **Policy Year**,[3] the terms **Policy Period** and **Policy Year** are used interchangeably herein.

Id. at 107, 170, 227.

The Insuring Agreements of Policies 2–4 require the insurer to pay "**Loss** and **Defense**

**Costs** resulting from a **Claim** first made...during the **Policy Period**, or Extended Reporting

Period, if applicable[.]" Id. at 79, 142, 314. The General Terms and Conditions of the three

policies each include a section entitled "NOTICE AND CLAIM REPORTING PROVISIONS,"

which provide:

---

[3] Policies 2 –4 define "Policy Year" as:

the period of one (1) year following the effective date of the **Policy Period** or any subsequent one-year anniversary thereof; or

In the event the Policy expires less than one (1) year following the effective date of the **Policy Period**, or more than one (1) year but less than two (2) years following the effective date of the **Policy Period**; then **Policy Year** shall mean any such period.

Doc. No. 7 at 107, 170, 227.

Notice hereunder shall be given in writing to the Company. If mailed, the date of mailing of such notice shall constitute the date that such notice was given and proof of mailing shall be sufficient proof of notice.

1.  As a condition precedent to exercising any right to coverage under this **Policy**, the **Insured** shall give to the **Company** written notice of a **Claim** as soon as practicable after any Chief Executive Officer, Chief Financial Officer, Chief Operating Officer, Chairperson, Executive Director, Human Resources Manager, In-House General Counsel, Managing Member or Fiduciary of any **Plan** becomes aware of such **Claim**, however:

    a.  if the **Policy** expires, is cancelled or is non-renewed and no Extended Reporting Period is purchased, no later than ninety (90) days after the expiration date or the effective date of such cancellation or non-renewal[.]

Id. at 112, 175, 232.

Finally, Policies 2–4 each contain a variety of exclusions, including an exclusion of prior or pending litigation. Policies 2–4 each include an amendment of this exclusion in an endorsement entitled "AMENDMENT OF PRIOR OR PENDING LITIGATION EXCLUSION" (hereinafter "Prior Pending Exclusion Amendment"), which provides in relevant part:

It is hereby agreed that the Directors and Officers **Coverage Part**, Section IV. EXCLUSIONS, Subsection A. "Prior or Pending Litigation" is deleted and replaced by the following:

Any litigation, demand, claim, arbitration, decree, judgment, proceeding, or investigation against any **Insured**, or any such action based upon the same or essentially the same facts, circumstances, matters, situations, transactions or events underlying or alleged therein which was pending on or prior to the effective date of this **Policy**;

provided that, if this **Policy** is a renewal of a **Policy** previously issued by the **Company** in a continuous succession of **Policies** with no lapses in coverage, the effective date of this **Policy** will mean the effective date of the first **Policy** issued by the **Company** in such succession of **Policies.**

**…**

All other terms and conditions of this **Policy** remain unchanged. This endorsement is part of your **Policy** and takes effect on the effective date of your **Policy** unless another effective date is shown.

Id. at 103–04, 166–67, 223–24.

USLI moves to dismiss this case for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6) on the basis that Nahant failed to timely report the Northeastern Action claim in accordance with the relevant policy's notice provision. Doc. No. 12 at 1. Specifically, USLI argues that because the Northeastern Action was filed in August 2019, Nahant needed to report the Northeastern Action no later than 90 days after the expiration date of the 2019 Policy in order to receive coverage for that claim. Doc. No. 13 at 9. Because Nahant did not report the Northeastern Action until July 27, 2021—over a year after the expiration of the 2019 Policy— USLI asserts that Nahant failed to provide timely notice and thus did not comply with a condition precedent to coverage. Id. at 10.

Nahant disputes the assertion that the July 27, 2021 notice was untimely based on its interpretation of the Prior Pending Exclusion Amendment. Nahant alleges that the Amendment's language stating "if this Policy is a renewal of a Policy previously issued by the Company in a continuous succession of Policies with no lapses in coverage, the effective date of this Policy will mean the effective date of the first Policy issued by the Company in such succession of Policies," Doc. No. 7 at 103, 166, 223 (emphasis added), modifies the meaning of "effective date" throughout the policy, beyond the prior or pending litigation exclusion alone. The term "effective date" is used in the definition of "Policy Period," which is defined as "the period of time from the effective date and time of this Policy to the date and time of expiration . . ." Doc. No. 7 at 107, 170, 227 (emphasis added). Nahant alleges that since it had a "continuous succession of Policies with no lapses in coverage," the "Policy Period" for each of Policies 1–4

had an effective date of the start of the first policy in the succession—June 19, 2018—under a "plain reading of the Prior Pending Exclusion Amendment." Id. ¶¶ 51, 54, 63–64. Consequently, the July 27, 2021 notice of the Northeastern Action (filed on August 9, 2019) was within the "Policy Period" of Policy 4 (the 2021 Policy) because Policy 4's effective date was June 19, 2018 and its expiration date was June 19, 2022. Id. ¶ 66. Therefore, according to Nahant, the notice was timely and the reporting requirement for coverage was satisfied. Id. ¶¶ 51, 66.

II.    LEGAL STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). A claim is plausible on its face when "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. The standard does not require the court to accept legal conclusions stated in the complaint as true, and the plausibility standard requires more than a mere possibility of a defendant's liability. Id. Courts reviewing a motion to dismiss may properly consider documents attached as exhibits to or incorporated by reference in the complaint, see Newman v. Krintzman, 723 F.3d 308, 309 (1st Cir. 2013); Pollak v. Fed. Ins. Co., No. 13-CV-12114, 2013 WL 6152335, at *1 n.2 (D. Mass. Nov. 21, 2013), such as the four insurance policies attached as exhibits to Nahant's complaint in the present action. Doc. No. 7 at 27–247.

The interpretation of an insurance contract is, under Massachusetts law, a "legal issue[] for resolution by the court." Utica Mut. Ins. Co. v. Weathermark Invs., Inc., 292 F.3d 77, 80 (1st Cir. 2002). "Absent ambiguity, insurance contracts are to be enforced in accordance with their plain language." Id. However, when a contract's terms are "ambiguous, uncertain, or equivocal

in meaning," there is "a question of fact" such that 12(b)(6) dismissal is improper. See Young v. Wells Fargo Bank, N.A., 717 F.3d 224, 231–32 (1st Cir. 2013) (quoting Seaco Ins. Co. v. Barbosa, 761 N.E.2d 946, 951 (Mass. 2002)); see also Utica Mut. Ins. Co., 292 F.3d at 80; Strange v. Genesis Ins. Co., 536 F. Supp. 2d 71, 74 (D. Mass. 2008). Insurance contract language is ambiguous "when there is more than one rational interpretation of the relevant policy language," Tocci Bldg. Corp. v. Zurich Am. Ins. Co., 659 F. Supp. 2d 251, 257 (D. Mass. 2009) (quoting Bos. Gas Co. v. Century Indem. Co., 910 N.E.2d 290, 305 n.32 (Mass. 2009)), where "terms are inconsistent on their face," or "where the phraseology can support reasonable differences of opinion as to the meaning of the words employed and the obligations undertaken." Fashion House, Inc. v. K Mart Corp., 892 F.2d 1076, 1083 (1st Cir. 1989).

III.   DISCUSSION

The Court holds that there is no ambiguity in the policy language at issue because there is not "more than one rational interpretation" of the relevant language. Tocci Bldg. Corp., 659 F. Supp. 2d at 257. The Court's explanation follows.

A.   USLI's Interpretation

USLI reads the language in the Prior Pending Exclusion Amendment that discusses the meaning of "effective date" as applicable to the Prior Pending Exclusion provision alone. Doc. No. 13 at 11. It reads this language as having "nothing to do with altering the **Policy Period** or expanding the timeframe in which an insured must provide notice of a claim" and suggests that this interpretation is clear based on the language at the end of the Prior Pending Exclusion Amendment that states, "All other terms and conditions of this **Policy** remain unchanged." Id.

It is possible to read the policy language as USLI suggests without doing violence to other provisions in the policy. Under USLI's reading, the effective date for purposes of the Prior

9

or Pending Litigation Exclusion (as amended) is the effective date of the first policy in the continuous succession of policies without lapses—in Nahant's case, June 19, 2018. However, for all other purposes beyond the exclusion, including for purposes of defining the "policy period," the "effective date" is the "effective date" listed at the beginning of the policy document (e.g., June 19, 2021 for Nahant's 2021 policy, Doc. No. 7 at 192–93). The "policy period" starts on that "effective date" and is the one-year period listed at the beginning of the policy document (e.g., June 19, 2021 to June 19, 2022 for Nahant's 2021 policy, id. at 191, 193).

The policies provide coverage for "**Loss** and **Defense Costs** resulting from a **Claim** first made against an **Individual Insured**" or the Organization "during the **Policy Period,**" which is the one-year period described above, subject to certain limitations. Id. at 79, 199.[4] One such limitation is the notice reporting provision, which requires the insured to provide written notice of a claim "as soon as practicable" but "no later than ninety (90) days after the expiration date or the effective date of [] cancellation or non-renewal." Id. at 112, 232. Under USLI's understanding of "policy period," the coverage and notice provisions combined mean, in relevant part, that each policy covers claims that arise in that specific one-year policy period, but only if the insured policy gives notice of the claim no later than 90 days after the expiration of that same one-year policy.

The Prior Pending Exclusion Amendment still serves a purpose under USLI's interpretation. It excludes coverage of litigation or other types of actions listed if the action was pending prior to the "effective date" of this policy, which, for the purposes of this amended

---

[4] The Court pincites to Policies 2 and 4 throughout this analysis because those are the two policies most at issue in the dispute based on the timing of the Northeastern Action (filed in August 2019) and the date on which Nahant gave USLI notice of the claims asserted by Northeastern (in July 2021). However, the points also apply to Policy 3, in which the relevant provisions contain identical or nearly identical language that in Policies 2 and 4.

exclusion provision alone, means the effective date of the first policy in a continuous succession of policies with no lapses. Id. at 103, 223. It also excludes litigation or other types of actions listed that arise out of the same set of facts or circumstances as an action pending on or prior to the "effective date" of the policy. Id. As an example, imagine that Plaintiff X filed Case 1 against Nahant during Policy 1, and then Plaintiff Y filed a separate Case 2 against Nahant during Policy 4. Further imagine that Case 2 arises out of the same facts or circumstances as Case 1, and Policies 1–4 are a continuous succession of policies with no lapses in coverage. If the effective date under this exclusion provision were just the start date of each one-year policy period, this provision would exclude Case 2 from coverage because it arises out of the same facts and circumstances as Case 1, and Case 1 was pending prior to the effective date of Policy 4. However, changing the "effective date" for purposes of this provision to the start date of the first policy in a continuous succession of policies means that Case 2 will not be excluded by this provision because the "effective date" of Policy 4 here is the same as the effective date of Policy 1, and neither case was pending before the effective date of Policy 1. If the facts were slightly different, though, and Case 1 was pending prior to the effective date of Policy 1, both Case 1 and Case 2 would be excluded from coverage. Under both of these scenarios, the notice requirement and other conditions on coverage still apply and provide potential separate bases for determining coverage of Case 1 or Case 2.

Based on the above analysis, the Court views USLI's interpretation as a "rational interpretation" of the policy language.

B. Nahant's Interpretation

The next question is whether the interpretation asserted by Nahant is also rational such that there is an ambiguity in the policy language at issue. Nahant reads the language in the Prior

Pending Exclusion Amendment that discusses the meaning of "effective date" as applying beyond the Prior or Pending Exclusion provision alone such that it modifies the meaning of "effective date" throughout each policy document. In particular, this would modify the meaning of "effective date" as used in the definition of "policy period," such that the "effective date" of the "policy period" for Policies 2–4 is the "effective date" of Policy 1: June 19, 2018. The Court holds that this interpretation is not rational because it results in numerous conflicts with various provisions throughout the policy documents.

Starting from the beginning of the documents for Policies 2–4, Nahant's view that the "effective date" is June 19, 2018 contradicts the date listed as the "effective date" in three separate places in the opening pages of each policy. Doc. No. 7 at 74–76 (listing effective date for Policy 2 as 06/19/2019); id. at 192–94 (listing effective date for Policy 4 as 06/19/2021). Interpreting each "policy period" as beginning on June 19, 2018 would also contradict the "policy period" listed in the opening pages of the policy documents. Id. at 73, 75 (listing "policy period" for Policy 2 as 06/19/2019 to 06/19/2020); id. at 191, 193 (listing "policy period" for Policy 4 as 06/19/2021 to 06/19/2022).

Changing the meaning of the term "policy period" is not a mere technicality—it would have substantial consequences. Further into the policy documents, there are multiple provisions that set a dollar amount cap "per policy period" on coverage for a specific type of claim. For example, the "DATA & SECURITY+ ENDORSEMENT" sets limits of liability for four categories of data and security-related expenses: data breach, identity theft, Workplace Violence Act, and kidnapping expenses. Id. at 96, 216. After setting dollar amount limits of liability for each of the four categories, the Endorsement states, "The maximum aggregate per **Policy Period** for [the four categories] above shall be $200,000 in the aggregate." Id. Nahant's interpretation of

12

"policy period" renders this cap highly restrictive for insured parties with continuous successions of policies. Instead of resetting each year, as it would under USLI's interpretation, the $200,000 aggregate cap would apply to the entire period between the "effective date" of the first policy and the end date of the last policy in a continuous succession of policies. Nahant had four years of successive coverage, and Nahant's interpretation converts what was an aggregate annual cap (replenished upon each renewal) into one aggregate cap for an entire set of successive policies, spanning multiple years. Nothing in the language of the policy supports reading the Prior Pending Exclusion Amendment language to make such a sweeping coverage change. This is not the only aggregate cap changed by Nahant's interpretation. Additional examples of aggregate limits per "policy period" that would be rendered far less generous for insured parties with continuous successions of policies under Nahant's interpretation include (1) the additional limit of liability on individual insured non-indemnified coverage, Doc. No. 7 at 79, 199 ("The **Company** shall pay an additional limit of liability, not to exceed an aggregate of $1,000,000 per **Policy Period**, solely for **Loss** covered under Section I."), and (2) the "$100,000 maximum sublimit of liability per **Policy Period** for **Loss** and **Defense Costs**" for "any ten percent (10%) **Excess Benefit Transaction Excise Tax** assessed by the Internal Revenue Service against any **Individual Insured**." Id. at 82, 202. A reasonable insured would not understand the Prior Pending Exclusion Amendment to reduce these aggregate limits in this way.

More generally, the use of the phrase "per policy period" in various places across the Policies, see, e.g., id. at 79, 82, 96, 199, 202, 216, suggests that the contracting parties anticipate insured parties having multiple policy periods. This would be common under USLI's interpretation, where a new policy period begins at each annual renewal. However, an insured party having multiple policy periods would be much rarer under Nahant's interpretation, where

an insured party would have to end coverage for a period and then later resume with the same insurer (creating a gap in coverage) in order to have more than one policy period. This weighs against Nahant's interpretation.

Nahant's interpretation is also incongruous with the accurate-rate-setting purpose of claims-made policies generally as well as the premium amounts listed for each of Nahant's policies. Under Nahant's reading, the risk USLI insures rises in each additional year of a successive chain of policies. In each successive year, USLI insures the risks that could arise that year and all of the risks from the prior years because, under Nahant's interpretation, the insured may submit notice of and receive coverage for claims that arose in that year or in prior years back to the start date of the first policy in the series. Such a policy would be inconsistent with the fundamental purpose of claims-made policies:

> The closer in time that the insured event and the insurer's payoff are, the more predictable the amount of the payment will be, and the more likely it is that rates will fairly reflect the risks taken by the insurer. The purpose of a claims-made policy is to minimize the time between the insured event and the payment. For that reason, the insured event is the claim being made against the insured during the policy period and the claim being reported to the insurer within that same period or a slightly extended, and specified, period. If a claim is made against an insured, but the insurer does not know about it until years later, the primary purpose of insuring claims rather than occurrences is frustrated. Accordingly, the requirement that notice of the claim be given in the policy period or shortly thereafter in the claims-made policy is of the essence in determining whether coverage exists.

Chas. T. Main, Inc. v. Fireman's Fund Ins. Co., 551 N.E.2d 28, 30 (Mass. 1990); see also Nat'l Union Fire Ins. Co. v. Talcott, 931 F.2d 166, 167 n.4 (1st Cir. 1991) ("The purpose of the notice requirement in 'claims made' policies is to ensure 'fairness in rate-setting,' . . . [and] a late notice would clearly always inhibit the insurer's task of setting its future premiums and reserves with full knowledge of the outstanding claims it is obligated to meet. . . ." (quoting Chas. T. Main, 551 N.E.2d at 29)). If this claims-made policy meant what Nahant says it means, then one would

expect the premiums to rise each year to account for the increased level of risk. Here, the premiums stayed the same or decreased each year: They are listed as $744 for Policy 1, $744 for Policy 2, $698 for Policy 3, and $698 for Policy 4. Id. at 28, 75, 134, 193. Such a trend suggests that the level of insured risk remained relatively constant each year. This is consistent with the nature of claims-made policies[5] and conflicts directly with Nahant's interpretation.

Turning to the language of the Prior Pending Exclusion Amendment, the Amendment concludes with the following statement:

> All other terms and conditions of this **Policy** remain unchanged. This endorsement is part of your **Policy** and takes effect on the effective date of your **Policy** unless another effective date is shown.[6]

Id. at 104, 224. Nothing in the text of the exclusion (as amended) itself, see supra Section I.B, or the above quoted language that concludes this Exclusion Amendment, even suggests let alone states that the exclusion language's discussion of "effective date" changes the meaning of that term outside of the exclusion and only other undiscussed terms "remain unchanged." And if the exclusion language operates as Nahant asserts that it does, then the policy has multiple conflicting definitions of the term effective date: (1) the date listed expressly as the "effective date" at the beginning of each policy (which Nahant's interpretation means is not the actual "effective date" under the Amendment's modification of "effective date"); (2) the "true" actual

---

[5] Though the Court views the consistency or inconsistency of each proposed interpretation with the nature of claims-made policies generally as instructive, the Court gives limited weight to the case law regarding interpretations of other claims-made policies cited by USLI in its motion to dismiss memorandum. See Doc. No. 13 at 7–13. The issue before the Court presently is whether the meaning of the unique policy language in Nahant's policies—in particular, the meaning and scope of the "effective date" language in the Prior Pending Exclusion Amendment—is ambiguous. Decisions ruling on other claims-made policies that do not share the same language or structure as the policies at issue here are of lesser weight at this Rule 12(b)(6) stage in determining whether the particular terms of Nahant's policies are ambiguous.

[6] This same language also appears at the end of the other Endorsements in Policies 2–4. See Doc. No. 7 at 92–104, 212–224.

"effective date of your **Policy**," which Nahant's interpretation suggests is the start date of the first policy in a continuous succession of policies (June 19, 2018 for Nahant's four policies); and (3) a third effective date referenced in the quoted language, "unless another effective date is shown." In contrast, under USLI's interpretation there is no conflict. The change to effective date in the Amendment applies only within the Amendment. The "effective date of your **Policy**" refers to the "effective date" listed in the opening pages of each policy document, and "unless another effective date is shown" applies when a particular provision, such as the Prior Pending Exclusion Amendment, defines a different "effective date" for that particular provision.

Nahant's interpretation also makes it difficult to understand the operation of amendments (referred to in the policies as "Endorsements") that are newly added to or modified in policy documents after the first year of a continuous succession of policies. The language quoted above stating that the endorsement "takes effect on the effective date of your **Policy**" appears at the end of of each of the Endorsements included in Policies 2–4.[7] So under Nahant's interpretation of "effective date," each of the Endorsements take effect on the start date of the first policy in a continuous succession of policies. But consider this in relation to Endorsements that are not included in the first year's policy document but are added in a later year, such as the Prior Pending Exclusion Amendment (which does not appear in Nahant's 2018 Policy, Doc. No. 7 at 43–60, but does appear in the 2019–2021 Policies), or Endorsements that are modified in some way between the first year's policy document and later documents. Under Nahant's interpretation of "effective date," these new Endorsements or modifications to Endorsements

---

[7] The Endorsements in Policy 1 (the 2018 Policy) all include either the same language or the following similar language: "This endorsement is a part of the Parent Organization's Policy and takes effect on the effective date of the Parent Organization's Policy unless another effective date is shown." Doc. No. 7 at 43–60.

must apply retroactively to the earlier policy years prior to when the Endorsements or
modifications were added. Such a retroactive application of a variety of Endorsements is neither
supported by express text nor rational when the policy documents do not mention anything about
how retroactive implementation would occur in practice.

As mentioned above, the Prior Pending Exclusion Amendment itself does not expressly
suggest in any way that the language changing the meaning of "effective date" is meant to apply
beyond the Prior Pending Exclusion Amendment provision. See Doc. No. 7 at 103–04, 223–24.
Nahant's interpretation reads the Prior Pending Exclusion Amendment as completely changing
the scope and operation of the policy. By changing the meaning of "effective date" and
consequently changing the definition of "policy period" throughout the policy, Nahant's
interpretation reshapes multiple material and important provisions, including the notice and
claim reporting requirements (drastically expanding the period of time in which insured parties
can report claims), the scope of the aggregate cap on data and security-related expenses, the
scope of the aggregate cap on liability for individual insured non-indemnified coverage, the
scope of the maximum sublimit of liability for loss and defense costs for 10% excess benefit
transaction excise taxes assessed by the IRS, and the implementation of new or modified
Endorsements (making them apply retroactively to the start date of the first policy in a series of
policies). These vast changes are all allegedly made by language in an exclusion that addresses a
narrow issue: prior or pending litigation. Nothing in the text of the Prior Pending Exclusion
Amendment alerts a reasonable insured that the entire policy has been rewritten in this manner.

Moreover, the Exclusion Amendment contains language that indicates that the amended
language is meant to apply only within the exclusion provision. The beginning of the
Endorsement directs that one specific provision only—"the Directors and Officers **Coverage**

17

**Part**, Section IV. EXCLUSIONS, Subsection A. 'Prior or Pending Litigation'"—is to be deleted and replaced by the Amendment language. Doc. No. 7 at 103, 223. The Endorsement then concludes, "All other terms and conditions of this **Policy** remain unchanged." Id. at 104, 224. Nahant asserts that this language could be read to mean that while the Amendment makes no changes to "other terms and conditions" not referenced in the Amendment, terms that are changed by the Amendment may still have broader application. Doc. No. 17 at 5. But as counsel for Nahant conceded at a hearing on the present Motion, Nahant's interpretation of this language would render this language superfluous, stating unnecessarily that anything (either within or outside of the Amendment) that is not changed by the Amendment is not changed. In contrast, USLI's interpretation of the clause gives the language meaning: it clarifies that policy terms and conditions outside of the particular provision being amended are not changed. See Doc. No. 13 at 11. Of course, Massachusetts law directs that every word "must be presumed to have been employed with a purpose and must be given meaning and effect wherever practicable." Allmerica Fin. Corp. v. Certain Underwriters at Lloyd's, London, 871 N.E.2d 418, 425 (Mass. 2007) (internal quotation marks omitted) (quoting Jacobs v. U.S. Fid. & Guar. Co., 627 N.E.2d 463, 464 (Mass. 1994)).

Considering that Nahant's interpretation renders some language superfluous (as Nahant concedes), the textual conflicts that exist under Nahant's interpretation, and the entirety of the policy language, as the Court must construe the policy as a whole, Strange v. Genesis Ins. Co., 536 F. Supp. 2d 71, 74 (D. Mass. 2008) (quoting Utica Mut. Ins. Co. v. Weathermark Invs., Inc., 292 F.3d 77, 80 (1st Cir. 2002)), the policy terms are not ambiguous. Simply put, a reasonable insured would not read the policies in the manner Nahant suggests and the terms at issue are not ambiguous. See, e.g., Fashion House, Inc. v. K Mart Corp., 892 F.2d 1076, 1083 (1st Cir. 1989)

(stating that contract language is ambiguous "where the phraseology can support reasonable difference of opinion as to the meaning of the words employed and obligations undertaken"); Davis v. Allstate Ins. Co., 747 N.E.2d 141, 149 (Mass. 2001) (explaining that insurance language is interpreted from the viewpoint of a reasonable insured). "Absent ambiguity, insurance contracts are to be enforced in accordance with their plain language." Utica Mut. Ins. Co., 292 F.3d at 80. Under the unambiguous meaning of the policy terms, Nahant has failed to "state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (internal quotation marks omitted) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). The Northeastern Action claim arose during the 2019 policy period (Policy 2), but Nahant failed to give written notice of the claim within 90 days of the expiration date of Policy 2. Since it failed to comply with this "condition precedent to exercising any right to coverage under this **Policy**," Doc. No. 7 at 112, Nahant has no plausible claim for coverage of the Northeastern Action.

IV.   CONCLUSION

Accordingly, the Defendants' Motion to Dismiss (Doc. No. 12) is ALLOWED.


SO ORDERED.


 /s/ Leo T. Sorokin
Leo T. Sorokin
United States District Judge